**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| 1)  **S.J., as parent, Conservator, and Next Friend of N.J.,** | § § § | |
| **Plaintiff,** | § § § | |
| **v.** | § § § | |
| 2)  **PERRYTON INDEPENDENT SCHOOL DISTRICT, and** | § § § | |
| 3)  **COLE UNDERWOOD, individually and in his official capacity as Athletic Director of Perryton ISD,** | § § § § § | **Case No. 2:24-CV-00168-Z** |
| **Defendants.** | § § § | |

---

**PLAINTIFF'S RESPONSE AND OBJECTION TO DEFENDANT PERRYTON
INDEPENDENT SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDGMENT**

---

Tyler L. Gentry, OBA No. 32400
Kyle Goodwin, OBA No. 17036 and
SBN 24117975
GOODWIN / LEWIS / CASON / GENTRY
420 NW 6th St., 2nd FL
Oklahoma City, OK 73102
P: (405) 900-5700
tgentry@goodwinlewis.com
kgoodwin@goodwinlewis.com
*Attorneys for Plaintiff*

MAYFIELD HEINRICH RAHLFS
WEABER & PARSONS, LLP
Brian P. Heinrich, SBN 09382320
320 S. Polk, Suite 1000
Amarillo, Texas 79101
(806) 242-0152 – Telephone
(806) 242-0159 – Fax
brian@mhrwp.com
*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION .........................................................................................................1

RESPONSE TO DEFENDANT'S FACTUAL BACKGROUND....................................2

ADDITIONAL MATERIAL FACTS SUPPORTING DENIAL OF SUMMARY JUDGMENT ...7

SUMMARY JUDGMENT STANDARD ......................................................................31

ARGUMENT & AUTHORITIES..................................................................................32

      A.     Genuine issues of material fact exist as to Plaintiff's Section 1983 claim ..........32

            1.     Genuine issues of material fact exist as to whether N.J.'s abuse arose from an official policy or custom of PISD ............................33

            2.     Genuine issues of material fact exist as to whether the policies customs were the moving force behind N.J.'s abuse ................................36

            3.     Genuine issues of material facts exist as to whether PISD's hiring practices were the moving force behind N.J.'s abuse.....................37

            4.     Defendant's *Motion* fails to address other forms of Section 1983 liability alleged by Plaintiff ..............................................................38

      B.     Genuine issues of material fact exist as to Plaintiff's Tite IX claim.....................39

            1.     PISD employees with supervisory power over Underwood had actual notice of the abuse..........................................................................40

            2.     PISD responded with deliberate indifference ...........................................41

      C.     Defendant PISD is not entitled to summary judgment on Plaintiff's claim for damages ...............................................................................................42

            1.     Punitive damages ...................................................................................43

             2.     Emotion distress under Title IX ................................................................41

             3.     "Concrete Evidence" is not a legitimate standard for emotional damages.............................................................................46

D.    The material facts presented herein establish a custom or practice of tolerating illegal conduct of a PISD official .......................................................48

1.    Plaintiff can provide evidence that is subject to 18 U.S.C. § 2251(A) ......48

2.    Defendant PISD is not immune from tort claims against Defendant Underwood in his official capacity ..........................................48

PRAYER .................................................................................................................................49

CERTIFICATE OF SERVICE ................................................................................................50

## TABLE OF AUTHORITIES

### CASES

*A.W. v. Humble Indep. Sch. Dist.*,
25 F. Supp. 3d 973 (S.D. Tex. 2014)..................................................................................... 34

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 248 (1986)......................................................................................................... 31

*Associated Terminals of St. Bernard, LLC v. Potential Shipping HK Co. LTD., et al.*,
324 F.Supp.3d 808 (E.D. La. 2018) ........................................................................................ 47

*Barnes v. Gorman*,
536 U.S. 181, 185 (2002)......................................................................................................... 45

*Bauer v. Texas*,
341 F.3d 352 (5th Cir. 2003) ................................................................................................... 32

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*,
520 U.S. 397 (1997)................................................................................................................. 36

*Burge v. St. Tammany Par.*,
336 F.3d 363 (5th Cir. 2003 ..................................................................................................... 36

*Carey v. Piphus*,
435 U.S. 247 (1978)........................................................................................................... 42, 44

*City of Canton, Ohio v. Harris*,
 489 U.S. 378 (1989)................................................................................................................ 39

*City of Newport v. Fact Concerts, Inc.*,
43 U.S. 247 (1981).................................................................................................................. 43

*Crawford v. Formosa Plastics Corp., Louisiana*,
234 F.3d 899 (5th Cir. 2000).................................................................................................... 31

*Cummings v. Premier Rehab Keller, PLLC*,
596 U.S 212 (2022 ............................................................................................................ 45, 46

*Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*,
220 F.3d 380 (5th Cir. 2000).............................................................................................. 40, 41

*Doe v. Beaumont Indep. Sch. Dist.*,
615 F. Supp. 3d 471 (E.D. Tex. 2022).............................................................................. passim

*Doe v. Edgewood Indep. Sch. Dist.*,
964 F.3d 351 (5th Cir. 2020) ................................................................................ 33, 38

*Doe v. Katy Indep. Sch. Dist.*,
427 F. Supp. 3d 870 (S.D. Tex. 2019) ............................................................ 39, 40, 41

*Doe v. Rains Cnty. Indep. Sch. Dist.*,
66 F.3d 1402 (5th Cir. 1995) ...................................................................................... 36

*Doe v. Taylor Ind. School Dist.*,
15 F.3d 443 (5th Cir. 1994) ................................................................................... 37, 39

*Estate of Davis ex rel. McCully v. City of N. Richland Hills*,
406 F.3d 375 (5th Cir. 2005). ..................................................................................... 34

*Franklin v. Gwinnet County Public Schools*,
503 U.S. 60 (2018) .................................................................................................... 45

*Gebser v. Lago Vista Indep. Sch. Dist.*,
524 U.S. 274 (1998)) ............................................................................................ 39, 40

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974) ................................................................................................... 42

*Hale v. Fish*,
899 F.2d 390 (5th Cir. 1990) ...................................................................................... 44

*Hitt v. Connell*,
301 F.3d 240 (5th Cir. 2002) ...................................................................................... 47

*Hoskins v. Kaufman Indep. School Dist.*,
2003 WL 21517830 ..................................................................................................... 44

*King v. Conroe Indep. Sch. Dist.*,
289 F. App'x 1 (5th Cir. 2007) ................................................................................... 40

*Little v. Liquid Air Corp.*,
37 F.3d 1069 (5th Cir. 1994) ...................................................................................... 32

*Lozano v. Donna Indep. Sch. Dist.*,
648 F. App'x 412 (5th Cir. 2016) ............................................................................... 39

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ................................................................................................... 32

*McGowan v. Southern Methodist University*,

715 F.Supp.3d 937 (N.D.Tex. 2024) .............................................................................. 46

*Monell v. Dep't of Soc. Servs.*,
436 U.S. 658 (1978) ................................................................................................ 32, 33

*Peterson v. City of Fort Worth*,
5858 F.3d 838 (5th Cir. 2009) ........................................................................................ 37

*Pineda v. City of Houston*,
291 F.3d 325 (5th Cir. 2002) .................................................................................... 34, 48

*Piotrowski v. City of Houston,*
237 F.3d 567 (5th Cir.2001) ........................................................................................... 48

*Qualls v. State Farm Lloyds*,
226 F.R.D. 551 (N.D. Texas 2005) ................................................................................. 43

*Rosa H. v. San Elizario Indep. Sch. Dist.*,
106 F.3d 648 (5th Cir. 1997) .................................................................................... 40, 41

*Rosado v. Deters*,
5 F.3d 119 (5th Cir. 1993) .............................................................................................. 32

*Snyder v. Trepagnier*,
142 F.3d 791 (5th Cir. 1998) .......................................................................................... 37

*Waltman v. Int'l Paper Co.*,
875 F.2d 468 (5th Cir. 1989) .......................................................................................... 41

*Webb v. Town of Saint Joseph*,
925 F.3d 209 (5th Cir. 2019) .......................................................................................... 33

*Webster v. City of Houston*,
735 F.2d 838 (5th Cir. ..................................................................................................... 34

*Zarnow v. City of Wichita Falls, Tex.*,
614 F.3d 161 (5th Cir. 2010) .......................................................................................... 34

## **STATUTES**

42 U.S.C. § 1983 ..............................................................................................32, 36, 37, 38, 43

TEX. CIV. PRAC. & REM. CODE ANN. § 118.001, *et seq*. ...............................................................49

## **RULES**

FED. R. CIV. P. 56(a)..............................................................................................................31

Plaintiff, S.J., as parent, Conservator, and Next Friend of N.J. ("Plaintiff" "N.J." or "Victim"), and for its *Response and Objection* to Defendant Perryton Independent School District's *Motion for Summary Judgment* ("Defendant's *Motion*") and brief in support, alleges and states:

## INTRODUCTION

This case centers around the response of Perryton Independent School District ("PISD" or the "School") to the contemptible degeneracy of Defendant Cole Underwood ("Underwood"). In a bizarre filing, PISD oddly claims that there is no dispute as to material facts and that PISD acted appropriately at all times. As the following brief will show, it is difficult to imagine a more egregious example of a school being unaware of its owns policies, failing to train on its policies, failing to supervise its policies, and ignoring the few policies that it is aware of, and then, quite literally, simply refusing to do anything to protect its students from sexual impropriety. The absolute apathy by PISD towards its own students is so severe that it makes the presentation of this case difficult from both a personal and professional standpoint.

While the disturbing genuine issues of material fact are addressed more fully below, the Court should prepare itself to learn that PISD: 1) knew Underwood had been placed on administrative leave for inappropriate communications with minors while at AISD and hired/promoted him anyway; 2) received at least approximately fifty-three (53) report and/or complaints ("reports") about Underwood for the year preceding the multiple rapes of N.J.; 3) failed to effectively document *at all* these complaints; 4) failed to inform Plaintiff (hereinafter "Plaintiff," "S.J.," or "Father") or N.J.'s mother about these complaints; 5) failed to address or document a formal report made against Underwood and N.J. by an administrator from another school district; 6) refused to take any meaningful action to discipline or monitor Underwood; 7) deleted or refused to turnover incriminating information or documentation; and 8) by virtue of testimony from its

Superintendent, Principals, and Board Members, PISD has admitted to liability in this case. Two particular facts seem to encapsulate PISD's attitude towards its own students. First, PISD Board Member, Sarah Tregellas ("Tregellas"), testified that the victim here was only "technically" raped. Tregellas testified "I believe she was consenting, but that is, according to the law, yes, it was rape" and "[r]ape and consent to underage sex are two different things. Physically, it is a different experience." (Ex. 31, App. 590). Second, as more fully explained below, Superintendent Greg Brown ("Brown") gave a written reprimand to Underwood on March 4, 2024 ("Reprimand"), *before* N.J. was repeatedly raped for several months. In the March 4 Reprimand, Brown told Underwood the following:

> The purpose of this summary and of the directives is to protect you...your career and your reputation. It is also to protect the reputation and mission of Perryton ISD. We have often

The policy of PISD during this entire episode was never to protect its students, or the victim here, N.J. Simply, it could not be put more plainly than Brown did in writing. PISD sought to protect the reputation and career of a disgusting pedophile, as well as its own reputation and that of its Superintendent. In other words, to save face, PISD sacrificed a 15-year-old minor female's innocence by being deliberately indifferent to the mountain of reports and complaints that were piling in from PISD administrators, teachers, coaches, staff, students, parents, and an administrator from a neighboring school district, all while routinely violating its own policies and procedures in the process, many of which PISD had no clue existed or were even being violated.

## RESPONSE TO DEFENDANT'S FACTUAL BACKGROUND

1. Admitted.

2. Admitted.

3. Disputed. Plaintiff and Underwood were not friends. (Ex. 1, App. 005).

2

4.    Admitted in part and disputed in part. Plaintiff admits that during the fall 2023 semester "multiple Perryton ISD coaches and faculty" made reports but disputes any insinuation that this alleged fact accurately depicts the facts and corresponding timeline. (See numbered ¶¶ 1-121 of Plaintiff's Additional Material Facts "AMF")

5.    Admitted.

6.    Admitted in part and disputed in part. Plaintiff admits that High School Principal, Tori Little ("Little"), "reported hearing rumors," but disputes any insinuation that she appropriately reported said rumors or followed PISD policy and procedure in reporting and responding to said rumors. Further, Plaintiff disputes that this alleged fact accurately depicts the facts. With respect to an inappropriate relationship between Underwood and N.J., beginning as early as December 2023, Little began receiving reports from Underwood, Little's office staff, Assistant Principal Francis Zavala ("Zavala"), office assistant Jennifer Feger ("Feger"), PISD counselor Paige Wade ("Wade"), PISD counselor Randy Cunningham ("Cunningham"), parent Tiffany Hernandez, students, and Gruver ISD Principal Delma Haberthur ("Delma"), all of which Little testified that she provided to Brown. Also, Principal Sandi Wheeler ("Wheeler") advised Underwood that Little was not going to report Delma's report to Brown. Finally, Little admits that her handling of Delma's complaint was in violation of PISD policy. (Ex. 2, App. 011-018, 038-053). Brown testified that several reports were made to Little that she did not report to Brown but Little testified the opposite. (Ex. 3, App. 090-099, 106, 109-111, 127, 152-154, 215-216, 219-223).

7.    Admitted in part and disputed in part. Plaintiff admits that he followed up with Underwood and N.J. following his meeting with Little and Cunningham but disputes any insinuation that he was being fully informed and apprised of the allegations and reports being made

3

to PISD about Underwood and N.J. as required by PISD policy. (See numbered ¶¶ 31-38 of Plaintiff's AMF).

8.      Admitted in part and disputed in part. Plaintiff admits that Brown received a report from Kevin Cummings ("Cummings") about an inappropriate relationship between Underwood and N.J. on December 9, 2023 but disputes that "Brown had not heard any concerns about the relationship between Defendant Underwood and N.J. before" Cummings report. As identified in Brown's deposition testimony and PISD's discovery responses, at least nine (9) separate "reports" had been made and received prior to Cummings report. Further, Little testified that several of those initial reports that were received by her and/or rumors that were circulating she reported to Brown. (Ex. 4, App. 229-230; Ex. 3, App. 080-116; Ex. 2, App. 011-017, 020, 053).

9.      Admitted.

10.     Admitted in part and disputed in part. Plaintiff admits that Brown repeatedly instructed Underwood not to be alone with N.J. but disputes that Brown "did not think the reported interactions between Defendant Underwood and N.J. were consistent with solicitation of a romantic relationship by Defendant Underwood." Brown testified the Underwood repeatedly violated his directives, both oral and written, and that he suspected Underwood was having an affair with N.J. and that he did not believe Underwood's denial of the affair.. Further, text messages between Brown and PISD school board member, Wes Beal ("Beal"), reveal that as of January 9, 2024, Brown and Beal were discussing the affair rumor, which Beal's wife had learned of at the "beauty shop." Additionally, this report, like many others, is absent from Defendant's discovery responses. (Ex. 3, App. 143; Ex. 5, App. 257; Ex. 4, App. 229-231).

11.     Admitted in part and disputed in part. Again, absent from Defendant's recitation of said fact is the additional fact that as of January 9, 2024, Brown suspected Underwood was having

4

an affair with N.J. and that he did not believe Underwood's denial of the affair. (Ex. 3, App. 142-143).

12.     Admitted in part and disputed in part. Plaintiff admits that Brown was notified by Little of another social media post involving Underwood and N.J. but disputes any insinuation that PISD has been honest and forthcoming about the reports it received. For example, only sixteen (16) of fifty-three reports and/or complaints are reflected in Defendant's discovery responses, and like many others, this report from Little is absent from said discovery responses. (Ex. 3, App. 063).

13.     Admitted.

14.     Admitted.

15.     Admitted in part and disputed in part. Plaintiff admits that Brown met with a student and his parents and would further advise the Court that said student (who is now an adult) was Holdyn Rowland and his parents. Plaintiff disputes that Holdyn and his parents met with Brown regarding "playing time." Simply, Holdyn was a senior and his football career was already over in February/March 2024 when this meeting occurred. Additionally, this report, like many others, is absent from Defendant's discovery responses. (Ex. 4, App. 229-231).

16.     Disputed. (See Plaintiff's AMF).

17.     Admitted in part and disputed in part. Plaintiff admits that Underwood drove N.J. home from a track meet in Canyon, Texas in his personal vehicle after being repeatedly directed by Brown not to be alone with her but disputes any insinuation that Underwood doing so was not a violation of PISD policy. Regardless of Plaintiff's acquiescence, PISD policy does not permit a parent to give permission for a student to ride with "someone designated by the parent," i.e. anywhere but the team bus, *unless* "a note and approval [are] in the coach's possession prior to leaving for the trip." (Ex. 6, App. 266). Simply, Underwood was permitted to violate PISD policy.

Like many other policies, the written policy was not followed or enforced. In fact, Brown testified that it was not actually PISD policy but an athletic policy, or in his words "guidelines," that were approved by the Superintendent and the Athletic Director, making each a policymaker. (Ex. 3, App. 076-078). The Athletic Handbook actually provides, "The Perryton Athletic Code of Conduct extends beyond and is in addition to school policy.  It is possible that a student who violates school policy will incur consequences from…" (Ex. 6, App. 260). Despite the fact that Brown and Underwood created and/or approved the Athletic Handbook, which is undisputedly policy, Underwood was again permitted to violate same. Throughout this case, Brown has attempted to minimize and downplay the severity of complaints/reports received as well as the plethora of policy violations involving same. (Ex. 3, App. 078, 133, 154, 164,217-218).

18.    Admitted in part and disputed in part. See response in numbered ¶ 17.

19.    Admitted.

20.    Disputed. Brown received numerous reports/complaints from March 4, 2024 to mid-April 2024. For example, in March 2024 and mid-April 2024 reports/complaints were received from PISD coach Spencer Dutcher ("Dutcher") and PISD coach Casey Arruda ("Arruda") regarding Underwood and/or N.J., both of which are in direct contravention to Brown's claim that the next report came from Duce Cooper ("Cooper"). (Ex. 4, App. 229-231; Ex. 3, App. 145-146). As a further example, text messages between Brown and PISD school board member, Sarah Tregallas ("Tregallas"), dated March 26, 2024, indicate a report Tregallas made to Brown, wherein she provided "The situation is bad if it's made it to me." (Ex. 7, App. 270).

21.    Admitted. With respect to additional factual context, the alleged report from Cooper that Underwood and N.J.'s vehicles were at the school at the same time on April 21, 2024, i.e. the straw that apparently broke the camel's back, was an instance which would have been repeatedly

happening over the previous several months, and of the fifty-three (53) reports received by PISD was one of the least significant. More importantly is the convenient fact that this specific report which caused PISD to finally take action came *just three (3) days after* PISD settled another Title IX case against PISD, styled *D.K. v. PISD, et al*., Case No. 2:23-CV-25. (Ex. 8, App. 279). Additionally, the reporting individual, Cooper, had met with Brown a month or more prior and made similar reports of an inappropriate relationship between Underwood and N.J., at which time Brown chose to ignore. (Ex. 9, App. 289).

22.    Admitted.

23.    Admitted.

24.    Admitted.

25.    Admitted.

**ADDITIONAL MATERIAL FACTS**
**SUPPORTING DENIAL OF SUMMARY JUDGMENT**

1.    Everyone associated in any way with PISD agrees that the purpose of any school district is first to protect the students and then to educate them. (Ex. 3, App. 057-058; Ex. 11, App. 315).

2.    N.J. was not kept safe by PISD in this case. (Ex. 3, App. 058-059).

***Previous Sexually Related Issues at PISD***

3.    In October 2017, PISD Superintendent, Robert Hall, and Assistant Superintendent, Keith Langfitt, both resigned following a sexual harassment complaint filed by another district employee. (Ex. 12, App.  339-344).

4.    In 2022, PISD employed a woodshop teacher named David Alexander Drew who was reported to be having a romantic relationship with a female minor student. (Ex. 3, App. 192; Ex. 10, App. 301-303; Ex. 13, App. 354-355).

7

5.      In 2023-2024, PISD employed a special education teacher named Victor Hackney ("Hackney"). Hackney was alleged to have sent a lewd photograph via Snapchat to a minor child at PISD.  *Id.*   Because of the nature of Snapchat (messages/photos automatically delete after viewing) the investigation "stalled." As with Underwood, Hackney denied everything when interviewed by Brown. (Ex. 3, App. 073-075, 190-191).

6.      On February 17, 2023, a lawsuit was filed in the Northern District of Texas, styled *D.K. v. PISD, et al.*, Case No. 2:23-CV-25. Generally, the allegations arose from the sexual battery of a PISD basketball player which purportedly occurred in the PISD gym.  The defendants in that case, among others, included PISD and its-then basketball coach, Ragan Watson. The lawsuit was litigated from February 17, 2023, until it was settled on April 18, 2024, **conveniently *three (3) days before* the Underwood allegations were finally taken seriously by Brown**.  Brown's contemporaneous hand-written notes include both notes on the settlement of the Lawsuit and complaints against Underwood. (Ex. 8, App. 275, 279; Ex. 3, App. 150-151, 183; Ex. 14, App. 364-367).

### *Underwood Had a History of Inappropriate Behavior with Minors*

7.      While employed at AISD from September 2017 to June 2022, Underwood was the subject of multiple complaints regarding inappropriate behavior involving minor students. (Ex. 15, App. 369-431).

8.      On August 7, 2018, AISD received a complaint from an anonymous parent that Underwood was sending text messages, Twitter messages, Snapchat, and/or social media messages to communicate with individual students. In addition, it was alleged that Underwood was attempting to build inappropriate relationships with AISD students.  Underwood was immediately

8

placed on administrative leave upon receipt of the report and during the subsequent investigation into these claims. (Ex. 15, App.  419, 391).

9.      The AISD personnel file concerning this first allegation against Underwood includes a copy of the relevant AISD Policy violated by Underwood (which is identical to the same PISD Policy), written statements from witnesses, a written statement from Underwood, correspondence, a summary of the investigation, and a letter detailing findings of the investigation, i.e., everything you would expect to be contained in an employment file. (Ex. 15, App 369-431).

10.     In defense of the violation, Underwood claimed he was merely communicating with the kids about "sports, workouts and life."  Underwood's mobile phone was inspected by an AISD investigator. (Ex. 15, App. 370).

11.     The Summary Report reveals that Underwood was informed in writing by AISD of the violation of multiple AISD Policies (identical to PISD), that communication by Snapchat can never be verified because it is not available after delivery, and that Underwood was hired as a "teacher and coach, and not a counselor." *Id.*   Underwood was permitted to return to work after being placed on administrative leave.  *Id.*

12.     In addition, Underwood was the subject of two (2) additional complaints.  The first was in 2020 and concerned drinking alcohol and being alone with underage female students. The second occurred in 2021 concerning drinking at a party with underage students. (Ex. 15, App. 421-422, 427).

13.     Brown, Little, and Wheeler *all* testified that had they known what was contained in Underwood's AISD employment file it would have affected how they handled the reports they received against Underwood. (Ex. 3, App.  194-195; Ex. 2, App. 021-023; Ex. 16, App. 454).

***The Hiring and Promotion of Underwood by PISD***

14. Kurt Haberthur ("Kurt") was employed by PISD as the head football coach and athletic director from March 2020 to May 2023. Again, Kurt worked alongside Underwood as a coach at AISD from 2018-2020. (Ex. 17, App. 468).

15. While coaching at AISD, Kurt became aware that Underwood was placed on administrative leave at AISD and that the former AISD volleyball coach, Kori Clements, reported concerns to AISD that Underwood was inappropriate with female students. (Ex. 17, App. 470-472).

16. As the PISD Athletic Director, Kurt was ultimately delegated the responsibility of hiring an assistant football coach by then PISD superintendent, James Mireles ("Mireles"). (Ex. 17, App. 474; Ex. 10, App. 296).

17. Prior to recommending Underwood, Kurt interviewed Underwood and contacted AISD football coach, Chad Dunham ("Dunham"), to inquire what happened, if anything, when Underwood was placed on leave. Kurt did nothing else to determine Underwoods' background. Kurt introduced Underwood to Mireles and talked to Mireles after the interview. Mireles delegated the responsibility to review Underwood to Kurt. (Ex. 17, App. 473-474; Ex. 10, App. 296).

18. Kurt did not inform Mireles about Underwood being placed on administrative leave at AISD or that he had knowledge that Kori Clements had reported concerns about Underwood to AISD regarding minor female student athletes. (Ex. 17, App. 473-474; Ex. 10, App. 297-298).

19. Neither Coach Haberthur nor Mireles requested to review Underwood's AISD personnel file. (Ex. 17, App. 475; Ex. 10, App. 298-300).

20. Kurt would not have hired Underwood had he known about what was in Underwood's AISD file. Similarly, Mireles agreed with Kurt and confirmed he would not have hired Underwood had he known about what was in Underwood's AISD file. Further, Coach

10

Haberthur testified that a single, informal conversation was not sufficient background investigation prior to hiring. (Ex. 17, App. 479-480; Ex. 10, App. 300).

21.    Brown claimed that "my administration" would have done a more thorough background check and that Underwood should not have been hired. (Ex. 3, App. 071-072).

22.    As a matter of practice, PISD does not perform actual background checks, but rather conducts criminal history checks.  PISD usually pays approximately $1.75 per criminal history check. Brown was uncertain whether a criminal history check was performed on Underwood. (Ex. 3, App. 066, 068).

23.    At the end of 2023, Kurt resigned as head football coach and athletic director of PISD.  After being employed at PISD for one (1) year, Underwood was promoted to head football coach and athletic director. (Ex. 10, App.  304-305).

24.    Little and Wheeler testified that if Kurt knew about Underwood's AISD issues and did not disclose those to Mireles during the hiring process that would be a "problem." (Ex. 2, App. 023; Ex. 16, App. 447).

### The Reports Received by PISD about Underwood and N.J.

25.     Beginning in the Spring semester of 2023, one (1) year before Underwood was arrested, PISD began to receive what would amount to at least fifty-three (53) reports and/or complaints (collectively "reports") concerning Underwood's behavior and interactions with female minor students and male students generally and specifically N.J. See summary of reports below.

26.    For purposes of brevity, the following represents a summary overview of the fifty-three (53) reports received by PISD from Spring 2023 to April 2024 when Underwood was

ultimately arrested.  It is material to note that ALL reports set forth below were admitted by PISD employees, either in written discovery responses or deposition testimony, to wit:

**Report #1**: *Spring 2023*.  H.F. [N.J.'s Mother] complained to 8th grade track coach, Toby Brown, that Underwood was too close to N.J.; N.J. called Underwood her "track daddy"; Underwood was also flirty with 8th grade girls and H.F. did not like the way Underwood looked at girls; Toby Brown told H.F. that she was "overthinking" things, which the Court will find is a common theme as it pertains to reports against Underwood.  (Ex. 18, App. 484, 490-491).

**Report #2**: *Spring 2023*.  H.F. and her husband, Z.F., made the same complaints to PISD school board member, Chris Lingo ("Lingo"); H.F. told Lingo they were not happy with Underwood around young girls; Lingo agreed as he had a daughter same age; Lingo said there were talks about it and things were being done. (Ex. 18, App. 491-492).

**Report #3**: *August 2023*.  A PISD football player nicknamed "Oodie" (football player) reported to Spanish Teacher Evelyn Tarango that Underwood was a "Perv" and "after all the girls." (Ex. 4, App. 229).

**Report #4**: *September 2023*. Mary Vasquez ("Vasquez"), parent of a PISD student, reported that Underwood yelled at her daughter after she called him a "Perv" (following Underwood contacting another female student on Snapchat.)  (Ex. 4, App. 229).

**Report #5**: *September/October 2023*.  PISD Biology teacher, Deborah Molina ("Molina"), reported learning about Underwood retaliating and scolding a student for calling him a "Perv." (Ex. 4, App. 229).

**Report #6**: *September-November 2023*.  A local businessman and PISD parent, Mike Blackshare, asked PISD volleyball coach, Abigaile Harris ("Harris"), "how do you like working for a pedophile?" in reference to Underwood.  Harris later reported hearing of a relationship between Underwood and N.J. (Ex. 4, App. 230).

**Report #7**: *September-November 2023*.  Two football players told PISD volleyball coach Shaun Lynch ("Lynch") that "something was going on" between Underwood and N.J.  Lynch also later heard that the community in general was concerned about Underwood using a massage gun on N.J. in the stands in December at a game.  (Ex. 4, App. 230).

**Report #8**: *2023-2024 School year*.  Jennifer Feger ("Feger"), a PISD office assistant, reported hearing rumors of a personal relationship between Underwood and N.J., but no reports of any sexual relationship.  (Ex. 4, App. 230).

**Report #9**: *2023-2024 School year*.  Zoe Salazar ("Salazar"), a PISD junior high volleyball coach, reported hearing rumors that Underwood was frequently alone with high school girls. (Ex. 4, App. 230).

**Report #10**: *2023-2024 School year*.  Francisco Zavala ("Zavala"), Assistant High School Principal for PISD, received reports that Underwood was too close to N.J. and then later reported again that the community was concerned about the massage gun used in the bleachers on N.J.  (Ex. 4, App. 230).

**Report #11**: *2023-2024 School year*.  Zavala reported seeing a photo of Underwood in the training room with two female students who were taking an ice bath.  (Ex. 4, App. 230).

**Report #12**: *End of Fall Semester 2023*. Tori Little, PISD High School Principal, reported that she generally heard rumors that the community was concerned about Underwood being too close with N.J. (Ex. 4, App. 230).

**Report #13**: *End of Fall Semester, 2023*. Little  reported that she and the PISD counselors met with Plaintiff about the rumor issues and discussed "boundary issues" and recommended Plaintiff address these concerns and check N.J.'s phone.  Little described that she did not believe there was any sexual or romantic relationship, but that N.J. would "develop feelings" for Underwood.  (Ex. 4, App. 230).

**Report #14**: *November 2023*.  PISD Head Girl's Basketball Coach, Ryan Daughtery ("Daugherty"), reported to Superintendent that Underwood was acting inappropriately with female students. (Ex. 13, App.  348-350; Ex. 16, App.  453).

**Report #15**: *December 9, 2023*. Kevin Cummings, a local CPA, businessman, and school volunteer, reported to Brown that N.J. posted on Instagram a collage of pictures of her and Underwood captioned "Best Duo". Cummings advised it appeared too personal. (Ex. 4, App.  – Def disc. resp. 10; Ex. 3, App.  123).

**Report #16**: *December 2023*.  Tiffany Hernandez, a relative of Zavala, reported that Underwood yelled at the PISD basketball team before a game in retaliation for talking about N.J. and Underwood; Zavala reported this incident to Little. (Ex. 19, App. 498).

**Report #17**: *December 2023*.  Underwood self-reported to PISD Junior High Principal, Sandi Wheeler, that he went to the locker room and scolded the team for spreading rumors about him and N.J.; Wheeler did not report to superiors or administration.  (Ex. 16, App. 456-457).

**Report #18**: *Unknown timing*.  Tiffany Hernandez reported directly to Little via email that Underwood retaliated against the PISD basketball team over of N.J. rumors.  This email was never produced by PISD. (Ex. 2, App.  014).

**Report #19**: *December 2023*.  Zavala reported to Little that she received a report from her brother, who is a local pastor, that Underwood was acting strangely with N.J. and that PISD administrators should "keep an eye on it." (Ex. 19, App.  499-500).

**Report #20**: *December 2023*.  Wheeler reported hearing rumors that Underwood was too close with N.J. (following the media post) and again a mention of the massage gun in bleachers situation.  (Ex. 4, App. 230).

13

**Report #21**: *December 2023*.  The Defensive Coordinator for PISD football, Brady Fletcher ("Fletcher"), reported hearing that Underwood was too close with N.J. (following the media post) and again a mention of the massage gun in bleachers situation.  (Ex. 4, App. 231).

**Report #22**: *December 2023*.  Delma Haberthur, an administrator at Gruver Independent School District and former PISD teacher, reported to PISD Principal Tori Little that Underwood used a massage gun on N.J. in the stands during a basketball tournament in Gruver. (Ex. 3, App. 38-41).

**Report #23**: *December 2023*.  Underwood self-reported to Wheeler that rumors were being spread about himself and N.J. being in an inappropriate relationship; Wheeler did not report to superiors or administration. (Ex. 16, App.  435-436).

**Report #24**: *December/January*.  A PISD student went to Zavala's office to report an incident where Underwood pulled him out of choir class to scold him in retaliation for speaking about N.J. and Underwood; the incident made student cry; Zavala reported the incident to Little. (Ex. 19, App. 501-503).

**Report #25**: *January 15, 2024*.  Little reported to Brown that a second social media post had been made via electronic application called *BeReal*, showing N.J. and another minor and Underwood in the training room with the young female students in an ice bath. (Ex. 3, App. 128-129).

**Report #26**: *January 2024*.  PISD Junior High Principal Sandi Wheeler asked her son (in high school at the time) about N.J. and Underwood rumors; Her son said that another student talked about N.J. and Underwood having an inappropriate relationship; Wheeler did not report to her superiors or administration. (Ex. 16, App.  458-459).

**Report #27**: *January 2024*.  PISD Safety Coordinator Dacey Smith ("Dacey") (formerly Dacey Underwood who was married to Underwood at all relevant times herein and is now the ex-wife of Underwood) received a report that Underwood and N.J. were having an inappropriate relationship. (Ex. 20, App. 521).

**Report #28**: *January/February 2024*. Brianna Uribe, a secretary at PISD, reported to Dacey that Underwood was having an inappropriate relationship with N.J.  (Ex. 20, App.  521-522).

**Report #29**: *January/February 2024*. Balinda Dodson, the Transportation Coordinator for PISD, reported to Dacey that Underwood was having an inappropriate relationship with N.J. (Ex. 3, App. 70).

**Report #30**: *January/February 2024*. Liliana Medrano, assistant to Brown, reported to Dacey that Underwood was having an inappropriate relationship with N.J. (Ex. 20, App.  521).

**Report #31-34**: *December to March*.  Brown received an additional 3-6 reports that Underwood was alone with N.J. in his office after Brown orally reprimanded and instructed

14

Underwood to stay away from N.J. Brown could not elaborate further on who made the reports. (Ex. 3, App. 131).

**Report #35**: *Spring 2024*.  Underwood told Wheeler that rumors regarding Underwood and N.J. are being discussed in public by a Perryton resident named Daria Walsh; Wheeler did not report to her superiors or administration. (Ex. 16, App. 436-437).

**Report #36**: *February/March 2024*.  A former student named Holdyn Rowland and both of his parents met with Brown to report an inappropriate relationship between Underwood and N.J..  Brown forgot the meeting in his earlier testimony.  (Ex. 3, App. 198-201).

**Report #37**: *March 1, 2024*.  Daughtery (also the assistant Athletic Director) reported that he had "received lots of calls" regarding "Cole and [N.J.]"; that he has been watching; that the relationship was "unprofessional"; N.J. was in Underwood's office in the gym "every day" by herself; and that Underwood was using the PISD camera system to monitor others' activities. (Ex. 14, App. 364-367).

**Report #38**: *March 1, 2024*. Daughtery reported that Underwood gave N.J. a ride home from the track meet in Canyon, TX alone in his personal vehicle.  (Ex. 4, App. 231).

**Report #39**: *March 2024*. Daughtery reported that Underwood previously had N.J. in his personal car at a previous track meet to "get coffee" for others at the meet after being admonished to not be alone with her.  (Ex. 3, App.  132).

**Report #40**: *March 2024*.    PISD Biology teacher Deborah Molina reported hearing a rumor that Underwood and N.J. rode back from Canyon track meet alone. (Ex. 4, App. 230).

**Report #41**: *March 9, 2024*.  N.J.'s Mother, H.F., received information from PISD Grade School teacher Brittany Morgan ("Morgan") that Underwood gave N.J. a ride home from a track meet; this information was apparently unreported to superiors or administration by Morgan. (Ex. 18, App. 492-493).

**Report #42**: *March 2024*.    Daughtery called PISD School Board member Bryce Hale ("Hale") requesting access to the PISD camera system in order to watch Underwood's activities with N.J.; Hale told him to ask Brown. (Ex. 21, App. 533).

**Report #43**: *March 2024*. PISD football coach Brady Fletcher reported hearing a rumor that Underwood gave N.J. a ride home from a track meet after being ordered to avoid being alone with N.J. (Ex. 4, App. 231).

**Report #44**: *March 2024*.  PISD men's basketball coach, Spencer Dutcher, reported hearing of an inappropriate relationship between Underwood and N.J. after a track meet situation. (Ex. 4, App. 231).

**Report #45**:  March 22, 2024.  Delma Haberthur, Gruver High School Principal and former PISD teacher, called Little to report that multiple PISD students had reported to her at a track meet

15

that an inappropriate relationship between Underwood and N.J. was going on, and that said students were fearful of retaliation at PISD if they complained any further; Brown originally did not remember any report from Little about Delma's complaint; Brown later recalled that Little may have told him about Delma's Complaint after reading Little's deposition transcript. (Ex. 4, App. 252; Ex. 2, App.  038-044; Ex. 16, App. 460-464; Ex. 3, App.  152-154, 220-223).

**Report #46**: *March 26, 2024*.  School Board Member Sarah Tregellas reported an incident related to an ice bath, Underwood giving rides in personal vehicle, and issues related to Underwood at AISD; Tregellas provided that the "situation is bad if it's made it to me." (Ex. 7, App. 270).

**Report #47**: *March/April 2024*. Pastor Duce Cooper (before he was on the PISD School Board) heard in a counseling session with three (3) people that an inappropriate relationship was going on between N.J. and Underwood; Cooper did not yet have dates and times; This is the first Cooper report; Brown acknowledged that PISD was looking into the issue.  Brown further responded that PISD had no proof yet and was looking into the problem. (Ex. 9, App. 285-288).

**Report #48**: *April 2024*. Before Underwood's arrest, an unknown female resident of Perryton accosted PISD softball coach Frank Pacheko at the grocery store regarding Underwood and N.J.; Pacheko became angry and cursed at her. (Ex. 22, App.  540-541).

**Report #49**: *April 2024*.    Assistant PISD football coach and powerlifting coach, Casey Arruda, reported hearing that a freshman girl had reported to someone that Underwood was "checking out all the girls".  (Ex. 4, App. 231).

**Report #50**: *April 21, 2024*.  Pastor Duce Cooper (before he was on the PISD School Board) reported that N.J. and Underwood's cars were seen at the high school at the same time on April 20; Cooper had received 2 or 3 more reports since his last report.  This is the Second Cooper Report; Cooper gave notes to Greg Brown with dates and times that N.J. and Underwood were together which have never been produced.  (Ex. 4, App. 231; Ex. 9, App. 290-291).

**Report #51**: *Unknown Date*.  Underwood reported to Little that rumors were going on around town regarding his relationship with N.J. (Ex. 2, App.  011-012).

**Report #52**: *Unknown Date*.  PISD Counselor, Paige Wade, reported complaints regarding N.J. and Underwood to Little. (Ex. 2, App. 013).

**Report #53**: *Unknown Date*.  PISD Counselor, Randy Cunningham, reported complaints regarding N.J. and Underwood to Little.  (Ex. 2, App. 013).

27.    In summary, ***a total of 28 PISD personnel made or received reports of an inappropriate relationship between Underwood and N.J.***  Reports were also made by at ***least twelve (12) parents or community members with more than ten (10) of the reports coming from***

16

*an unknown source*. Most troubling, many of the reports arose from PISD personnel hearing complaints from PISD students. *Id*.

28.     Particular attention must be paid to Report #45.  The situation had grown so obvious at PISD concerning Underwood and N.J., that an administrator, Gruver High School, Delma Haberthur, reported the inappropriate relationship to Little, at which time Wheeler was also present. Delma's Complaint included information that was received from students at PISD during a Gruver track meet. The PISD students were afraid to report at PISD due to previous retaliation from Underwood and nothing being done about previous reports or said retaliation.  In more than thirty-four years of being in education, Brown testified that he had *never* received a report of an inappropriate relationship from an administrator from another district. Moreover, Little testified that her handling of Delma's complaint was in violation of district policy. (Ex. 2, App. 038-044; Ex. 16, App.  460-464; Ex. 3, App. 152-154, 220-223; Ex. 4, App.  252).

29.     No one associated with PISD ever followed up with or contacted Delma concerning Delma's formal complaint. (Ex. 2, App. 052-053).

30.     Dacey Smith, PISD's Safety Director and Underwood's wife at all relevant times herein, testified that at the beginning of the Spring 2024 semester, she heard a rumor that her husband, Underwood, was having a relationship with a student, and she suspected it to be N.J. but she did not make a report to anyone about her suspicion because she thought PISD already knew. (Ex. 20, App. 518-519).

***Communications with N.J.'s Parents***

31.     Under the written PISD Policies (FFF Local), PISD has a mandatory duty to inform parents of any allegation of misconduct related to their child. (Ex. 23, App. 544).

17

32.     N.J. resided primarily with her mother, H.F., until November 2023, at which point she moved in with S.J. full-time. (Ex. 18, App. 488-489).

33.     S.J. was informed about only one (1) of the at least fifty-three (53) reports identified above.  As noted in Report #13, S.J. was called in to discuss the Best Duo collage. (Ex. 1, App. 006).

34.     H.F. was never contacted by anyone at PISD about *any* reports concerning Underwood.  (Ex. 18, App. 485-489).

35.     PISD did not inform either S.J. or H.F. that it had received more than thirty (30) reports (later determined to be 53 reports) regarding inappropriate behavior of Underwood.  *Id; See also,* (Ex. 3, App. 144-145, 213-214).

36.     PISD never informed S.J. that Underwood was provided a written reprimand on March 4, 2024. (Ex. 3, App. 144, 203).

37.     Beal testified that Brown told him that S.J. had been apprised of the written reprimand by Brown. However, Brown admitted that he did not tell Beal that he had apprised S.J. of the written reprimand. (Ex. 3, App. 202-203).

38.     According to all PISD employees that were asked, S.J. would have done things differently with N.J. had PISD notified S.J. of the information and reports it had received.  (Ex. 3, App. 162-163; Ex. 13, App. 351, 359).

### Underwood's Retaliation Against Reporters

39.     As noted in Report #'s 16, 17, 18 and 24, Underwood repeatedly retaliated against students for making reports against him regarding his inappropriate relationship with N.J. *Id.* These retaliations included yelling at the boys' basketball team and pulling a student out of choir to accost him regarding reports.  *Id.* In other words, PISD permitted the alleged perpetrator to

18

confront his accusers and was effectively not disciplined in any way for doing so. (Ex. 3, App. 173-182; Ex. 16, App. 456-457).

40.     Daughtery acknowledged that he was not afraid of reporting Underwood, but he knew it was not going to be good for him. (Ex. 13, App. 360).  PISD admits that the retaliation by Underwood against students could prevent later reports that students or faculty might make. *Id.* (Ex. 3, App. 180; Ex. 2, App. 025).  Brown also recognized that Underwood's retaliation against the basketball team sounded like someone taking up for his girlfriend.  (Ex. 3, App. 178).  Further, a former student, Holdyn Rowland, who made repeated reports regarding an inappropriate relationship between Underwood and N.J., was instructed by PISD coaches Daugherty, Johnson, Appelhans, and Dutcher (all of whom he had made a report to), to document Underwood's behavior himself because they felt it was an "awkward" situation for them and they might "lose their job" if they made a report against Underwood. (Ex. 1, App. 349-350).

### The Lack of Training on Policies and Procedures at PISD[1]

41.     PISD utilizes Policies and Procedures offered by the Texas Association of School Boards. *Id.* The Policies and Procedures utilized by PISD are very voluminous and detailed. *Id.* PISD does not do extensive training on the Policies and Procedures for their employees. Each employee is offered only 1-2 hours of training per year on the Policies and Procedures. A PISD employee does not face any ramifications for missing in-person training. (Ex. 3, App. 079).

42.     For the year in question, school year 2023-2024, PISD conducted no Title IX training. (Ex. 3, App. 166-167).

---

[1] Plaintiff has not regurgitated all of the written policies and procedures which PISD has repeatedly admitted to violating as described herein.  For purposes of this *Response*, PISD representatives (both policymakers and staff) admitted to not knowing, following, or enforcing these policies on a regular basis.  In fact, the only real policy followed by PISD was the consistent practice or custom to ignore or simply be indifferent to PISD's written policies.

43.    The then Title IX Coordinator, Donna Hale ("Hale"), admitted that she had insufficient Title IX training to perform her duties as the Title IX Coordinator. (Ex. 11, App. 331-333).

44.    After the arrest of Underwood, Brown began personally providing Title IX Training to PISD employees, because he "realized that staff had not had the appropriate training prior to" this case. *Id.*

45.    According to Hale, no one at PISD was receiving sufficient Title IX training. *Id.*

46.    The general practice is for teachers and employees to sign a statement that they have read the Policies and Procedures, but then they do not actually read the Policies and Procedures. (Ex. 16, App. 446; Ex. 2, App. 030; Ex. 13, App. 356-357; Ex. 24, App. 548; Ex. 22, App. 542).

47.    Brown originally testified (on September 23, 2025, over a year after Underwood's arrest) that PISD Policies and Procedures did not prohibit PISD staff from contacting or communicating with students via electronic applications such as Snapchat. (Ex. 3, App. 085-087). However, in a later deposition, Brown admitted that written PISD Policies and Procedures prohibited the use of Snapchat communication with students. (Ex. 3, App. 207).

48.    Despite knowing it is a violation of PISD policy, Wheeler thought it was appropriate to use social media platforms, such as Snapchat or Facebook, to communicate with students and she was aware that Underwood was doing so but she failed to report it. (Ex. 16, App. 444, 454-455; Ex. 25, App. 550-551).

49.    Little testified that Underwood should have been put on administrative leave as soon as PISD learned of his initial Snapchat communications with students. (Ex. 2, App. 019, 026-028).

50.     Little testified that she was not aware of certain policies that were violated in this case during the time period in question. Further, when asked, "If [] you don't know these policies how are you expected to enforce them," Little testified "There is no excuse, should have known the policies" and agreed that she cannot enforce a policy she doesn't know it exists.  Finally, when asked who has to pay for the mistake that PISD does not know or follow its policies, Little testified, "N.J."! (Ex. 2, App. 031-037).

51.     Little confirmed that a plethora of PISD policy violations occurred in this matter, with many occurring before any sexual act occurred between Underwood and N.J., and that if PISD policies were followed certain sexual acts would not have occurred. (Ex. 2, App. 031-037).

52.     Wheeler confirmed that a plethora of PISD policy violations occurred in this matter and that PISD did not do everything it should have to stop the rape of N.J. (Ex. 16, App. 438, 440-441, 442-443).

53.     Dacey Smith, *PISD's Safety Director* and Underwood's wife at all relevant times herein, testified that she did now know that AISD or PISD had a policy that prevented a school employee from Snapchatting students, and that she was aware that Underwood was doing so with minor female students at both AISD and PISD. However, Dacey did not report. (Ex. 20, App. 507-509).

54.     Dacey testified that PISD did not require her to read the policy manual or handbook and PISD did not put on any trainings, for example, that would have taught her that an employee cannot Snapchat a student. (Ex. 20, App.  510-511).

55.     Dacey testified she was aware that other employees on PISD's campus were communicating with students through social media. Further, Dacey testified that she is unsure

whether she would have reported Underwood if she had known it was a PISD policy violation. (Ex. 20, App. 512-514).

56.     Dacey testified that "there's other policies that people didn't follow that could have protected students that people knew about." (Ex. 20, App. 514-515).

57.     Dacey testified that Underwood did not care what PISD was telling him to do or not do and that he said "I don't care that the school tells me don't do this, I am going to do it[.]" But again, Dacey never reported that to PISD because she did not know her reporting obligations. (Ex. 20, App. 516-517).

58.     Dacey testified that Brown lies about "safety stuff," and in text messages with Underwood during the Spring 2024 semester provides that Brown lied to the public on the radio about said "safety stuff," specifically, "Said we train teachers and staff to look for suspicious activity at after school events and stuff…like no we don't?" Further, when Underwood asked Dacey "Does [Brown] really not ever ask you anything about safety stuff lol…feel like he's never really in tune with safety, especially after this morning," Dacey responded, "lol no." (Ex. 20, App. 528-529; Ex. 26, App. 553-556).

59.     School Board member Bryce Hale ("Bryce") testified "there's a bunch of policies that the school has. Obviously, there's going to be slipups." Further, Bryce confirmed that as a result of the violation of various PISD policies N.J. was raped for the better part of two (2) months on PISD grounds. When asked as a follow-up, "Do you think that was just a slipup," Bryce responded, "No." Finally, when asked how PISD fixes this problem going forward, Bryce agreed that PISD should follow their own policies. (Ex. 21, App. 534-536).

***The Investigations and Reprimand of Underwood***

60.     Of the 53 reports, Brown claims that he conducted four (4) "major" investigations of his own volition and outside the purview of a formal Title IX investigation.  (Ex. 3, App. 115-120, 124-126, 147-149, 189, 208-209; Ex. 2, App. 24; Ex. 9, App. 291-292).

61.     In addition to the "major" investigations purportedly performed by Brown, he likewise claims that he performed many "minor" investigations as well. (Ex. 3, App. 209-211). However, Brown is unable to provide any information relating to these minor investigations. *Id.*

62.     From the 53 reports and purported investigations done by Brown, only two (2) documents in total were generated and retained by PISD from these investigations. First, on March 4, 2024, Brown wrote a two-page reprimand letter (hereinafter the "Reprimand") he delivered to Underwood. (Ex. 27, App. 558-559). Second, Brown, took some notes (hereinafter the "Notes") arising from Coach Ryan Daughtery's multiple complaints after the track meet event where N.J. rode home with Underwood.  (Ex. 14, App. 366-367).  No other documents exist to evidence any major or minor investigation conducted by PISD.  (Ex. 3, App.  210-211).

63.     As result of Brown's alleged investigations and prior to April 20, 2024, the only action taken by Brown against Underwood was: 1) Underwood was directed by Brown in December 2023 that he should not be in any more social media posts and should avoid being alone with female students; and 2) Brown gave Underwood the Reprimand. (Ex. 3, App.  121-123 ,204-206).

64.     From January to March 2024, unidentified people continued to express concerns to PISD about an inappropriate relationship between Underwood and N.J. (Ex. 3, App.  140-141).  At the same time the rumors regarding the inappropriate relationship were ramping up Underwood was getting divorced from Dacey Smith. *Id.*

65.     Between December 2023 and March 4, 2024, Brown volunteered to be a self-styled marriage counselor to Underwood and Dacey. (Ex. 3, App. 138-139). As a result, Brown suspected Underwood was having an affair with N.J. between January and March 2024. (Ex. 3, App. 141-143).

66.     With that suspicion on his mind, on March 4, 2024, Brown delivered *the only organized evidence* associated with the 53 reports, i.e. the Reprimand to Underwood. As noted above, the Reprimand arose from the Track Meet Incident referenced in Report #'s 38, 40, 41, 43 and 44. The Reprimand states that Underwood was the subject of rumors and suspicions concerning female students over the course of the year. (Ex. 27, App. 558).

67.     As noted in the Reprimand, prior to March 4, 2024, Brown had spoken with Underwood "several times" about female students and N.J. On those occasions, Brown orally directed Underwood "several times" to not be alone with N.J. (Ex. 27, App. 558).

68.     The Reprimand identifies three (3) instances in which Brown was aware that Underwood had violated multiple oral directives given to Underwood by Brown. *Id.*

69.     Shockingly, Brown admitted PISD's purpose for issuing the Reprimand to Underwood was to protect the reputations of Underwood and PISD. No mention is made for the safety of PISD students, nor is the safety or protection of N.J. mentioned any place within the Reprimand. *Id.*

70.     With the Reprimand, Brown simply repeated his previous and multiple oral directives for Underwood to avoid being "alone with any female student at any time and in any situation." *Id.* Brown agrees that the Underwood situation was similar to telling a child to do something over and over again and they continue to do it. (Ex. 3, App. 134-135).

24

71.     Ultimately, the Reprimand did absolutely nothing, as Underwood began raping N.J. *after* the Reprimand.  (Ex. 3, App.  136-137).

72.     Also in the Reprimand was Brown's admonition to Underwood for misusing the PISD camera system to eavesdrop on Brown's private telephone conversations.  (Ex. 27, App. 559).  At or around the time of the Reprimand, PISD Coach Ryan Daughtery, requested permission from both a school board member (Wes Beal) and from Brown to have access to the camera system at PISD to watch Underwood's actions as a result of his concerns. Brown *denied* Daughtery's request for camera access and *reinstated* Underwood's access to the camera system despite Underwood's previous abuse of the system. (Ex. 3, App.  186-188; Ex. 13, App.  352-353).

73.     Following the Reprimand, PISD failed to put any system in place to monitor Underwood's activities. (Ex. 3, App.  160-161).  Rather, Brown told some administrators to "keep their eyes and ears open".  (Ex. 3, App.  160-161).

74.     One of the most egregious failures by PISD was the failure of PISD to monitor the mandated school messaging system ("ParentSquare").  (Ex. 3, App.  156-160).  Brown offered no real response as to why ParentSquare remained unmonitored. *Id.*  As noted below, Underwood repeatedly used ParentSquare to organize the rapes of N.J. (Ex. 28, App.  561-569). Brown had access to these ParentSquare messages and could have reviewed and monitored them at any point in time, just as Dacey could have an eventually did. (Ex. 3, App.  154, 156-160; Ex. 20, App.  523-526).

75.     Brown admitted that the follow up to the Reprimand was insufficient and he wishes he would have checked the camera system earlier.  (Ex. 3, App. 160-161, 061-062).

76.     Brown had the authority to check Underwood's phone but chose not to do so.  (Ex. 3, App. 064-065).

77.     It is material to note that *on the same day* that Brown delivered the Reprimand to Underwood, PISD *extended* Underwood's contract with PISD and gave Underwood *a raise*. (Ex. 29, App. 571 - 574).

78.     Brown testified that Underwood would simply not stay away from N.J., no matter what Underwood was ordered to do, which was a frustration for Brown. (Ex. 3, App. 130).

### *The Rape of N.J.*

79.     A majority of the rapes occurred on PISD grounds. (Ex. 3, App. 059; Ex. 31, App. 580).

80.     Underwood devised a scheme to communicate with N.J. on ParentSquare, whereby N.J. would request access to the PISD gym on weekends, which Underwood would facilitate for her. (Ex. 28, App. 561-569).

81.     Beginning on March 14, 2024, N.J. was raped by Underwood at the PISD gym approximately ten (10) times until Report #50 on April 21, 2024. (Ex. 28, App. 561-569).

### *PISD Title IX Coordinator Testimony*

82.     At all times material to this case, Donna Hale ("Hale") was the Assistant Superintendent and Title IX Coordinator for PISD. (Ex. 11, App. 309). Prior to PISD, Hale also previously served as the Title IX Coordinator for Miami Independent School District in Texas. (Ex. 11, App. 310).

83.     Hale was responsible for determining whether a Title IX investigation should be initiated. (Ex. 11, App. 311).

84.     It was the responsibility of "anyone that had a concern" to notify Hale in order to permit her to make a Title IX investigation determination. (Ex. 11, App. 312).

85.     Even the Superintendent (Brown) had an obligation to inform Hale as Title IX Coordinator of reports concerning inappropriate relationships with a student. (Ex. 11, App. 312-313).

86.     The only reports made to Hale were the Best Duo Collage in December and the Track Meet Incident in March. (Ex. 11, App. 313-314).

87.     Effectively none of the 53 reports were ever forwarded to Hale on behalf of PISD. (Ex. 3, App. 171-172).

88.     Hale was not aware that Underwood was being called a "Perv" by the students in early August 2023 (Report #3, #4, and #5). This allegation would have warranted a Title IX investigation. (Ex. 11, App. 316-317).

89.     Hale was not aware that Mike Blackshare called Underwood a pedophile in the Fall of 2023 (Report #6). Again, this allegation would have warranted a Title IX investigation. (Ex. 11, App. 317).

90.     Hale was not aware of the massage incident (Report #'s 7, 10, 20, 21 and 22) where Underwood used a deep tissue massager on N.J. in the stands at the Gruver basketball tournament. Again, this allegation would have warranted a Title IX investigation. (Ex. 11, App. 317-318).

91.     In Hale's opinion as Title IX coordinator, Underwood should have been placed on administrative leave to investigate these allegations, based only on Report #'s 3-7 (the reference to the first "five reports" was prior to learning about Report #'s 1 and 2). (Ex. 11, App. 318).

92.     Hale was not made aware of the Delma Complaint (Report #45). The Delma Complaint was "significant information" not relayed to Hale as Title IX Coordinator. Hale admitted it was odd that no one from PISD ever attempted to contact Delma Haberthur, which would have been done had Hale initiated a Title IX investigation. (Ex. 11, App. 319-320, 329-330).

27

93.    Hale was not aware that Underwood had violated school policy with the Track Meet Incident.  (Ex. 11, App. 321).

94.    Hale was not aware that Brown and Little were discussing "rumors and suspicions regarding your relationship with female students" prior to the Reprimand.  (Ex. 11, App.  321).

95.    Because Underwood had previously disregarded orders to avoid being alone with N.J., a further Title IX investigation was warranted and the Reprimand was insufficient.  (Ex. 11, App. 323).  Hale did not initiate a Title IX investigation at the time of the Reprimand because the discussions were about Underwood's unprofessional conduct.  (Ex. 11, App. 324). Even though a Title IX investigation was warranted based upon Underwood's refusal to follow oral directives, Hale did not initiate an investigation at the Reprimand because she "didn't think about doing one." (Ex. 11, App. 324).

96.    Underwood being alone with N.J. after being orally directed by Brown to avoid that situation should have been reported to Hale as the Title IX Coordinator.  (Ex. 11, App.  325-326).

97.    The Reprimand's use of a "concrete evidence" standard is not an appropriate standard for initiating a Title IX investigation.  (Ex. 27, App.  558; Ex. 11, App. 327).

98.    The Title IX investigation standard requires only that "when in doubt report" and is a low standard for initiating an investigation.  It is not the reporting party's duty to judge truthfulness under Title IX and a rumor or suspicion is enough to warrant a Title IX investigation. (Ex. 11, App.  327-328).

99.    Had a Title IX investigation been initiated, Hale would have interviewed N.J.  (Ex. 11, App.  329-330).

100.    Not receiving all the Reports hampered Hale's ability to do her job as the Title IX Coordinator.  (Ex. 11, App. 337).

***PISD Admissions of Liability and Unreasonable Conduct in this Matter***

101.    Brown admitted that he should have intervened earlier with a written reprimand to Underwood.  (Ex. 3, App. 060).

102.    Brown admitted he should have reviewed the PISD camera system earlier.  (Ex. 3, App. 061-062).

103.    Brown estimates that the staff could have done 1000 things differently.  (Ex. 3, App. 062-063).

104.    Brown admitted that he could have inspected Underwood's phone but failed to do so.  (Ex. 3, App. 060-065).

105.    Brown admitted PISD could have done a better job in checking Underwood's background before hiring him.  (Ex. 3, App. 067).

106.    Brown acknowledged at least sixteen (16) PISD employees had suspicions concerning Underwood's intentions toward N.J., including some classified as allegations.  (Ex. 3, App. 171).

107.    As noted above, Brown admitted that the follow-up Reprimand was insufficient. (Ex. 3, App. 160-161).

108.    Brown stated that had he viewed the ParentSquare messages after the Reprimand, he would have called Underwood for questioning.  (Ex. 3, App. 164-165).  Hale and Dacey believed it would have been easy for Brown to see the ParentSquare communications between Underwood and N.J..  (Ex. 11, App.  334-335; Ex. 20, App.  523-527); Wheeler concurs that it is easy to view ParentSquare messages and that Brown had plenty of reason to pay attention to the messages.  (Ex. 16,  App.  451-452).

109.    According to Brown, Wheeler breached the trust of PISD by being a confidant of Underwood and by sharing information unknown to Underwood.  (Ex. 3, App. 185).

110.    Daughtery said more could have been done by PISD to protect N.J. from Underwood.  (Ex. 13, App. 358).

111.    Hale agreed, testifying that PISD could have done more to protect N.J. and should have intervened sooner.  (Ex. 11, App. 336).

112.    Wheeler believes that Underwood should have been placed on administrative leave in order to investigate the reports. Wheeler also agrees that Underwood was grooming N.J. right under her nose.  (Ex. 16, App.  439-440).

113.    Wheeler admitted that she did not perform her duties in accordance with state and federal law and district policy and ethical standards.  Wheeler also admits that not everything was properly reported in this case.  (Ex. 16, App.  443, 445).

114.    Wheeler ultimately believes that PISD is liable for its actions in this case and PISD did not handle Underwood's issues appropriately.  (Ex. 16, App.  448, 450).

115.    The reports and concerns from students about the inappropriate relationship between Underwood and N.J. was being ignored to the extent that at least one (1) student began taking photographs of N.J. and Underwood in the PISD hallway almost everyday at the direction of PISD employees.  (Ex. 13, App.  349-350).

116.    Little admitted that PISD never requested or received a written statement from Underwood about reports of the inappropriate relationship.  (Ex. 2, App. 022).

**The Undisputed Effect on N.J.**

117.    Immediately after publicity about the inappropriate relationship between Underwood and N.J. surfaced, N.J. began hearing people discussing her at PISD.  (Ex. 30, App. 578-579).

118.    After Underwood's arrest and in the following school year, N.J. (a basketball player) was shooting free throws at an opposing school's gym.  While shooting the free throws, the crowd began chanting "Underwood, Underwood, Underwood…".  (Ex. 13, App.  361-362).

119.    After the arrest and fallout from the public and in order to protect N.J., the family moved out of the Texas Panhandle to Oklahoma.  (Ex. 1, App. 004, 007).

120.    N.J. lost out socially in school, is forced to undergo indefinite counseling, has been diagnosed with Post Traumatic Stress Disorder, suffers from sudden-onset uncontrollable emotions and is forced to live with this incident "everyday".  (Ex. 30, App.  581-586).

121.    PISD School Board Member Bryce Hale admitted that N.J. "is going to be messed up for the rest of her life".  (Ex. 21, App. 536).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact," and thus, "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Conversely, summary judgment is *not* appropriate where the evidence reflects genuine issues of material fact. *Crawford v. Formosa Plastics Corp., Louisiana*, 234 F.3d 899, 902 (5th Cir. 2000). Genuine issues of material fact exist "if the evidence is such that a reasonable jury could return a verdict for nonmovant." *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)). Movant bears the "initial burden of identifying those portions of the pleadings and discovery on file, together with any affidavits," which it believes demonstrate the absence of genuine issues of material fact. *Rosado v. Deters*, 5 F.3d 119, 122 (5th

31

Cir. 1993). If movant fails to meet its burden, "the motion *must* be denied," *regardless of nonmovant's response*. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (emphasis added).

If movant meets its initial burden, the burden shifts to nonmovant to demonstrate genuine issues of material fact beyond the pleadings. *Id*. Summary judgment evidence is to be viewed in the light most favorable to the nonmovant, with all reasonable inferences drawn in nonmovant's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986); *Crawford*, 234 F.3d 899, 902 (5th Cir. 2000). Further, nonmovant may not simply rely on "mere allegations or denials in its pleadings but must set forth specific facts showing the existence of a genuine issue for trial." *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993). If, after discovery, nonmovant "produce[s] proof that it has facts to support its case," summary judgment is inappropriate. *Little*, 37 F.3d at 1076. Finally, actual factual controversies are resolved in favor of nonmovant. *Id*. at 1075.

## ARGUMENT & AUTHORITIES

**A.    Genuine issues of material fact exist as to Plaintiff's Section 1983 claim.**

42 U.S.C. § 1983 provides a cause of action to a plaintiff against any person who deprives an individual of federally guaranteed rights "under color" of state law. Simply, Section 1983 "provides a method for vindicating already conferred federal rights." *Bauer v. Texas*, 341 F.3d 352, 357 (5th Cir. 2003). Further, municipal entities such as PISD qualify as "persons" for purposes of Section 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).[2] As this Court previously noted, "The Fifth Circuit has unequivocally held that children in

---

[2] As acknowledged in the Court's *Memorandum Opinion and Order*, "two elements" must be met as a threshold matter under Section 1983, including "first, that they were deprived of a right or interest secured by the Constitution and laws of the United State, and second, that the deprivation

32

school have an interest in their bodily integrity and that a school employee's sexual abuse of that child violates that right." (ECF No. 28).

One form of Section 1983 liability, commonly referred to as "municipal liability" or "*Monell* liability," requires proof of three (3) elements: 1) an official policy promulgated by 2) a policymaker 3) that was the moving force behind the violation of a constitutional right.[3] *Monell*, 436 U.S. at 694; See also *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 364 (5th Cir. 2020). Ultimately, to succeed against a school district, a plaintiff "must show that the district's final policymaker acted with deliberate indifference in maintaining an unconstitutional policy that caused the plaintiff's injury." *Id*. at 365.

### 1. Genuine issues of material fact exist as to whether N.J.'s abuse arose from an official policy or custom of PISD

Evidence of an official policy may be shown in various ways, including: 1) explicit or written policies, 2) widespread practices or customs, and 3) in some circumstances, a single decision may constitute policy when the policymaker performs the specific act that forms the basis of the Section 1983 claim. *Webb v. Town of Saint Joseph*, 925 F.3d 209, 215 (5th Cir. 2019); *Doe v. Beaumont Indep. Sch. Dist.*, 615 F. Supp. 3d 471, 495 (E.D. Tex. 2022). To be a widespread practice or custom, it must be "persistent," "widespread," and "so common and well settled" that it "fairly represents" school district policy. *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir.

---

occurred under color of state law." (ECF No. 28) (citing *Doe v. Rains Cnty. Indep. Sch. Dist.*, 66 F.3d 1402, 1406 (5th Cir. 1995). Defendant's *Motion* does not acknowledge nor argue that it is entitled to summary judgment on either of these elements, and thus, Plaintiff's *Response* does not address them. It appears from the Court's previous *Order* and the material facts alleged herein that (1) a rights violation occurred (2) under color of state law. (ECF No. 28).

[3] Defendant's *Motion* only addresses elements 1) and 3) and does not argue element 2). Thus, it appears from Defendant's *Motion* that we can assume a "policymaker" promulgated the disputed policies and had actual or constructive knowledge. In other words, it appears that "policy" and "moving force" are the only elements at issue for purposes of summary judgment.

2002). *See also Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 169 (5th Cir. 2010) ("A customary policy consists of actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct."). Finally, a pattern of conduct "may be shown on the part of municipal actors or employees" and not just a policymaker. *Id*. (citing *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir.), *on reh'g,* 739 F.2d 993 (5th Cir. 1984)).

PISD appears to argue that because Underwood is the only recent PISD employee charged with rape, that Plaintiff cannot establish an official school policy or pattern of behavior of allowing sexual misconduct. This exacting interpretation of a policy or pattern is exaggerated. First, Plaintiff must only establish at trial facts "sufficient to allow a reasonable inference that there was a pattern of misconduct involving similar acts." *A.W. v. Humble Indep. Sch. Dist.*, 25 F. Supp. 3d 973, 1001 (S.D. Tex. 2014) (*citing Zarnow v. City of Wichita Falls*, 614 F.3d 161, 169 (5th Cir. 2010)). There is simply no law that Plaintiff must establish criminal rapes, rather than a history of inappropriate sexual conduct, some of which involved student/teacher relationships. Certainly, previous student/teacher sexual misconduct is "similar" for purposes of establishing a policy or pattern. As the 5th Circuit noted, "While the specificity required should not be exaggerated, our cases require that the prior acts be fairly similar to what ultimately transpired." *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005).

It is certainly a rarity that a school district admits in writing, such as PISD did in this case, that their actual policy is to protect the reputation of the school and the sexual predator, rather than the well-being of the student.  However, PISD admitted in writing that PISD policy is to ignore the rights or sexual integrity of its students in favor of PISD's reputation. Surely, such admission establishes an unconstitutional policy as a matter of law under the *Monell* analysis.

34

Beyond PISD's admission of its own unconstitutional policy, Plaintiff's undisputed facts establish that a jury could reasonably determine that is the widespread practice or custom by PISD to allow improper sexual conduct by its employees and ignore or disregard any written policies to the contrary. It is undisputed that four separate incidents of a sexual nature occurred in the years leading up to N.J.'s rape, including two prior incidents of student/teacher sexual impropriety. In response to these sexual improprieties, PISD continued to allow its employees to avoid training or even review its own policies that would prevent future sexual incidents. Even those delegated with policymaking authority were unaware of the written policies and even if they were, simply ignored them.

Further, PISD's custom or policy of turning a blind eye to inappropriate sexually based student/teacher incidents regularly occurred beyond just Underwood and N.J. The material facts show that Underwood regularly had sexually charged interactions with other students, including, but not limited to, i) inappropriately watching underage student girls take ice baths at the school; and (ii) was given the moniker of "Perv" because he was "after all the girls."

In a strikingly similar case involving a school ignoring signs of improper teacher/student sexual abuse, that Court determined a school adopted an unconstitutional policy or custom when the school i) failed to conduct background checks of prospective employees, ii) failed to train staff to observe and report – or otherwise ignored signs of child abuse on school premises; iii) failed to report and mischaracterized complains of sexual misconducts; and iv) failed to terminate those credible accused of sexual abuse. *Doe v. Beaumont Ind. School Dist.*, 615 F.Fupp.3d 471, 491 (E.D.Tex. 2022).  That Court specifically warned that "The First Circuit has also clarified that "school boards that adopt a head-in-the-sand policy would be foolish indeed, morality aside,

35

because they would encounter other problems, such as the threat of liability under 42 U.S.C. § 1983." *Id.*

### 2. Genuine issues of material fact exist as to whether the policies or customs were the moving force behind N.J.'s abuse

Additionally, a plaintiff must adduce evidence that, through its deliberate conduct, the district was the moving force behind the constitutional violation. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 1388, 137 L. Ed. 2d 626 (1997). As the Court previously noted, a plaintiff "must allege the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." (ECF No. 28 at p. 11) (citing and quoting *Brown*, 520 U.S. at 404). Culpability requires "deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow" a policymakers' decisions if there is no per se unconstitutional policy. *Id.* at 404. A failure to train or supervise employees can give rise to Section 1983 liability where the "inaction is indicative of an official policy or custom that manifests deliberate indifference towards the rights of the injured person[]." *Doe v. Rains Cnty. Indep. Sch. Dist.*, 66 F.3d 1402, 1409 (5th Cir. 1995). Simply, the identified deficiency must be closely related to the ultimate injury. *Id.*

Deliberate indifference "generally requires that a plaintiff demonstrate at least a pattern of similar violations arising from training that is so clearly inadequate as to be obviously likely to result in a constitutional violation." *Burge v. St. Tammany Par.*, 336 F.3d 363, 370 (5th Cir. 2003) (internal quotations omitted). Finally, as the Court previously noted, "Plaintiff must demonstrate that PISD acted with deliberate indifference to the likelihood that PISD's failure to train its staff and failure to implement its own policies would violate N.J.'s rights." (ECF 28 at p. 11). Finally, the "***Fifth Circuit has consistently instructed district courts to leave it to juries to decide*** whether

36

a statutorily authorized policymaker ha[s] promulgated an unconstitutional policy." *Doe v. Beaumont Ind. Sch. Dist.*, 615 F. Supp. 3d 471, 497 (E.D. Tex. 2022) (emphasis added) (internal quotations omitted).

Plaintiff has certainly established sufficient facts regarding deliberate indifference to allow its claims to be submitted to the jury. In a 5th Circuit case regarding sexual molestation by a teacher, the Court found deliberate indifference to a teacher's sexual misconduct when (i) it received numerous reports regarding the misconduct, (ii) regularly dismissed the reports and parents' complaints, (iii) kept no or minimal records of the incidents, (iv) declined to discuss the incidents with the student or others. *Doe v. Taylor Ind. School Dist.*, 15 F.3d 443, 456-457 (5th Cir. 1994). All of these factors, ***and more***, are present and disputed in the current case.

As this very Court previously noted, deliberate indifference can be established by the failure to train its employees or enforce its own written policies. *See Peterson v. City of Fort Worth*, 5858 F.3d 838, 851 (5th Cir. 2009) ("The failure to train can amount to a policy if there is deliberate indifferent to an obvious need of training when citizens are likely to lose their constitution rights."). Here, PISD, including its superintendent, administrators, safety director, and teachers readily admit that PISD failed to train its employees or enforce its policies that would have prevented the sexual abuse of N.J. As provided above, a litany of policies and customs, or the policy of ignoring them, were moving forces behind N.J.'s abuse, and thus, genuine issues of material fact exist warranting denial of Defendant's *Motion*.

### 3.    Genuine issues of material fact exist as to whether PISD's hiring practices were the moving force behind N.J.'s abuse

Another form of  Section 1983 liability arises under theories of inadequate hiring and training policies, which also require "culpability and causation." *Snyder v. Trepagnier*, 142 F.3d 791, 795 (5th Cir. 1998). The policy "must have been adopted with deliberate indifference to its

known or obvious consequences" and "the municipality must be the moving force behind the constitutional violation." *Id*. In addition to a hiring practices argument, PISD may also be held liable under the narrow single incident exception if the decision to hire Underwood was made by a policymaker and a "plainly obvious consequence of that decision" was the abuse of N.J. *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 366 (5th Cir. 2020). See also *Doe v. Beaumont Indep. Sch. Dist.*, 615 F. Supp. 3d 471, 498 (E.D. Tex. 2022) (internal quotations omitted) ("A third method of proving a moving force exists. It allows a municipality to be held liable in extreme factual situations when [an] official ratifies a subordinate's decision.") Like those arguments above, the central analysis herein focuses on "deliberate indifference."

Plaintiff's material facts establish that: (i) PISD generally spends a total of $1.75 for its background due diligence, (ii) the PISD Board delegated hiring decisions to administrators, which are then delegated downward; (iii) PISD failed to review Underwood's AISD file, which was riddled with complaints and disciplinary actions; (iv) PISD admitted the AISD would have affected its hiring decision and subsequent handling of Underwood; and (v) PISD did absolutely nothing to discover the multiple issues involving Underwood's previous inappropriate actions towards underage female student .

### 4. Defendant's *Motion* fails to address other forms of Section 1983 liability alleged by Plaintiff.

Additional forms of Section 1983 liability exist, for example, equal protection, due process, inadequate training, and Underwood's own sexual gratification, which were previously discussed in Plaintiff's *Response to Defendant's Motion to Dismiss* (ECF 21) and alleged in Plaintiff's Complaint (ECF 1), but were not addressed by Defendant's *Motion*. While these forms of liability arguably require different analyses and the establishment of different material facts, each generally relies on the element of deliberate indifference, which has been discussed at length herein. See

*Doe v. Beaumont Indep. Sch. Dist.*, 615 F. Supp. 3d 471, 491 (E.D. Tex. 2022) ("[I]t is well established that § 1983 suits based on the Equal Protection Clause are available to plaintiffs alleging unconstitutional gender discrimination in schools.") (regarding sexual gratification, "'[t]o prevail on such a cause of action, a plaintiff does not have to allege membership in a protected class or group,'" and instead merely needs "'to present evidence that the defendant deliberately sought to deprive [her] of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position.'"); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 (5th Cir. 1994) (municipality, with its broad obligation to supervise all employees, is liable under federal civil rights statue if it supervises its employees in a manner that manifests deliberate indifference to the constitutional rights of citizens); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 1204, 103 L. Ed. 2d 412 (1989) ("[A] city can be liable under § 1983 for inadequate training of its employees[.]"). In summary, genuine issues of material fact exist as to the element of deliberate indifference, and thus, summary judgment is inappropriate. See *Doe v. Taylor Ind. Sch. Dist.*, 15 F.3d 443, 454 (5th Cir. 1994) ("[A] school official's liability arises only at the point when the student shows that the official, by action or inaction, demonstrates a deliberate indifference to his or her constitutional rights.)

**B.    Genuine issues of material fact exist as to Plaintiff's Title IX claim.**

A school district may be liable under Title IX if it has "actual knowledge of discrimination in [its] programs and [fails] adequately to respond." *Doe v. Katy Indep. Sch. Dist.*, 427 F. Supp. 3d 870, 878 (S.D. Tex. 2019) (citing *Lozano v. Donna Indep. Sch. Dist.*, 648 F. App'x 412, 413 (5th Cir. 2016) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998)). To succeed on a Title IX claim, a plaintiff must allege and prove that "(1) a school district employee with supervisory power over the offending teacher (2) had actual

39

notice of the abuse and (3) responded with deliberate indifference." *Id*. (citing *King v. Conroe Indep. Sch. Dist.*, 289 F. App'x 1, 4 (5th Cir. 2007).

        **1.**        **PISD employees with supervisory power over Underwood had actual notice of the abuse**

First, the "relevant question is whether the official's actual knowledge of sexual abuse is functionally equivalent to the school district's actual knowledge." *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 660 (5th Cir. 1997). With respect to who is an appropriate "official," said official must have "authority to take corrective action to end [the]…abuse of students." *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 384 (5th Cir. 2000). See also *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290, 118 S. Ct. 1989, 1999, 141 L. Ed. 2d 277 (1998) ("An 'appropriate person' under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination."). Certainly, as the top-end administrators of PISD, Brown, Little, and Wheeler meet the threshold of supervisory officials with actual notice/knowledge. Further, PISD board members who also had actual notice/knowledge meet the threshold of supervisory officials.

Second, "[a]ctual knowledge *is a question of fact*." *Doe v. Katy Indep. Sch. Dist.*, 427 F. Supp. 3d 870, 878 (S.D. Tex. 2019) (emphasis added). To demonstrate a "factual dispute" as to "actual knowledge," Plaintiff "need not show that the district knew that a particular teacher would abuse a particular student," but rather "it is enough that the school district failed to act even though it knew that [the teacher] posed a substantial risk of harassing students in general." *Id*. at 879 (internal quotations omitted). Simply, the test, *inter alia*, is whether PISD had "actual knowledge of substantial risk that such abuse would occur." *Id*.

Plaintiff has submitted material facts sufficient that a jury could determine Underwood was a substantial risk and that PISD had the requisite knowledge. Shockingly, Brown himself admitted

that he had suspicions that Underwood was having an affair with N.J. Simply, a recital of the voluminous material facts cited herein does not seem warranted here.

**2. PISD responded with deliberate indifference**

A school district with actual notice may be found liable when it was "deliberately indifferent" to the harassment, and the district's conduct "must amount to an intentional choice, not merely an unintentionally negligent oversight." *Doe v. Katy Indep. Sch. Dist.*, 427 F. Supp. 3d 870, 879 (S.D. Tex. 2019). Further, a school district may avoid liability by responding "reasonably to a risk of harm," however, "[w]hat makes a response or a remedial action 'reasonable' ***depends on the facts of each case***." *Id*. And where those facts are in dispute, summary judgment is not appropriate. See also *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 384 (5th Cir. 2000) (whether the district's response was reasonable depends on the facts of the case); *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 660 (5th Cir. 1997) (quoting *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 479 (5th Cir. 1989)) ("What is appropriate remedial action will necessarily depend on the particular facts of the case—the severity and persistence of the harassment, and the effectiveness of any initial remedial steps.").

PISD's deliberate indifference has been well briefed and established through the material facts cited herein and discussed in response to Section 1983. As a reminder, it took at least 53 complaints or reports before any meaningful action was taken which was only done so *after* PISD contemporaneously settled another sexual misconduct case. Further, PISD's Title IX coordinator admits to the multiple and continued violations of Title IX and the fact that a Title IX investigation should have started as early as August 2023 despite one never being done. Plaintiff has adduced a plethora of evidence sufficient to create genuine issues of material fact that (1) several PISD employees with the authority to take corrective action to end the harassment/discrimination, (2)

had actual notice of the harassment/discrimination, and (3) acted with deliberate indifference. As a result, Defendant's *Motion* should be denied.

**C.    Defendant PISD is not entitled to summary judgment on Plaintiff's claim for damages.**

Defendant begins its damage arguments by offensively claiming that Plaintiff or Victim have no damages despite N.J. being raped multiple times by a PISD official on campus while PISD buried its head in the sand. In support, no case law or statutory authority is provided by PISD, rather just an offhand argument that Plaintiff has "no expert testimony to support a finding of actual damages." Simply, Defendant's argument is without legal or factual support and therefore should be denied without detailed argument. As this Court stated in its previous *Order*, "A party inadequately briefs an argument if it does not offer any supporting argument or citation to authority or identify relevant legal standards nor any relevant Fifth Circuit cases." (ECF No. 28, at Page 18) (internal citations omitted).

In terms of a § 1983 claim involving rape, actual damages may include, without limitation, medical expenses incurred, future and ongoing medical expenses or mental health care, lost wages or future earning capacity, relocation and safety costs and legal fees. Further, non-economic damages can include pain and suffering, emotional distress, and loss of enjoyment of life. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974) (compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as "impairment of reputation ..., personal humiliation, and mental anguish and suffering.") *See also Carey v. Piphus*, 435 U.S. 247, 264 (1978) (mental and emotional distress constitute compensable injury in § 1983 cases).

Certainly, Plaintiff's non-economic damages can be established by the direct testimony of Plaintiff N.J., S.J. and N.J.'s counselors. Also, Plaintiff has submitted evidence of the economic

damages incurred by Plaintiff, such as medical bills incurred by N.J. and will submit testimony of the cost of continued therapy. Additionally, both N.J. and S.J. testified that the incident required them to move due to public attention which culminated at a PISD basketball game where N.J. was fouled and while on the free throw line, spectators began chanting "Underwood, Underwood, Underwood…". See AMF ¶ 118. S.J can testify as to actual costs incurred due to the required move from Perryton, which have been produced in discovery.

Expert testimony is generally only required to establish causation in specific cases, such as medical malpractice or when "the specific cause alleged is not within the general experience and common sense of a lay person." *Qualls v. State Farm Lloyds*, 226 F.R.D. 551, 558 (N.D. Texas 2005). It is certainly within common sense of a lay person that a 15-year-old being repeatedly raped on school grounds without any intervention by officials of PISD would lead to economic and non-economic damages. N.J., S.J., and N.J.'s counselors can testify to N.J.'s pain and suffering, emotional distress, and loss of enjoyment of her life. Importantly, it has been admitted by a PISD Board Member, Bryce Hale, that "[N.J.] is going to be messed up for the rest of her life." This statement constitutes an admission by PISD recognizing the severity and enduring nature of N.J.'s injuries. Frankly, the complete and utter disregard for N.J.'s well-being by officials of PISD as evidenced by the undisputed facts set forth herein make any expert testimony superfluous in this case.

### 1. Punitive damages

Plaintiff generally agrees that the Supreme Court case of *City of Newport v. Fact Concerts, Inc.*, 43 U.S. 247 (1981) restricted a punitive damage award against a municipality (i.e., City of Newport) under 42 U.S.C. § 1983. However, punitive damages remain available against Underwood himself, and there does not appear to be any controlling 5th Circuit case that extends

*City of Newport's* restriction on punitive damages to school districts. The Fifth Circuit Court of Appeals has stated, "A creature of tort liability, § 1983 permits the recovery of compensatory damages, attorney's fees, and when appropriate, even punitive damages. *See Hale v. Fish*, 899 F.2d 390, 404 (5th Cir. 1990)." *Stanley for Morgan, et. al*, 120 F.4th 467, 473 (5th Cir. 2024). Interestingly, when 5th Circuit jurisprudence had the opportunity to specifically extend the general rule that municipalities cannot be held liable for punitive damages arising from § 1983 claims in the case of *Hoskins v. Kaufman Indep. School Dist.*, 2003 WL 21517830, the case went unreported in the federal register. Technically, therefore, there appears no binding precedent that a school district cannot be liable for punitive damages.

One of the underlying principles of a Section 1983 claim is deterrence, which is similar to the underlying principle behind awarding punitive damages. The Supreme Court describes this deterrence as follows:

> Title 42 U.S.C. § 1983 provides a cause of action against "[e]very person who, under color of any statute ... of any State ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws...." The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.

*Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (citing *Carey v. Piphus*, 435 U.S. 247, 254–257, 98 S.Ct. 1042, 1047–1049, 55 L.Ed.2d 252 (1978). It is suggested that the failures as egregious as this, where there exists: (i) a history of sexual offenses at this school, (ii) 53 reports against Underwood; (iii) the lack of any knowledge or training by administrators or teachers; (iv) the lack of any corrective action, written reports and retention (with a raise) of Underwood despite the 53 reports indicates this school district is deliberately indifferent, and could be argued, that it encouraged and/or acquiesced to the continued rape of N.J. In short, PISD has shown no willingness to take

44

any corrective action or protect its students. To date, Plaintiff is unaware that any PISD employee involved in this matter has received any disciplinary measure for repeated and admitted policy violations. Deterrence is a priority here. Due to the atrocious conduct, this Court may desire to authorize punitive damages as an exception, or limitation, of the holding in *City of Newport*.

In any event, any lack of availability of punitive damages is not dispositive to a significant damage award in this case.  As the Supreme Court has provided, "Indeed, as reflected in the Restatement's similar treatment of emotional distress and punitive damages is the fact that the line between these two kinds of damages is indistinct and hard to draw." *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S 212, 224-225 (2022) (internal quotations and citations omitted).

### 2.    Emotional distress under Title IX

Defendant correctly admits that the Supreme Court has authorized a private right of action for monetary damages or injunctive relief due to sexual abuse by a teacher pursuant to Title IX. *See Franklin v. Gwinnet County Public Schools*, 503 U.S. 60, 63 (2018*); See also, Barnes v. Gorman*, 536 U.S. 181, 185 (2002) (Court held Spending Cause statutes may be enforced through implied rights of actions, and plaintiffs may secure injunctive or monetary relief).  Plaintiff also recognizes that the recent case of *Cummings* has been interpreted as a limitation to certain Title IX damages.

The Court in *Cummins* recognized that many jurisdictions recognized exceptions allowing emotional distress or punitive damages for particularly vial or reprehensible conduct, to-wit:

> These jurisdictions confine recovery for mental anguish where nonpecuniary contracts are at issue in two main ways. First, a number permit recovery only if the breach also qualifies as "unusually evil," with the precise terminology varying from "reckless" and "willful" to "wanton" and "reprehensible." Second, many States limit recovery for mental anguish to only a narrow "class of contracts upon breach of which the injured party may, if he so elect, bring an action sounding in tort."

*Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 228, 142 S. Ct. 1562, 1575, 212 L. Ed. 2d 552 (2022) (citations omitted). PISD argues the *McGowan* case as limiting emotional damages in Title IX cases, but it was not argued that such case involved any particularly reprehensible conduct; but rather involved sports injuries to female collegiate rowers at Southern Methodist University. *McGowan v. Southern Methodist University*, 715 F.Supp.3d 937 (N.D.Tex. 2024). The rowers complained of unequal treatment of these injuries to other athletes as a Title IX violation. The Court rejected the claims for emotional damages in that case. It would seem a far cry that inequal rehabilitation of a sports injury rises to the level of the reprehensible conduct in this case. The undisputed and circumstantial facts establish that PISD knowingly allowed the continued rape and sexual abuse of a 15-year-old, or at least turned a blind eye, until it could settle another pending case of sexual assault. In fact, Perryton's own school board members seem to condone the rape by claiming it was consensual sex between a child and her teacher, but not really rape.

    **3.**        **"Concrete Evidence" is not a legitimate standard for emotional damages.**

PISD appears to argue that some undefined standard of "concrete evidence"[4] is required to award compensatory damages, including pain and suffering, mental anguish or emotional damages. Such an argument is practically impossible and specifically not the law.

> …Damages arising from pain and suffering are not subject to precise measurement. Id. "[A]ny amount awarded for pain and suffering depends to a great extent on the trial court's observation of the

---

[4] It should not go unnoticed that Superintendent Brown testified that he incorrectly believed he needed "concrete evidence" to suspend Underwood or take any remedial action – thereby allowing the continued and repeated rape of N.J. Apparently, PISD is so enthralled with this made-up "concrete evidence" standard, that PISD's counsel now argues "concrete evidence" is required to establish emotional damages, which is flatly contrary to existing jurisprudence. Frankly, this continued theme by PISD, and its counsel, indicates a continued pattern of willful ignorance of the depravity of this situation.

> plaintiff and its subjective determination of the amount needed to achieve full compensation….Each award for pain and suffering depends heavily on its own facts."

*Associated Terminals of St. Bernard, LLC v. Potential Shipping HK Co. LTD., et al.*, 324 F.Supp.3d 808 (E.D. La. 2018) (internal citations omitted).

Similarly, the testimony of N.J. and S.J. is sufficient to establish emotional distress damages. The Fifth Circuit explained that to obtain compensatory damages for mental anguish or emotion distress:

> …a plaintiff is not absolutely required to submit corroborating testimony (from a spouse or family member, for example) or medical or psychological evidence. The plaintiff's own testimony, standing alone, may be sufficient to prove mental damages but only if the testimony is "particularized and extensive" enough to meet the specificity requirement…

*Hitt v. Connell*, 301 F.3d 240, 250-251 (5th Cir. 2002) (internal citations omitted). The jury must weigh this testimony and Plaintiff be allowed to testify on her emotional damages and mental anguish. Certainly, at this stage of the proceedings summary judgment is improper.

Plaintiff's pecuniary damages can also be easily established from the record and testimony to be given at trial. PISD admits that documents were produced indicate the cost of a counseling session attended by N.J. Further, N.J., S.J. and N.J.'s counselors can testify to the number of sessions she has already paid for and attended. As stated in *Associate Terminals of St. Bernard*, supra., "Courts calculate past medical expanse based on amounts actually expended…[and] agreed-upon past expenses can be readily calculate." *Id*. at 825. In this case, it is rather simple to multiply the number of counseling sessions attended by N.J. by the cost of each session.

With respect to future medical expenses, courts award damages when it is reasonably likely that a plaintiff will incur them in the future. *Id*. In addition to common sense, N.J.'s counselors

47

will testify that it is reasonably likely that N.J. will require some form of therapy for the rest of her life due to her repeated rape.  PISD even admitted N.J. will be "messed up for the rest of her life."

**D.      The material facts presented herein establish a custom or practice of tolerating the illegal conduct of a PISD official.**

**1.      Plaintiff can provide evidence that is subject to 18 U.S.C. § 2251(A).**

Defendant PISD asserts that "Plaintiff can provide no evidence of an official policy adopted by PISD, nor a custom or practice of tolerating the unlawful conduct that is subject of 18 U.S.C. § 2251(A)" therein citing to *Pineda*, 291 F.3d at 328.  (ECF No. 49 at 31).  However, that Defendant failed to adequately review the holding in its own cited case which states that a governmental body (in this case a school district) may face liability herein as follows:

> 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury…' Proof of [] liability sufficient to satisfy *Monell* requires: (1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom).

*Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (Citing *Monell v. Dep't of Soc. Serv.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir.2001)).  This is the identical analysis as set forth above, and based on the undisputed facts, certainly a reasonable jury could determine that such policy or widespread custom exists at PISD. As such, Defendant's *Motion* should be denied.

**2.      Defendant PISD is not immune from tort claims against Defendant Underwood in his official capacity.**

Defendant's argument that PISD can hide behind governmental immunity for tort-based claims was recently waived by the Texas legislature with respect to, *inter alia*, claims of sexual assault.  Accordingly, the federal cases cited by PISD in Subsection (D)(2) of its brief are no longer

48

applicable due to recent statutory enactments. In 2025, the 89th Legislature for the State of Texas passed, and the Governor signed into law, HB4623 which explicitly waived a school's governmental immunity from suits for sexual misconduct or failure to report. See TEX. CIV. PRAC. & REM. CODE ANN. § 118.001, *et seq*. The legislative enactment authorized a damages award of $500,000 per claim. *Id*. Further, and most importantly, the statutes specifically waive the school and school official's governmental immunity and ***do not exclude*** other remedies.  Rather, the $500,000 is authorized damages in addition to any other legal remedies. Admittedly, HB4623 was adopted after this case was filed. However, such waiver abrogates, or at a minimum, calls into question, those cases cited by PISD which claims blanket immunity for the actions of Underwood and PISD's other employees and administrators.

**WHEREFORE**, premises considered, Plaintiff respectfully requests that Defendant's *Motion* be denied, and that it be awarded any other and further relief the Court deems just and equitable.

Respectfully submitted,

/s/ *Tyler. L. Gentry*

Tyler L. Gentry, OBA No. 32400
Kyle Goodwin, OBA No. 17036 and
SBN 24117975
GOODWIN / LEWIS / CASON / GENTRY
420 NW 6th St., 2nd FL
Oklahoma City, OK 73102
P: (405) 900-5700
tgentry@goodwinlewis.com
kgoodwin@goodwinlewis.com

and

MAYFIELD HEINRICH RAHLFS
WEABER & PARSONS, LLP
Brian P. Heinrich, SBN 09382320

320 S. Polk, Suite 1000
Amarillo, Texas 79101
(806) 242-0152 – Telephone
(806) 242-0159 – Fax
brian@mhrwp.com

***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was served on all parties of record via the Court's Electronic Filing System on the 17th day of April 2026.

/s/ *Tyler. L. Gentry*
Tyler L. Gentry