# Exhibit 1

001

**S.J. - September 25, 2025**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| S.J., as Parent, Conservator, and Next Friend of N.J., <br><br> Plaintiff, <br><br> V. <br><br> PERRYTON INDEPENDENT SCHOOL DISTRICT, and <br><br> COLE UNDERWOOD, Individually and in his Official capacity as Athletic Director of Perryton ISD, <br><br> Defendants. | Case No. <br> 2:24-CV-00168-Z |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

S.J.

SEPTEMBER 25, 2025

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION of S.J., produced as a witness at the instance of the Defendant, Perryton Independent School District, and duly sworn, was taken in the above-styled and numbered cause on the 25th day of September, 2025, from 9:06 a.m. to 12:51 p.m., before Gay R. Richey, CSR, in and for the State of Texas, reported by machine shorthand, at the Perryton ISD Administration offices, located at 821 SW 17th Avenue,

**AMARILLO COURT REPORTING**
**806-374-4091**

002

S.J. - September 25, 2025

Perryton, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

S.J. - September 25, 2025

Q. Okay. How long have y'all been dating?

A. Um, since May of 2025.

Q. Okay. Did you move to Yukon, uh, because you were dating someone?

A. No, sir.

Q. What was the reason that you moved to Yukon?

A. Because of this incident.

Q. You ever told anybody a different reason for moving to Yukon?

A. No, sir.

Q. Okay. How many times have you been married?

A. Twice.

Q. Um, first marriage was to, who?

A. ███████ my children's mother.

Q. Okay. Do you know what last name she's going by now?

A. ███████

Q. ███████

A. Yes.

Q. And she lives somewhere in the Perryton area?

A. She lives south of town.

Q. And when was the last time you spoke with ███████

A. I mean, she really won't talk to me on the phone very much. Uh, a phone call or text, what do you --

Q. Let's go phone call.

S.J. - September 25, 2025

Q.   -- I mean, do you break it, in your mind, down to employees or School board members, or --

A.   All of them, yeah.

Q.   Okay.  Anybody outside the School District that you think has any accountability, um, for Cole and ▮▮▮▮

A.   Cole, himself.

Q.   Okay.  Do you hold him more, or less, responsible than the School, in your mind?

A.   I mean, I think it's about a 50/50.

Q.   And why do you think it's 50/50?

A.   Because he's the one that actually did the act.  And then the School -- everything happened at the School, sexually, or intercourse at least.

Q.   Okay.  So who is Cole Underwood?  How do you know him?

A.   So, they kept saying "family friend."  He's not a family friend.  Um, they said that we went to school together.  We "did not" go to school together.  I graduated in '07.  Um, and I don't even know what year he graduated.

Q.   Is he older or younger than you?

A.   He's younger than me.  I'm 36.  And, what, he just turned 30?

Q.   I don't know.  Um, he was at -- I think he was at

S.J. - September 25, 2025

past two days, she would have never been in that car.

Q. And specifically, um, what have you learned this week, in September of 2025, that was different than you had heard, um, through the rumor mill and people approaching you?

A. All the rumor mill that I heard was through Darya, and that was coming from her son. Um, other than that, nobody in the community came to me. Um, so -- I mean, if I'd had known what the School knew at that point--out of all the reports that went through them, that weren't relayed to me--then she would have never been in that situation.

Q. What did the School relay to you back in December?

A. They just said that they were worried that she was getting too close to him.

Q. Okay. And, then, did you have further discussions with anybody else at the School after that meeting?

A. {Sighed}. I mean, not that I recall.

Q. Okay. But during that time, and after that, you were monitoring, um, what was going on between your daughter and Cole; fair?

A. Fair.

Q. Um, and why? Why were you continuing in January,

S.J. - September 25, 2025

Q. Okay. Does that involve -- are you out in the field doing that?

A. Uh, yeah. Um, I deliver to the field. I deliver to offices. Um, I stop in offices; talk to customers, um, take customers out to eat. Um, but most of mine is just driving to locations and dropping off tools.

Q. And you moved to Yukon in November of 2024, correct?

A. Yes.

Q. And was there -- or were there discussions of ███████ staying in Perryton, um, at least through basketball season and maybe the end of that school year?

A. At first, yes, there was; but, I ultimately realized that that wasn't going to be the best thing for her.

Q. Okay.

A. Because I -- it was more that she wanted to finish basketball. And I did think about it, but I realized that it was not the right choice for her. I needed to get her out of Perryton.

Q. Who were the families that y'all discussed her living with?

A. With my brother, Ryan and Halston █████.

Q. Okay. Anybody else?

A. Uh, no.

# Exhibit 2

008

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

S.J., a Parent, Conservator,      )
and Next Friend of N.J.,          )
        Plaintiff,                )
                                  )
vs.                               )        Case No. 2:24-CV-00168-Z
                                  )
PERRYTON INDEPENDENT SCHOOL       )
DISTRICT, and                     )
                                  )
COLE UNDERWOOD, Individually      )
and in his official capacity as   )
Athletic Director of Perryton     )
ISD,                              )
        Defendants.               )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VIDEOTAPED AND ORAL DEPOSITION OF

TORI LITTLE

HAD ON THE

24TH DAY OF SEPTEMBER, 2025

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

WORD FOR WORD REPORTING, L.L.C
620 NORTH ROBINSON, SUITE 202
OKLAHOMA CITY, OKLAHOMA 73102
(405)232-9673

REPORTED BY:  DARLA RILEY, CSR

APPEARANCES


FOR THE PLAINTIFF:

Mr. Tyler L. Gentry
Mr. Kyle Goodwin
GOODWIN LEWIS, PLLC
420 Northwest 6th Street, Second Floor
Oklahoma City, Oklahoma   73102
(405) 900-5700



FOR THE DEFENDANT, PERRYTON INDEPENDENT SCHOOL DISTRICT:

Mr. Slater Elza
UNDERWOOD LAW FIRM
Post Office Box 9158
Amarillo, Texas   79105
(806) 376-5613
(806) 379-0316 FAX



Also Present:   Mr. ██████ ██████

Mr. Brad Snyder, Videographer

the hall interacting with students I would watch to see what those interactions were. When I was at the games, regardless of where the game was, I was watching him and his interactions with students on each or both sides as well.

Q    And we have -- and we will look at them today -- received production, we have talked to various witnesses ourselves. There seems to be a consensus that he, for example, walked her to class often. Is that something that you observed?

A    That --

MR. ELZA: Objection, form.

A    That is not something that I have observed.

Q    (By Mr. Gentry)  That she was often in his office and alone at times. Is that something that you observed?

A    No, I did not.

Q    Is there anything else that you think you could have done differently with respect to the Underwood situation?

A    At the moment not that I can think of.

Q    Do you believe that the school did everything in its power to prevent the rape of ███████ ███████

MR. ELZA: Objection, form.

A    I believe that with the information that we had, yes.

Q    What information did you have?

A    Mr. Underwood reported to me that there were rumors going around town. We asked him directly if that was -- what truth there was to it. We talked to him several times as he

brought -- brought me new information. Every report -- or I am sorry -- the majority of the reports that came my way came from him directly.

I was made aware when the complainants came to the school to visit with me about the incident as well. And then my office staff occasionally would tell me things that they were hearing in public, but nobody ever came and actually reported anything to me directly.

Q    What would have talking to him directly have done?

A    Talking to who directly?

Q    Cole Underwood. What benefit does that serve?

A    Asking him for his side of it, finding out what's going on. It's gathering information to determine whether or not there is anything else to follow up on. And then when talking to other people to compare his version of events with what they have to say.

Q    You would agree with me if you ask a criminal if they have committed a criminal act, typically they are going to deny doing that, correct?

A    I would assume so.

Q    So you -- you had rumors that were reported to you from Underwood directly, correct?

A    Correct.

Q    You talked to Underwood about those rumors, correct?

A    Correct.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Tori Little 09/24/2025                                                    Page 16

Q     You were made aware of complaints received from other people, correct?

A     Yes.

Q     And you received additional information from your office staff that maybe they heard in public?

A     Correct.

Q     Anything else?

A     Not that I can think of.

Q     Who would these complainants have been?

A     The people who were telling me what was heard, my assistant principal.

Q     Who is that?

A     Frances Zavala.

THE REPORTER:  Excuse me?

THE WITNESS:  Frances Zavala. Z-a-v-a-l-a.

Q     Is Frances still your assistant?

A     Yes, she is.

Q     Who else?

A     The counselors were made aware of some of the rumblings and so they would let me know what they had heard as well.

Q     Who are they?

A     Paige Wade, Randy Cunningham.

Q     Who else?

A     They are the only one -- and Ms. Feger, Jennifer Feger. She is office assistant.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Tori Little 09/24/2025                                                    Page 17

Q    Can you spell that for me?

A    Sure.  Feger is F-e-g-e-r.

Q    Who else?

A    I did receive an e-mail from a parent about a conversation that occurred in a locker room.  That was -- she is the sister-in-law of Ms. Zavala.

Q    What is that parent's name?

A    Her first name is Tiffany.  I believe her last name is Hernandez.

Q    Anyone else?

A    No one else reported anything to me directly.

Q    So we've got obviously, Underwood himself, the two counselors, Paige Wade and Randy Cunningham, Jennifer -- is it Feger (pronouncing?)

A    Feger (pronouncing.)

Q    Feger, and then your assistant principal Frances Zavala, and then a parent, Tiffany Hernandez?

A    Correct.

Q    What about just in general?  Were you aware of rumors that circulated in the school between students about Cole and █████?

A    Ms. Zavala and the counselors told me that some of the students were concerned, yes.

Q    When did these rumors and concerns start pouring in?

A    I believe in December.

Q    Of 2023?

A    Correct.

Q    And with respect to these people, all of these whatever you want to call them, rumors, reports, complaints, did you forward all of that information upon their receipt directly to Greg Brown?

A    Yes.

Q    Was there anything that you never forwarded to Greg Brown?

A    No.

Q    We went through with Ms. Wheeler, oh, I think we got up to about eight different things with respect to information she received that she did not forward to Greg Brown.  That was not the case with you, I take it?

A    Correct.

            MR. ELZA:  Objection, form.

Q    (By Mr. Gentry)  Do you think that that was appropriate for Ms. Wheeler not to forward that information on?

A    I think that in her position I would have forwarded it on.

Q    Do you think the district's policies require that information to be provided to Greg Brown?

A    Yes.

Q    Now, in Mr. Brown's deposition we went through with respect to complaints, reports, rumors, suspicions that were

identified in the school's discovery responses, as well as many we had ourselves. I think we got up to around 22 plus various reports and complaints from the fall of '23 through the spring of '24 with respect to the inappropriate relationship between Cole Underwood and ███████ ███████ Okay? And if I understand your testimony correctly, you didn't receive 22 of them?

A    No.

Q    Now, there were seven or eight of these that Greg Brown testified he was unaware of but that would have been reported to you. Thoughts about that?

MR. ELZA: Objection, form.

A    As I mentioned, nobody came and visited with me. As it was going on, I -- when cer -- when Ms. Zavala or others would come to me and say these are the things that are being said, I always encouraged, these people need to come and talk to me if they have information, if they have seen something, it needs to be reported to me. She wouldn't give me names of who the people were and nobody ever came to visit with me.

Q    Does Ms. Zavala have the authority not to provide you names upon you asking?

A    She probably does if I pressed for it, but at the time I believed that they were rumors as happens in small towns. Everything that Cole Underwood told me regarding the relationship was confirmed by the father.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Tori Little 09/24/2025

Page 20

He came to the school concerned about the rumors that were going around town. He -- it was in Ms. Cunningham's office that we were talking. At the time he was upset that the rumors were happening. He wanted them to stop. But he confirmed everything that Cole had told me. He was a family friend. They had grown up together.

We were aware that ███████ had experienced a lot of loss the year before with the custody issues and Cole was supporting her. He was her confidant. He was who she was talking to. He begged us not to take that away from her because of how much she was struggling at that time. And everything he told us in that office was a confirmation of what Cole had said.

So given that information, it seemed reasonable that they were rumors and that people were just concerned but the father wasn't concerned.

Q    But they weren't just rumors, correct?

A    We know that now --

MR. ELZA:  Objection, form.

Q    (By Mr. Gentry)  Does district policy care about whether or not something is a rumor?

A    I don't believe it does.

Q    Right.  And whether you believe it or not, the district has an obligation to investigate and report, correct?

A    Yes.

MR. ELZA:  Objection, form.

Q    (By Mr. Gentry)  And do you think the district did everything it should have with respect to the investigation of those reports?

MR. ELZA:  Objection, form.

A    Looking back, there have been things we could have done differently.

Q    (By Mr. Gentry)  Right.  I mean, you could have, for example, asked Ms. Zavala to simply provide you with those names and you could follow up with those individuals and get their side of the story, correct?

A    Correct.

Q    And you didn't do that?

A    No.

Q    Is there anything else that you should have done that you didn't do?

A    Probably, but I can't think of anything at the moment.

Q    If you think of any can you supplement your answer at a later date?

A    Yes, I will.

Q    Something you are going to think about?

A    I'm sorry?  I didn't know that was a question.

Q    Is that something you are going to think about?

A    Yes, it is something I will think about.

Q    We are going to bounce around a little bit.  Let's talk about just briefly these cameras, because there's been a lot

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Tori Little 09/24/2025                                          Page 34

A    Administrative leave is when -- when we feel that we have reason to further investigate and need the person off campus while the investigation is occurring.

Q    Were you aware that there was another employee that was put on administrative leave during this time on a single suspicion of an inappropriate Snapchat communication with a student?

MR. ELZA:  Objection, form.

A    No, I was not aware.

Q    (By Mr. Gentry)  If that was true, then it would make sense that Cole Underwood should have been put on administrative leave and a proper investigation done long before he was actually put on leave, correct?

MR. ELZA:  Objection, form.

A    I think we could have put him on sooner.

Q    (By Mr. Gentry)  Going forward is the school going to take these things more seriously, and, for example, put someone on leave sooner?

MR. ELZA:  Objection, form.

A    I believe so.

Q    (By Mr. Gentry)  Are you aware that a majority of these complaints Greg Brown testified yesterday that the father was not made aware of.  Are you aware of that?

A    No.

Q    Do you think that that's a problem?

A     I really -- yes, I do.

Q     If it was your child, how would you feel about it?

A     I would want to know.

Q     You've got a father defending an alleged perpetrator without having all the information about the complaints being made against that perpetrator.  That's a problem, isn't it?

A     Yes.  However, when he came to visit with me he had the same information I did.  There was not anything I knew that he didn't share with us in that meeting.

Q     Well, but apparently there was several things that Greg Brown knew that you didn't know, correct?

          MR. ELZA:  Objection, form.

A     That I don't know.

Q     Okay.  Do you think you and Greg Brown had appropriate communications about everything that he knew?

          MR. ELZA:  Objection, form.

A     I know that we were talking regularly.  There were times that he brought information to me.  There were times that I brought information to him.

Q     (By Mr. Gentry)  Ms. Wheeler was very clear earlier -- early on that she felt like she has liability in this case. Do you think you do?

          MR. ELZA:  Objection, form.

A     I think that there are things that I could have done and should have done differently.

So four or five years before he got to Perryton ISD.  Okay?  I want you to take a minute and read this document.  It's about a page and a half.  And then I am going to ask you some questions about it.  So go ahead.

A    I am finished.

Q    Is this the first time you are hearing or seeing these things?

A    Yes, it is.

Q    Had you known these things at the time or the time period in question would it have changed the way you handled things?

A    I believe so.

Q    I am not going to go through all, but let's take a snippet, August 7th of 2018, parent reported to David Vinson, that she overheard people at a volleyball game discussing Coach Underwood Snapchatting the students.  And that sounds a lot like what happened in this case, right?  Someone heard something that someone else said, right?

A    Correct.

Q    I think we can both agree that Snapchatting a student is a violation of district policy, correct?

A    Yes.

Q    And if I understood it correctly yesterday -- at least in Texas the schools have effectively the same -- those are put together by a -- a consistent entity and those policies are pretty consistent from school to school, right?

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Tori Little 09/24/2025                                                          Page 41

          MR. ELZA:  Objection, form.

A    I would assume so.

Q    (By Mr. Gentry)  Right.  I mean, Amarillo ISD doesn't have substantially different policies than Perryton, right?

          MR. ELZA:  Objection, form.

Q    (By Mr. Gentry)  They received this on August 7th, a report from David Vinson.  She overheard people at a volleyball game discussing Coach Underwood Snapchatting with students.  And by 3:45 that day he is asked to write a written statement and then he is immediately placed on administrative leave.  Do you see that?

A    Yes.

Q    You-all never had Cole write a single statement, correct?

A    Not that I am aware of.

Q    And you certainly did not immediately put him on administrative leave upon the receipt of a report?

A    No, we did not.

Q    In fact, you didn't put him on administrative leave following the receipt of upwards of 22 reports that we can tell.

          MR. ELZA:  Objection, form.

Q    (By Mr. Gentry)  Correct?

A    I didn't receive 22 reports.  I --

Q    Well, the five, six, or seven that we talked about you -- he certainly wasn't put on administrative leave, correct?

A    I would not have been able to put him on administrative leave, but no, he was not.

Q    Okay.  Had you known what you just read in this letter about his issues in the past, do you think the school would have been more prone to put him on administrative leave earlier?

A    I believe so.

Q    And if Perryton ISD at the time of his hire was aware that these things occurred, did nothing to follow up on them, is that problem for Perryton ISD?

        MR. ELZA:  Objection, form.

A    I would think so.

Q    (By Mr. Gentry)  Someone screwed up, correct?

        MR. ELZA:  Objection, form.

A    Essentially, if they were aware and knew it.

Q    (By Mr. Gentry)  Is that how people typically get hired in Perryton?  Oh, I know this guy, let's hire him and there's just not a lot done about it or is there more to that?

A    I haven't been here for very long, so I can't -- I know for the hirings that I've done that is not the case, but I can't speak to everything.

Q    Now, we are not going to go through all of them, but the file we got from Amarillo ISD is fairly substantial.  And -- and for purposes of today we have kind of went through seven or eight, nine different exhibits that have various formal

023

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Tori Little 09/24/2025                                                Page 46

record at 2:37.

Q    Ms. Little, I am going to follow up with a thing or two you said relative to ▮▮▮ father, ▮▮▮ How many times did you meet with ▮▮▮

A    Just the one time.

Q    And when was that?

A    December, I believe.

Q    At that time I think we can all agree that a lot of these discussions were, in fact, just rumors, correct?

A    Correct.

Q    So you would have discovered some additional things following December of '23, correct?

A    Potentially.

Q    I mean, everything that you received and I mean, gosh, the five or six things that we looked at, those didn't all come before December of '23, right?

A    No.

Q    Okay.  Did you follow up with him after December of '23?

A    No.

Q    Do you think that district policy requires you to?

A    Yes.

Q    So you would agree with me that you violated the policy in that sense?

A    Yes.  I should have called him and let him know that people were still saying the same things.

Q    But you weren't told about this?

A    I was not told about it.

Q    Okay.  The incident --

A    By the student or the teacher.

Q    Okay.  The incident with Vasquez and Underwood yelling at as a result of her calling him a perv, let me ask you, did you know about that after he did that?

A    Yes.

Q    Okay.  Do you think it's appropriate that an alleged perpetrator is addressing the complainant?

A    No.

Q    Especially if it's a student?

A    Correct.

Q    You would agree with me that that too is a violation of district policy?

A    Yes.

Q    Would you agree with me that that would discourage students from making reports?

A    Yes.

Q    So in September of '23, we have already set a precedence for other students that they need to be wary of making complaints because of what Underwood did, right?

        MR. ELZA:  Objection, form.

A    Potentially.

Q    Okay.  Do you recall that being a concern that Delma

MR. ELZA: Objection, form.

A    I was not aware.

Q    (By Mr. Gentry)  Are you aware that she and Cole had discussions about why they couldn't use Snapchat and how that bothered them, for example?

A    No.

MR. ELZA: Objection, form.

Q    (By Mr. Gentry)  You would agree with me that Cole ultimately violated this policy, correct?

A    Yes.

Q    And based on what you know now, you would agree with me that he violated presumably a similar policy back at Amarillo ISD, correct?

A    Yes.

Q    And we learned from the exhibit that followed his alleged violation he was immediately put on administrative leave in that case, correct?

A    Correct.

Q    Do you think the school should have immediately put him on administrative leave when it learned of his issues with Snapchat at Perryton ISD?

MR. ELZA: Objection, form.

A    Probably.

Q    (By Mr. Gentry)  That was early on, right?  In the fall of '23, correct?  That he was already having those

026

communication issues?  Do you know?

A    I don't know.  I know that Mr. Brown started that year and in the summer before the school year began a directive was put out to all staff that we were not to do it.  And I was not aware of anybody thinking that he was doing so.  I thought it was just a general directive made to everybody.  And we know it's happened in the past and none of us are doing it anymore. It was very common on the athletic side of things the year prior before Mr. Brown came.

Q    What's the problem with use of something like Snapchat?

A    The problem is there's no oversight.

Q    Right.  There's no oversight, and there's no way to determine what did or didn't happen because once it's looked at, it's gone, right?

A    Correct.

Q    It goes on to provide, kind of mid-way down, employee shall have no expectation of privacy in electronic communications with students.  Do you agree with that?

A    I'm sorry.  I got off of here too fast.  Where are we?

       MR. ELZA:  205, right in the middle.

       THE WITNESS:  Thank you.

Q    (By Mr. Gentry)  It says an employee shall have no expectation of privacy in electronic communications with students.  Do you see that?

A    205, right in the middle.  Yes.

027

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Tori Little 09/24/2025

Page 71

Q    Okay.  It goes on to provide each employee shall comply with the district's requirements for records retention.  Do you see that?

A    Yes.

Q    And obviously, the use of something like Snapchat prevents that required record retention, correct?

A    Correct.

Q    Now, Greg Brown testified that he would have had the authority, for example, to take Cole's phone and look at it.  Would you agree with that?

A    Yes.

Q    Do you think that based on these allegations and things that we have gone through that that might have been a reasonable thing to do?

A    Yes.

Q    And was that ever done that you are aware of?

A    Not that I am aware of.

Q    Do you know there at the bottom it provides reporting improper communication.  In accordance with administrative regulations an employee shall notify his or her supervisor when a student engages in improper electronic communication with the employee.  Now, Ms. Wheeler seemed to be aware he was Snapchatting with students and failed to report.  Did you ever have that same issue?

         MR. ELZA:  Objection, form.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Tori Little 09/24/2025                                                        Page 72

A    No.

Q    (By Mr. Gentry)  If you will go to 113 for me.  This is identified as policy FFF Local, correct?

         (Plaintiff's Exhibit No. 113 was

         introduced and made a part of the

         record.)

A    Yes.

Q    It provides the district shall notify a parent of a student with whom an educator is alleged to have engaged in misconduct, informing the parent as soon as feasible that the alleged misconduct may have occurred.  Do you see that?

A    Yes.

Q    Was that violated in this case?

A    Yes.

Q    Repeatedly, correct?

A    Yes.

Q    Just these couple of policies we have looked at, were you aware of these during the time period in question?

A    Not specifically, generally.

Q    Have you gone back and looked at these now?

A    Yes.

Q    Do you think that's going to help you be a better administrator going forward?

A    Yes.

Q    Do you recall signing off on the employee handbook?  Is

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Tori Little 09/24/2025                                                    Page 73

that something you read all the way through before you signed it and said you did?

A    Yes.

Q    You aware that we've received several -- well, including Ms. Wheeler this morning that it's often the case at Perryton ISD that they are given the handbook and they just simply sign off on it without actually reading it?

MR. ELZA:  Objection, form.

A    I assume so, because I read it my first year here, but it doesn't change and I don't read it each individual year.  So that would have -- my first year I would have read it then, yes.

Q    (By Mr. Gentry)  If as you -- we've discussed, you don't know these policies how are you expected to enforce them?

A    There is no excuse, should have known the policies.

Q    You can't enforce something you don't know that it's there to enforce, right?

A    Correct.

Q    Too little, too late now, isn't it?

MR. ELZA:  Objection, form.

A    Yes.

Q    (By Mr. Gentry)  Who has to pay for that mistake?

MR. ELZA:  Objection, form.

A    ████████

Q    (By Mr. Gentry)  A 15-year-old girl, right?

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Tori Little 09/24/2025

Page 74

MR. ELZA:  Objection, form.

Q    (By Mr. Gentry)  116.  This is identified as FFG Legal, correct?

(Plaintiff's Exhibit No. 116 was introduced and made a part of the record.)

A    Yes.

Q    It provides there kind of towards bottom duty to report. Do you see that?

A    Yes.

Q    Any person who has reasonable cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect by person shall immediately make a report as required by law.  Do you see that?

A    Yes.

Q    What do you think is meant by make a report?

A    It means file with CPS.

Q    Was that done in this case at any point?

A    No.

Q    Do you think it should have been?

A    With more information it would have been.  With the information that we had, no.

Q    Well, you didn't have all the information, correct?

A    Correct.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Tori Little 09/24/2025

Page 75

Q    So it probably could have been, shouldn't it?

A    Had we had more information, yes.

Q    What about if you had this information that we have discussed, would it have been?

A    Yes.

        MR. ELZA:  Objection, form.

Q    (By Mr. Gentry)  Yes?

A    Yes.

Q    Go to 118, please.  This is identified as policy HHH Local, correct?

        (Plaintiff's Exhibit No. 118 was
        introduced and made a part of the
        record.)

A    Yes.

Q    It says there at the top, note this policy addresses discrimination including harassment and retaliation against district students.  Do you see that?

A    Yes.

Q    Would you agree with me that Cole Underwood retaliated against students for making allegations against him?

A    Yes.

Q    Do you think that that was in violation of district policy?

A    Yes.

Q    Go to the next page for me.  We have under, for example,

other sexual harassment, and I will submit to you that there is all sorts of definitions of sex harassment in this policy. Before now have you read this policy?

A    Yes.

Q    Okay.  Other sexual harassment, just there at the bottom. It's identified romantic or other inappropriate social relationships between students and district employees are prohibited.  Do you see that?

A    Yes.

Q    And based on these reports that we have got from teachers and students and parents, and I know we haven't done the board members yet, would you agree with me that there was clearly some type of inappropriate social relationship between Cole and █████████

A    Yes.

          MR. ELZA:  Objection, form.

Q    (By Mr. Gentry)  Sexual harassment doesn't just have to include a physical touching between the two, correct?

A    Correct.

Q    Would you agree with me that the purpose of these policies and their broad definitions is to prevent that hopefully before it happens, right?

A    Yes.

Q    Lastly, Exhibit 122, please.  This is the Perryton ISD athletic code of conduct.  Have you read this?

(Plaintiff's Exhibit No. 122 was introduced and made a part of the record.)

A    No.

Q    Do you think anything was done wrong with respect to him -- or Cole driving ███ home from the track meet?

A    Yes.

Q    And it sounds like there was other incidences where she was alone in his personal vehicle.  Do you think that there's an issue with that?

MR. ELZA:  Objection, form.

A    There is an issue with that, yes.

Q    (By Mr. Gentry)  I am going to go to the third to last page.  This is the travel policies, correct?

A    Yes.

Q    Have you read these before?

A    No.

Q    Let's briefly go through them.  It provides players will travel to and from -- from games on the team bus.  Do you agree with that?

A    Yes.

Q    And then it looks like that there are certain exceptions on these asterisks provided here where a child may be excepted from riding to and from on that team bus, right?

A    Correct.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Tori Little 09/24/2025                                                    Page 78

Q    For example, players must travel to and from the games on the team bus unless they have received approval from the coaches for other modes of transportation prior to departure, right?

A    Correct.

Q    What is your understanding, at least with respect -- let's just take -- are you aware of what happened at the Canyon track meet?

A    Yes.

Q    Tell me what you think happened.

A    ██████ wanted to get home for her sister's basketball game.  And it wasn't -- as far as I know wasn't discussed prior to going.

Q    By what -- let me stop you there.  While she was at the track meet she was interested in not riding home on the team bus, for example?

A    Correct.  She needed to get back before the team was going to in order to see the game.

Q    Okay.  And then what -- what happened after that?

A    There was a text exchange between Cole and her father discussing the possibility of Cole driving her back.  And in the end father gave permission and asked him to do this favor so that she could be back for the games.

Q    This is the same father who we have now determined did not get a plethora of these reports communicated to him in

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Tori Little 09/24/2025                                                      Page 79

violation of district policy, right?

A    Correct.

        MR. ELZA:  Objection, form.

Q    (By Mr. Gentry)  Meaning we have policy violations long before we ever get to the Canyon track meet issue, don't we:

A    Yes.

Q    Okay.  It provides here in the second asterisk, players may be released to a parent or legal guardian at out of town games with a signed and dated note releasing the athletic from the coach to the parents, legal guardian.  At the time they are released which requires the parents or legal guardian's presence, and I think we can both agree that there's no way that could have occurred, right?

A    Correct.

Q    So we have determined that we did not have approval prior, we did not have a parent present, so we are left with the third and final exception.  Players may be released to someone designated by the parent or legal guardian but a note and approval must be in the coach's possession prior to leaving for the trip?  We know that didn't occur, right?

A    That's correct.

Q    So it has absolutely -- at least with respect to the travel policy, no bearing on the violation of this policy that ██████ permitted that while she was there, correct?

A    Correct.

Q      You would agree with me that he should have never even been given that option?

A      Correct.

Q      Are you aware of what happened between Cole and ████ on the way home from that trip in his personal vehicle?

A      No.

Q      Are you aware that there were sexual acts that were performed on the way home?

A      No.

Q      Would you agree with me that had this policy been followed that those would not have occurred?

A      Yes.

         MR. ELZA:  Objection, form.

         MR. GENTRY:  Probably need another break. About five minutes.

         THE VIDEOGRAPHER:  Going off the record at 3:18.

         (Break was taken.)

         THE VIDEOGRAPHER:  Going back on the record at 3:29.

Q      (By Mr. Gentry)  I want to go to, just real quick, a block of exhibits -- or a block exhibit here.  Exhibit 57, which should be text messages.  It's going to be a big stack. Probably the big clamp there.

         (Plaintiff's Exhibit No. 57 was

letters on any of your camera reviews?

A    We do not use the school lockers in the hallways.  My assumption, but it could be an incorrect one, is that it was the locker room lockers, and the cameras are not in the locker rooms.

Q    And we determine, if you will go to like the last letter for me, that last page, should be 179 there at the bottom.

A    Yes.

Q    That as evidenced by the first sentence, he was sending her love letters as early as the end of 2023, correct?

MR. ELZA:  Objection, form.

A    It looks that way.

Q    (By Mr. Gentry)  Obviously, we don't -- no one disputes that this was inappropriate, correct?

A    Correct.

Q    I want to talk about a conversation that you had -- had with Ms. Delma Habethur.  Do you recall that?

A    Yes.

Q    And if I understand the specifics of this conversation correctly it occurred on March 22nd of 2024, correct?

A    Probably.

Q    And this was a conversation that you ultimately did not report to Greg Brown, correct?

A    Untrue.

Q    Okay.  Did you report it to him?

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Tori Little 09/24/2025                                                      Page 85

A    Yes.

Q    When?

A    We were driving -- Ms. Wheeler and I were driving to a recruiting something or other.  So when we got back, probably on campus the next day, I would have let him know about it. And I don't recall exactly.  We just -- I told him everything, he told me everything, so my assumption is that I did.  I don't recall a specific conversation on it.

Q    Do you recall reporting this conversation that you had with Ms. Habethur to Greg Brown?

A    I believe I did.  But I can't be one hundred percent sure.

Q    How -- how could we con-- he -- he testified that he didn't think you did.  So how can we be sure or how can we figure out whether you did or did not?

A    We can't, because it wouldn't have been a recorded conversation.

Q    Right.  And no one wrote anything down anywhere, correct?

        MR. ELZA:  Objection, form.

A    Correct.  On this, correct.

Q    (By Mr. Gentry)  This is a report that you received from a fellow administrator in another district.  I mean, the (inaudible) of reports, administrator to administrator and no one writes anything down about it.  Do you think that that's a problem?

A     Yes.

          MR. ELZA:  Objection, form.

Q     (By Mr. Gentry)  We are going to talk about this conversation.  But I want to -- before I do that, go back to 57 real quick.  And if, in fact, you did not report this conversation to Greg Brown, you would agree with me that that would be a violation of district policy, correct?

A     Correct.

Q     Okay.  This one is going to more difficult.  Can you read the little numbers at the bottom?

A     No, I cannot.

Q     Hand me that exhibit and I am going to help you.  I've got eagle eyes.  Well, gosh, no one can read these.  Okay.  Almost there.

          MR. ELZA:  About what date range are you in?

          MR. GENTRY:  March 26th.

          MR. ELZA:  Got you.

Q     (By Mr. Gentry)  Give you the top half back.  We don't need those.  But I don't want to mess these up for the reporter.  Okay.  We are going to start there at the top.

          This was a conversation -- and these the text messages between Cole and Ms. Wheeler -- that Cole and Ms. Wheeler are having about the call you received from Delma Habethur.  Do you see that?

040

A    Yes.

Q    She says did she tell you Delma called her yesterday? You didn't tell him that, right?

A    No, I did not.

Q    Did you ever tell the father about this report that you received from Delma Habethur?

A    No.

Q    Okay.  It goes on to provide down at the bottom -- or towards the bottom -- Tori handled it perfectly.  Do you see that?

A    Yes.

Q    Do you agree with that?

        MR. ELZA:  Objection, form.

A    Yes.

Q    (By Mr. Gentry)  I think --

A    Well, not perfectly, but I think that I handled it well.

Q    I mean, you didn't write it up anywhere?

A    Correct.

Q    We are not sure if you actually told Greg Brown about it, correct?

A    Correct.

Q    And you certainly didn't tell the father about it, correct?

A    Correct.

Q    Okay.  He's asking if it was about him.  She goes on to

provide she told Tori it was some duh, duh, duh.  Okay.  Let's go to the next page.  Let's go to the next page.  Next page.  There it's got March 26th at 9:20 a.m. at the top.

A     Did you say 928?

Q     9:20 a.m.

A     9:20.  I see 913.

Q     Should be Tuesday, March 26th at 9:20 a.m.?

A     Oh, that's p.m.  Sorry.

Q     Okay.  It says there who is your group you are with for TIL.  Do you see that?

A     Uh-huh.

Q     Okay.  They are going on in here, and following his discovery that you received a phone call from Delma Habethur about him he's asking Ms. Wheeler would it be wrong of me to text Tori thank you.  Do you see that?

A     Yes.

Q     And she's telling him that she would rather he didn't.  It says I did tell her we talk a lot and I support you wholeheartedly so I am sure she knows that I would tell you, but I also only heard it because we were in a car together.  Do you see that?

A     Yes.

Q     And he says true.  I won't say anything.  She says thank you.  Do you see that?

A     Yes.

Q    He says of course.  And then as we go on to the next page he asks if she's going to tell Greg?  And Ms. Wheeler responds no.  Do you see that?

A    Yes.

Q    Did you have conversations with Mr. Wheeler about whether or not you would tell Greg Brown?

A    Not that I recall.

Q    Why do you think she would say that then?

        MR. ELZA:  Objection, form.

A    I would be speculating.  I don't know.

Q    (By Mr. Gentry)  Now, Greg Brown says he doesn't think you told him.  She's telling Cole Underwood you didn't tell him.  I mean, can we presume you that probably didn't tell him?

A    You can presume that it's a possibility.

Q    Okay.  But we don't know because no one took anything down, right?

A    Correct.

Q    Now, let's talk about this conversation with Ms. Habethur.  What did she ultimately report to you?

A    She wanted me to be aware that some of our students who have former coaches there in Gruver had gone to them to let them know about the incident in Canyon with him driving ███ back and that they had concerns.  And I let her know that we were aware and that we were investigating.  And I may

have told her that he had already been placed on -- on a directive, but I don't recall if I told her that or not.

Q    So the only thing that you recall her telling you is that some students went to former coaches in Gruver about the Canyon incident?

A    Correct.

Q    Well, they didn't go to former coaches, they went to her, right?

A    She told me that they had spoken with coaches.

Q    She seem to tell -- and we did a very detailed interview with her -- a very different story than what you have told us. Any idea why?

        MR. ELZA:  Objection, form.

A    I couldn't say.

Q    She says that these two boys came to her with serious concerns they had about the relationship between Underwood and ▮▮▮▮▮▮▮ and that she relayed those concerns to you. You don't recall that?

A    I recall the conversation being that they had spoken with the coaches there.

Q    She --

A    And that she wanted me to be aware.

Q    She also -- let me ask you this. You are an administrator, and you previously taught where? You said Amarillo?

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Tori Little 09/24/2025

A    Correct.

Q    If two students from Amarillo came to you with allegations that were occurring at Amarillo because they felt uncomfortable telling someone at Amarillo, would you take that seriously?

A    Yes --

Q    Do you think that this was taken seriously in this case?

A    Yes.

Q    Why?

A    Because she called me to let me know.

Q    I mean, she's making a formal report to you as she thinks she is required to by law, correct?

A    Uh-huh.

        MR. ELZA:  Objection, form.

Q    (By Mr. Gentry)  And you simply tell her we've got it under control effectively, don't worry about it, right?

        MR. ELZA:  Objection, form.

A    Yes.

Q    (By Mr. Gentry)  Do you think that that's the appropriate way to handle that?

A    I let her know that we were handling it.

Q    But you weren't handling it, correct?

        MR. ELZA:  Objection, form.

Q    (By Mr. Gentry)  Correct?

A    We thought that we were.  We were continuing to watch

him.   We were continuing to be aware of what was going on.

Q     I mean, if it --

A     He had been placed on -- he was written up.  We were taking steps.

Q     He got a letter that said don't do it, right?

          MR. ELZA:  Objection, form.

Q     (By Mr. Gentry)  That's effectively all that letter provided, don't do it.  Right?

          MR. ELZA:  Objection, form.

A     Yes.

Q     (By Mr. Gentry)  That's the same thing you-all had been telling him verbally, correct?

A     Correct.  It was the next step.  And if he had done it again after that we would have had grounds for removing him.

Q     And we went through all -- well, he was doing it -- but we went through all of these reports.  You then get a report from an administrator in another district and you-all don't immediately put him on leave?

          MR. ELZA:  Objection, form.

A     Correct.

Q     (By Mr. Gentry)  That was wrong, correct?

          MR. ELZA:  Objection, form.

A     Given what we know now, yes.

Q     (By Mr. Gentry)  I mean, gosh, given what you -- what apparently you and Mr. Brown between the two of you knew then,

046

you then get this report from an administrator.  It doesn't --
it doesn't get any higher than this from a reporting
perspective, right?

MR. ELZA:  Objection, form.

A    Yes and no.  She told us things that had already been
told to us.  There was nothing new presented in her
conversation.

Q    She is saying the same thing everyone else says, right?

A    Uh-huh.

Q    Presumably if enough people say it it probably starts to
bear some truth, right?

MR. ELZA:  Objection, form.

A    Not in every situation.

Q    (By Mr. Gentry)  I mean, it was certainly true in this
one, right?

A    Correct.

MR. ELZA:  Objection, form.

Q    (By Mr. Gentry)  Now, she says in addition to telling you
that these boys had relayed to her their serious concerns
about their relationship, they also relayed the Canyon track
meet incident, right?

A    Correct.

Q    They also relayed -- or she relayed that they were
worried about telling anyone at Perryton for fear of
retaliation.  Do you recall that?

A    I do not recall that.

Q    They even gave her the example of Coach Underwood removing a student's Hudl account because that student made an allegation against him.  Do you recall that?

A    I was not aware of that.  This is the first I am hearing of it.

Q    What reason and what motivation would Delma Habethur have to lie about this stuff?

MR. ELZA:  Objection, form.

A    I don't know.

Q    (By Mr. Gentry)  She says she also relayed to you that those boys told her that ████ is always up in Cole's office.

MR. ELZA:  Objection, form.

Q    (By Mr. Gentry)  And that there's just something not right about that.  Do you recall that?

A    No.

Q    She says that she relayed to you that it scared them because it happened all the time and that everybody should be able to see it.  Do you recall that?

A    No.

Q    They -- she says that she relayed to you he walks her to class almost every day, apparently the same thing that Ryan Daugherty was witnessing.  Do you recall that?

MR. ELZA:  Objection, form.

A      No.

Q      (By Mr. Gentry)  She says she went on to tell you I want to let you know, I am going to report this.  And I am going to talk to your administration about it.  That was something she guaranteed to those boys.  Did she mention that to you?

A      No.

MR. ELZA:  Objection, form.

Q      (By Mr. Gentry)  And she did, in fact, honor her word, right?  She went to administration, you.

A      Correct.

Q      Did she -- she alleges that she also communicated to you things that she witnessed at a basketball tournament in Gruver.  Do you recall that?

A      I believe so.  I think she mentioned the gun incident as well.

Q      She describes it as it had made it -- these allegations and rumors had made their way all the way out to Gruver.  And so as early as the Christmas Classic I believe in December of '23, these things have already made their way out to the Gruver.  Any reason to dispute that?

A      No.

Q      And that she felt compelled as an administrator to follow Cole and ███ around all day, and she did that.  Do you recall discussing that with her?

A      No.

Q   And that at that tournament she witnessed Cole sitting next to ███ the whole time in the midst of all the other students.  Do you recall that?

A   No.

Q   Do you recall her telling you that she followed them around and witnessed them continuously flirting during that tournament?

A   No.

(Attorney sneezes.)

THE WITNESS:  Bless you.

MR. GOODWIN:  Thank you.

Q   (By Mr. Gentry)  She says that in response you told her this, that you-all were already looking into it and watching cameras.  Do you recall that?

A   Yes.

Q   And that it's already under investigation, correct?

A   Correct.

Q   Because it's already under -- under investigation does that mean that you don't have to report it?

A   No.

Q   Do you believe that your handling of Ms. Habethur's complaint was in violation of district policy?

A   Yes.

Q   Do you think that she would have a better memory of this thing as the person who reported it to you?

MR. ELZA:  Objection, form.

A    Honestly, no.  Because she wasn't asked immediately at the time.  It was a short conversation while driving.  There's a lot of information presented here.  And I don't see how that all could have come out in such a short period of time that we were driving and I had Ms. Wheeler next to me.  And while she didn't hear the conversation, I am not somebody who stays on the phone long when I am in the presence of other people because I feel that it's rude.  So I typically don't answer calls and only did in that case because of who it was calling me.

Q    I mean, with all due respect, you don't even remember if you told Greg Brown about it.

MR. ELZA:  Objection, form.

A    I really thought that I did, but the fact that he doesn't recall it is what is causing me doubts.  But again, these questions came how long after the incidents?  We should have taken notes and documented and wrote things down.

Q    One thing that she took a lot of issue with was the fact that not only these boys were concerned about it, but that her position is effectively that -- that high school boys don't sit around and -- and worry too much about what a younger girl -- or a younger class girl is typically doing.  Would you agree with that?

MR. ELZA:  Objection, form.

051

A    Yes.

Q    (By Mr. Grady)  I mean, she says this is a freshman girl. The guys are seniors.  They are subject to this athletic director's authority.  This is not typical -- a typical kind of reporting situation.  Would you agree with that?

MR. ELZA:  Objection, form.

A    Yes.

Q    (By Mr. Gentry)  Which is why she says she took it so seriously.  Would you agree with that?

MR. ELZA:  Objection, form.

A    Yes.

Q    (By Mr. Gentry)  And this is what blows my mind.  Let's assume you told Greg Brown about it.  What I can't comprehend is why he doesn't ever pick the phone up and call her and get into this with her.

MR. ELZA:  Object to the sidebar comment.

Q    (By Mr. Gentry)  Do you understand that?

A    Yes.

MR. ELZA:  Objection, form.

Q    (By Mr. Gentry)  Do you think he should have picked the phone up and called her about these allegations that were made?

A    Potentially.

Q    I mean, from administrator to administrator, that would seem like the logical, sensical thing to do, right?

052

A    Uh-huh.

Q    Because she apparently has a lot to say, doesn't she?

A    She said she did.

Q    And she says after --

THE REPORTER:  I didn't hear your answer.

THE WITNESS:  Yes.

Q    (By Mr. Gentry)  She says after she made the report no one ever called her, no one ever followed up with her like she expected.  Do you think it's reasonable that another administrator would expect to receive a call about the allegations that she made?

A    Yes.

Q    Ms. Wheeler made some interesting comments, and I quote, that you were doing your own investigation.  Is that correct?

A    I don't know what she would have meant by that.  I was talking to Mr. Brown on everything.  I was not doing any separate from him that I am aware of.

Q    You didn't try to take this matter under your own hands and get to the bottom of it, for example?

A    Correct.

MR. GENTRY:  I don't have anything further.

MR. ELZA:  We will reserve our questions until the time of trial.

She will read and sign.  You can send it

# Exhibit 3

.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

S.J., a Parent, Conservator,     )
and Next Friend of N.J.,         )
          Plaintiff,             )
                                 )
vs.                              )      Case No. 2:24-CV-00168-Z
                                 )
PERRYTON INDEPENDENT SCHOOL      )
DISTRICT, and                    )
                                 )
COLE UNDERWOOD, Individually     )
and in his official capacity a   )
Athletic Director of Perryton    )
ISD,                             )
          Defendants.            )

*********************************************

VIDEOTAPED AND ORAL DEPOSITION OF

GREG BROWN

HAD ON THE

23RD DAY OF SEPTEMBER, 2025

*********************************************

WORD FOR WORD REPORTING, L.L.C
620 NORTH ROBINSON, SUITE 202
OKLAHOMA CITY, OKLAHOMA 73102
(405)232-9673

REPORTED BY:  DARLA RILEY, CSR

*Word for Word Reporting, LLC**
**405.232.9673 (OKC) | 918.583.9673 (TULSA)**

055

APPEARANCES


FOR THE PLAINTIFF:

Mr. Tyler L. Gentry
Mr. Kyle Goodwin
GOODWIN LEWIS, PLLC
420 Northwest 6th Street, Second Floor
Oklahoma City, Oklahoma  73102
(405) 900-5700




FOR THE DEFENDANT, PERRYTON INDEPENDENT SCHOOL DISTRICT:

Mr. Slater Elza
UNDERWOOD LAW FIRM
Post Office Box 9158
Amarillo, Texas  79105
(806) 376-5613
(806) 379-0316 FAX




Also Present:  Mr. ██████ ██████

Mr. Brad Snyder, Videographer

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

Page 6

the truth, the whole truth, and nothing but the truth, so help you, God?

THE WITNESS:  I do.

GREG BROWN

the witness, called on behalf of the Plaintiff, after having been first duly admonished and sworn, testified under his oath as follows, to wit:

EXAMINATION

BY MR. GOODWIN:

Q    Good morning, Mr. Brown.  I would ask you, what is the goal of the school district?  What are you trying to accomplish?  Give me a priority list, please.

MR. ELZA:  Objection, form.

A    First is probably keeping the kids safe.  Second, make sure they have a good education that prepares them for success in their future, whether that be in a -- a career, a trade, or just being a good citizen.

Q    (By Mr. Goodwin)  Anything else?

A    I think that would -- most everything we do fits under those two things.

Q    And the way you prioritize them is number one was to keep the kids safe, and number two was to give them a good education, correct?

A    Uh-huh.

Q    Is that a yes?

057

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

Page 7

A    Yes.  I am sorry.

Q    That's okay.

A    Yeah.

Q    So with regard to keeping kids safe, you believe that is a higher priority than even educating the children?

A    Yes.

Q    How long have you been in education?

A    I believe I am on my 34th year.

Q    How long as the superintendent?

A    Of -- of any school?

Q    Yes, sir.

A    I am on my fifth year.

Q    Where you a superintendent prior to coming to Perryton?

A    Yes.

Q    And where were you there?

A    Claude ISD.

Q    Claude?

A    Claude.

Q    How do I spell that?

A    C-l-a-u-d-e.

Q    Is that in Texas?

A    Yes, right outside Amarillo, 20 miles.

Q    So in your two -- in your priority, keeping kids safe, number one, and a good education, number two.  Do you believe that happened here that ███████ ███████ was kept safe?

MR. ELZA:  Objection, form.

A     No.

Q     (By Mr. Goodwin)  So the school didn't do its job in that regard?

MR. ELZA:  Objection, form.

A     I disagree with that question too.

Q     (By Mr. Goodwin)  So it was not the -- so, now the person that raped ████ ████ was a school employee, correct?

A     That's correct.

Q     And many of those rapes -- I think all of those rapes happened at the school, correct?

A     I am aware of some that happened at school, yes.

Q     Are you aware of any that happened outside the school?

A     No.

Q     So as far as you know, all the rapes that occurred here occurred at the school?

A     The ones that I am aware of occurred at school.

Q     So the facts are an employee of the -- of the school raped a student on school -- on school grounds, and you do not believe the school failed in its mission -- its -- its highest mission of keeping the kids safe?

A     I agree that -- that a very unfortunate thing happened with ████  I don't agree that our efforts were not fully intent on trying to keep her safe.

Q     Do you believe all the actions you took against

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                    Page 11

Q    The purposes were to make sure everyone in the situation was safe?

A    Uh-huh.

Q    Number two was keep ███████ safe?

A    Uh-huh.

Q    And number three was to protect Cole -- I think I wrote this down right -- and make sure his career was not damaged?

        MR. ELZA:  Objection, form.  Misstates what he said.

A    There is also an addition to that.  If at the time in the limited knowledge that we had, if he was not doing something that he should have been doing.

Q    (By Mr. Goodwin) Well, in hind--

A    If he wasn't being unsafe with a student.

Q    Thank you.  I interrupted.  I'll try not to do that.  In hindsight do you wish you would have done things differently?

A    I think we always can see in hindsight some moments that we could have done something differently.

Q    What would you have done differently, in hindsight?

A    With the full luxury of hindsight, I may have intervened in writing with a directive a little earlier, but I can state -- well, that's it.

Q    You may have intervened with a writing a little earlier?

A    With -- with a written directive for him to not be alone with ███████ ███████ a little bit earlier.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                                Page 13

unprofessional.

Q    And that's the track meet return, correct?

A    Yes.

Q    All right.  We will get into -- we will get into all the specifics in a little bit.  I am just trying to get from a ten thousand foot view that even looking back on it, the only thing you would have done differently is you would have issued a written directive a little earlier?

A    Uh-huh.

Q    Is that a yes?

A    Yes.

Q    Now, do you wish you had reviewed the cameras earlier?

A    So I think the root of your question is do you wish I had caught him earlier?  Yeah, I do wish I would have caught him earlier.  So --

Q    That's not the root --

A    Do I wish --

Q    No, no.  Sir, I am going to interrupt you.

A    That's okay.

Q    That was not my question.

A    Okay.

Q    My question is do you wish you would have looked at the cameras earlier?

A    Yeah.

Q    You knew that Cole was manipulating the cameras.  That

was in your March 4th directive, correct?

MR. ELZA:  Objection, form.

A    No.

Q    (By Mr. Goodwin)  You knew that he was using the camera system at PISD to monitor you, correct?

A    I knew he had done that once.

Q    And you wrote him up for it?

A    Correct.

Q    So you already knew he knew about the camera system?  He knew how to operate it?

A    Yes.

Q    And he had already used it for an illicit purpose, correct?

A    Correct.

Q    But even as you sit here today, you think you looked at your cameras at the first opportunity you had?

MR. ELZA:  Objection, form.

A    No.

Q    (By Mr. Goodwin)  Well, now I am confused.  Do you wish you would have looked at the cameras earlier or not?

A    I wish I would have looked at the cameras and found that evidence earlier, yes.  Earlier than April 21st.

Q    Okay.  All right.  We will move on from that.  Do you think your staff did everything that they could do to protect ███ ███ in this case?

A    That's a really broad question, because we could -- there's -- in hindsight there's a thousand things you can do.

Q    Okay.  Well, let's talk about it at the time.

A    Okay.

Q    We'll break it up --

A    Okay.

Q    -- to be fair with you.

        MR. ELZA:  Did you get a chance to finish your answer.

        THE WITNESS:  There is some things I could add to it.

Q    (By Mr. Goodwin)  Okay.  Go ahead.  I'm sorry.

A    That's a really broad question.  In full hindsight you can think of a thousand things you could have done.  As I sit here today, I am pretty satisfied with the -- with the efforts my staff took to -- to protect ████ to investigate the matter with the knowledge that we had.  And to take -- I am satisfied with the efforts we took, the actions we did take, based on what we knew at the time.

Q    So we'll break it -- I think you've answered the first part of the question which I was trying to break up.  At the time you were satisfied with what you did?

A    Uh-huh.

Q    Is that a yes?

A    Yes.

Q    But looking back on it, you said there are thousands of things you could have done differently?

A    In a broad sense, yes.

Q    What are some of those?

A    In an extreme sense, follow him around every second of the day, track his movements all through the school.  Make logs of the times he and ███████ made contact.  Follow him home, follow his -- put a -- somebody outside of his house.  I mean, these are -- these are extreme.  And these are things that school districts don't normally do.

Q    You could have looked at his phone at any time, correct?

A    I could have asked for it.

Q    Do you know pursuant to the school policies that you can look at a teacher's phone if it has any school data on it at any time?  You are aware of that, correct?

A    Uh-huh.

Q    Did you ever do that?

A    No.  Well, though, a couple of times he offered it.  He looked -- showed it to me.

Q    That wasn't my question.  Did you look at it?

A    I didn't investigate his phone, no.

Q    Have you ever had children, sir?

A    Yes.

Q    Did you ever look at your kid's phone to see what they were doing?

A    Yes.

Q    Why is that?  Why is that important to look at your kid's phone?

A    Because I am their father, because I can, and to make sure to see what they are doing.

Q    Right.  But what's the purpose of looking at your kid's phone?

A    To get information about what my kids are doing.

Q    And you had the opportunity to do that with Cole's phone, but you never did that, correct?

A    No, I didn't do that.

Q    So it's your -- I mean, getting ready to move into the documents.  It's your belief that you did everything within your powers to protect ██████ ████████

A    I am satisfied with the things I did, yes.

Q    Okay.

         MR. GOODWIN:  Let's go with 1 and 7 please, Tyler.

         MR. GENTRY:  Here's 1 and 7.  They are not stapled.  I don't know why, but nothing in those boxes are stapled.

         MR. GOODWIN:  All right.  So, Mr. Slater, I don't know how to do this without throwing it at you.  What do you want me to do with getting you documents?

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

Page 24

on your -- on your own?

A    No, we pay for a company to do that.

Q    What is the name of the company?

A    I can't tell you that right now.

Q    Is it Palatine?

A    I don't know.

Q    How much do you pay?

A    Not very much.  I think somewhere around a $1.75 a background check, something like that.

Q    So it is to Palatine.  I've seen multiple checks to Palatine for anywhere between 30 cents and $1.20.  Does that sound about right?

A    The -- the amount sounds about right.  I don't know the company.

Q    The second -- so was that done with Mr. Underwood in this regard?

A    I don't know.  I haven't looked at his file specifically for that check.

Q    You don't know whether you -- a background check was run for Mr. Underwood or not?

A    No.

Q    Even after all of this has occurred and he's arrested you did not look back to see, man, did we even run a background check on this guy?

A    No.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                                    Page 29

Q    Could we communicate --

A    It's -- it's plausible, yes.

Q    So you would agree with me that the school district in this case should have done a better job in checking references at Amarillo?

A    We could have done a deeper dive, yes.

Q    Do you think you should have?

A    Yeah, I would say.

Q    And looking back on it, I mean, Mr. Underwood was placed on administrative leave for inappropriate communication with young females, correct?

A    I don't know what his administrative leave was for.

Q    Have you looked at his Amarillo file yet?

A    No.

        MR. ELZA:  Hang on.

Q    (By Mr. Goodwin)  So that's been provided to your counsel but you have not looked at it?

        MR. ELZA:  Hold on.  You are talking about what we got Sunday night?

        MR. GOODWIN:  Yeah.

        MR. ELZA:  No, he has not seen what we got Sunday night.  I haven't even been somewhere I can print it.

        MR. GOODWIN:  You don't have a printer --

        Do you have printers here in Perryton,

067

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                                    Page 32

Texas.  In Oklahoma you run for it and then whoever is elected is on the school board, correct?

A    Correct.

Q    Is that the way -- the same thing here?

A    Yes.

Q    So tell me about the full background check and how that is different from the initial background check in step number four.

A    Okay.  Both of these background check are looking in criminal records.  The first background check that is done is again, run against state data bases.  So it's state specific. The next background check, which is in the process of onboarding them is where we are required by statute to fingerprint them.  And I believe those are submitted to national data bases, such as FBI, et cetera, to see if there was any criminal history in other states.

Q    So when you say you are doing a background check, what I am hearing it's limited to criminal convictions?

A    Those two background -- those two steps that I described; to you are, yes.

Q    So it's not really a background check?  It's a criminal history check?

A    Yes.

Q    Now, how much do you pay for what you call the full background check in step number four?

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                                    Page 33

A    I think it's somewhere around 40 or $50.00, but I am -- I am not exactly sure.

Q    So assuming the first numbers that we spoke about earlier are correct, you are spending somewhere around $50.00 per employee for a full background check, correct?

A    For a -- as you say, a -- a criminal history check that goes beyond the state boundaries, yes.

Q    All right.  Then -- a little confused on this.  When we talked about certifications are checked.  That's somewhere in the process.  When do you check the certifications?

A    Usually after the application is done, while they are possibly being interviewed, we check to make sure they have proper certifications to be in a teaching subject.

Q    So the initial background check and the full background check and the certifications check.  Do you receive documents from wherever you are hiring these people to -- to get --

A    Uh-huh.

Q    -- the information?  Is that a yes?

A    Yes, it is.

Q    Okay.  And so once you receive that information, what do you do with it?

A    We check it to make sure that there's no criminal history that would disqualify them in a -- to be in a teaching role.  Yeah.

Q    And so then what are done with those documents?

Q    -- since Mr. Underwood was arrested?

A    Yes.

Q    Okay.  Keep going.

A    I called James Morales and briefly asked -- told him what had happened and asked him if he knew anything from the background check, and he said no -- or from -- when I say background check, if he knew of any allegations at the time. And he said no.  Those are the things I've done.

Q    Well, that's not all you did.  You called Corey Clements too, correct?

A    Yeah, I did.  I guess I did talk to Corey.  Yeah, I did. I did.

Q    She -- she is very clear about her feelings on Mr. Underwood and his behavior in Amarillo.  Did she relay that to you?

A    Yes.

Q    She told you that he was inappropriate with girls, especially on her volleyball team, correct?

A    She told me she suspected it, yeah.

Q    But none of that made it into your answer, did it, sir?

        MR. ELZA:  Objection, form.

A    I suppose not.

Q    Did you make any other phone -- do you have any other friends at Amarillo High School other than Corey Clements?

A    At Amarillo High School?

know that was for about two years.

Q    What -- what -- what was for two years?

A    His employment with AISD.  Or with -- yeah.

Q    Do you know whether Mr. Underwood ever received any additional complaints about behavior with female students after he was placed on administrative leave?

A    I don't have evidence of that, no.

Q    Have you heard any rumors about that?

A    I have, I have heard rumors.

Q    What have you heard?

A    That he didn't have a very good reputation there.  Corey Clements has told me that she was very suspicious.

Q    Did she give you reasons why she was suspicious?

A    She said -- I am having -- it's been a long time since we talked.  That his -- his actions or attitudes towards some of volleyball students she thought was suspicious and didn't trust him.

Q    Do you know that Mr. Underwood was, denied a coaching position within Amarillo High School because of his suspicious activity with female girls?

A    No.

Q    Have you contacted any coaches to find out about that?

A    No.

Q    Do you believe now looking back on it that that's something that PISD should have done was follow up on this

administrative leave suspension?

A    Had we been aware of it at the time, I am pretty sure under -- under my administration we would have followed up.

Q    I mean --

A    And --

Q    -- sitting here today, same situation, coach comes in being placed on administrative leave for inappropriate relationship with a female student, what would you do now?

A    I would investigate.  I would make calls.  And we probably wouldn't hire that person until I found out exactly what the administrative leave was for and what the resolution was.

Q    Now, in this case Mr. Underwood's -- he's -- he's a PISD graduate, correct, sir?

A    Yes.

Q    And I mean, his family -- everybody knows his family in town, correct?  Very prominent family?

        MR. ELZA:  Objection, form.

Q    (By Mr. Goodwin)  Is that correct?

A    I -- I think to say that everybody knows him is a broad statement.

Q    Okay.

A    He is -- he is -- he is well known in the community.

Q    But his family is well known in the community, correct?

A    I would say so, yes.

under oath, do you understand that, sir?

A    I do.

Q    So we've had an off-record-record discussion or you and your counsel have had an off-the-record discussion regarding the identity of a teacher who was previously had suspicions contacting young minor girls, correct?

A    Incorrect.

Q    Okay.  Tell me what's going on then.

A    Okay.  The story is this.  The teacher's name was Victor Hackney.  He worked with us --

Q    I'm sorry.  Slow down.

A    Sorry.  Sorry.  Victor Hackney, H-a-c-k-n-e-y.

Q    Okay.  Thank you, sir.

A    He worked with us as a special ed teacher for about, I am guessing six months.  Law enforcement came to me and let me know that from his house -- from the IP address that -- that is associated with his home, that a Snapchat conversation had taken place between a minor boy and this IP address where the person at the IP address asked how old the boy was.  The boy replied, and I can't remember what it was.  But the person at the IP address replied that he was 17 and sent a lewd picture to the boy.

Q    So Mr. Hackney's IP sent the lewd picture?

A    The -- the IP associated with his -- his house.

Q    While claiming he was 17?

A    Yes.

Q    Okay.  So Mr. Hackney is not 17 I would understand?

A    No.

Q    How old -- 30s, 40s, older?

A    40s, maybe working into his 50s.

Q    All right.  So what kind of investigation did you perform on these allegations?

A    Asked Mr. Hackney, immediately brought him into the office, asked him about it.  Put him -- he denied everything. I put him on leave while the investigation with the sheriff's office went through.  He remained on leave for the rest of the year.  I also immediately informed SPEC, made the report to SPEC, to State Board of Educator Certification, SPEC.  And he remained on leave for the rest of the year.  At the end of that year we non-renewed his contract.  And he had a flag on his certificate.  SPEC recently cleared him and took the flag off of his certificate.  The -- the investigation stalled at the sheriff's department because of the issue with Snapchat.

Q    They could not --

A    They could not identify who at that IP address had sent the picture.  Mr. Hackney is not the only male that resides at the -- at the address.  And his certificate recently cleared. The last I knew, he had applied for a job in Oklahoma.  And they called me for a reference.  And I intended to -- when I called them back I could not get ahold of them.  There was no

answer to the phone.

Q    What is the school district in Oklahoma?

A    I don't remember.

Q    How long ago was this?

A    Six months ago, last -- early -- I am -- I am trying to remember.  It's been a while.  It's been maybe in the spring of last year.

Q    So the '24-'25 school year?

A    Or this year.

Q    The '24-'25 school year?

A    Yes.

Q    It was the '24-'25 school year the year Mr. Hackney was placed on suspension?

A    No, this was the year of the same '23-'24 school year.

Q    So while Mr. Underwood was going on, Mr. Hackney was on paid administrative leave?

A    I believe that's right.

Q    So when you say you attempted, you returned a phone call from a reference call?

A    Yes.

Q    Did you leave a message?

A    There wasn't a way to leave a message and they never answered the phone.

Q    All right.  So in a previous case it's fair to say that you have attempted to notify a school only based upon

075

Q    The next sentence says the same thing we already went through.  That any sexual relationship between a student and a district employee is always prohibited even if consensual, correct?

A    Correct.

Q    Last -- go to the last provision of this paragraph, number 25.  It says as required by law the district shall notify the parent of a student with whom an educator is alleged to have engaged in certain misconduct, correct?

A    Yes.

Q    So it requires that each time on allegation is made that the parent be notified by the district, correct?

A    Uh-huh.

Q    Is that a yes?

A    Yes.

Q    All right.  Paragraph number 26 is the athletic department policy.  Have you seen this before, sir?

A    Yes.

Q    According to the travel policy -- and so -- I mean, do you have any dispute that this is not the appropriate Perryton ISD athletic policies?

A    I don't have any reason to dispute it right now.

Q    It says under travel policy, players will travel to and from games on the bus, correct?

A    Yes.

Q    And then we go down a little bit further, it says players must travel to and from the games on the team bus unless they have received approval from the coaches for other modes of transportation prior to departure.  Do you see that, sir?

A    Yes.

Q    So on this March 1st incident where Cole Underwood brought ███████ ███████ back from a track meet, where was that track meet again?  Canyon?

A    I believe it was Canyon.

Q    Did the school have prior written approval?

A    No, not to my knowledge.

Q    The next sent-- the next paragraph says, players may be released to a parent or legal guardians at out of town games with a signed and dated note.  Now, that didn't happen here because ███████ wasn't there, correct?

A    We didn't have a signed and dated note, no.

Q    The next paragraph says players may be released to someone designated by the parent or legal guardian but a note and approval must be in the coach's possession prior to leaving for the trip.  That's what it says, correct?

A    Correct.

Q    And you are telling us today -- you are testifying that the school did not receive a note prior to coming home with Mr. Underwood?

A    Correct.  Not a signed and dated note, no.

Q    Right.  But that's what is required, correct?

A    Yeah, correct.

Q    It says if a coach does not have a signed note prior to leaving and verbal confirmation the athlete will not be released to the designated party.  Correct?

A    Correct.

Q    And it goes on to say just a verbal or just a note will not work.  It has to be both.

A    Correct.

Q    So when Mr. Underwood brought ███████ back from this track meet that was in violation of PISD's policies, wasn't it?

A    It was?  Our athletic policies, yes, not PISD policies.

Q    Well, are the athletic policies not for PISD?

A    They are not considered our legal and local policies, no.

Q    What do you consider the athletic policies then?

A    Guidelines.

Q    Oh, they are only guidelines?

A    Well, they are guidelines.  They are -- they are -- yes.  They are not policies that are approved by the board.

Q    Who does approve them?

A    The superintendent.

Q    So approve them --

A    And the athletic director.

Q    Okay.  Well, let's talk about the structure of how PISD

Q    What kind of ramifications does the employee receive for not attending?

A    I would say probably not much about the in-person.  Now, last year if they didn't the -- if they were certified staff and they didn't complete the on-line training, they had to give up a vacation day with me, right before Christmas.

Q    How many -- how many employees had to do that with you?

A    I had about six.

Q    And what do you do with them?

A    I sat them in this room and we completed the training.

Q    And that's for the on-line portion, though, correct?

A    Yes.

Q    So what do you say about these teachers that say they don't even know -- they have -- they have never read the policies and procedures, they don't know anything about them?  They just sign the sheet and move on.

A    They are still expected to follow them and know them.

Q    Do you believe they are being accurate in what they tell us?

A    Does who believe what?

Q    Do you believe that the employees that tell us they don't know anything about the policies and procedures and don't do any inservice training on those, are they being untruthful with me?

A    No.  Wait a minute.  Yes, they are being untruthful.

Q    Did you do anything -- when did you first learn about this allegation?

A    December 9th.

Q    Of what year, sir?

A    Oh, of this allegation.

        MR. ELZA:  I am sorry.

        MR. GOODWIN:  No, no, that's okay.

Q    (By Mr. Goodwin)  What year -- when did you first find about number -- the first complaint?

A    Number one?

Q    Yes, sir.

A    After Cole had been arrested.

Q    Well, what is --

A    And I am not even familiar with some of the specifics in here.

Q    But what did you do to follow up about this particular -- the first complaint?

A    When I learned of it?

Q    Yeah.  What did you do to follow up with it at any time.

A    When I learned of it?  Nothing.

Q    You've never done anything with that -- that allegation?

A    No --

Q    What --

A    -- not me personally.  No.

Q    What is Ms. Torango supposed to do with that information

pursuant to the school's policy?

A    She would report it to her supervisor.

Q    Who is Ms. Torango's supervisor?

A    It was Ms. Little.

Q    And I'm sorry.  You will have to help me with -- is -- is Ms. Little the --

A    Principal at the high school.

Q    -- of the high school?  She's the high school principal?

A    Yes.

Q    Okay.  And Ms. Wheeler is the junior high?

A    Yes.

Q    Little is the high school, so pursuant to the policy Ms. Torango should have taken that to Ms. Little, correct?

A    I think in our policy a -- based on our policy, a general accusation or something -- some criticism that is laid out against one of our teachers may not be something under policy that they would report.

Q    So you don't believe Ms. Torango should have done anything with this?

A    Not if you are going to talk about under our policy.  If this matches something that would be reported under our policy, I would probably -- I would expect her to mention it to our -- to her principal, yes.

Q    Do you know whether she did or not?

A    No.

Q    I mean it could have happened, you just don't know.

A    Uh-huh.

Q    Is that a yes?

A    Yes.

Q    All right.  And you don't believe that any contact was made with Mr. ▇▇▇▇ about number one?

A    Not to my knowledge.

Q    All right.  Let's go to number two.  So that's in August of 2023.  That's the first report that you are aware of anyway, correct, sir?

A    For first report I am aware of now after the fact, yes.

Q    Now, I'll tell you I've numbered these.  There's 16 of them.

A    Uh-huh.

Q    I will tell you that I believe there are multitudes of others that are not on your list.  Do you have any reason to believe that evidence wouldn't be correct?

         MR. ELZA:  Objection, form.

A    I have no reason to believe that that evidence is correct or incorrect.

Q    (By Mr. Goodwin)  All right.  So it could be possible that there were additional complaints filed or complaints made about Underwood during the '23-'24 school year, correct?

A    It could be possible.

Q    All right.  Let's go to number two.

A    It could also not be possible.

Q    Number two says in September 2023, Mary Vasquez -- who is Mary Vasquez?

A    I believe she is a parent of a teacher -- or a student in our district.  I don't know her personally.

Q    Mary Vasquez has a student in PISD?

A    I believe so.

Q    All right.  It says that Mary Vasquez reported also to Evelyn Torango that Underwood had yelled at Ms. Vasquez' daughter, Abbi Vasquez.  Do you know Abbi Vasquez?

A    I know of her, yes.

Q    After Abbi called Underwood a perv because Underwood contacted a student named Juliette Meyer via Snapchat?  That's what that says, correct?

A    That's what that says.

Q    Now, what investigation was performed about number two?

A    I don't know.

Q    Was an investigation performed at all?

A    I don't have knowledge of that.

Q    What it be appropriate for Underwood to yell at a student for calling him a perv for contacting a student via Snapchat?

A    In this characterization I wouldn't say it would be appropriate.

Q    Do you think it is appropriate for Underwood to yell at Abbi Vasquez about calling him a perv?

MR. ELZA:  Objection, form.

A    No.

Q    (By Mr. Goodwin)  That would be inappropriate, wouldn't it, sir?

A    Yes.

Q    Okay.  So let's break this down a little bit.  Did Mr. -- was there ever an investigation to determine whether Underwood contacted a student named Juliette Meyer via Snapchat?

A    Not to my knowledge.

Q    Did you ever talk to Ms. Meyer?

A    No.

Q    How old was Ms. Meyer at this time?

A    I believe Juliette Meyer is one of our students, and I don't know.

Q    Is she still a student here?

A    I know we have a student named Juliette, but I am not sure if this is the same Juliette.

Q    What have you done to determine whether number two is accurate or not?

A    I have not done anything.

Q    So you don't know whether Underwood contacted a student named Juliette Meyer via Snapchat?

A    No.

Q    And you don't know whether Underwood yelled at Abbi Vasquez about calling him a perv because of that incident?

084

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                                    Page 90

A    No.

Q    And again, under your policies -- and we will go through the policies later -- but under your policy it is inappropriate for a teacher to be aggressive with or to prohibit a student from reporting inappropriate conduct, correct?

A    Not -- not -- not under that characterization.

Q    Well, if a student knows about inappropriate conduct, do you think it's appropriate for a teacher to prevent that report?

A    Not under this characterization.  I don't know the details of this, so I can't -- I can't respond to that.

Q    So -- I am not asking about this particular.  So in any occasion, let's assume a student knows or has suspicion that Mr. Underwood was having a relationship with Mr. Underwood [sic.]  Is it appropriate for Mr. Underwood to try to suppress that knowledge or try to suppress that report?

A    No.  Not under those facts.

Q    Right.  So if Mr. Underwood is yelling at somebody because they know something bad about him, I mean, you would agree that Juliette Meyer being contacted by Underwood by Snapchat if it happened would be inappropriate, correct?

A    Yes.

Q    And in this case Mr. Underwood is chastising Ms. Vasquez for knowing that fact, correct?

085

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                                    Page 91

A    Okay.  So let's back up on that.  At this time our policy was that we did not have a policy that they were supposed to use ParentSquare.  I had no idea at this time that they were using Snapchat.  I think Snapchat was a common application that our staff was using to contact students.

Q    Well, and we'll --

A    And so -- so to say it's inappropriate to be using Snapchat, although that's not something I would do, there's no law or policy at that point regarding the use of Snapchat or not.

Q    Okay.  Well --

A    And so to say that it was inappropriate to contact Juliette Meyer by Snapchat, at that time I don't think you can characterize it that way.

Q    I think it was absolutely against your policy for a teacher to contact a student by Snapchat.  And we will go through the policies later.

A    Okay.

Q    But it's your testimony that you do not believe that it was inappropriate at that time?

A    No, I -- I am disagreeing with you that to say that -- that being yelled at because it's inappropriate for her to use Snapchat.  I -- I don't know that I can agree with that point --

Q    Okay.

A    -- as -- as to that.

Q    Well, I want -- I want -- I want to boil it down a little further.

A    Okay.

Q    It's your testimony as you sit here today that at this time in September of 2023, you believe it was appropriate for a teacher to contact a student via Snapchat?

A    Me personally, and under my leadership, no.  At that point a directive had not been given to not use Snapchat.

Q    Okay.  We will go after that in a little bit.

A    Okay.

Q    But so let's assume that it was against policy, because I think I am right in that regard.

A    Uh-huh.

Q    If it was against the policy for Mr. Underwood to contact students via Snapchat, would it be inappropriate for Mr. Underwood to yell at a student about that knowledge?

A    I don't know why Mr. Underwood is choosing to yell at that student.

Q    It says because she called him a perv.

A    Uh-huh.

Q    Because he had contacted Juliette Meyer via Snapchat. That's what it says.

A    Okay.

Q    And you don't believe that's inappropriate?

087

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                         Page 93

A       Inappropriate to correct a student for calling a name to a teacher?  I don't think that's inappropriate.

Q       Even if that name was accurate?

A       We didn't know at that time it was accurate.

Q       Again, also been called a perv at Amarillo, you understand that?

A       I understand that now, yes.

Q       But you didn't at this time?

A       No.

Q       All right.  Was Mr. ██████ contacted about this particular incident?

A       No.

Q       Was --

A       Not to my knowledge.

Q       Was Ms. Vasquez -- Mary Vasquez, was she contacted about this allegation?

A       It's possible, but I -- not to my knowledge.

Q       Who would have contacted them without your knowledge?

A       The principal may have called.

Q       Ms. Little?

A       Or the assistant principal may have called.

Q       Ms. Little and who all --

A       To follow up on the -- on the incident.

Q       And who would that be?

A       That would have been Ms. Little or Ms. Zavala.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                                    Page 94

Q    Can you spell the last name, please?

A    Z-a-v-a-l-a, Zavala.

Q    So Ms. Little or Ms. Zavala would have to say whether contact was made with either Mary Vasquez or Juliette Meyer's mom?

A    Uh-huh.

Q    Is that a yes?

A    Yes.

Q    All right.  So that's number two.  Number three, in September, October of 2023 freshman biology teacher Debra Molina reported learning that Underwood scolded cheerleader Abbi Vasquez after calling Underwood a perv for contacting a student named Juliette Meyer via Snapchat, correct?  That's what it says.

A    Uh-huh.

Q    Is that a yes?

A    Yes.

Q    And so now we have two separate teachers, Mr. Torango and Ms. Molina that have heard about this incident --

A    Uh-huh.

Q    -- where Underwood scolded Abbi Vasquez, correct?

A    Yes.

Q    Now, do you know whether Ms. Molina or Ms. Torango contacted -- what would you expect that they do with that information?

A    I would expect they would contact their supervisor?

Q    Did they?

A    I don't know.

Q    Should they have done so?

A    I suppose so, yes.

Q    Ms. Molina also reported hearing a rumor in March of '24, that ████ ████ rode back to Perryton following a track meet in Canyon, Texas. We have already talked about that, correct?

A    Uh-huh.

Q    Is that a yes?

A    Yes.

Q    So by September or October we have three reports that Underwood is contacting students via Snapchat and he is known as a perv, and he's after all the girls. That's what we know by this point, correct?

A    I don't think that's what -- the way you are characterizing it is exactly what it says here.

Q    Okay. Do you think my characterization is wrong?

A    Yes.

Q    You bel-- but it clearly, I mean, the answer says that Debra Molina reported learning that Underwood scolded a cheerleader. Right? Who did she report that to?

A    I don't know. I am assuming she reported it to Ms. Little.

Q    Was there an investigation conducted -- I can't remember if I asked you this -- and I am sorry if I did -- was there an investigation conducted about number three?

MR. ELZA:  Objection, form.

A    I don't know.  Could have been.

Q    Did Mr. Underwood receive --

MR. ELZA:  Hold on.  Hold on.

Q    -- any kind of admonition --

MR. ELZA:  Just a second.

Don't -- don't write on...

MR. GOODWIN:  I told him to.

MR. ELZA:  Oh, you did?

MR. GOODWIN:  I told him to.

THE WITNESS:  Yes.

MR. ELZA:  I'm sorry.

MR. GOODWIN:  So we can keep track and we can refer back to it.

MR. GENTRY:  Don't write on yours.

MR. ELZA:  Yeah.  I won't.

MR. GENTRY:  One -- one of you don't write on them.

THE WITNESS:  Okay.

MR. GOODWIN:  I want him to write on that one because it's easier to go back to it if we need to.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

Page 97

MR. ELZA:  I got you.

THE WITNESS:  Okay.

Q    (By Mr. Goodwin)  And I'm sorry, I don't remember the question.  Do -- did you -- was there an investigation performed on number three?

A    I don't know.

Q    Did you perform an investigation on number three?

A    No.

Q    To your knowledge do you recall an investigation being performed on number three?

A    Not to my knowledge, but that doesn't mean there wasn't.

Q    And who would have performed that if it wasn't you?

A    Most likely Ms. Little.

Q    And as you sit here today you don't know whether Ms. Molina reported that to Ms. Little or not?

A    As I sit here today, no.

Q    All right.  Number four is the top one on page six.  Are you with me, sir?  You can go ahead and put a four on it.  We are going to come back to it.

A    Okay.

Q    So so far the first three complaints have all been made by people within the school, correct?

A    I believe so, yes.

Q    I mean, I'll call it within the PISD umbrella.

A    Yes.

Q    Whether it's a student --

A    Student --

Q    -- or a teacher.

A    -- teacher or parent, yes.

Q    All right.  Number four says sometime during football season in 2023 Mike Blackshire -- who is that?

A    He was -- at that time I think he was the president of our booster club.  He was also a parent.

Q    Had a kid?

A    Yes.

Q    Mike Blackshire verbally asked volleyball coach Abigail Harris -- now she is within the school district, correct?

A    She was, yes.

Q    Was she a teacher too?

A    She was a teacher and a coach, yes.

Q    What did she teach?

A    I believe she taught PE at the junior high.  She was a junior high teacher and coach.

Q    Mike Blackshire verbally asked volleyball coach Abigail Harris how do you like working for a pedophile.  Do you see that, sir?

A    Yes.

Q    Do you know what Mike Blackshire based that opinion on?

A    No.

Q    Coach Harris reported generally hearing statements in the

093

community during the fall of 2023 of Underwood having a relationship with a student. That's what it says, correct?

A    That's correct.

Q    Harris was later told by high school male students that the female student was supposedly ███████ ███████ is that correct?

A    That's what it says.

Q    Now, it says Coach Harris reported generally reporting these statements. Who did she report those to?

A    I don't know.

Q    Who was her immediate supervisor?

A    Sandi Wheeler.

Q    Coach Harris said she also generally heard -- she reported that during the fall she heard that Underwood was having a relationship with a female student. Do you know who she reported that to?

A    I don't.

Q    Did she report it to you?

A    No.

Q    Was there -- did you perform an investigation on number four?

A    No.

Q    Did you notify any parents that Underwood was potentially having a relationship with a student, correct?

A    No. No, I didn't notify any parents.

Q    Did you do anything to in --

A    At this point.

Q    I'm sorry.  Did you do anything to investigate that Mr. Underwood was having a relationship with a student?

        MR. ELZA:  Objection, form.

Q    (By Mr. Goodwin)  I mean, that's a serious allegation, isn't it, sir?

A    Uh-huh.

Q    Is that a yes?

A    Yes.

Q    I mean, that's really bad when a parent -- when a student has a relationship with a teacher?

A    Uh-huh.

Q    You would agree with me?

A    Yes.

Q    Do you know if anybody under you, Ms. Little or anybody else, performed an investigation with regard to number four?

A    I don't know.

Q    And do you know if Abigail Harris told -- would you expect Abigail Harris to tell somebody that the rumors were that Underwood was having a relationship with a student?

A    Yes.

Q    That's very serious.  Who would you expect that she report that to?

A    At least to her supervisor --

Q    And that was --

A    -- if not to me.

Q    -- Ms. Wheeler?

A    Yes.

Q    And with Ms. Wheeler, was Mr. Underwood also her director --

A    Yes.

Q    -- being a volleyball coach?

A    Yes.

Q    So she would have two direct reports?

A    Uh-huh.

Q    Is that a yes?

A    Yes.

Q    If I asked you this, I'm sorry.  Was my client, Mr. ███ advised at any time that Ms. Harris had made this report in football season in 2023?

A    Not to my knowledge.

Q    So now we have -- let's keep a list -- we have Torango, Molina, and Harris, three teachers -- or three employees of the school system that have had reports of inappropriate behavior by Mr. Underwood, correct?

A    Yes.  Somebody has brought suspicions to them or had suspicions.

Q    All right.  So then let's go on to number five.  The one that says sometime during football season.  Do you have that,

sir?

A    Yes.

Q    Sometime during football season in 2023, volleyball Shawn Lynch reported that two football players had told them that something was going on with Underwood and N.J.  Do you see that, sir?

A    Yes.

Q    And later he heard rumors that the community was generally concerned about Underwood's relationship with N.J. after he used a theragun to provide therapy to N.J. at the stands at a basketball tournament at Gruver in December of 2023.  Correct?

A    Yes, that's what it says.

Q    All right.  So let's break these down.

A    Uh-huh.

Q    So the first part of it says that during the football season Shawn Lynch -- tell me about Shawn Lynch.  What -- was -- is that him?

A    He was -- he was a teacher at the high school and a volleyball coach -- head volleyball coach.

Q    What did-- what -- what did he teach?

A    Bible is one of them.  I am not exactly sure what his teaching assignment was beyond that.

Q    It said that -- according to number five, it said that Shawn Lynch reported that two football players told him

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

Page 103

something was going on between Underwood and N.J.  Again, that's a very serious allegation, isn't it, sir?

A    Uh-huh.  It could be, yes.  Especially in hindsight, looking at this, yes.

Q    Well, I mean, this is back in the fall.

A    Uh-huh.

Q    Is that correct?

A    Yes.

Q    And so who did Shawn Lynch report that to pursuant to this number five?

A    I don't know.

Q    It says he reported it, but you don't know who he reported it to?

A    Correct.

Q    Did he report it to you?

A    I don't remember him reporting that to me.

Q    Did you perform an investigation about number five?

A    No.

Q    Did -- to your knowledge did --

A    No, I didn't.

Q    To your knowledge did anybody at PISD perform an investigation about number five?

A    If it includes the theragun incident there may have been -- we at least, I think, took that report when it was brought to us.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                                    Page 104

Q    Okay.  Well, let's talk about the first part of it.  The stuff that happened in the fall.  Did anybody to your knowledge perform an investigation about that part of number five to your knowledge?

A    Not to my knowledge.

Q    All right.  Let's go to the second part then.

A    That doesn't mean -- that doesn't mean one didn't occur.

Q    And who would have performed that if it was not you?

A    Probably Ms. Little.

Q    So if an investigation was performed and it was not by you, it would have been by Ms. Little, correct?

A    Uh-huh.

Q    What about from Ms. Hale?

A    No, she didn't investigate that.

Q    I mean, she's the Title 9 coordinator at that time, correct?

A    That's correct.

Q    All right.  The second part of number five talked about the theragun incident.  Is that okay if I call it that?

A    Yes.

Q    And so explain to the Court what the theragun incident involved.

A    To the best of my knowledge on this incident that it was at a tournament in Gruver and they were up in the stands, sitting -- when I say they, Coach Underwood and ▮▮▮▮ were

in the stands surrounded by a group of the players. And I believe at least from what's been pictured in my mind or described to me ▮▮▮▮ was laying on one of the bleachers and Coach Underwood was using the theragun -- theragun on her upper leg to, I guess, loosen her muscles. I am not exactly sure why. But that's -- and it -- and it, I think, made some people uncomfortable.

Q    I mean, several people saw that, correct?

A    Uh-huh.

Q    Is that a yes?

A    A multitude, I think. Yes.

Q    A multitude. I agree with you. Many people saw that and many people reported that to the school, correct?

A    I know of one.

Q    Who was that?

A    I believe it was one of the administrators in Gruver.

Q    And who was that?

A    Darla Habethur.

Q    And I believe one person that we spoke to said they couldn't even watch it it was so bad. I think that was a former coach.

        MR. ELZA: Objection, form.

Q    (By Mr. Goodwin) Do you agree with that?

A    I have no knowledge of that.

Q    Did you believe the theragun incident to be

inappropriate?

A     I wasn't there.  I didn't see it.  I have -- I can't answer that, whether it was inappropriate or not.

Q     And a multitude of people saw it and said it was inappropriate, correct?

A     Uh-huh.

Q     Is that a yes?

A     That's a yes -- or at least -- yes.

Q     So these multitude of people that thought it was inapp--

A     Well, hold on.  No.  Clarify that.  A multitude of people saw it.  I know of one that was concerned about it being inappropriate and reported it.

Q     And it was also a school administrator at another school?

A     Yes.

Q     And so was there an investigation performed by you about the theragun incident?

A     No.

Q     Did Ms. Little perform an investigation about the theragun incident?

A     I don't know.

Q     Was any action taken against Cole Underwood about the theragun incident?

A     Not to my knowledge.

Q     Was -- was there even a meeting sought with Cole about the theragun incident?

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

Page 107

A     I can't remember exactly when the report came.  I think it's my recollection that it was after the fact.  It wasn't immediately following.  I don't think there was an investigation done.  And I really think sitting in this moment that we were already doing an investigation when the report came to us.

Q     All right.  What were you doing an investigation about?

A     I can't remember.  I can't remember which part it was.

Q     All right.  So at the end of December 2023, is that the same time that Cole and Dacey met with you and told you they were getting a divorce?  Correct?

A     Yes.

Q     So by the end -- and we are not even finished yet, but --

A     Uh-huh.

Q     -- through number five we have four separate employees that have reported inappropriate conduct on behalf of Mr. Underwood in the first semester of 2023-2024, correct?

A     That's what they claim.

Q     Do you think they are lying?

A     I don't know.

Q     I mean, Ms. Torango, Ms. Molina, Ms. Harris, and Mr. Lynch, are they truthful people?

A     To my knowledge they are.

Q     I mean, Mr. Lynch taught Bible.  Does that hold any water with you?

A    Sure.  It does characterize his statements.

Q    Do you believe that they were concerned about what was going on between ▮▮▮▮ and Mr. Underwood?

A    That is what's implied here, yes.

Q    It's not what's implied.  It's what is stated, isn't it?

A    Uh-huh.

Q    Is that a yes?

A    Yes.

Q    All right.  Number six.  This one is not dated.  Jennifer Feger, an office assistant for the high school reported generally hearing rumors of a personal relationship between Underwood but no reports of a sexual relationship.  Do you see that, sir?

A    Yeah, I do.

Q    Did you talk to Ms. Feger about this incident?

A    Her name is actually Feger (pronouncing) without an "R." F-e-g-e-r.

Q    I am sorry.  F-a-g-e-r.

A    E.  F-e-g-e-r.  Feger (pronouncing.)

Q    Okay.

A    No, I have not talked to her about this.

Q    And did you ever specifically speak to Mr. Lynch about number five?

A    I think Mr. Lynch was probably -- was one of the people that expressed some concerns to me, but it was not at this

time.  It was after we were already concerned, and I had been made known of some of the -- some of the concerns.

Q    Did you talk to him about number five, though?

A    I can't remember the -- the material of our conversation, no.  I can't remember that.

Q    With regard to number five, did you report any of that to my client, Mr. ███?

A    No.

Q    All right.  Move on up to number seven.  During the 2023-'24 school year, junior high volleyball coach Zoe Salazar reported generally hearing rumors that Underwood was frequently with high school girls, including ███ ███ and about Underwood being alone with female students in the training room.  Do you see that?

A    Yes.

Q    Now, it's not dated, so we don't know when that was.  Did you speak to Ms. Salazar about this issue?

A    Not about this issue.

Q    Did you perform any investigation with regard to number 7?

A    I did speak to Zoe Salazar later in the year.

Q    Was that after --

A    She --

Q    Sorry?

A    She expressed her concerned to me in general about the

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                                    Page 110

attitudes of the coaches towards females.  I can't remember if she brought these specific allegations towards Underwood to me.

Q    There's another incident --

A    I did look into what she -- what she talked about during that meeting.  And I can't remember all the specifics.

Q    Well, Ms. Salazar was unhappy with both -- both Coach Underwood and Dutcher about an incident at a track meet later --

A    I believe that's right, yes.

Q    -- and her wearing bike shorts, correct?

A    Yes.

Q    All right.  But do you remember talking to her about number 7?

A    No.

Q    To your knowledge was any investigation performed as a result of number 7 by anybody at the school?

A    I think that Coach Salazar -- Zoe Salazar's sentiments could have been a part of my investigations during the spring.

Q    But I've asked -- so an investigation was done but not as a result of number 7?

A    They -- it could have been a part of my investigations in the spring into Underwood, yes.

Q    Did you notify my client about number 7?  Mr. █████

A    No.

Q    All right.  Number 8.  During the 2023-'24 school year, assistant high school prin-- principal Frances Zavala received reports from her brother and sister-in-law that Underwood was too close with N.J.  Let's stop right there.  Who is her brother and sister-in-law?

A    I don't know.

Q    What did Ms. Zavala do with that report?

A    I don't know.

Q    Did she -- did she directly report that to you?

A    I don't think she reported that to me, no.

Q    So do you know who she reported to?

A    She may have reported to Ms. Little.

Q    So did Ms. Little perform an -- I mean, we are up to number 8.  Do you have any evidence that Mrs. Little performed an investigation on any of these first eight?

A    No.

Q    Do you know who her brother and sister-in-law -- if I asked you that I am sorry -- do you know who they are?

A    I don't know who she is speaking about there, no.

Q    Now, the same brother and sister-in-law later reported the community was generally concerned about Underwood and ██████ after he used a theragun to provide therapy to N.J. in the stands at a basketball tournament in Gruver, correct?

A    That's what it states.

Q    So other people, not just Ms. Habethur, other people were

also concerned about observing that as well, correct?

A    Looks like that's stated here, yes.

Q    Ms. Zavala also reported seeing a photo of Underwood being in the training room while two other students were in the ice bath, correct?

A    That's what's stated.

Q    Now, did you -- did you personally investigate anything related to number eight?

A    Yes.

Q    What did you look at?

A    The photo.

Q    When was that?

A    That was in spring of 2024.

Q    There were multiple photos, correct?

A    There were multiple photos.

Q    So this was not the one in the first semester, it's -- there were multiples in the second semester, correct?

A    This was the second semester that I got to see a copy of that particular photo, yes.

Q    What did you do about it?

A    I added it to the list of photos that was being used at the time in the investigation.

Q    What action was taken against Mr. Underwood as a result of this photo that is referenced in number eight?

A    None.  Because the photo does not characterize -- I

wouldn't characterize the photo as sexual or really even inappropriate.

Q    That's not the standard, though, that it's sexual, correct?  It has to be an inappropriate relationship?

A    Uh-huh.

Q    Is that correct?

A    Yes.

Q    Did you believe it to be evidence of an inappropriate relationship?

A    Not this photo.

Q    Had he -- had you previously told Mr. Underwood to avoid photos?

A    I had.

Q    But he did it anyway?

A    This photo, I think, was taken before any of the suspicions came to me or any of the investigations were done.

Q    Well, it may have been --

A    This was earlier in the fall.

Q    All right.  It may have been taken earlier in the fall, but he posted after you told him to not do that.

A    It was never posted.  It came to me.

Q    How did it come to you?

A    Somebody sent it to me.

Q    Did you with regards to number eight, the allegations contained in complaint number eight, did you provide any of

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

Page 114

that information to my client?

A    No.  Me personally, no.

Q    Did anybody else for the school?

A    I can't say that they did or didn't.

Q    All right.  So through number eight, I am taking -- go ahead.  I don't want to interrupt you.

A    That's okay.  The theragun incident was provided -- or I think that that happened after your client had been advised of some of our concerns by the counselor and the principal of the school.

Q    But that's what you believe they did?  You are not sure.  Were you there?

A    No.

Q    So through number eight, compliant number eight we have one, two, three, four, five, six people inside the school and three people outside the school that have been -- made reports of inappropriate conduct by Mr. Underwood, correct?

A    That's what they say.

Q    All right.  Number nine, around the end of the fall semester, high school principal Tori Little reported that she generally heard rumors that the community was concerned about Underwood and N.J. being too close.  That's the first sentence, correct?

A    Yes.

Q    Who did she that report to?

A    I think she probably at this point was reporting to me.

Q    So did she tell you by the end of the fall semester that everybody -- or not everybody -- that the community was concerned about Underwood and N.J. being too close?

A    She told they that she had heard rumors, yes.

Q    And that was at the end of the fall semester of 2023?

A    I believe so.

Q    And so --

A    In December.

Q    -- what did you do to investigate Ms. Little's report?

A    I can't remember exactly when we had that conversation. It was, I think, after I had been made aware by the -- by Kevin Cummins of the concerns. It was after the first photo. I think, Ms. Little and I were discussing that, and she made me aware that there were some rumors out in the community about it.

Q    Can you tell the Court why the community would know about this relationship and you would not?

A    No.

Q    I mean, if you had a lot of these answers that the community knew this and the community thought, why would the community know more than you do?

A    And in the -- when you say the community knew, I don't think the community knew anything. I think the community -- there was suspicions.

Q    Or they were concerned is what this one said.

A    Yes.

Q    The next sentence says -- well, do you know whether this first paragraph, did you report Ms. Little's concerns to my client at the end of 2023?

A    No.

Q    The next sentence says Principal Little reported that she and the high school counselors met with ███████ ███████ to speak with him about boundary issues between N.J. and Underwood and recommended that S.J. address these concerns with N.J. and check her phone.  Do you see that?

A    Yes, I do.

Q    So were you at this meeting?

A    No, I wasn't.

Q    Who was at the meeting, if you know?

A    I think Ms. Little was -- I can't remember -- I don't know if this was one meeting or two.  But I know that around this time Ms. Little had a conversation with ███████ and also Randy Cunningham, our -- one of our counselors at the high school had that conversation.  In my mind I think Paige, the other counselor, Paige Wade, was also involved, but that's not necessarily -- it could -- it could have been just Randy and Tori.

Q    Okay.  You think that this is one meeting, though?

A    I don't know if this was one meeting or two.

Q    Do you know when it was?  Was it the end of '23, start of '24, or do you know?

A    It was the end of '23, I believe.

Q    And it says that Principal Little reported that she -- and it went on to say what she's reported.  She report that to you?

A    Yes.

Q    Now -- and the recommendation was that ███ checked her phone, correct?

A    That's what it says, yes.

Q    Was there a recommendation that you check Underwood's phone?

A    No.

Q    Why not?

A    I can't speculate.

Q    Well, I am asking why didn't you check his phone at this time if it's recommended to my client that he check his daughter's phone, why didn't you check your employee's phone?

A    At this point I didn't -- didn't have any evidence that anything inappropriate was going on.

Q    You've had at this point --

A    I had some suspicions.

Q    At this point you had nine separate reports of inappropriate conduct on behalf of Mr. Underwood.

A    No.  At this point, which you are claiming is nine

separate people who claimed that they had suspicions during that time. But the first report I had ever received about it was on December 9th.

Q    What happened on December 9th?

A    Kevin Cummings called -- called me and set up a meeting with me and showed me the first Snapchat photo collage and expressed his concerns that there was something -- there could be something inappropriate going on.

Q    Okay. We are jumping ahead. That's fair enough. So but this one, I am only talking about through number nine.

A    Uh-huh.

Q    This is the one that Ms. Little reported?

A    Uh-huh.

Q    You did not take the opportunity at this point, you had nine separate complaints, correct?

A    Uh-huh.

Q    Is that a yes?

A    Yes.

Q    And you --

A    Well, at this point I had nine people that according to their -- their responses were concerned.

Q    Actually ten.

A    I had one report.

Q    And who -- and that one report was from who? That was from Mr. Cummings?

A    Kevin Cummings.

Q    Okay.  So you did not consider Ms. Little's report to be a report to you?

A    No, that is a report to me.

Q    So it would have been more than one?

A    I had done the investigation on the picture.

Q    All right.  So all the previous nine reports were inconsequential to you?

MR. ELZA:  Objection, form.

A    I can't -- no.

Q    (By Mr. Goodwin)  And how did you -- you did nothing about them.

A    I didn't know them at that time.  I have stated several times that those reports did not make it to me.

Q    Did Ms. Little tell you that there were nine separate reports of inappropriate conduct?

A    I don't know that Ms. Little knew of all of those.

Q    All I am looking at is your interrogatory responses, and I have nine separate reports prior to the end of the fall semester -- ten including Mr. Cummings.  Maybe even more than that.  At least ten complaints and reports of inappropriate conduct with Mr. Underwood.  And I am trying to figure out what the school was doing about it.

A    You have nine people that admit that they had some suspicions before December.

Q    I have reports.  Every one of these says report.  Coach Harris reported, that's number four.  Shawn Lynch reported; that's number five.  Jennifer Feger reported rumors of personal relationship.  Zoe Salazar reported hearing rumors; You've got nine, ten reports.  What did you do with those?

A    A few of those identified that it was early in the football season.  Several are undated.  And those became a part of the investigation when I began working on investigations on Underwood.

Q    But that was not --

A    The ones that made it to me.

Q    But that was not until the end of December or in 2024, correct?

A    Right.

Q    All right.  Let's go on to number ten.  Add Mr. Cummings to this list.

A    Okay.

Q    And number ten on December 19th, 2023, Mr. Cummings, a local CPA and school volunteer, reported to you personally that N.J. had made this Instagram post, correct?

A    Correct.

Q    Why is Kevin Cummings following these Instagram posts?

        MR. ELZA:  Objection to form.

A    I couldn't say.

Q    (By Mr. Goodwin)  Were you following Mr. Underwood's

posts?

A    No, not particularly.

Q    Were you following -- at this point had ten separate reports of inappropriate conduct. Were you following Ms. ███████ Instagram?

A    No.

        MR. ELZA: Objection, form.

A    I was not following Ms. ███████ social media at all.

Q    So this is the best duo with a flame emoji embedded in the collage, correct?

A    Yes.

Q    What did you do about this?

A    I took it, I took Kevin's concerns. I had a conversation with Mr. Underwood almost immediately. Well, let's see -- let's back it up. I took his complaint, took his concern, took down the details. I believe that that night was a basketball game, and I had a conversation with our board president in the cafeteria. That's mentioned in the -- in our interrog that is mentioned in this.

Q    And who is that?

A    And I informed out board president, Wes Beal, that I had received a concern from a community member about an inappropriate relationship with our athletic director and head football coach and a student. And I told him that I was going to investigate it, that I was going to confront Cole and was

going to look and see if there was any evidence of it. And --
and that's what I did.

Q    Okay. Well, let's go through that then.

A    Uh-huh.

Q    So you told Mr. Beal that you were going to investigate
it?

A    Yes.

Q    What else did you tell him you were going to do?

A    If -- I told him that we were going to see what the
investigation came out with, if there was something that
required action, especially in light of what the -- what the
complaint was, that I would keep him informed. And that I was
going to begin my investigation.

Q    Okay. What did you do in the investigation?

A    I first talked to Cole and talked to him about the post.
I asked him if he and -- if anything was going on
inappropriate with ███████ ███████   He said no.

Q    What did you expect him to say?

A    I was -- I expected him to tell me the truth.

Q    Well, of course. But you've been an administrator and a
teacher for years. Is that what happens?

A    Not always.

Q    In fact, oftentimes they say no, I didn't do that at all?

A    Of course.

Q    And you have to do additional things to determine whether

that was true or not, correct?

A    Correct.

Q    All right.  So what did you do after you talked to Cole and he denied it?

A    He denied it.  I talked to him about the fact -- Cole gave me a reasonable explanation that he and ███████ were good friends, had been friends for a long time, went to high school together, that they hang out at each other's house.  And that he had been walking with ███████ and his family through a custody issue, and that it was very hard on ███████ and her brother.  And that he had become a mentor and a friend to ███████ and to her brother.  And that he was -- as a long time friend was helping them through this custody issue and providing support as a friend.

Q    And you -- I mean, had a background check been done or had full references been checked you know this is his MO?  This is what he did in Amarillo too.  Did you know that?

A    I don't know that.

Q    He makes friends with a parent and then it goes up to the kid.  Do you -- are you aware of his MO?

A    I don't know that.

Q    You don't know that?

A    No, not from Amarillo.

Q    All right.  So other than talking to Cole when he denied it, who else did you talk to?

A    I talked to -- I followed up with Tori Little.

Q    What did you talk to her about?

A    I talked to her about the fact that the post was out there. And that there was suspicion, and I believe that's probably when we had the conversation about her suspicions and rumors in the community. And I told her that we needed to watch and just make sure. I told them it's possible that the -- the -- the explanation Cole gave me is plausible. It's also very possible that there could be something inappropriate going on. So I asked her to watch it and let me know of anything -- any other suspicions she might have or anything that happened that could indicate that something untoward was happening.

Q    So you talked to Cole and you talked to Tori Little. Who else did you talk to?

A    I think I followed up with Ms. -- Mr. Beal.

Q    But did Mr. Beal --

A    I would assume I did. I can't remember that conversation, but I would assume --

Q    Did he help with the investigation or not, though?

A    No.

Q    What I am talking about is the investigation. In the investigation you talked to Mr. Cole who denied it --

A    Uh-huh.

Q    -- and Ms. Little. Did you talk to anybody else?

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                    Page 125

A    No.

Q    Did you call Ms. ▮▮▮ in? The student.

A    No.

Q    Was she ever admonished by the school to not post things such as that?

A    No. Not to my knowledge.

Q    So what else did you do in the investigation besides talk to Cole?

A    I confirmed with Ms. Little that they had had a meeting with ▮▮▮ And that ▮▮▮ was fully behind Mr. Underwood's involvement in his daughter's life. And he confirmed -- ▮▮▮ -- or Cole's story about being involved in the custody issue. And had indicated to Ms. Little and to Mr. Cunningham -- or Mrs. Cunningham that Cole had his full support behind being involved in ▮▮▮ ▮▮▮ life.

Q    Anybody else besides Cole and Little that you talked to in this investigation?

A    Not in this one, I don't think.

Q    Did you talk to any of the students that were friends with ▮▮▮

A    No.

Q    Don't you think they would have told you what's going on?

A    I can't speculate what they would tell me.

Q    Why didn't you ask?

A    I considered my investigation sufficient.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

Page 142

Q    I don't see that anywhere.  I haven't been provided written copies of the investigation and the results of that investigation.  Did you perform a written investigation?

A    I don't think I have anything written down, no.

Q    Everything was just -- you told me what you did.  You only talked to Little and Underwood, correct?

A    Yes.

Q    Did you take notes of that?

A    No.

Q    I have -- I have a lot of notes from you.

A    Uh-huh.

Q    Why -- why did you not take notes of that one?

A    I can't give you a reason why I didn't take notes of that one.

Q    So there was no notes taken, and there's no writing that talks about the investigation that occurred as a result of number ten?

A    No.

Q    All right.  Let's move on to number 11.  And I think I asked -- well, let me back up again.  I think I asked you that this morning and I may have forgotten.  Was any action taken against Underwood as a result of complaint number ten?

A    There was a verbal admonishment that this created a -- a picture of him in the community that I didn't think he wanted to be painted of him.  So I had -- there was an admonishment

of him to not let things like this get posted even if they were innocent. That it could in an unintended way arouse -- or illicit suspicion.

Q    All right. So the only admonishment you gave him was no more photos or postings?

A    No, I also told him to -- when I asked him if he was -- if there was a problem here, if he was having any kind of a relationship with ▇▇▇▇▇ he denied it. And I said you should not be -- I admonished him to not be alone with a girl or a female student by himself. And let's see, is there anything else I did? And then I also admonished him that posts like this shouldn't -- shouldn't be put out there.

Q    So two things you did?

A    Uh-huh.

Q    Is that a yes?

A    Yes.

Q    So was that the first time you ever admonished Mr. Underwood to not be alone with any female students?

A    Directly, yes.

Q    Now, I've noticed in -- when you say directly, what does that mean?

A    Well, that's the first voice to voice conversation that I have had with him. He might have heard me talk about that in front of staff and say that we can't be -- put ourselves in a situation that is compromising with other students as part of

the trainings.

Q    That was the first --

A    But that was the first direct -- direct conversation I had with him and told him that he needed to not be alone with female students for his own protection.

Q    All right. And so that occurred sometime after December 9th or on December 9th?

A    It was very -- I don't know if it occurred on December 9th, but it was very soon after. It could have been the next day.

Q    So if I say on or about December 9th, that's pretty close?

A    Yes. Likely -- I would say likely it didn't occur December 9th because I got the report from Mr. Cummings late in -- in the day and had a conversation with the board member that night at a basketball game. So it was probably the 10th, on or about December 9th will work.

Q    All right. so go on the number 11.

A    Okay.

Q    It's says beginning in December 2023, after ▓▓▓▓ posted photos of her and Underwood on social media junior high principal Sandi Wheeler reported hearing rumors generally that Underwood was too close with ▓▓▓▓ and that Underwood had used a theragun to provide treatment in the stands during a basketball tournament in Gruver. In December of 2023?

tournament in Gruver, Texas in December 2023.  Correct?

A    That's what it states, yes.

Q    Coach Fletcher also heard rumors in March of 2024, that Underwood had taken ████ ████ home to Perryton alone in his car from a track meet in Canyon, Texas.  Correct?

A    That's what it states, yes.

Q    And we haven't got to the car ride yet, but we've already covered all the rest of it with 12, correct?

A    Yes.

Q    So I would guess that you did no independent investigation relating to number 12?

A    I never heard of concerns that Brady Fletcher had.

Q    Did you hear about concerns that Ms. Wheeler had in 11?

A    I believe she probably -- we had a discussion about that, yes.

Q    Do you know --

A    I don't remember when or what the content of that discussion was, but I believe we did.

Q    All right.  On number 13, on or about March 4th 2024, assistant athletic director Ryan Daugherty reported to the superintendent that Underwood gave Natalee ████ a ride home from a high school track meet in Canyon, Texas.  That is what it says, correct?

A    That's correct.

Q    And you did do an investigation here?

A    Yes.

Q    What did you do?

A    Took Ryan's report.

Q    Was it a written report?

A    No, it was phone call.  And he was concerned because of it, because Cole had been alone with ▇▇▇▇    So I took his report.  I called Coach Chris Simmons, who was the head track coach at that time to confirm that ▇▇▇▇ had gone home with Cole early from the track meet.  And he confirmed that that happened.

Q    I'm sorry.  Who was the track coach again?

A    Chris Simmons.  S-i-m-m-o-n-s.

Q    Okay.

A    So I confirmed with him that -- that Cole and ▇▇▇▇ had left the track meet together.  And then I became -- I became -- I started doing preparations to meet with Cole the next day.  And I met with him about several concerns that had been brought up to me based on my conversation with Ryan.  Questioned him directly about those.  He answered them.  And I prepared a written write-up at that point.

So I met with him that -- that morning immediately.  This was on a Monday morning.  I believe it was March 4th.  and asked him again if there was anything going on between him and ▇▇▇▇ if they have having any kind of relationship, which he denied that they were.

At this point I told him that what was done by being alone with her in a car for several hours riding back was completely and unprofessionally inappropriate. I told them that there was going to be a written write-up regarding it. We also dealt with several other issues that I believe you are probably going to -- to bring up. And I prepared the -- the write-up.

Right after Cole left my office, that's when I got an e-mail from your client informing me that he was fully behind Cole taking ███████ home from the track meet. In spite of that, it was unprofessional and in -- was in violation of some verbal directives that I gave him. So I continued with the write-up and gave him a written directive to not be alone with female students, especially ███████ ███████

Q    Okay. We are getting to that particular write-up. It's going to be Exhibit No. 40, which is coming here.

(Plaintiff's Exhibit No. 40 was
introduced and made a part of the
record.)

A    Uh-huh.

Q    There you go, sir.

A    Uh-huh.

MR. ELZA:  Did you give him two?

MR. GOODWIN:  He's got two copies.

THE WITNESS:  Sorry.

Q    (By Mr. Goodwin)  Is this the write-up you provided?

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                    Page 153

to -- to make a difference there.

Q    But in the end --

A    To show that the girls athletics had attention.

Q    End of the day it was still just an excuse?

A    It was, yeah, it's something he brought up to me as -- as a excuse or a reason.

Q    Now, you also say that you talked several times.  I've only heard one occasion prior to March the 4th that you had talked to Cole about being alone with █████████

A    Uh-huh.  I talked to him about being alone with █████████ after the December 9th, the very first post.  I talked to him about being alone with ███████ directly after the second post, which was around January 15th with the two of them being alone together in a gym.

Q    Who told you that that had occurred?

A    I believe I got a -- the picture came from Tori Little.

Q    Well, why is that not in the list of complaints that we have here?

A    I don't have an explanation.

Q    You would agree with me that's an additional complaint?

A    Yeah.

Q    So where in the hierarchy -- so where between 12 and 13 --

A    Uh-huh.

Q    -- there's a break.  So it should be in there between 12

and 13, correct?

A    Uh-huh.

Q    So tell the Court and tell the jury what happened with regard to the incident in 2012 -- or excuse me, in January of 2024.

A    Okay.  So in January -- January 15th, I got a picture of a post that ████ had made.  And it was a post that was part of a social media program, I think it's called GetREAL.  And it -- it shows the picture of what is showing on the front facing camera -- camera of the phone and the rear facing camera of the phone, verifying, I think, that you were there in that moment.

In the picture was -- was ████ face and the -- and out -- she was, I guess, that's the -- the screen facing camera. And in the back of the phone facing camera was a picture of Cole inside of a gym.  It appeared that there wasn't anybody else in the gym.  So I got that picture and I immediately got on our camera system and looked and watched that interaction to see what had happened.

In that -- the picture looked like they were both alone in a gym.  When I got on the camera and I looked at what had happened I found where they were in the gym together, but I also saw coaches, kids playing in the background.  I saw ████ and Cole.  ████ was -- Cole was underneath the basket at that time.  ████ was going around the three point key taking shots

and Cole would throw the -- the basketball back to her.  This went on for probably ten -- ten minutes -- ten or 15 minutes.

And then at one point they switched places and I could see the moment where she took the picture.  And then they walked out and were standing close to each other on the free throw line for a minute or so.  And then they both exited and left in separate directions.

Q    When was the date all of these events occurred?

A    Well, that was January 15 when it was -- so it was around January 15.

Q    So this occurred after your first admonition?

A    Yes.

Q    And did -- you personally logged into the cameras and watched all these things?

A    Yes.

Q    So did you consider this to be an investigation?

A    Yes.

Q    And what did you conclude from that investigation?

A    When I look at that through a neutral lens it looks to me like a coach who is helping a player with their shot.  He's throwing a basketball back to her while he's probably telling her to follow through or giving her -- giving her admonition about her shot.

Q    Was there anybody -- was anybody else present when this went on?

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                           Page 160

they were the only two in the office with the door open.

Q    And so for you, if the door is open it's fine?

A    If the door is open and other people are there, it's not a -- it's not a great situation. It's not best practice, but it's not alone with the door closed.

Q    Well, it's not best practice when you've told him now at least twice not to be alone with her, correct?

A    Uh-huh. Correct.

Q    He just won't stay away from her. Is that -- was that your impression --

A    Yeah.

Q    -- at the time?

A    Yes. It was --

Q    Did that not raise red flags to you?

A    It was a frustration that I had.

Q    Now, I noticed that -- so looking at page 7 --

A    And yes, it was a -- it was a great concern to me.

Q    On page 7 of the interrogatories we have number 12 and we have 12A, which is the January one that we...

A    Okay. Hold on.

Q    Was not in here.

A    Page what?

Q    Page 7 in the interrogatories.

A    Okay.

Q    We are still continuing on with our numbering system.

A    Okay.

Q    Number 12 is the one that says beginning on December of 2023.

A    Yes.

Q    And then we came -- I put 12A in here.  That is the January 15 complaint that's not listed, correct.

A    Correct.

Q    And then you tell me that there --you just said between the time period of December and March, several other people told you that ▇▇▇▇ would go to Cole's office during the day.

A    Uh-huh.

Q    Do -- do -- those aren't listed here either, are they?

A    No.

Q    How many other reports do you think you received?

A    I don't know.  I can't give a you solid number.  I would say it could have been anywhere from 3 to 5, or 6.

Q    All right.  So three -- we are back with several -- we are back on the several word that you used.

A    Yeah, over the course -- over the course of the months, yes.  December 9th to here we are.

Q    So somewhere between three and six people reported to you that ▇▇▇▇ was going to Cole's office during that time.

A    That she would go up to Cole's office during the school day, yes.

Q    All right.  So you say, since that conversation I have not seen any more posts; however, it has been reported to me that there have been numerous times that you have been alone with her.  It has been reported to me that -- bullet point: On March 1st, 2024, you left the track meet in Canyon early and traveled alone with ███████ ███████ in your personal vehicle back to Perryton, correct?

A    Yes.

Q    And that's what we have -- we've been talking about that one?

A    Yes.

Q    The second bullet point says:  At a previous track meet you left the track meet with ███████ ███████ and traveled to Starbucks to buy coffee.  Although you bought coffee for others, this is still a time when you were alone with her.

A    Yes.

Q    Tell me about that one.  I don't see that anywhere in here.

A    Okay.  That was something that was a part of the concerns that Ryan Daugherty, when he called me.  He told me that there were other times at other track meets that he had gone to get coffee with ███████ by himself.  And that they had brought coffee back for other people.

Q    So that was Coach Daugherty told you that?

A    Coach Daugherty told me that in a -- in the phone call.

A    I've said several of them. Video evidence of them hugging or kissing. People who would testify that they were in -- they were physically inappropriate. Anything that was beyond just that I've seen them together and it just looked suspicious. Something that -- that would absolutely rock solid show me that there was -- there was an inappropriate relationship going on.

Q    Now, by March the 4th you had 15 separate complaints about Cole Underwood's behavior, specifically with ███████ ███████ correct?

A    Uh-huh. I had -- well --

        MR. ELZA:  Objection, form.

A    -- not all of those had come to me. I had several people who had expressed their concerns to me, yes. And had had conversations along the way with multiple people, yes.

Q    And you go on to say, however, each one of these times opens up vulnerabilities in your reputation and the reputation of PISD athletics, correct?

A    Yes.

Q    It also opened up vul-- vul-- I can't say it. It made ███████ vulnerable to Cole raping her, correct?

A    If there -- of the three bullets that are in the top portion, I would say two of them could be vulnerable, leaving ███████ vulnerable.

A    But --

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                                              Page 171

Q    But you don't mention ████ safety anywhere in this letter, do you?

A    I don't think I do.

Q    What you say to Cole is in order to safeguard Cole's reputation and the school's reputation, here's what I am going to tell you to do.

A    Uh-huh.

Q    Is that correct?

A    That's correct.

Q    Number one, you are not to be alone with a female student at any time or any situation.  That's the first sentence, correct?

A    Correct.

Q    Now, you already told him this.

A    Correct.

Q    Why are you telling him again?

A    Because I am memorializing it on paper.

Q    Does that make it more effective?

A    It makes it stronger.

Q    How do you think?

A    Because now it's on paper and I can have conversations with people like you about what I told him.

Q    Well, you can tell me about what you did -- you told him orally too.

A    True.

Q    I mean, what this -- how this reads to me is like I really mean it this time.

A    Uh-huh.

Q    It's like a parent who has told a child over and over and over to do something or to not do something and they continue to do it.

        MR. ELZA:  Objection, form.

Q    (By Mr. Goodwin)  That's what has happening here, correct?

A    Yeah.

Q    You've said you told him several times about rumors and suspicions regarding his relationship with ███████ ███████

A    Uh-huh.

Q    Yes?

A    Yes.

Q    And you are telling him yet again, stay away from her. I don't understand how this did anything.

A    It affirmed my --

        MR. ELZA:  Hold on.  Let him ask your question.

        THE WITNESS:  Okay.

        MR. ELZA:  Let him finish.

        MR. GOODWIN:  I was finished.

        THE WITNESS:  Okay.

        MR. ELZA:  Is there a question?

MR. GOODWIN: Yes.

Q    (By Mr. Goodwin)  I don't understand how this did anything.  Can you explain that to me?

A    It affirmed on paper what I -- the directives I had given him verbally beforehand.  And in -- in an employee's discipline, putting something on paper is an escalation.

Q    Well, in looking back in hindsight this letter did absolutely nothing, did it?

A    I wouldn't say that.

Q    Well, do you know that on March the 4th of 2024, when you wrote this letter sexual intercourse had not happened between these two?

A    I didn't know that.

Q    All sexual intercourse, that all occurred at the school all occurred after this letter.  Do you know that, sir?

A    I don't know when it started.

Q    Do you have any evidence that it started beforehand, the -- the sexual intercourse?

A    No.

Q    Would you agree with me this letter did absolutely nothing to stop Cole Underwood's behavior towards ▇▇▇▇ ▇▇▇▇

MR. ELZA: Objection, form.

A    I agree with you that he continued to violate this directive.  And I agree with you that even after I issued this

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

Page 174

letter that he had a sexual relationship with ████ ████ yes.

Q    Why did you not put him on administrative leave as a result of his repeated violations of your direct orders?

A    Because to put him at this point, like I say in the letter, I didn't have concrete evidence that there was an inappropriate relationship between him and ████ What I had was people's suspicion. I had him not following a best practice with a female athlete. I had him really violating my verbal directives to not be alone with her.

But I also had the full throated support of her dad completely supporting their relationship. I had his permission -- written permission, by text, for him to take her home from the track meet. If I would have had concrete evidence of their inappropriate relationship at that time I would have put him on leave.

Q    But isn't it true, sir, you were much more concerned about the reputation of the district than you were at this particular instance in protecting ████

A    No.

Q    You don't mention the protection of ████ one time in this letter. Would you agree?

A    This letter was not to ████ This letter was to Cole.

Q    Yeah, but it's about ████

A    Right.

A    Yes.

Q    Late December Cole and Dacey come to you and say that they are getting divorced?

A    Yes.

Q    And you accuse Cole -- or asked Cole whether he was having an affair, correct?

A    Yeah, I asked him.

Q    You asked him multiple times, didn't you?

A    At least twice.

Q    So let's put the timeline together.  In December he's got an inappropriate text that you told him not to have any more -- or post.  You told him not to do that anymore.  At the time he tells you he's getting divorced, correct?

A    Yes.

Q    Then you --

A    Except, no, I -- I would clarify that.  I didn't see the -- the collage of pictures as inappropriate.

Q    Okay.  Then in early January you have another Instagram post or Be Real or whatever it is?

A    Yes.

Q    A social media post?

A    Yes.

Q    At the same time again, he's getting divorced, correct?

A    Yes.

Q    Now, Cole in his grievance, we will get into it in a

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

Page 185

little bit, says that you offered to give him Christian counseling. He and Dacey, you were going to give them Christian marriage counseling, correct?

A    Uh-huh.

Q    Is that correct?

A    Yes. I mean, the way he puts it is -- I don't -- he can put it that way. I offered to be someone he could talk to and they could talk to and maybe help them out with their marriage.

Q    Did you do that?

A    No.

Q    Did you do that with Dacey?

A    No.

Q    According to Cole you're riding to basketball games alone with her at this time. Is that true?

A    No.

Q    You never rode in a -- you never rode to any game with her by herself?

A    No.

Q    Did she ever ride in the car with you by herself at any time?

A    No, not to my memory.

Q    Did you and your wife have Cole and Dacey over to your house for dinner?

A    No.

Q    You never had them over?  Did you ever have Cole over for dinner at any time?

A    No.

Q    How about Dacey?

A    No.

Q    But you offered to have counseling with him -- counseling sessions with them?

A    I offered to be somebody he could talk to him about his marriage, yes.

Q    And you supported him in your text messages, you gave him advice, marital advice and life advice in your text message during this early January time period?

A    I can't remember specific text -- text messages like that.

Q    You don't remember you did that?

A    No.

MR. ELZA:  Objection, form.

Q    (By Mr. Goodwin)  Okay.  So late December, early January Cole is having problems in his marriage.  At the same time the rumors about these relationships continued to ramp up between he and ███████ correct?

A    I would say they were out there, yes.

Q    And, in fact, they continued from January to March to get more and more substantial, didn't they?

A    There were people that would come to me and express

concerns, yes.

Q    So Cole's marriage is going down and the rumors regarding his relationship with ███████ are going up, correct?

A    I don't know that I would say they were going up. I would say they were there.

Q    Well, you had issues in January with a post?

A    Uh-huh.

Q    You had a group of people, between three and six people, telling you about the inappropriate relationship?

A    They were --

Q    You had --

A    -- telling me that they were suspicious.

Q    Okay. I don't know that there's a difference, but three to six people were telling you there were suspicious circumstances. You had another issue in January the 15th with another post. You had multiple repeated violations of direct orders for him not to be around ███████ and he continued to cling on to this despite your orders, didn't he?

A    Yes, he did.

Q    Is all that true that I just said?

A    For the most part, yes.

Q    And in one of your text messages you say, you know, people don't often move on unless they have another -- and I am paraphrasing -- it's not an exact quote -- people don't move on from their marriage unless they already have something

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

Page 188

else identified. That's what you thought, correct?

A     That is in the conversation I had with him, and I think that was January 8th. And the conversation I had with him, yes. What I told him -- or what I asked him, I said often times when I am involved in a situation like this where somebody is divorcing and pursuing divorce at the level or intensity that he was is that they are in another relationship. And I asked him directly are you in another relationship.

Q     And he denied it?

A     He denied it.

Q     And you believed it?

A     He denied it. I didn't believe him.

Q     And if you didn't believe it what did you do to follow up on that theory that he was having a relationship with somebody else?

A     I didn't do anything to follow up on that.

Q     You didn't believe him, you just didn't do anything then, correct? All right. Now --

A     I think -- I think in that inference you are inferring that -- that I suspected that he was having an affair with ▮

Q     I am inferring that the dots between his marriage ending and the rumors about this relationship are unbelievably close.

        MR. ELZA: Objection, form.

Q    (By Mr. Goodwin)  And that your reliance on the concrete evidence standard that is nowhere in your policies is what prevented you from identifying and stopping this relationship before the rape occurred on your property.  Is all that a fair statement?

A    If -- if that's your belief, it's a fair statement.

Q    Do you believe --

A    But I don't think that's --

Q    -- that everything I just said is true?

A    No.

Q    What is untrue?

A    Again, at the time of the January 8th conversation when I directly questioned him if he was having an affair and said he wasn't.  I didn't believe him because the -- my previous experience tells me that somebody acting like him is having an affair.  At that point I didn't have concrete evidence that it was ████████    At that point I thought probably he was, but I was thinking it was probably an adult somewhere.

Q    And yet between January the 8th and March the 4th he repeatedly violated your direct order to stay away from her?

A    Yes.

Q    And that never dawned on you, there's the affair?

A    I wouldn't say it didn't dawn on me.

Q    So you suspected it?

A    I thought it could be possible, yes.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                          Page 190

Q    He repeatedly violated your order to stay away from her. Wasn't that the biggest red flag you could possibly get, sir?

A    Not necessarily, because I had the full throated support of his -- of her father.  That her father verified Cole's story that they were family friends, that he was involved in Nat's life, and that she needed that support.

Q    And at the same time you were not keeping him informed as to all the information that you had.  Did you tell my client that between three and six people told him [sic] that there were suspicions of an inappropriate relationship between January and March?

A    No, I didn't.

Q    Did you tell him that you had written this written admonition on March the 4th?  Did you give that to ▮▮▮▮

A    No.

Q    He did not have all the information, did he, sir?

A    He did not know everything that we had done or gone through, no, he didn't.

Q    You had much more information about this inappropriate relationship then he did, correct?

MR. ELZA:  Objection, form.

A    No.  I had asked more questions.  I had done investigations.  And again, those investigations did not turn over concrete evidence.  So in a sense, I probably did know more than he did.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                    Page 191

Q    (By Mr. Goodwin)  Well --

A    But I had -- I had -- I considered ▇▇▇▇ informed based on our conversation in December 9.

Q    You had 14 separate employees report to somebody -- we don't know to who --

A    Uh-huh.

Q    -- some to you, but some to -- we don't know where these reports have gone.

A    Uh-huh.

Q    14 separate PISD employees reported inappropriate behavior between Cole and ▇▇▇▇  Did you tell ▇▇▇▇ that there were 14 separate reports of that, sir?

A    No.

Q    You had one, two, three, four, five people outside of the school system also report to somebody in the school system of this inappropriate relationship.  Did you tell ▇▇▇▇ that?

A    That's what they say, yeah, and no, we didn't.

Q    We haven't even gotten to Duce Cooper yet.

A    Uh-huh.

Q    So let's get back to Exhibit No. 7, page 7.  Get through these as quickly as we can.

A    Okay.

Q    And number 17 -- complaint number 17 starts off in mid-April of 2024.  Do you see that one?

A    I do.

Q    Assistant football and power lifting coach Casey Arruda reported hearing rumors generally that there was a freshman girl who has reported to someone that Underwood was checking out the girls.  Did you report to █████

A    No.

Q    That's after you had already told Cole to stay away from her in writing, correct?

A    Uh-huh.

Q    Is that a yes?

A    That is a yes.

Q    Then the last one.

A    That was after -- but I --

Q    I'm sorry.

A    Up to this day -- or up until we prepared this, I wasn't aware of that.

Q    On 18, complaint number 18 is on or about April 21st, 2021, Duce Cooper informed the superintendent that N.J.'s car and Underwood's car were seen at the high school at the same time on April 20 of 2024, correct?

A    Correct.

Q    How does Duce Cooper know that you are watching N.J. -- or █████ and Underwood's relationship?

A    Duce was somebody that was involved with our athletics, spent a lot of time with kids and at the school.  But probably his most intense involvement of this -- of this is Duce is

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

Page 198

A   Yeah.

Q   -- where you go through the -- you go through all the video. It's every weekend for the four weekends before. Correct?

A   That's -- as you -- I don't know any reason to doubt what you say.

Q   So why didn't somebody report it before then?

MR. ELZA: Objection, form.

A   No idea.

Q   (By Mr. Goodwin) And why was this off-hand comment at church the thing that -- the straw that broke the camel's back, so to speak? What was so unique about this report, rather than the previous 17, that made you go look at the cameras?

A   I can address this one report. Because like I had done every time, when somebody told me that there was a picture or gave me something to look into, which this was, then I immediately checked the camera system. And wanted to verify, were they at the school at the same time. And that's -- through a -- through a almost 24-hour period investigating all of the cameras. At first not seeing anything inappropriate, but having some questions about what I saw, I went deeper into the camera system. I went and walked the facility so that I understood what the layout of the facility was.

Q   Had you done that before?

A    No.

Q    Okay.

A    So I first -- let's -- let's back up to the first.  So observing the videos, I did see that they were at the school at the same time on that day.  And this is again, we are talking about the April 20th, the Saturday.  I did see that they were -- I see Cole arrive.  I see him go up to his office -- or first I see him prop the door, put a prop in the door that's by his office.  But it's also by the girls locker room.

I see ███ come in -- or he goes up to his office, climbs the stairs to his office.  I see ███ come in and I see her unprop the door.  I see her go in the locker room.  I see her come out.  I see her go to the training room.  I see her go back in the locker room, spend about two hours in that locker room.  And then she comes out, walks out of the locker room and leaves.  And then a little while later Cole -- Cole leaves.

So based on -- on what they -- based on what I see, I don't see them interact at all.  I don't see them together.  But two things bothered me.  One is that when Cole props the door ███ unprops it, which tells me that prop was for her.  The second thing is why does she spend two hours in the locker room.

And not knowing the layout very well because I am a new superintendent, I haven't walked all the in or outs -- ins and outs of our buildings yet.  At that point this was Sunday

evening, I went over and walked, I walked the -- the -- the gym and the -- the area around his office. And when I walked into the girls locker room that's when I discovered the back exit to the locker room. And I discovered that was right next to the weight room.

So I went to the camera system again to check and see if ████ ever came out that back door. And at the time I didn't see her come out the back door. So I -- but still wanting to see if I could figure out exactly if they ever did interact, that's when looked up to knowing the weight room door was next to the back entrance to the locker room, and knowing there were stairs -- there were back stairs -- now that I knew there were back stairs from the weight room up into the office area, that's when I checked the weight room cameras.

And everything was dark, but I did -- around the time where I saw her go into the locker room for the second time I saw the door briefly open, and I saw ████ come through that door. and I saw her move towards the back stairs. And then about the time that I had seen her exit the locker room before I saw her passing out of the locker room and out of the building.

So at that point I knew that Cole had most likely, although I didn't -- I didn't have evidence, I didn't have video evidence of her going to his office, I knew that most likely they were together and they had been in the office. So -- and having watched that now, I realized how practiced it looked.

So that made me suspicious that there were other times. and that's when I started going back to other times where we were on a weekend or holiday or people weren't in the building. and that's when I discovered four other times that they had been doing this. So at the point I knew Cole had violated my directive.

Q    Again, I mean, he violated it several times before, correct?

A    Yeah, I would say this one was the most serious, because they were -- they were alone together. Doors -- I didn't know. It appeared, based on the video evidence, that Cole and ███ had been alone together in a building without anybody there.

Q    So but what about the 21st was different than the previous 17? Why did this one spur you to take such significant action to determine what was going on?

A    I don't think it was any different than the others. It's just every time that it was set of -- or another place where I had something concrete to look into.

Q    Well --

A    I took that -- every time I had that I looked into it.

Q    And you also settled the case -- the other case that was pending against the -- PISD on the Friday before, didn't you?

A    Yeah, that was about the right time.

Q    Friday the 19th --

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                    Page 202

A    Uh-huh.

Q    -- PISD settled a case whereby something -- the allegation was made that something was inserted into a boy's rectum, correct?

A    That -- yes, that allegation was made.

Q    You don't think it happened, correct?

A    No.

Q    Oh, you don't think that happened?

A    No.

Q    Have you looked at the police reports about this?

A    I have.

Q    Where all the boys say it happened and a lot of other worse stuff happened than that?

A    I don't think that happened.

        MR. ELZA:  Objection, form.  That
    misstates the complete investigation and it
    certainly misstates the video.

A    Uh-huh.

Q    (By Mr. Goodwin)  Okay.  Well, we'll go through those statements here in a little bit where other boy are saying that happened and lot of worse stuff happened.  But that settled the Friday before you were told two days later on an offhand comment from a -- from your preacher, correct?

A    I believe that's correct.

        MR. ELZA:  Objection, form.

Q    (By Mr. Goodwin)  Now, one of things that you did not talk about, it's not in this list of 18.  If you will turn back to page 28.

MR. ELZA:  Of what?

MR. GOODWIN:  Of Exhibit 7 we are still on.

A    Okay.  Okay.  I am there.

Q    (By Mr. Goodwin)  A request for admission number nine, admit that a Gruver administrator reported Underwood's inappropriate behavior towards ████████ on or about March 21st, 2024 to PISD principals Tori Little and Sandi Wheeler.  Do you see that?

A    I do.

Q    Now, you admitted -- although you admit it's March 1st -- 4th, which I don't how that could be 17 days prior to the 21st incident -- you admitted that the Gruver ISD administrator reported to Tori Little and Sandi Wheeler that Underwood had transported ██████ home from a track meet, correct?

A    This is request for admission number nine?

Q    Yes.

                    (Deponent reads to himself.)

A    I don't remember a Gruver administrator doing that.

Q    So would it shock you that Ms. Little and Ms. Wheeler did not tell you about this report?

A    About the Gruver administrator reporting?

Q    Yes.

A    I don't know that it would shock me.

Q    I mean, that's an important bit of information, isn't it? An administrator from another school is reporting to your principals, Wheeler and Little --

A    Uh-huh.

Q    -- and I'll to tell you, this admission, Ms. Habethur is who this is.

A    Uh-huh.

Q    Ms. Habethur, her testimony is going to be much more specific about what she told Little -- Little and Wheeler.

A    Uh-huh.

Q    She went on and on about the stuff she had heard. And she heard it from children at her track meet, and this was a track meet not at Canyon, but at Gruver.

A    Okay. Okay.

Q    Are you aware of any of this, sir?

A    No, I don't think I was aware of that. But if it was discussed with me, we already knew that -- that he had transported her alone.

Q    Yeah, that's what I am saying what Ms. Habethur said had nothing to do about the Canyon incident. Ms. Habethur's report came from a Gruver track meet, not the Canyon track meet. Was any of that reported to you, sir?

A    No.

Q    Wouldn't that be a violation of your policies if Little and Wheeler knew that another report from another administrator at another school talked about the inappropriate relationship between ███████ and Underwood?

A    Yes.

Q    The next admission says admit that principals Little and Wheeler reported to the Gruver administrator in March 2024 that an investigation of Underwood was being conducted by PISD. And that's admitted, correct?

A    Uh-huh.

Q    Is that a yes?

A    Yes.

Q    Now, this particular report is not included in the 18 we have already gone through, correct?

A    No, I think that that is the report on the March 4th incident.

Q    No.

A    I think they were referring to the investigation --

Q    Okay.

A    -- on the March 4th.

Q    Clearly they were not. I can tell you it's an additional one. Because what Ms. Habethur is going to say is very different than what this admission says.

A    Okay.

Q    And so I am going to add, there's number 19. Because

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                      Page 208

Q    You did that over a one or one and a half day period?

A    Yes.

Q    All right.  So did you ever look at the ParentSquare communications between them?

A    Yes.

Q    When did you do that?

A    I looked at the Parent -- it was probably was early either in either December or January I looked up any conversation between Cole and ████████  And at that point there was very few out there.  There was -- and they were all, I think one of them was hey, can I stay in athletics instead of go to this other class?  There were a few little friendly type things, not flirting at, just all almost like a, I don't know, a neutral random text to -- to a coach.

Q    Well, I mean --

A    At that point.

Q    -- they are all right here in front of us, aren't they?

A    Yes.

Q    And so are these all of the ParentSquare communications that you were able to find between Cole and ████████

A    They look to be, yes.

Q    And, in fact, all -- if you looked in January --

A    Uh-huh.

Q    -- through the first page and a half, there are multiple -- I don't know, they are not text messages -- or

MR. ELZA:  Objection, form.

A    I don't know.

Q    (By Mr. Goodwin)  Because he's literally the one that reported the final incident, the final complain that broke all of this, correct?

A    Yes.  I don't have any explanation for that.

Q    Is he an honest guy?

A    I've known him to be, yeah.

Q    He's a preacher, correct?

A    Yes.

Q    Is he the main preacher for your church?

A    Yes.

Q    So on April the 21st did you go to the ParentSquare notifications?

A    At that point I don't think I did.

Q    I mean, it was the easy thing to do, correct?

A    It could have been done, yeah.

Q    I mean, they tell you in very detailed every weekend when they are going to do this process that they had, correct?

A    Uh-huh.

Q    Is that a yes?

A    It's -- I mean, I would have to check to make sure this was every weekend.  The ones -- each one that I saw in the video.  But I have looked at these since and numerous times. It looks like they were setting up the process that I

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

Page 211

observed, yes.

Q    Is it a difficult process to look at the ParentSquare messages?

A    No.

Q    Is it easier than watching the videos?

A    Probably, yeah.

Q    On March the 4th you --

A    Probably about the same.

Q    -- tell -- in March the 4th, 2024, you tell Cole Underwood not to be alone with ██████ correct?

A    Uh-huh.

Q    Is that a yes?

A    Yes.

Q    Then you proceed to see on ten days later ██████ says hey, Coach Underwood, will you prop the door open at the gym for me in like ten minutes. And he says please. And then she says yes please, and he said yes, I will. Correct?

A    Yes.

Q    And one minute later, correct?

A    Yes.

Q    The next weekend, on March the 23rd, I guess it would be two weekends?

A    Uh-huh.

Q    Be nine, ten days. Tomorrow morning around like 10 can you let me in the trainers room so I can do heating pad and

stuff, please.  Correct?

A    Yes.

Q    And that's at 10:19 p.m.

A    Yes.

Q    Do you know whether they were together on March the 24th?

A    The 23rd or 24th?

Q    Well, the 24th is when they actually met on the -- I mean, she's up there on the 24th, correct?

A    Oh, tomorrow morning.  Yes.  I -- I would have check the dates on the videos.

Q    Well, it says --

A    But I think it probably is.

Q    Well, they are not the videos.  Those have not been provided to us.

A    Okay.

Q    All we have is April.  We don't have anything in March.

A    Okay.

Q    But on March the 24th she says I am done in the training room, Coach Underwood, I closed the doors.  Thank you.  Correct?

A    Yes.

Q    And then they go on to talk about her knee for a while on the 24th.  Do you know whether they were together on the 24th alone?

A    I don't.

Q    The next weekend, on Saturday, March the 30th, she does the same thing, prop the door open, and he does.  Correct?

A    Yes, according to the texts.

Q    Had you seen this -- let's say you'd seen this on Sunday, March the 31st, what would you have done about it?

A    I would have -- at that point I might have gone to check the cameras to see the same -- the same as when I got the report that their cars were up there together that weekend.  I might to gone to check the cameras.  I might have had the conversation with Cole about it.

The texts or the ParentSquare messages themselves don't indicate that they were alone together.  ▮ was an athlete in our system.  Cole was other athletics.

Q    She could have asked her own coach rather than Coach Underwood, though, to do that, correct?

A    She could have.

Q    And this would have pro-- I mean, is there any other students up there on the weekends doing training?

A    I don't know.  There could have been.

Q    It would have at least prompted you to take a look, though, correct?

A    Sure.  I would have asked some questions.  I would have looked at the cameras, yes.

Q    I mean, this is -- you say it's not hard to get into this system.  Why didn't you do this?

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                                    Page 214

A    At this point I had -- I didn't know this was going on.

Q    Now, after you gave the directive on March the 4th, 2024, what did you do as a school district to enforce the three directives to Cole Underwood?

A    Kept my ears open for any place where I found evidence or reports that he was violating the directive.

Q    It's right here in Exhibit No. 36, correct?

A    I didn't know this was happening.

Q    You didn't look.

A    At this point.

Q    You didn't look, did you?

A    That's true.  I didn't look at it at this time.

Q    You could have looked on any weekend, correct?

A    Sure.

Q    Okay.  So to enforce your directive to stay away from ██████ after he had repeatedly violated your orders, what did you do?

A    What timeframe are you talking about?

Q    After your March 4th directive.  You gave him a written directive.  You told him again stay away from her.  What did you do to enforce your orders to him?  Just give me a list --

A    I don't think --

Q    -- of everything you did.

A    I think I talked with administrators, followed up with the administrators, asked them to keep their eyes and ears

open. And to anything that might be suspicious or where he was violating my directive, to report it to me.

Q    Is that it? You told them to keep --

A    I mean, I can't remember that specific conversation, but that's something I would have done.

Q    Were you serious about enforcing the directive against Mr. Underwood?

A    Yes.

Q    But the best you did was tell your staff to keep their eyes and ears open?

A    Yeah.

Q    Do you think that was sufficient?

A    In hindsight, no.

Q    Well, even at the time. He had repeatedly violated your orders and the best you did was keep your eyes and ears open?

        MR. ELZA: Objection, form.

A    Yeah.

Q    (By Mr. Goodwin) It looks pretty weak now, doesn't it, sir?

        MR. ELZA: Objection, form.

Q    (By Mr. Goodwin) I think you need to go back to what was happening at that time? Because we still had the narrative that he was helping ███████ with -- and was a support for her and had the full support of her dad -- you -- you --

A    -- with that relationship.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

Page 217

Q    -- you may have done something different in your original conversation with him in December.  Do you remember that testimony?

A    I believe I do.

Q    Don't you believe that ███████ would have done something different had he known that there were 19 separate complaints that you know about that related to Cole Underwood?

A    Again, I didn't know at that time.

Q    You do now.

A    Uh-huh.

Q    Correct?

A    Yes.

Q    Don't you think he would have made different decisions had he been fully informed?

MR. ELZA:  Objection, form.

A    Probably.

Q    (By Mr. Goodwin)  I mean, it seems like we keep blaming --

A    If we knew --

Q    -- this back at ███████

A    If we knew all that was there at that time.

Q    It seems like you keep laying this back at ███████ feet.  Oh, he had the full support.  No, you got one e-mail from an uninformed person.  Did you ever reach out to him after the March 4th e-mail?

A    No.

Q    Did you ever tell him, by the way, I don't think you knew all of this, but I gave him a -- I gave Cole Underwood a written admonition today that he has to stay away from her daughter. I would appreciate some help with -- from you to make sure that happens.

A    I don't think I could have -- could have informed him of that because discipline and personnel is confidential.

Q    I believe you're required to under the policies and procedures of this school to inform him of any alleged inappropriate relationship with his daughter.

      MR. ELZA:  Objection, form.

Q    (By Mr. Goodwin)  Is that not true?

A    That is true.

Q    And as far as these ParentSquare notifications go, you know -- I mean, I'll show you some texts here in a little bit -- your staff is keeping reports from you. Have you admonished Ms. Little or Ms. Wheeler for keeping the Gruver report from you? Ms. Habethur's report?

A    So back to that, I believe they told me about the report of the Gruver administrator having concerns about the basketball game and Cole's actions.

Q    That's back --

A    I am not aware of a Gruver track meet that Cole brought ▇▇▇ back by himself.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                                    Page 220

Q    All right.  And --

A    Because those texts have been in my possession.

Q    And in that e-mail -- in that text string Cole is very concerned whether you are going to be told or not.  And Ms. Wheeler says no, you are not going to be told.  Does that upset you that you are being -- information and reports are being purposely withheld from you?

A    Yes.

Q    And you would agree that's a violation of many of the policies of this school district, correct?

A    If it is -- if it is as you say, yes, that would be a violation.  And I would not be okay with it.

Q    Because you want to be fully informed, don't you?

A    Correct.

Q    And don't you believe my client should be fully informed?  Don't you think he wants to fully informed as well?

        MR. ELZA:  Objection, form.

A    I think he wants to, yes.  There are some things that I can't share with him because of some confidentiality.

Q    So in Exhibit No. 36 these ParentSquare notifications --

A    Uh-huh.

Q    -- these were accessible to you at all times, correct?

A    Yes.

Q    And you believe that had you known, say, March the 14th, ten days after you gave an admonition to Mr. Underwood to not

be around ▮▮▮▮ had you known that he was propping the door open for her, what would you have done?

A    I would have probably called Cole in and asked him some questions.  And I would have also probably checked the cameras to see what was going on.

Q    And what would you have done had you seen the cameras that we are going to show you?  What you've -- what you've already seen.

A    Probably the same thing that -- that happened would happen a whole lot earlier.

Q    Now, are you planning to attend Wheeler and Little's depositions tomorrow?

A    I wasn't planning to.

Q    Well, hopefully you change your mind in that regard.

MR. ELZA:  Objection, form.

Q    (By Mr. Goodwin)  Exhibit Nos. 53 and 54.

MR. GOODWIN:  Here you go, Slater.

THE WITNESS:  Are we done of with any of these other pages?

MR. GOODWIN:  Oh, we will probably keep number 7 out because that seems to be -- we keep going to number 7 a lot.

MR. ELZA:  Pile the rest of them up and make yourself some room.

Q    (By Mr. Goodwin)  Okay.  Tell the Court what we are

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

Page 222

looking at with regard to Exhibit No. 53?

A    We are looking at some Title 9 training information. This looks to be the slides that I use to train our staff.

Q    Now, were you prov-- were you doing the training on Title 9 back in 2023?

A    No.  I didn't do this in 2023.  This was in the 2024-2025 school year.  Yeah, I think so.

Q    Oh, so these slides that I am looking at with 53, these were not given to the staff in 2023?

A    No.

Q    Are these the ones that you prepared?

A    Yes.

Q    So you agree -- and you can look at 54 really quickly -- 54 is a principal's and director's agenda.  Have you seen this before?

A    Yes.  Yes.

Q    If you look at Bates number 461 it said every employee must be trained by Mr. Brown on page 461, Title 9 training.

A    Yes.

Q    Was this done in 2023?  Was it important for you to -- for you personally to give every employee Title 9 training in 2023?

A    It was important to me that every employee be trained in Title 9 in 2023, yes.

Q    That's not my question.

MR. ELZA:  Well, hold on.  I think he's still talking.

A    I did not do the training in 2023.

Q    (By Mr. Goodwin)  Who did?

A    We didn't have scheduled training in 2023.

Q    So Title -- Title 9 was not taught to the staff in 2023?

A    No.

Q    Let's go back to the slides.  Do you think that Title -- the Title 9 slides that we are looking at, did the law change between 2023 and 2024?

A    I don't -- I am not aware of law changing.

Q    I agree with you.  I mean, what I am -- I guess what I am saying is are these slides also applicable to the 2023-2024 school year?

A    I would say yes.

Q    And are these -- I guess -- if I didn't know this -- you put these together?

A    Yes.

Q    Did somebody help you with these?

A    No.  I think these were ones that I put together.  They were based on a training that I did in -- in one of my previous districts.

Q    Now, I'll tell you these are actually Bates numbered, but you can't tell it.  So I wish I could tell you which page numbers these are.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

Page 224

A    You can describe it.

Q    It's actually on --

A    You can describe it.  I'll get there.

Q    It says Title 9 sexual harassment/abuse.

A    Yes.  I am there.

Q    Okay.  The bullet point is most of the news surrounding Title 9 have been in the area of sexual harassment/abuse, correct?

A    Yes.

Q    And infamous investigations are university athletics, correct?

A    Yes.

Q    Where did you get this information?

A    Just my knowledge of most of the -- most of the Title 9 news that had been out in the news atmosphere was about Penn State, some of other universities that -- where it made national news.

Q    And did you -- I -- I -- you said nobody helped you with this?

A    No.

Q    What in your background --

A    Not that I remember.

Q    -- makes you or allows you to teach Title 9 requirements?

A    I went -- I was the Title 9 coordinator for Plainview when I was there for at least a couple of years.  I was there

when there were major changes to Title 9, and that's where I developed these slides. I believe I had Title 9 training at one of the service centers.

Q    So this was done -- so when were you at Plainview?

A    1992 to 2021.

Q    And you developed these slides when you were at Plainview?

A    Most of them, yes.

Q    So the one we were just talking about, sexual harassment/abuse --

A    Yes.

Q    -- was that one done at Plainview?

A    I believe so, yeah.

Q    The next page is definitions, sexual harassment. When did you do this one?

A    I think I developed this at Plainview.

Q    Last bullet point says: Sexual assault, dating violence, domestic violence or stalking as these term are defined in federal law.

A    Yes.

Q    What federal law defines those terms?

A    I don't know, Title 9, I guess.

Q    Would you agree that ███████ was sexually assaulted in this case?

A    Yes.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                                    Page 226

Q    The next page is recognizing sexual harassment.  Do you see this?

A    Yes.

Q    And you believe ███████ was subject to this verbal sexual harassment?

A    I don't -- I don't know that I could confirm that these are things she experienced.  I won't -- I won't disagree.

Q    All right.  Let's get to the one that's got red on it.  It says high standard of liability.  Hopefully yours is in color?

A    Yes.

Q    All right.  When was this slide developed?

A    Six years ago maybe, five or six years ago.  It was while I was in Plainview.

Q    So before you were --

A    Yes.

Q    -- in Perryton?

A    Yes.

Q    It says the previous standard says the school or district was held liable when someone with the authority to do something about it was made aware of the allegation, correct?

A    Yes.

Q    And so how was that different from than the new standard?

A    The new standard is any employee that is made aware of the allegation that there's liability to it.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

Page 227

Q    And in this case --

A    And that was -- and that was the purpose of developing this slide is because that had happened changed and I wanted everyone to understand it.

Q    And that's a very important standard, isn't it?

A    It is.

Q    And in this case you had, what, 16 employees that were aware of allegations of impropriate conduct?

A    I had, as you say, 16 employees that had suspicions. And some of those I could probably classify as allegations, yes.

Q    What does the last slide mean? USDE, to a child an adult is an adult. What does that mean?

A    That is a direct quote, I believe, from the letter that outlined the new standard. And it was trying to make it clear that a child could report sexual misconduct or sexual harassment to any adult, rather than somebody who had the authority. It didn't have to be the principal. It could be a custodian as a part of the school district.

Q    All right. The next page says reporting, what to do?

A    Uh-huh.

Q    Any time you find yourself with knowledge of sex based harassment you should report it to the district's Title 9 coordinator, correct?

A    Correct.

Q    And in this case not a single referral was made to the

Title 9 coordinator, correct?  As the result of Coach Underwood's conduct?

A    Not directly.

Q    Was it indirectly done to the Title 9 coordinator?

A    Ms. Hale as my assistant superintend was with me in some of these investigations, so she was aware of some of this conduct.  But, no, I would agree with you that it wasn't made to the district's Title 9 coordinator.

Q    And then the coordinator has to make a determination about that behavior, that's kind of the way Title 9 works, correct?

A    Uh-huh, yes.

Q    And then the last bullet point says say something.  When in doubt, report.  Do you believe that happened here?

A    No.

Q    The next page shows the PISD Title 9 coordinator to be Donna Hale with her address and various --

A    Yes.

Q    -- information, correct?

A    Yes.

Q    Was Ms. Hale's office here at this building?

A    Yes.

Q    Is your office here at this building?

A    Yes.

Q    Now, Ms. Hale has moved on, correct?

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

Page 232

don't specifically remember it.

Q    Hand you Exhibit No. 86.

A    Okay.

Q    Now, from e-mail has been redacted.  Can you tell me why?

A    No.

Q    And this is to Cole Underwood directly, correct?  Is that correct?

A    It looks to be, yes.

Q    And it says I would like to discuss meeting you had with the basketball boys before the Dumas game on Friday.  Let me know when we can meet.  Correct?

A    Yes.

Q    And so that would have just been the first week of January was when that basketball game occurred, correct?

A    Yes.

Q    About the same -- about a week after he told you he was getting divorced?  Right?

A    That's about right.

Q    Now, the next page is from Tori Little to somebody on January the 16th, correct?

A    Yes.

Q    And then at the bottom part of it it says on January 16th at 8:56 a.m. somebody from Perryton ISD is the one that made the complaint, correct?

A    Looks to be, yes.

Q    Do you know who it is?

A    No.

Q    Why is that redacted?

A    I have no idea.

Q    So the original e-mail sent on January the 12th said, I wanted to reach out to you after a conversation that blank and I had last night.  He told me he was called in your office and asked about what happened in Dumas.  As we were talking, it was brought to my attention that the coach told the boys that if their parents were saying anything about him and girls that they needed to tell their parents to shut their f-ing mouths. Although he used the real word, right?

A    No, there's asterisks.

Q    There's asterisks.

A    Ut we know what it is.

Q    I think we know what it is.  I asked blank if he told about this and he said he had forgotten about until just now. I also don't though if you know but blank will not repeat vulgar language or cuss words.  He just kept saying that every other word was a cuss word.  My husband and I are not okay with this at all for many different reasons.  Now, let me stop here and we will get back into it.  Coach Underwood was not a basketball coach, was he?

A    No.

Q    Why was he addressing the basketball team?

A    I think it was because there was -- at this point there was talk about rumors and suspicions among the basketball team.

Q    About what?

A    About, I believe, Cole and ███████ relationship.

Q    And so what Cole did was go down and chew out the basketball team?

A    Yeah, he did.

Q    And apparently used a lot of expletives?

A    He did.

Q    Was there an investigation on this?

A    At least one that we can see -- that we know.

Q    I'm sorry?

A    At least one that we know.

Q    At least one. she keeps saying he said that every other word was a cuss word.

A    Okay.  Yeah.

Q    Was there an investigation about this Dumas basketball issue?

A    I believe Ms. Little looked into this.  And I believe she had a conversation with Cole about it and the way he responded.

Q    I mean, whoever this person is was not okay with this, were they?

A    No.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

Page 235

Q   We know that our children will be exposed to such language in the world, but it shouldn't come from someone in such a high position.  Do you agree with that, sir?

A   I agree.

Q   Was Cole reprimanded for the use of foul language with a team that was not his?

A   I don't believe he was.

Q   Who was the high school basketball boys coach at this time?

A   This was January?  That would have been Spencer Dutcher.

Q   He took over during the year, didn't he?

A   Yes.

Q   Was it Coach Fletcher before then?

A   It wasn't Coach Fletcher.  I can't remember him.  He was -- he resigned abruptly in, I believe, early November.

Q   And Dutcher --

A   Took a job in Oklahoma.

Q   And Dutcher had to take over?

A   Yes.

Q   We are also not okay with someone telling our child to come and tell us anything, especially something so disrespectful.  If the coach had a problem with the parents that should have been addressed in a separate parent meeting.

Lastly, we also feel this whole situation regarding the relationship between a coach and a female student should never

be addressed with our son or any other student for that matter.

Our student should feel safe to report or talk about a situation

that makes them feel uncomfortable and not face backlash or be

subject to an angry rant, especially before an important

district game.  Do you believe --

MR. ELZA:  Objection, form.

Q    (By Mr. Goodwin)  Do you agree with all that?

A    Yeah, I would say I agree with it.

Q    And so what -- what became of this situation?

A    I am not exactly sure.  I think Tori Little talked
with -- I can't directly say that she talked with Cole, but I
think she did.  She was aware of this.  I think she made me
aware that it had happened and that she -- I believe she told
me that she had addressed it and had a conversation with Cole
about it, since it dealt with students.

Q    Did you receive other complaints about this yelling
before a basketball game?

A    I don't think I received them directly.  I don't remember
any.

Q    Did you receive any directly from this particular
complaint?

A    I remember Tori telling me about it.

Q    This particular complaint is not included in the 19 we
have already identified, is it, sir?

A    No, I don't think so.

Q    I mean, it kind of sounds like that Cole is taking up for his girlfriend, doesn't it?

A    That is one way to construe it, yes.

Q    And at this point Cole has told you he's getting divorced. He's already been in trouble for the dynamic duo post. He's been instructed by you to not be alone the ███████ And we are within two or three days of the second post that you had to investigate. And in the time his judgment was to go yell at the basketball team about rumors about he and ███████ correct?

A    I believe that's correct.

Q    And nothing happened to him about this, did it?

A    No. Other than the conversation with Ms. Little, I believe.

Q    How are those conversations going? Were they working?

        MR. ELZA: Objection, form.

A    I think you can construe them as no.

Q    Were the basketball boys interviewed?

A    I don't know what Tori did with that. She may have.

Q    Did this conduct raise red flags with you after what you just were told within the last two weeks about Mr. Underwood?

A    It was one of the things that I kept in my mind.

        MR. GOODWIN: All right. Let's take --
    top of the hour again. Let's take a quick
    break.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

Page 238

I am going to try to pare down, try to get done as quick as I can, Slater.

MR. ELZA: Okay.

THE VIDEOGRAPHER: Going off the record at 3:56.

(Break was taken.)

THE VIDEOGRAPHER: Going back on the record at 4:19.

Q Okay. Mr. Brown, you understand we are back on the records and you are still under oath, sir?

A Yes.

Q I have not been asking you these questions as I was earlier in the deposition. Have I asked you anything so far you haven't understood and you went ahead and answered?

A I -- no, I don't think -- I don't think you have.

Q Okay. So we were talking about this yelling incident when we went off the record that happened it Dumas. Are you with me, sir?

A Yes.

Q Now, would you agree with me that was retaliation against kids that were reporting or had knowledge of this in appropriate relationship?

MR. ELZA: Objection, form.

A No. I would agree that this was retaliation towards them talking about a rumor or suspicion that they had heard.

That's how I would construe this.

Q    (By Mr. Goodwin)   But you would agree with me --

A    Appropriate, no.

Q    You would agree with me that this kind of behavior from Mr. Underwood would make the kids not want to come forward and report, doesn't it?

A    I would agree.   Yes.

Q    And going a step further.  He even removed some of the kids Hudl accounts, didn't he?

A    I don't know that.

Q    So if that happened, you just don't know about it?

A    Yeah, I am not aware of that.

Q    Well --

A    I am not saying it didn't happen.

Q    -- briefly explain to the Court what a Hudl account is.

A    Hudl is a video sharing platform that we use mainly in athletics.  In fact, the only -- only in athletics as far as I know where film can be shared with opposing teams.  It can be shared with colleges, agents to help them look at our players and how they are playing.

Q    And so say, for instance, you have a wonderful wide receiver.  The Hudl account that he has would show his plays in any given week, correct?

A    Uh-huh.

Q    Is that a yes?

A    Yes.

Q    And so then that would allow him to be recruited or it would allow him to show off even to his girlfriend or whoever it might be how good he was as a wide receiver correct?

A    Yes.  Yes.

Q    And it's your testimony that you don't know whether Mr. Underwood removed Hudl accounts for players or not?

A    I am not aware of him removing Hudl accounts.

Q    And if we believe we have information that he did so, would it be inaccurate?

A    What do you mean?

    MR. ELZA:  Objection, form.

A    Would what be inaccurate?

Q    (By Mr. Goodwin)  Would that claim be inaccurate or you just not know about it?

A    If you have information that he did, I just don't know about it.  I wouldn't say it's inaccurate.

Q    And you would agree with me that his behavior in yelling at these students would have a chilling effect on their desire to report an inappropriate relationship?

A    Yes, I would agree.

Q    And would it also -- could that be a reason why these students are telling a previous administrator who is at another school now about this inappropriate, relationship rather than people within the school?

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

Page 241

A    I don't know --

MR. ELZA:  Objection, form.

A    -- what's in their mind, but it could be.

THE REPORTER:  Excuse me.

Did you object to something?

MR. ELZA:  Yes.

MR. GOODWIN:  He did not.

MR. ELZA:  I have objected twice.

Q    (By Mr. Goodwin)  All right.  So if we would look at -- let's go back to Exhibit No. 1, sir.  It's the complaint.

A    Okay.

MR. ELZA:  Page?

MR. GOODWIN:  Page ten.

Q    (By Mr. Goodwin)  Okay.  Do you -- have you seen this allegation before, sir, with regard to exhi-- paragraph number 41?

A    Yes.

Q    And how did you hear about this first?  I mean, did you hear about it outside of our complaint?

A    I believe I was very vaguely aware of this in the midst of our investigations, yes.

Q    And was there any investigation done about this, or did you do any investigation about this?

A    No.

Q    And this was with another child and not ▇▇▇▇ correct?

A    She was then.

Q    Let's go to 48A.  Do you have those, sir?

A    48A?

Q    Yes, sir.

A    Is that in the stack?

Q    It's in the stack I gave you.  I hope so.

A    Okay.  Yes.

Q    Can you identify Exhibit 48A and what we are looking at?

A    These look to be my notes.

Q    Is that your handwriting?

A    Yes.

Q    These were produced to us early in this case.  The first page, Bates number 816 at the top, says closed session settlement agreement.  What does that refer to?

A    I believe that refers to the settlement agreement with -- on the Miller case.

Q    What does that have to do with Cole?

A    It doesn't have anything to do with Cole.

Q    Why is it directly above Cole?

A    This is one of the things -- this was my note of things to talk with the board about in closed session.

Q    So when was the board meeting in relation to April the 22nd?

A    Let's see, the board meeting was on Tuesday, so...

Q    The 23rd?

A       I believe so.

Q       So you reported to the board session about the closed session settlement agreement, and then you reported to the board about how many hours Cole and ███████ were together. That's what it appears to be, correct?

A       That's -- yes, that's what it was.

Q       The next page you have Cole Underwood notes on investigation April 12, 401.

A       That is.

Q       Nat leaves through what?

A       Nat leaves through -- that's probably weight room.

Q       The next page, what's the next page?

A       The next page is some random notes about coaches and positions, I think we are needing.  You are risking your career, reputation, possibly your freedom over this friendship with a 16-year-old girl.  That was me writing out specifically what I was going to discuss with Cole Underwood.

Q       This is before the March 4th meeting, isn't it, sir?

A       I believe it's probably right before I talked with him. This looks to be -- I think the -- what is -- what is listed here is my notes on what Ryan told me on the call on March... I guess, what was it -- 2nd when he called me.

Q       That's why I think -- looking at this, this is all before the March 4th meeting.  Would you agree with me?

A       Yeah, I think so.

forth.

Q    Did they -- did Sandi breach any trust with the -- Ms. Wheeler, did she breach any trust with the school district?

A    Yes, I would say she would probably admit that too. She had admitted me -- to me that she did.

Q    What -- how did she breach that trust?

A    She was a confidant with Cole, and Cole would ask her things about if I had said anything in an -- in an administrative meeting. Asked her how to handle certain things. He -- he consulted her after I issued the write-up. So I would say she was a confidant.

Q    And I think I asked you this question, but she is not here anymore, correct?

A    No, Sandi Wheeler is the principal at the junior high. You're going to be talking with her tomorrow.

Q    She's still here?

A    Yes.

Q    Okay. I am having problems reading your writing on the next bullet point. Pull --

A    I understand.

Q    Pull somebody. Who is that?

A    I was having...

Q    Is it Brook?

A    Brook, Brooklee, Brooklyn. Brooklee out of class, acting

A    Ryan.

Q    Ryan?

A    Concerned, I think, is what I wrote.

Q    Okay.  Did he tell you who that was?

A    No.

Q    Did that concern you that people from the community were approaching the girls basketball coach?

A    Everything about this concerned me all the way through it.  So yes, I was concerned.

Q    And then the last bit is about Cole looking at cameras and listening in on the people who are on the phone.  Correct?

A    Yes.

Q    And that's what included in the March 4th letter?

A    Yes.

Q    Now, did Mr. Daugherty ask for access to the cameras to do his own investigation?

A    Yes.  Well, I don't know what his -- his reason for asking for access to the cameras was.

Q    Did you give it to him?

A    No.

Q    So in March 4th if you would have given Mr. Daugherty or Coach Daugherty access, he may have let you know immediately, correct?

A    Immediately what?

Q    Well, if he had access he was interested in doing an

investigation or he was interested in watching the situation, wasn't he?

A    He was interested in the situation, yes.

Q    And if he would have had the ability to look at the cameras, after the first weekend he might have told you that it had occurred, correct?

          MR. ELZA:  Objection form.

A    That's poor speculation, but it's possible.

Q    (By Mr. Goodwin)  Either way, I mean, hindsight being 20/20, do you wish you would have given him the authority to look at the cameras?

A    I don't regret that decision, no.

Q    Why did you deny him access to the cameras?

A    We try to limit who has access to the cameras for the whole reason that -- that we had the issue with Cole. Sometimes people misuse them.  So I try to limit access to them.

Q    But you gave access back to Cole.  I mean, you took access away from him to March the 3rd, correct?

A    Correct.

Q    And you gave it back to him on April the 3rd, correct?

A    I think that's probably about right.

Q    You denied access to Coach Daugherty?

A    Yes.

Q    And you gave access to Cole who had already misused the

camera system.  Correct?

A    That's correct.  But I gave him back access in a very limited scope.  Before I gave him back access or before I shut off his access he had access to the whole system.  When I restored his access he only had access to the athletic facilities.

Q    Well, that's all he really needed, wasn't it?

          MR. GOODWIN:  Objection, form.

A    Yes.  Both --

Q    (By Mr. Goodwin)  I mean, to perform --

A    Both to do his normal job as athletic director and in this case to --

Q    For -- for his scheme?

A    Yes.

Q    Why not look at the cameras after Daugherty asked for access to them to see what he was look for?

          MR. ELZA:  Objection, form.

A    Ryan never told me why he wanted access to the cameras. He just wanted access to the cameras.

Q    Did you not ask him why?

A    No.

Q    Wasn't that important in determining whether he should have access or not?

A    Not necessarily.

Q    All right.  Let's look at 48B.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025

Page 263

A    Uh-huh.

Q    So with regard to the ice bath photo, what did you do to investigate this photo?

A    I didn't do anything to investigate this photo. What was -- it shows Cole in the training room with two female students in a bath, but they are fully clothed. An ice bath is something that you would do with an -- with an athlete in recovering. So I didn't do anything with this.

Q    You thought this was appropriate?

A    I don't think it's inappropriate.

Q    You think in light of everything that had -- that has come about with regard to Mr. Underwood's behavior and just seemingly attraction to -- or attraction to Ms. Underwood [sic] -- or -- or to Ms. ███████ that there were no further questions to be asked of him about this?

A    In light of everything we know, possibly. But still looking at the picture I don't see -- I don't consider this an inappropriate picture of all.

Q    So possibly you could have done an investigation about this or asked question about it, but you did not do so?

A    Yeah.

Q    And the next page, 54. Is that the...

A    This is the gym picture.

Q    The gym picture we talked about previously in January?

A    Yes.

Q    That never occurred here, did it?

A    No.

Q    He was also asked if he had had a romantic or sexual relationship with students.  He said no, never.  That's what he told you as well, correct?

A    Correct.

Q    And that was a lie, wasn't it, sir?

A    I don't know.

Q    Well, it was a lie that he had --

A    It was a lie here.

Q    It was a lie here --

A    Yes.

Q    -- what he's telling you, correct?

A    Yes.  I don't know about this.

Q    Three days later we look down at the bottom on 8-10 of 2018, Cole was released from administrative leave, correct?

A    Yes.

Q    He's also ordered to immediately cease all electronic communication with individual students and ordered to use professional communication at all times complying with all laws and rules, correct?

A    Yes.

Q    And I'll tell you if you read through it, the reason that was is because you know what happened -- do you -- I mean, explain to the Court what happens with Snapchats.  How does it

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Greg Brown 09/23/2025                                             Page 270

work?

A     Snapchat is a texting application where you have friends or people that you can put in your list and you can send them messages and photos.  And one of the selling points, I guess, or the charac-- characteristics of Snapchat is that it will disappear after a certain amount of time.  At least that's what they claim.

Q     Well, I've done my best to figure out what my kids do, and I can't find that you can pull it back.  Have you ever found that you can pull it back to photos that are sent?

A     Yes.

Q     You've been able to pull --

A     Well, I cannot.

Q     But you think it can be done?

A     I think it can be done, under a subpoena in a criminal investigation, yes.

Q     And is that as a result of what you had with a -- your previous employee?

A     Yes.

Q     Then it goes on and it's on January 15 of 2020 there was a report of Cole Underwood drinking with students, correct?

A     Looks like it, yes.

Q     And then on December 7th of 2021, just shortly before he was hired by Perryton there's a Facebook post about Cole Underwood being at a party where drinking is occurring,

A      I need to reread it.  I don't know what happened with David Drew.  I don't know what the resolution of that was.

Q      Do you know anything about Mr. Drew?

A      Yes.

Q      What -- tell me about the allegations about Mr. Drew.

A      That he had had a romantic relationship with a student and he's no longer employed with the -- or was alleged to have a romantic relationship with a student, and that he's no longer an employee.

Q      Was that while -- was the inappropriate relationship with a student while he was an employee?

A      That's my understanding that it was.  I don't agree with the special education teacher, the paragraph.

Q      Well, let's go back -- if you don't mind going back up with Mr. Drew.

A      Yeah.

Q      Whoever this person is says I think he and the student lived together in Colorado.  Do you know that to be true or not?

A      I do not know that to be true.

Q      Okay.  Do you disagree with the next one?  We talked about this person, correct?

A      Yes.

Q      What do you disagree with about the special education teacher?

A   That's not what happened.  As I -- as I said, that refers to Victor Hackney.  And he was placed on leave when we heard the allegation.  He was kept on leave until the end of the year when we non renewed his contract, still with no evidence, no charges being filed.

Q   So they are accurate, no charges being filed?

A   Yeah, that's correct.

Q   But is your issue is with the resignation?

A   No.  I guess he was -- he did resign, I guess.  But he was going -- he was on his way to being non renewed.

Q   So this is actually accurate then?

A   Yeah, it would say that.  I don't agree with Perryton ISD having along history of covering up such things.

Q   Well, we've identified three here, correct?  I mean, we are not -- you haven't covered up ███ ███ but that's what we are here on today, correct?

A   Uh-huh.  Okay.  I disagree that everyone knew something was going on with PISD, not act.

(Affiant is reading out loud to himself.)

MR. ELZA:  Don't -- don't mumble --

MR. GOODWIN:  Don't mumble.

MR. ELZA:  -- because she's going to slap you.

THE WITNESS:  Sorry.  Okay.  That was me

Q    (By Mr. Goodwin)  According to this letter, the role of the jealous ex-wife let both Coach Underwood and your client hang themselves legally instead of her -- her doing the right thing at the appropriate time.  Whoever wrote this does not like Dacey, correct?

A    It seems like that's what it says, yeah.

Q    Do you know of anybody in the school system that does not like Dacey?

A    Nobody comes to mind.

Q    It says Smith, Underwood, and Brown watched the videos for months and didn't report.  Is that true?

A    That is not true.

Q    Did Cole have a legal obligation under your policies and procedures to report himself?

A    Yeah, I would say so.

Q    He didn't do that, did he?

A    No.

Q    What about Mr. Morales, the superintendent?  Do you believe he did anything wrong here?

        MR. ELZA:  Objection, form.

A    From what I understand about the situation, I think that at the time that he was -- they were hiring Cole, there was no known suspicions or we didn't know about anything that happened at AISD.

        You know, in hindsight having hired somebody that ended

up being a predator and a sexual abuser, sure, we would -- we would not have waned that person in our district.  we would want that person in jail.  But I don't know that I can condemn Mr. Morales and his actions based on what we knew at the time.

Q    Well, certainly a more in depth review of Mr. Underwood's background may have revealed that, correct?

A    It could have, yes.

Q    All right.  So --

MR. GOODWIN:  All right.  I think we will -- pursuant to my agreement with counsel we are going to suspend the deposition at this time until a later date for the remaining portions of it, correct, counsel?

MR. ELZA:  That's fine with us.

MR. GOODWIN:  I got you to 5:15.

THE REPORTER:  What about read and sign?

MR. ELZA:  No.  Yes, he will read and sign.  Send it to me.

THE VIDEOGRAPHER:  Going off the record at 5:10, and this concludes the deposition for now.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

S.J. a Parent, Conservator,      )
and Next Friend of N.J.,         )
                                 )
          Plaintiff,             )
                                 )
vs.                              )  Case No. 2:24-CV-00168-Z
                                 )
PERRYTON INDEPENDENT SCHOOL      )
DISTRICT, and COLE UNDERWOOD,    )
Individually and in his          )
official capacity as Athletic    )
Director of Perryton ISD,        )
                                 )
          Defendants.            )


CONTINUATION OF THE DEPOSITION OF

GREGORY MARK BROWN

TAKEN ON BEHALF OF THE PLAINTIFFS

IN PERRYTON, TEXAS

ON FEBRUARY 17, 2026


WORD FOR WORD REPORTING, L.L.C.
620 NORTH ROBINSON
SUITE 202
OKLAHOMA CITY, OKLAHOMA   73102
(405)232-9673


REPORTED BY:   JENESSA KENDALL KALSU, CSR

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Gregory Brown 02/17/2026                                    Page 283

APPEARANCES

For the Plaintiff:

KYLE GOODWIN
Attorney at Law
420 N.W. 6th Street
Second Floor
Oklahoma City, Oklahoma   73102
kgoodwin@goodwinlewis.com


For the Defendant:

MR. SLATER ELZA
Attorney at Law
Post Office Box 9158
Amarillo, Texas   79105
slater.elza@uwlaw.com

And, thereupon, the said Plaintiffs produced the following witness, to-wit;

GREGORY MARK BROWN,

having been first duly sworn, was examined and testified on his oath, as follows:

DIRECT EXAMINATION

BY MR. GOODWIN:

Q   Mr. Brown, we are here on a continuation from your last deposition.

Can you tell me if you've received any additional reports since our last deposition time?

A   Regarding --

Q   This --

A   -- the issue with Cole and ███████

Q   Yes.

A   No.

Q   No additional reports?

A   Not that I can remember right now, no.

Q   So we've received some information that a gentleman -- a young man by the name of Holdyn Rowland and his parents both met with you.

And if you would like to look at your interrogatory responses, those were not mentioned.

Can you explain why Mr. Rowland's meeting, with his parents, were not -- you didn't mention

that before?

A    I think I do.  Are you talking about the time during which this was going on?  The -- during the -- was it March/April of 2024?

Q    I believe Mr. Rowland's theory was it was February, maybe early March, that they met with you.

A    Okay.  Honestly, I just didn't remember that one.  It was -- it was Mr. Rowland and I think his parents.  I think it was also his girlfriend at the time, which was Ryan Daugherty's daughter.

Their concern was more along the lines of retaliation against Holdyn and not playing, and retaliation in athletics.

And it wasn't dissimilar to some of the things that other people had brought to my attention, just --

Q    What do you mean by that, "not dissimilar"?  Other people complained about retaliation?

A    No.  Sorry.

Regarding Cole and ███████  I think their -- their main concern was that Cole was -- seemed to be, I guess, maybe favoring ██████ or -- suspicions, just like other people have had, that Cole was favoring ████████

And that was causing -- because Holdyn -- I think there was something relational that went on between Holdyn and ▮▮▮▮ and that was causing retaliation against Holdyn, for -- athletically, because he was involved, at one point, I think, with ▮▮▮▮ maybe.

Q    What did that --

A    I don't remember a whole lot about that meeting.

Q    Did that cause you concern that Mr. Underwood would be concerned about a high school relationship?

A    I didn't take it as -- I took it as a part of the whole.

I mean, I think their -- mainly, what I heard was they were concerned because of the retaliation and -- because Holdyn wasn't going to get to play, or was -- didn't want to play anymore because of it.

That's not uncommon in athletics. It's not uncommon for an athlete to come in complaining about not enough playing time or "He's not playing me" or "I didn't get to be on first team because of one reason or another."

And, again -- and, again, the reason was

there -- one of the reasons that was given to me was that they thought that Cole -- because of Holden's previous relationship with ███████████ And I guess felt -- and I don't exactly remember how they were putting it, but because he seemed to be favoring ███████ or --

One of their concerns was "This is retaliation and I'm not getting to play."

And so, honestly, I just remember the tenor of the meeting was more about complaining about the retaliation in athletics and not getting to play or not getting what he wanted in athletics. That's not uncommon.

And, again, his complaint towards ███████ and Cole was not dissimilar than what I was hearing. And he didn't offer any more reliable evidence that it was happening.

Q    What about all of the photos that he took of them together every day?

A    Which ones?  The ones that have been produced?

Q    Yes.

A    Those are the only ones I know about.

Q    Yeah.  I mean he told you about those during the meeting, correct?

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Gregory Brown 02/17/2026                                      Page 298

A    I wasn't in this room, no.

Q    Have you read his transcript?

A    No, I haven't.

Q    Have you read any of the deposition transcripts?

A    Yes.

Q    Whose did you read?

A    Mine, Sandi Wheeler's, Tori Little's, Duce Cooper's.

Q    Little, Wheeler, Cooper.  And there was another one -- and yours?

A    And mine.

Q    Any others?

A    No.

Q    Did you look at Ms. Tregellas'?

A    Who?

Q    Ms. Tregellas.  Maybe I'm not saying that correctly.

MR. ELZA:  Sarah?

MR. GOODWIN:  Sarah Tregellas.

THE WITNESS:  Tregellas?  No.

Q    (By Mr. Goodwin) She was a board member at the time, correct?

A    Yes.

Q    So Mr. Beal testified that you told

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Gregory Brown 02/17/2026

Page 299

Mr. Beal --

A    Uh-huh.

Q    -- that you had provided notice to ███████ ███████ of the written directive to stay away from ███████ Do you follow me?

A    Yes.  You're talking about the March 4th directive?

Q    Yes.

So Mr. Beal testified that you told him that you provided notice of that written reprimand to ███████ ███████

A    Uh-huh.

Q    Is that true?  Did you tell him that?

A    I don't remember telling him that.

Q    Did you tell Mr. Beal that you had provided notice to Mr. ███████

A    I don't remember doing that.

Q    I mean, he was adamant about it.  I mean, you testified at your first deposition that you did not provide notice of the written reprimand to ███████ ███████ Does that still remain correct?

A    According to my memory, yes.

Q    Why would you tell Mr. Beal that you had told Mr. ███████ about that?

MR. ELZA:  Objection, form.

Q    The policies and procedures of Perryton ISD.

A    There is an awful lot of those.

Q    I agree with you.

Have you looked at any of the policies in relation to this case, since your last deposition?

A    Yes.

Q    Which ones?

A    DH Local.

Q    I'm sorry?

A    DH Local.

Q    All right.  We'll get to that one.

A    Uh-huh.

Q    So 106 is BP Local, correct?

A    Correct.

Q    It says, "The superintendent" -- the first line of "Development" says, "The Superintendent and administrative staff shall be responsible for developing and enforcing procedures for the operation of the district."  [As read.] Correct?

A    Yes.

Q    Who's responsible -- what enforcement actions were taken against Mr. Underwood, prior to his termination, sir?

Or his resignation, he was not terminated.

A    Across the course of the year?

Q    Yes.

A    Give me a moment to think. I'm trying to remember them all.

I think, especially through the fall, there were several things that I corrected him on verbally, on issues that were not in relation to the issue between him and ██████ ███████

Q    What were those related to?

A    The use of Snapchat by our coaching staff. Um --

Wanting him to correct some character or unprofessional actions in our coaching staff, specifically regarding language and profanity and its use with students.

Q    Was that him, directly, or his staff?

A    His staff. But him, as the AD, that he was to make sure that didn't happen.

And then, entering into the fall and spring time, I verbally investigated and challenged him on his relationship to ████████ when the first collage came out.

I corrected him, that he was not to be alone with her or put himself in a position that was compromising or unprofessional.

Very similar at -- when the second picture came out, questioned him on whether he was being untoward or doing anything inappropriate or unprofessional towards ███████

Corrected him in the -- verbally told him that pictures that could be inferred that they were having a relationship should be -- should not be posted.

Then leading up to the March 4th written directive, after the track meet incident, where I both, verbally and in written form, corrected him on being alone with students -- female students, especially ███████

And several other -- several other things, including misuse of the camera system to clandestinely listen to one of my phonecalls.

And then finally putting him on leave for violating my directive of being alone with a student. And that was April 21st, I think.

Q    Those are the ones you can think of today?

A    That's the ones I can think of today.

Q    Any other enforcement actions taken against him, that you can recall?

A    Not at the moment.

Q    And only one of those was in writing,

policies and procedures that you previously reviewed?

A     Yes, this is a policy and procedure that is based on the exhibit that you just showed me.

Q     And this is -- this particular policy and procedure precludes or prohibits communication via applications on telephones, correct?

A     Correct.

Q     Now, last time we were here you were -- you thought that it was possible to communicate by Snapchat, but after going through the policies, you admitted that you can't do that.

A     No, that's -- you are correct.

Our policy states that you cannot use an application or a personal method of communication with students.

Q     And if I remember, we went through a series of questions relating to you have the ability to look at his phone at any time, correct?

A     I had the authority, yes, to request it.

(Off-record discussion.)

Q     (By Mr. Goodwin) So Exhibit Number 112, please, sir.

(Deposition Exhibit 112 was utilized after being introduced in a previous deposition.)

A    Yes, that was when he resigned.    Umm...

Q    According to this --

A    Yes --

Q    Sorry.

A    -- yes.    I was still thinking.

It's possible we -- that I reported to TEA in between the conference where I put him on leave and his resignation.    But I know I reported it, I reported the termination and resignation.    I notified TEA of what happened.

Q    If you look down at "Investigation" it says, "A superintendent shall complete an investigation of an employee if there is reasonable cause to believe the employee may have engaged in misconduct described above, despite the employee's resignation from district employment before completion of the investigation."    [As read.] Correct?

A    Let me read through this again.    (Reviewed document.)

Yes, that's what it says.

Q    And in this case, how many investigations did you conduct, sir?

A    Oh, I can -- I think you can -- of the major ones, one, two, three, four.

Q    The first one -- you called them "major ones."  So what are the "major ones"?

A    The collage, the picture in the gym, the track meet incident, and the final video incident that broke everything open.

Q    So there were four major investigations.

A    Uh-huh.

Q    Did you perform any other investigations?

A    If you mean asking some questions when somebody would bring me a rumor or a suspicion, if you would call that an investigation, there were numerous of those.  I don't think I can give you details of when and where and who in this moment.

Q    Well, of the major ones --

A    Uh-huh.

Q    -- how many of those do we have writings about?  How many of those did you provide any kind of writing?

A    And if by that, you're talking about notes or written reprimands?

Q    I'm talking about anything that would be documentary evidence of an investigation.

A    Of the four major ones, I think there is documentary evidence of every one of those investigations.

Q    Performed by you?

A    Yes.

Q    So what documentary evidence do you have of the collage investigation?

A    I have the collage.

Q    Right.  But you didn't do that.

I'm asking for you.  I want notes or documentary evidence that you performed an investigation.

A    I can't think of anything on the collage right now that's my notes or --

Q    I haven't seen any --

A    -- or a history or a journal, no.

Q    I haven't seen those.  Have you provided those to your counsel?

A    I don't think --

MR. ELZA:  Objection, form.

THE WITNESS:  I don't think those exist. I've provided you everything I have.

Q    (By Mr. Goodwin) Okay.  So there's no documentary evidence of your investigation on the collage; is that a fair statement?

A    I think that's a fair statement.  (Nodded head.)

Q    Same on the photo in the gym?

A    I can't remember anything on paper, no.

Q    The track meet, you have the written reprimand, correct?

A    Yes.  And you have my notes from my call from Ryan Daugherty.

Q    And on the final video incident?

A    I think you have some notes where I had written some dates as I was going through.

You have my administrative leave letter.

I can't remember anything else.

Q    Any documentary evidence of the numerous -- of the other, I'll call them, "minor investigations" then?

A    No.

Q    So if you turn to Page 3 of 4 --

A    (Witness complied.)

Q    -- "Solicitation of Sexual Contact."  Do you see that, sir?

A    Uh-huh.

Q    The last sentence says, "The following acts considered in context may constitute prima facie evidence of the solicitation by an employee of sexual contact with a student." [As read.]

A    Uh-huh.

Q    Would you agree with me that's what that

more than one?  Yes.  That I know of.

Q   I mean, it's what your reprimand letter says.  You said you "talked to him on several occasions."

A   Yes.  On those several occasions, I had no evidence that he had truly been alone with her, but I was warning him not to be.

Q   But he was after you had already told him not to do that, correct?

A   When are you talking about?

Q   Well, we can talk about the March 4th incident.

A   Uh-huh.

Q   Let's go to the letter.  Do you remember it, sir?

A   Oh, yes, very well.

Q   Well, in the letter you said you had spoke to him on several occasions regarding your directive to not be alone with ██████  ██████  and other female students, correct?

A   Yes.

Q   So you don't dispute that on multiple occasions -- or on several occasions you told him not to be alone with ██████

A   Correct.

being introduced in a previous deposition.)

Q    (By Mr. Goodwin) Is this another one of the policies and procedures you reviewed again, sir?

A    No.

Q    I don't remember if we talked about this one last time, so I apologize if I'm plowing the same ground again.

But according to this particular policy and procedure, "The district shall notify a parent..." [As read.]

That means it's mandatory, correct, sir?

A    Yes.

Q    "...with whom an educator is alleged to have engaged in misconduct." [As read.]   Correct?

A    Yes.

Q    And then below, it says, "Misconduct is defined as an educator's alleged abuse or commission of an otherwise unlawful act with a student or involvement in a romantic relationship." [As read.] Correct?

A    Yes.

Q    And I believe -- if I remember correctly, the only time you ever informed ███████ ███████ --
or let me scratch that.

You, personally, never informed

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Gregory Brown 02/17/2026                                Page 329

Mr. ███████ of any of the more than 30 reports about his inappropriate conduct, did you?

          MR. ELZA:  Objection, form.

          THE WITNESS:  No.

     Q    (By Mr. Goodwin) Now, you did --

     A    Although, I think --

     Q    -- have --

     A    Although I think 30 reports misstates what we have.

     Q    I agree with you.  I think it's closer to 50.

          So we'll go through that at trial.

     A    I disagree with that number, too.

     Q    Okay.

          So you did have -- I'm still very unclear. I've actually read your deposition again.  I'm very unclear about this Little and Wheeler report from Ms. Haberthur; are you with me --

     A    Yes.

     Q    -- what I'm talking about?

     A    (Nodded head.)

     Q    So the context is that Ms. Haberthur received a complaint from multiple students from Perryton ISD.  Are you with me so far?

     A    I am.

Word for Word Reporting, LLC
405.232.9673 (OKC) | 888.277.9673 (Toll-Free)

214

Q    Would you agree with me that that's true?

MR. ELZA:  Objection, form.

THE WITNESS:  State what you want me to agree with again.

Q    (By Mr. Goodwin) Sure.  That Dane Staggs, Holdyn Rowland, and a Jaret Rowlan -- I think they're not related -- complained to Ms. Haberthur at another school event, correct?  Are you with familiar with that?

A    I don't know that, no.

Q    What don't you -- what don't you believe about that, sir?

MR. ELZA:  Objection, form.

THE WITNESS:  I don't know who complained to her.  I don't know that it was Perryton students.

I do know that Delma called Sandi or Tori and told her some -- her concerns.

Q    (By Mr. Goodwin) Have you reached out to Ms. Haberthur to find out who told her?

A    No.

Q    Well, isn't that kind of important, sir?

MR. ELZA:  Objection, form.

THE WITNESS:  At this point, I don't think so.

Q    (By Mr. Goodwin) It doesn't matter what

happened then?

A    Oh, it matters greatly what happened.

Q    Then why wouldn't you just call Ms. Haberthur and talk to her?

A    Cole has been arrested and he's in jail and he's in federal prison.

Q    Yeah, I agree with all of that.  But don't you want to know what happened so you can prevent it in the future?

A    I have looked into many things about the way we handled this and have made some corrections where I deemed them appropriate.

Q    What are --

A    That's not -- one thing that I've done.

Q    What are those corrections?

A    I've trained staff on Title IX; I have talked with my administrators on reporting standards; I have made sure they understand the law and what we are to do to report; I have had specific, pointed conversations with our employees about avoiding and not engaging in anything that could even be construed as a romantic relationship or sexual relationship with a student.

I have expressed my expectations with our coaching staff, that they are to -- not to be alone

at the time, the policies and procedures of this school district, correct?

A    Uh-huh.

Q    Is that a yes?

A    Yes.

Q    So you've done nothing except say "Follow the policies and procedures"?

A    Well, at least of those things that I can remember right now.  I would agree with that, those --

Listing those right there, yes, those are the policies and procedures that are in place.

Q    And they were already in place when Mr. Underwood was here.

A    Sure.

Q    So what have you done other than telling people to follow the policies and procedures?

A    I can't remember anything right now.  I know I've done some things.

Q    Why are these necessary?  Why was it necessary to go through these four things?

A    To avoid something like this happening again, to avoid a student getting into an unsafe situation.

Q    Another way to put it is to avoid the

violation of the previous policies and procedures, correct?

A    Yeah.

        MR. ELZA:  Objection, form.

    Q    (By Mr. Goodwin) So how come Delma Haberthur --

A    Uh-huh.

    Q    I don't understand -- sir, please help me understand why it's not important to figure out exactly what happened so that it doesn't happen again.

        MR. ELZA:  Objection, form.  Objection, asked and answered.

        THE WITNESS:  Um -- is that a question?

    Q    (By Mr. Goodwin) Yes.  Help me -- I said help me understand why you haven't called Delma Haberthur.

    A    Because I think I need to know, at this point, all that I need to know from that situation.

        She received a report; she let my administrators know of her concerns and that she had received a report.  We took the report and, at the time, took the action that we thought was appropriate, which was probably looking into it.  We were already aware of some of the concerns.

Q    So in reading your deposition, and after deposing Ms. Wheeler and Ms. Little, did they tell you about the phonecall from Delma Haberthur or not?

A    Yes.

Q    So you remember --

A    I remember -- I remember Tori telling me that she had received a phonecall from Delma Haberthur. But in my memory, it was about the Gruver basketball game, where Cole had been using a TheraGun on ███████ leg. And they were -- she was concerned --

In my memory, Delma had seen it and Delma was concerned.

I was not aware that some concerns had come to her from students.

Q    So is it fair to say that you were not provided all the information that Ms. Haberthur reported?

A    I don't know what she reported.

Q    Have you read her deposition?

A    No.

Q    Why not?

MR. ELZA:  Has -- hold on. Ms. Haberthur's deposition?

Q    (By Mr. Goodwin) Well, Mr. Haberthur, did

you read his?

A    No.

Q    But, again, you haven't called her to find out what she said?

MR. ELZA:  Objection, asked and answered.

THE WITNESS:  That's correct.

Q    (By Mr. Goodwin) So all you remember about what Ms. Little told you was that Delma saw the TheraGun incident?

MR. ELZA:  Objection, asked and answered.

THE WITNESS:  Yes.  And was concerned with how that looked.

Q    (By Mr. Goodwin) Nothing about -- do you remember anything that Ms. Little told you about students reporting things to her?

MR. ELZA:  Objection, asked and answered.

THE WITNESS:  In this case?

Q    (By Mr. Goodwin) Yes.

A    About students reporting to Delma Haberthur?

Q    Yeah.  I want to make sure we're communicating.

A    Yeah.

Q    So my understanding is that these three students reported incidents to Ms. Haberthur; she

then called Little and Wheeler.

And I'm trying to find out everything that Little told you: Who reported this; how it was reported, what was reported.

I'm not trying to be tricky or unfair with you.

A    I understand.

I don't remember her reporting some of those details to me. I remember her calling me and telling me that she had gotten a call from Delma Haberthur.

Q    I'm sorry to interrupt.

A    I'm sorry.

Q    Ms. Little told you this?

A    Yes, Ms. Little --

Q    Okay.

A    -- told me that she had received a report from Delma Haberthur and Delma was concerned.

I remember in that conversation the -- her talking about the TheraGun incident. I don't remember any more details. That's not to say that Tori didn't tell me, but those aren't the details that I remember.

Q    How many occasions, in your history, has an administrator from another school reported an

inappropriate relationship at a school where you were the administrator?

A    I can't think of one.

Q    Other than this one?

A    Other than this one.  (Nodded head.)

Q    So it's fair to say that this report, from another administrator, about an employee at your school --

A    Uh-huh.

Q    -- is very unique?

A    Unique in situation, yes.

Q    Well, it's rare, for lack of a better term.

It's never happened to you in -- how many years have you been an administrator now?

A    34.

Q    And in 34 years of being an administrator, this has never --

A    Is that right?  34 years in education -- hold on.  29, 30, I think in -- 28 in --

Q    All right.  I'm not trying to --

A    -- administration.

Q    -- hold you --

A    I understand.

Q    You've been around a long time.

A    Yes.

Q    And in that amount of time, the only time you can remember another administrator reporting an inappropriate relationship is the one Delma Haberthur reported here?

A    I believe that's correct.

Q    Did you -- I've seen no writings from an investigation conducted about this report, correct?

A    I believe that's correct.  (Nodded head.)

Q    Why -- so what has happened, since your last deposition, that you remember this conversation with Ms. Little now?

A    I read through her deposition and it jogged my memory.

MR. GOODWIN:  We've been going an hour. Slater, do you need a break?  I don't have much longer.

MR. ELZA:  No.  Let's do take a break.  I need to make a phonecall.

MR. GOODWIN:  Okay.

(Short break.)

Q    (By Mr. Goodwin) Okay.  You understand, Mr. Brown, that we're back on the record and you're still under oath?

A    Yes.

# Exhibit 4

224

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| S.J., as parent, Conservator, and Next Friend of N.J., | § § § § § | |
| Plaintiff, | § | |
| v. | § § | CASE NO. 2:24-CV-00168-Z |
| PERRYTON INDEPENDENT SCHOOL DISTRICT, and | § § § § | |
| COLE UNDERWOOD, Individually and in his official capacity as Athletic Director of Perryton ISD, | § § § § § | |
| Defendants. | § | |

---

## DEFENDANT PERRYTON INDEPENDENT SCHOOL DISTRICT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS AND REQUESTS FOR ADMISSION

---

TO:    Plaintiff, S.J. as Parent, Conservator and Next Friend of N.J, through their attorneys of record R Tyler L. Gentry and Kyle Goodwin of Goodwin Lewis, PLLC, 420 NW 6th St., 2nd FL, Oklahoma City, OK 73102; and, Brian P. Heinrich of Mayfield Heinrich Rahlfs Weaber & Parsons, LLP, 320 S. Polk, Suite 1000, Amarillo, Texas 79101

Pursuant to Federal Rule of Civil Procedure, Defendant Perryton Independent School District ("PISD," "Perryton ISD" or "Defendant") serves these objections and responses to Plaintiff's First Interrogatories, Requests for Production and Requests for Admission. Defendant reserves the right to supplement this response as necessary.

Defendant Perryton ISD's Responses to                                              Page 1
Plaintiff's First Discovery Requests

Respectfully submitted,

/s/ Slater C. Elza

Slater C. Elza
State Bar No. 24000747
slater.elza@uwlaw.com
Fred A. Stormer
State Bar No. 24013579
fred.stormer@uwlaw.com
UNDERWOOD LAW FIRM P.C.
P.O. Box 9158
Amarillo, Texas  79105
Tel:  (806) 376-5613
Fax:  (806) 379-0316

Janet Sobey Bubert
State Bar No. 24036281
janet.bubert@uwlaw.com
UNDERWOOD LAW FIRM, P.C.
600 Bailey Avenue, Suite 200
Fort Worth, Texas  76107
Tel: (817) 885-7529
Fax: (817) 439-9922

**ATTORNEYS FOR DEFENDANT
PERRYTON INDEPENDENT SCHOOL DISTRICT**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was served on all parties of record via email on the 20th day of December, 2024:

Tyler L. Gentry
Kyle Goodwin
Goodwin Lewis, PLLC
420 NW 6th St., 2nd FL
Oklahoma City, OK 73102
P: (405) 900-5700
tgentry@goodwinlewis.com
kgoodwin@goodwinlewis.com

Brian P. Heinrich
Mayfield Heinrich Rahlfs
Weaber & Parsons, LLP
320 S. Polk, Suite 1000
Amarillo, Texas 79101
(806) 242-0152 – Telephone
(806) 242-0159 – Fax
brian@mhrwp.com
*Counsel for Plaintiffs*

/s/ *Slater C. Elza*
Slater C. Elza

## GENERAL OBJECTIONS TO PLAINTIFF'S DISCOVERY REQUESTS

**GENERAL OBJECTION NO. 1:** Objection is made to the Definitions and Instructions used in and throughout these discovery requests on the grounds that the Definitions and Instructions, individually and/or jointly are too vague, ambiguous, and overly broad, and are outside the permissible scope of discovery. To the extent any Definition, individually and/or jointly, or in conjunction with any discovery request, exceeds or attempts to exceed what is permissible discovery under the Federal Rules of Civil Procedure or otherwise, objection is made. Objection is made to any Definition, or any combinations thereof, which seeks or attempts to seek, in conjunction with any discovery request or otherwise, information protected by any privilege, including the work product and attorney-client privileges. For purposes of this response, the responding party shall give all terms and phrases contained in the discovery requests their ordinary and customary meaning and shall fully comply with the Federal Rules of Civil Procedure regarding responding to discovery. This objection to Definitions and Instructions applies to each Definition and Instruction contained in this discovery request, and is incorporated by reference into all individual responses and objections set out below.

**GENERAL OBJECTION NO. 2:** The following responses are based on information available as of the date hereof. These responses are given without prejudice to respondent's right to produce or rely on subsequently discovered information. Further discovery, independent investigation, or other analysis may lead to the discovery or identification of additional information, which may require additions or changes to these responses.

**GENERAL OBJECTION NO. 3:** Nothing herein is intended to be or should be construed as a waiver of the attorney-client privilege, the work product doctrine, or any other protection. Inadvertent production of such protected information is not intended to be and shall not operate as a waiver of the applicable privilege. Any information withheld on the basis of such privilege will be identified on a privilege log.

**GENERAL OBJECTION NO. 4:** Respondent objects to the requests to the extent that they would require Respondent to produce documents or information covered by confidentiality agreements with others, or that would require Respondent to violate the privacy interests of others.

Defendant Perryton ISD's Responses to                                                 Page 4
Plaintiff's First Discovery Requests

## OBJECTIONS AND RESPONSES TO
## PLAINTIFF'S FIRST INTERROGATORIES

**INTERROGATORY NO. 1:**    Identify with particularity each and every person that had access to the PISD video camera system for the 2023-2024 school year, and for each person identified include each person's position within PISD, whether each such person had the ability to delete or alter the videos captured by the system, and whether each such person accessed the system, including the dates and times each such person accessed the system.

**ANSWER:**    Defendant objects to this interrogatory because the request asks for information that is not relevant to this matter nor reasonably calculated to lead to admissible evidence because it exceeds the scope of issues raised in Plaintiff's Original Complaint.

Subject to and without waiving the foregoing objections, see report attached hereto.

**INTERROGATORY NO. 2:**    Identify each and every Complaint made by any person to PISD concerning Underwood's actions toward any and all female students at PISD and for each Complaint, state the identity of the complainant, the date the Complaint was made, and the substance of each Complaint.

**ANSWER:**    Defendant objects to this interrogatory as vague and overly broad because the references to "Complaint" and "PISD" are not limited in scope or otherwise properly defined/identified. As written, the request asks for information that is not relevant to this matter because it exceeds the scope of issues raised in Plaintiff's Original Complaint. Defendant further objects because the interrogatory is not proportional to the needs of the case and places an unreasonable and undue burden on Perryton ISD.

Subject to and without waiving the foregoing objections, Defendant is aware of the following reports made by persons to Perryton ISD concerning Underwood's actions toward female students:

- Sometime in August of 2023, a football player named "Oodie" reported to Spanish teacher Evelyn Tarango during a barbeque at Ms. Tarango's brother's house that Underwood was a "perv" and "is after all the girls."

- In September of 2023, Mary Vasquez reported to Spanish teacher Evelyn Tarango that Underwood had yelled at Ms. Vasquez' daughter, Abby Vasquez, after she [Abby] called Underwood a "perv" because Underwood contacted a student named Juliet Myer via SnapChat.

- In September or October of 2023, freshman Biology teacher Deborah Molina reported learning that Underwood scolded cheerleader ▮▮▮▮▮▮▮, after calling Underwood a "perv" for contacting a student named J▮▮▮▮▮ via SnapChat. Ms. Molina also reported hearing a rumor in March of 2024 that NJ rode back to Perryton alone with Underwood following a track meet in Canyon, Texas.

- Sometime during football season in 2023, Mike Blackshire verbally asked volleyball coach Abigale Harris "how do you like working for a pedophile?" Coach Harris reported generally hearing statements in the community during the fall of 2023 of Underwood having a relationship with a student. Harris was later told by High School male students that the female student was supposedly NJ.

- Sometime during football season in 2023, volleyball coach Shaun Lynch reported that two football players told him that "something was going on" between Underwood and NJ, and that he later heard rumors that the community was generally concerned about Underwood's relationship with NJ after he used a TheraGun to provide therapy to NJ in the stands at a basketball tournament in Gruver, Texas in December of 2023.

- During the 2023-2024 school year, Jenifer Ferger, an office assistant for the High School, reported generally hearing rumors of a personal relationship between Underwood and NJ, but no reports of any sexual relationship.

- During the 2023-2024 school year, Junior High Volleyball Coach Zoe Salazar, reported generally hearing rumors that Underwood was frequently with High School girls, including NJ, and about Underwood being alone with these female students in the training room.

- During the 2023-2024 school year, Assistant High School Principal Francis Zavala received reports from her brother and sister-in-law that Underwood was too close with NJ and they later reported the community was generally concerned about Underwood and NJ after he used a TheraGun to provide therapy to NJ in the stands at a basketball tournament in Gruver, Texas in December of 2023. Ms. Zavala also reported seeing a photo of Underwood being in the training room while two other students were in the ice bath.

- Around the end of the fall semester in 2023, High School Principal Tori Little reported that she generally heard rumors that the community was concerned about Underwood and NJ being too close. Principal Little reported that she and the High School counselors met with █████ █████ to speak with him about boundary issues between NJ and Underwood and recommended that SJ address these concerns with NJ and check her phone. Little did not believe there was any sexual or romantic relationship, but that NJ would "develop feelings" for Underwood.

- On or about December 19, 2023, Kevin Cummings, a local CPA and school volunteer, reported to the Superintendent that NJ made a post on social media that contained a collage of various photos of her and Underwood with the caption "Best Duo" along with a flame emoji embedded in the collage. Mr. Cummings advised that it appeared Underwood's and NJ's relationship was too personal, but Mr. Cummings did not allege that Underwood and NJ were sexually involved.

- Beginning in December 2023, after NJ posted photos of her and Underwood on social media, Junior High Principal Sandi Wheeler reported hearing rumors, generally, that

Underwood was too close with NJ and that Underwood had used a TheraGun to provide treatment in the stands during a basketball tournament in Gruver, Texas, in December of 2023.

- Beginning in December of 2023, Defensive Coordinator and Head Baseball Coach Brady Fletcher reported hearing rumors, generally, that Underwood was too close with NJ after Underwood had used a TheraGun to provide treatment to NJ in the stands during a basketball tournament in Gruver, Texas, in December 2023. Coach Fletcher also heard rumors in March of 2024 that Underwood had taken NJ home to Perryton alone in his car from a track meet in Canyon, Texas.

- On or about March 4, 2024, Assistant Athletic Director Ryan Daugherty reported to the Superintendent that Underwood gave NJ a ride home from a high school track meet in Canyon, Texas.

- In March of 2024, High School Football Coach Spencer Dutcher reported hearing rumors, generally, of an improper relationship between Underwood and NJ after NJ rode back to Perryton following a track meet in Canyon, Texas.

- In mid-April of 2024, Assistant Football and Powerlifting Coach Casey Arruda reported hearing rumors, generally, that there was a freshman girl who reported to someone that Underwood was "checking out the girls."

- On or about April 21, 2024, Duce Cooper informed the Superintendent that NJ's car and Underwood's car were seen at the high school at the same time on April 20, 2024.

**INTERROGATORY NO. 3:**    Identify with particularity the person that "reported" to Brown that the PISD camera system was used by Underwood to "secretly listen..." to Brown's telephone conversation as identified in Brown's March 4, 2024 admonition letter to Underwood (PISD 0040-0041) and include the manner in which the reporting party was aware of Underwood's "secret listening".

**ANSWER:**    Assistant Athletic Director Ryan Daugherty informed Superintendent Brown on March 4, 2024, that Underwood had verbally reported to him [Daugherty] that he [Underwood] had eavesdropped on Mr. Brown's prior conversation by accessing the District security camera system.

**INTERROGATORY NO. 4:**    State the name, address, telephone number, and area of expertise of all experts who you propose to call as witnesses at any proceeding in this matter. For each person identified:
    a.    State the subject matter on which each person is expected to testify;
    b.    Provide the substance of the facts and opinions to which each expert is expected to testify and a summary of the grounds for each opinion;

    c.    Provide the qualifications of the expert, including a list of all publications authored by the expert witness with the preceding ten (10) years;

    d.    Identify all compensation paid or to be paid to the expert witness for the testimony; and

    e.    Provide a listing of any other cases in which the expert witness has testified as an expert at trial or by deposition within the preceding ten (10) years.

**ANSWER:**    Defendant objects to this Interrogatory to the extent its requirements seek to expand on Defendant's lawful obligations under the FRCP and any scheduling order or other order from this Court. Subject to and without waiving such objections, Defendant has not yet determined what witnesses it may call at time of trial. Defendant will supplement this information in accordance with the Federal Rules of Civil Procedure and any scheduling order entered by the Court.

**INTERROGATORY NO. 5:**    In Brown's March 4, 2024 admonition letter to Underwood (PISD 0040-0041), Brown states "[w]e have talked several times over the course of the year regarding your relationship with female students, and particularly ▮▮▮▮ ▮▮▮▮ Describe with particularity the factual basis for Brown's claim, including identifying the following:

    a.    the dates for each of the "several" communications between Brown and Underwood;

    b.    the substance of each communication identified herein;

    c.    identifying each person that provided the Complaint to PISD about Underwood's conduct which initiated the communications;

    d.    identifying all witnesses who will testify about Brown's claim and a summary of their testimony; and,

    e.    identifying all documents which relate in any way to Brown's claim.

**ANSWER:** Defendant objects to this request to the extent it requires Perryton ISD to produce personally identifiable student information in violation of the District's obligations under FERPA. Student records protected by FERPA may be released in this matter only in response to a subpoena or court order unless the requestor provides written consent from the student's parent or the adult student. For records relevant to this matter, Perryton ISD will comply with any lawfully served subpoena or court order in accordance with the procedures required by FERPA.

Subject to and without waiving the foregoing objections, Superintendent Brown met with Underwood on the following dates:

- On or about December 19, 2023, Kevin Cummings, a local CPA and school volunteer, reported to Superintendent Brown that NJ made a social media post that contained a collage of various photos of her and Underwood and that it appeared that Underwood's relationship with NJ was too personal. Superintendent Brown met with Underwood on December 10, 2023, concerning this post and confronted Underwood directly about whether he was involved in a romantic or sexual relationship with NJ. Underwood denied having any romantic relationship with NJ. Underwood informed Brown that he was a friend of the

family and was helping SJ and NJ as they worked through a difficult custody battle with NJ's mother. Superintendent Brown admonished Underwood about the perception that NJ's post created, reminded him generally to maintain professional boundaries with all female students and directed Underwood specifically not to be alone with NJ and not to allow photos of him and NJ.

- On or about January 8, 2024, Superintendent Brown met with Underwood to discuss Underwood's pending divorce. Brown asked Underwood if the reason for his divorce was because he was having an affair. Underwood denied having an affair with anyone and reported the reason for his divorce was that he was "too devoted" to his position as Athletic Director and Head Football Coach.

- On or about January 15, 2024, Principal Tori Littler informed Superintendent Brown that NJ had posted another photo of her and Underwood on social media, in which Underwood appeared to be alone with NJ in the High School gym. Brown checked the security cameras and after reviewing video of the gym, determined that coaches were present in the gym with their children at the time NJ and Underwood were present. Underwood and NJ left the gym in separate directions after the photo was taken. Superintendent Brown had a conversation with Underwood regarding the prior directive to not allow photos of him and NJ and about the perception created by this further social media post. Brown, again, confronted Underwood on whether he was having a romantic relationship with NJ and Underwood denied it. Brown verbally directed Underwood that he should not be alone with NJ or any other female student and further directed Underwood to ensure that there would be no more social media posts of just him and a female student.

On or about March 3, 2024, Assistant Athletic Director informed Superintendent Brown that Underwood drove NJ home in his car from a track meet in Canyon, Texas, and that Underwood had eavesdropped on Mr. Brown's conversation with a Trustee on December 19, 2023, by accessing the District's security camera system. Superintendent Brown met with Underwood on March 4, 2024, about being alone with NJ in his car while driving back from the track meet and advised this was a violation of the prior verbal directives. At this meeting, Superintendent Brown also addressed Underwood's improper use of the security camera system to listen in on Brown's conversations. Underwood provided a series of text messages to Superintendent Brown that shows SJ requested and gave permission for Underwood to take NJ home from the track meet for a family event. Superintendent Brown again verbally admonished Underwood for violating the directive to not be alone with NJ. Brown again asked Underwood if he was having a romantic relationship with NJ. Underwood denied it, and Brown directed Underwood to avoid all contact with NJ that would create a perception that he and NJ were having an improper relationship and also reminded him generally to maintain professional boundaries with all female students. Brown also received an email from SJ expressing his support for Underwood and advising Brown that Underwood was a family friend and that he, SJ, had requested Underwood to bring NJ home. Mr. Brown met with Underwood later that same day to inform Underwood that he must comply with school directives regardless of parental request(s) and to review the March 4, 2024 admonition letter with written directives.

- On or about April 21, 2024, Superintendent Brown received a call from Duce Cooper informing Brown that the day before, NJ's car and Underwood's car were at the school at the same time. Brown reviewed security video footage that showed Underwood propping open an entrance to the gym, NJ entering through that door, walking through a locker room, the gym, and the weight room and then walking up the stairs to where Underwood's office was located. On April 22, 2024, Brown confronted Underwood about being alone with NJ in his office. Underwood initially denied being with NJ. After being confronted with the fact that Brown had a video recording of NJ entering the building and making her way to his office, Underwood eventually admitted to being alone with NJ in his office. Superintendent Brown immediately placed Underwood on paid administrative leave. Brown also reported Underwood to the Ochiltree County Sheriff's Office and notified DFPS-Texas Child Protective Services.

**INTERROGATORY NO. 6:**    Identify with particularity each and every action taken or process employed by PISD or PISD Administration to monitor Underwood's actions and compliance with the March 4, 2024 written admonishment by Brown (PISD 0040-0041) to Underwood.

**ANSWER:**    Following the January 15, 2024, conversation with Underwood, Superintendent Brown gave verbal directives to various District employees, including Tori Little, Ryan Daugherty, Francis Zavala, and Shaun Lynch, to keep an eye on Underwood and report any instance where Underwood was alone with NJ. Brown also reviewed Parent Square communications sent to and from Underwood. These directives remained in effect following the March 4, 2024 written admonishment from Mr. Brown.

**INTERROGATORY NO. 7:**    Identify with particularity the date upon which PISD first received a Complaint which related in any way to Underwood's conduct with NJ and identify the person that made the Complaint and the substance of the Complaint.

**ANSWER:**    Defendant objects to this interrogatory as vague and overly broad because the references to "Complaint" and "PISD" and "related in any way . . ." are not limited in scope. As written, the request asks for information that is not relevant to this matter because it exceeds the scope of issues raised in Plaintiff's Original Complaint. Defendant further objects because the request is not proportional to the needs of the case and, therefore, places an unreasonable and undue burden on Perryton ISD.

Subject to and without waiving the foregoing objections, Defendant PISD believes that various PISD employees heard rumors of an improper relationship between Underwood and NJ sometime during football season in the fall of 2023. The first person to report a concern to Superintendent Brown about Underwood was Kevin Cummings, a local accountant that volunteers with District sports teams. Mr. Cummings expressed his concern to Brown on December 19, 2023. This was following the first social media post of the photo collage of SJ and Underwood. Mr. Cummings was suspicious about the nature of the relationship between Underwood and NJ. Other than the social media post, Mr. Cummings did not provide any evidence of impropriety involving

Underwood, but simply expressed his suspicion and concern about NJ's relationship with Underwood.

**INTERROGATORY NO. 8:**    Describe in detail each and every in-service or training provided to PISD teachers and PISD Administrators concerning PISD Policies DH and FFH since August 1, 2022 and include the date(s) of each such training, the person presiding over the training and a log of each person attending the training.

**ANSWER:**    Defendant objects to this interrogatory as vague and overly broad because the references to "concerning PISD Policies DH and FFH . . ." are not limited in scope. As written, the request asks for information that is not relevant to this matter because it exceeds the scope of issues raised in Plaintiff's Original Complaint. Defendant further objects because the request is not proportional to the needs of the case and, therefore, places an unreasonable and undue burden on Perryton ISD.

Subject to and without waiving the foregoing objections, the District provided Title IX compliance training through: EdHero Online Professional Development; directed employees during Teacher Inservice prior to the start of the 2022-2023 and 2023-2024 school years to review the Employee Handbook, which covers Board Policies DH(LOCAL) and FFH(LOCAL); and, the Superintendent provided in-person Title IX training to each campus, starting with the 2024-2025 school year. See attached logs and sign-in sheets for these training courses in response to RFP No. 22.

**INTERROGATORY NO. 9:**    Identify all persons who have knowledge as to the facts as alleged in this matter, including their respective addresses and phone numbers, and summarize the knowledge held by each such person.

**ANSWER:**    See persons identified in Defendant's Rule 26(a)(1) Disclosures and any future supplements thereto, as well as persons identified in any discovery responses of any Party, medical or healthcare records exchanged by the Parties, and depositions in this matter.

**INTERROGATORY NO. 10:**    Identify with particularity each and every action taken or process employed by PISD or PISD Administration to investigate Underwood's background prior to his retention by PISD and identify each person interviewed by PISD.

**ANSWER:**    Perryton ISD conducted a criminal history background check on Underwood, pursuant to Texas Education Code §22.083, when he was first employed. Perryton ISD also checked the Texas Education Agency State Board of Educator Certification webpage to confirm Underwood's certificate was in good standing. Perryton ISD checked references for Underwood. Further, Kurt Haberthur, Perryton ISD's Athletic Director, worked with Underwood at Amarillo Independent School District and was not aware of any disciplinary action taken by Amarillo Independent School District against Underwood. No reports of misconduct by Underwood were revealed or reported.

**INTERROGATORY NO. 11:**  Describe in detail the duties and responsibilities of Dacy Smith (nee "Underwood") as Director of Communications and Safety for PISD and include Dacy Smith's access credentials to the PISD video camera system.

**ANSWER:**  Dacy Smith's duties as Director of Communications and Safety involve managing the District's website, responding to media requests, posting and distributing announcements and news regarding Perryton ISD, and managing the ParentSquare platform. She also partners with the District's CFO, Britney Meraz, to facilitate safety procedures and policies for the District. Ms. Smith does weekly door checks for District facilities and coordinates compliance with state standards regarding school safety. Dacy Smith has access to view the security camera system but does not have the ability to alter or delete files.

**INTERROGATORY NO. 12:**  Identify with particularity each and every person that had access to the ParentSquare application used by PISD for the 2023-2024 school year, and for each person identified include each person's position within PISD and whether each such person had the ability to delete or alter the communications captured by the application.

**ANSWER:**  Defendant objects to this interrogatory as vague and overly broad because the references to "each and every person that had access" is not limited in scope. As written, the interrogatory asks for information that is not relevant to this matter because it exceeds the scope of issues raised in Plaintiff's Original Complaint. Defendant further objects because the request is not proportional to the needs of the case and, therefore, places an unreasonable and undue burden on Perryton ISD.

Subject to and without waiving the foregoing objections, every student, parent, teacher and administrator affiliated with Defendant had access to the ParentSquare application for the 2023-2024 school year. See list attached of persons with ParentSquare access for the 2024-2025 school year. Defendant requested similar material but was not able to obtain such a list for the 2023-2024 school year. To the Defendant's knowledge, messages cannot be altered or permanently deleted.

**INTERROGATORY NO. 13:**  Identify with particularity each and every claim, lawsuit, or demand made against PISD since January 1, 2014 which relate in any way to abuse, harassment, sexual abuse or sexual conduct between a PISD employee and a PISD student and include the outcome, if any, of each such claim or lawsuit.

**ANSWER:**  Defendant objects to this interrogatory as vague and overly broad because the reference to "relate in any ways to . . . " is not limited in scope. As written, the request asks for information that is not relevant to this matter because it exceeds the scope of issues raised in Plaintiff's Original Complaint. Defendant further objects because the request is not proportional to the needs of the case and, therefore, places an unreasonable and undue burden on Perryton ISD. Defendant Perryton ISD also objects to this interrogatory to the extent it requires Perryton ISD to produce personally identifiable student information in violation of the District's obligations under the Family Educational Rights & Privacy Act ("FERPA"). Student records protected by FERPA

may be released in this matter only in response to a subpoena or court order, unless the requestor provides written consent from the student's parent or the adult student. For records relevant to this matter, Perryton ISD will comply with any lawfully served subpoena or court order in accordance with the procedures required by FERPA.

Subject to and without waiving the foregoing objections, there has not been any other claim, lawsuit, or demand made against Defendant Perryton ISD since January 1, 2014, which arises from abuse, harassment, sexual abuse or sexual conduct between a Perryton ISD employee and a Perryton ISD student.

**INTERROGATORY NO. 14:**   In the event you deny or otherwise refuse to admit Request for Admission No. 10 herein, explain in detail the factual basis for such denial and identify all witnesses and exhibits that will support your contention.

**ANSWER:**   Nonapplicable.

**INTERROGATORY NO. 15:**   Identify with particularity each and every communication between PISD and SJ concerning the "rumors and suspicions regarding [Underwood's] relationship with female students, including ▆▆▆▆ ▆▆▆▆ as referenced in the March 4, 2024 admonition letter from Brown and include the date of each communication and the substance of each communication.

**ANSWER:**   Superintendent Brown communicated with SJ on two occasions about Underwood and NJ. The first was an email that SJ sent to Brown defending Underwood's involvement with NJ and calling the rumors of an inappropriate relationship between Underwood and NJ "bs." This email was sent by SJ on March 4, 2024, following the incident in which SJ requested and gave permission for Underwood to drive NJ home alone from the track meet in Canyon, Texas. The second communication was a phone call between SJ and Brown after Underwood was put on administrative leave and the criminal investigation against Underwood was pending. To the best Superintendent Brown can remember, he informed SJ of the status of the District's and the Sheriff's investigations. Brown also asked SJ how he and NJ were doing, and let SJ know that the District would support NJ in whatever way she needed.

SJ came to the High School to meet with Principal Tori Little in late November or early December of 2023, in an attempt to stifle community rumors that began to spread shortly after NJ made the social media post of the photo collage of her and Underwood. Counselor Paige Waide and Principal Tori Little both met with SJ in Mrs. Waide's office. During this meeting, Mrs. Waide strongly recommended that SJ check NJ's phone and all the apps that NJ had for (1) signs of an improper relationship with Underwood or (2) that NJ was developing an emotional attachment to Underwood. Mrs. Waide reports that SJ was dismissive of her recommendation and SJ advised that he trusted Underwood and that they were friends.

Defendant Perryton ISD's Responses to
Plaintiff's First Discovery Requests

Page 13

237

**INTERROGATORY NO. 16:**   Describe in detail any and all investigations performed by PISD concerning Underwood and include a description of the actions taken in the investigations, the person(s) interviewed, the person(s) conducting the investigation and the date(s) of each investigation.

**ANSWER:**   Defendant Perryton ISD objects to this interrogatory to the extent it requires Perryton ISD to produce personally identifiable student information in violation of the District's obligations under the Family Educational Rights & Privacy Act ("FERPA"). Student records protected by FERPA may be released in this matter only in response to a subpoena or court order, unless the requestor provides written consent from the student's parent or the adult student. For records relevant to this matter, Perryton ISD will comply with any lawfully served subpoena or court order in accordance with the procedures required by FERPA.

Subject to and without waiving the foregoing objections, Superintendent Brown conducted four investigations into the allegations of an inappropriate relationship between NJ and Underwood.

The first investigation began on December 19, 2023, immediately following the report by Kevin Cummings of the social media post of the photo collage of NJ and Underwood. Superintendent Brown met personally with Underwood about the photo collage, the perceptions it created, and the need to maintain professional boundaries. Underwood stated that he was a personal friend of NJ's father, SJ, that Underwood, SJ and NJ all spent time together outside of work, and that he [Underwood] had been supportive and instrumental in helping SJ and NJ through a messy custody fight with NJ's mother. Underwood also stated that, at the time he was assigned to be the Athletic Director and Head Football Coach, he was informed that the Board wanted the Athletic Director to give more attention to female athletics, which was the reason he gave some of his attention to female athletics. Superintendent Brown directly confronted Underwood about whether Underwood was involved in a romantic relationship with NJ. Underwood denied it. Mr. Brown verbally directed Underwood to make purposeful steps to keep his distance from NJ in order to prevent any misperceptions and further social media posts that may create a perception of an improper relationship between he and NJ.

The second investigation was performed on or about January 15, 2024, after being informed by Tori Little that a second picture with NJ and Underwood was posted on social media. The picture appeared to show NJ and Underwood alone in an empty Rangerette Gym. When Superintendent Brown received the picture, he immediately accessed the security camera system and found the timeframe when the picture was taken. He observed NJ practicing her shooting and Underwood throwing the ball back to her. He also observed a group of the other coach's children playing in the gym, indicating that Underwood and NJ were not alone. NJ took the picture (using both front and back cameras of her phone to show them both in the frame). The security video showed they were approximately 25 feet apart at this time. After the practice session, Underwood and NJ met briefly at the free throw line, talked for approximately 30 seconds, then Underwood exited the gym towards the coaches' offices and NJ exited the gym towards the east outside exit. There was no observable physical contact between Underwood and NJ during the entire session. Despite what appeared to be an appropriate interaction, Superintendent Brown contacted Underwood to discuss how the post made the relationship between him and NJ look suspicious. Brown again asked Underwood directly if there was anything inappropriate or unprofessional between him and NJ.

Underwood insisted the relations was commensurate with his friendship with the family and denied any romantic relationship with NJ. Superintendent Brown verbally directed Underwood to reduce his interactions with NJ and stated that he was not to place himself any situation where he might be alone with NJ.

The third investigation was conducted following a track meet in Canyon, Texas on or about March 3, 2024. Assistant Athletic Director Rhyan Daugherty called Superintendent Brown to express concern that Underwood had driven NJ home early from the track meet the previous Friday alone and in his personal vehicle. During this same conversation Coach Daugherty also told Brown that Underwood had used the security camera system to listen in on a private conversation that Brown had with a Trustee on the evening on or about December 19, 2023. Superintendent Brown then called Chris Simmons, the Head Track Coach, to confirm that Underwood had left the track meet early with NJ. Superintendent Brown removed Underwood's access to the video camera system that weekend. At 7:30 am on Monday March 4, 2024, Superintendent Brown met with Underwood in Brown's office and interviewed him about leaving the track meet with NJ. Underwood was conciliatory, admitted to taking NJ home early, and revealed that it was because her father had requested that he [Underwood] take NJ home early. Underwood further stated that he had warned SJ about how it would look, that SJ disregarded the warning and still requested he [Underwood] drive NJ home. Underwood produced text messages from SJ confirming this communication and that SJ had, in fact, still requested Underwood to drive NJ home. Underwood further admitted to using the security camera system to listen in on Superintendent Brown's conversation on or about December 19, 2023. Brown verbally reprimanded Underwood for agreeing to be alone with NJ in violation of previous directives, and for violating Brown's trust by using the security camera system to eavesdrop on Brown's private conversation. Superintendent Brown again verbally directed Underwood to never be alone with NJ or any other female student and notified him that his access to the security camera system was suspended. Later that afternoon, Superintendent Brown issued the written correction and directives dated March 4, 2024 concerning Underwood's restricted interaction with NJ and Underwood's misuse of the video camera system.

The final investigation occurred on the weekend of April 21, 2024, when it was reported to Superintendent Brown that Underwood's and NJ's cars were seen at the High School at the same time on April 20, 2024. Upon receiving this report, Brown immediately reviewed the available security camera video footage and determined that Underwood would prop a gym door open for NJ. NJ would enter, close the door, and then make her way through the locker room, through the gym, through the weight room and then up the stairs that led to Underwood's office. A review of the available security camera footage showed that this occurred on multiple occasions on various weekends during the prior month. On Monday April 22, 2024, Superintendent Brown called Underwood to his office to confront Underwood for being alone with NJ. Underwood initially denied that he and NJ had been alone together, but eventually admitted it. Underwood again firmly denied that he was engaged in romantic or sexual relationship with NJ, and that they only met to talk about the difficulties NJ was having in her family situation. Brown placed Underwood on administrative leave. Superintendent Brown reported the results of his investigation to the Ochiltree County Sheriff's Office ("OCSO") and DFPS-Texas Child Protective Services. After it was determined by OCSO that Underwood and NJ had a sexual relationship, Assistant Superintendent and Title IX Coordinator Donna Hale, visited with NJ and offered supportive measures.

**INTERROGATORY NO. 17:**   Describe in detail each and every in-service or training provided to PISD teachers and PISD Administrators since August 1, 2022 concerning Title IX and PISD's obligation to address sex discrimination and include the date(s) of each such training, the person presiding over the training, and a log of each person attending the training.

**ANSWER:**   Under the EduHero online training system, the session titled "Sexual Harassment for Educators" was assigned to all staff in May of 2024, and some staff, including Underwood, took this training in August of 2023. In addition, in-person training was conducted with each department in the fall semester of 2024. Superintendent Brown conducted the in-person training. Logs and a PowerPoint presentation are provided in response to Plaintiff's Request for Production. In 2024-2025, employees were directed to complete the EduHero Sexual Harassment for Educators training on Title IX.

**INTERROGATORY NO. 18:**   Describe in detail PISD's Title IX complaint process and procedures, including any and all grievance procedures for sex discrimination complaints, and identify the Title IX coordinator(s), investigators, decisionmakers, and facilitators that are responsible for Title IX complaints.

**ANSWER:**   See attached Title IX Procedures and Perryton ISD Board Policy FFH(LOCAL) & (LEGAL).

**INTERROGATORY NO. 19:**   In the event you deny or otherwise refuse to admit Request for Admission No. 5 herein, explain in detail the factual basis for such denial and identify all witnesses and exhibits that will support your contention.

**ANSWER:**   Defendant has made reasonable inquiry and lacks sufficient information to either admit or deny Admission No. 5 because Defendant's employees were not eye-witnesses to the actions of Underwood and NJ at all times. But, based on information provided by ███████ and the GPS information on NJ's phone it appears that on multiple occasions NJ drove to Underwood's home, then went to the end of dirt road outside of Perryton, Texas known to be a location where students go to "hook up." NJ's car would remain parked at such location for some time, and then would return to Underwood's house before NJ would return home. ████████ advised she made this information known to SJ, who did not act on it. ████████ further reported that a neighbor of Underwood, and friend of SJ, told SJ that he had witnessed NJ pick up and drop off Underwood at Underwood's home. Defendant believes that NJ and Underwood would go to the location at the end of the dirt road in furtherance of their sexual relationship.

**INTERROGATORY NO. 20:**   In the event you deny or otherwise refuse to admit Request for Admission No. 7 herein, explain in detail the factual basis for such denial and identify all witnesses and exhibits that will support your contention forming.

**ANSWER:**    Nonapplicable.


**INTERROGATORY NO. 21:**    In the event you deny or otherwise refuse to admit Request for Admission No. 9 herein, explain in detail the factual basis for such denial and identify all witnesses and exhibits that will support your contention.

**ANSWER:**    Nonapplicable.


**INTERROGATORY NO. 22:**    In the event you deny or otherwise refuse to admit Request for Admission No. 12 herein, explain in detail the factual basis for such denial and identify all witnesses and exhibits that will support your contention.

**ANSWER:**    See response to Request for Admission No. 12. It is believed that this information was provided by Francis Zavala and Head Baseball Coach Brady Fletcher.


**INTERROGATORY NO. 23:**    In the event you deny or otherwise refuse to admit Request for Admission No. 26 herein, explain in detail the factual basis for such denial and identify all witnesses and exhibits that will support your contention.

**ANSWER:**    Nonapplicable.


**INTERROGATORY NO. 24:**    In the event you deny or otherwise refuse to admit Request for Admission No. 22 herein, explain in detail the factual basis for such denial and identify all witnesses and exhibits that will support your contention.

**ANSWER:**    No Trustee of the District during the 2022-2023 or 2023-2024 school year advised Underwood to end his relationship with NJ. Trustee Bryce Hale advised Underwood to make a conscious effort to stay away from NJ after Mr. Brown issued the March 4, 2024, written admonishment to Underwood. See response to Request for Admission No.22.


**INTERROGATORY NO. 25:**    In the event you deny or otherwise refuse to admit Request for Admission No. 13 herein, explain in detail the factual basis for such denial and identify all witnesses and exhibits that will support your contention.

**ANSWER:**    See response to Request for Admission No. 13.


Defendant Perryton ISD's Responses to                                                    Page 17
Plaintiff's First Discovery Requests

241

**OBJECTIONS AND RESPONSES TO
PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION**

Documents or other things constituting or concerning:

**REQUEST FOR PRODUCTION NO. 1:** Produce a complete copy of each and every document identified, reviewed and/or otherwise relied upon for purposes of providing your answers to the foregoing interrogatories.

**RESPONSE:** Defendant objects to this Request as overly broad in scope because the Request does not describe or identify with any specificity the type or category of documents or other materials to which Plaintiff is referring. Defendant further objects to the Request as not proportional to the needs of the case because the burden on Perryton ISD to respond outweighs any likely benefit. Defendant Perryton ISD also objects to this Request to the extent it requires Perryton ISD to produce personally identifiable student information in violation of the District's obligations under the Family Educational Rights & Privacy Act ("FERPA"). Student records protected by FERPA may be released in this matter only in response to a subpoena or court order, unless the requestor provides written consent from the student's parent or the adult student. For records relevant to this matter, Perryton ISD will comply with any lawfully served subpoena or court order in accordance with the procedures required by FERPA.

Subject to and without waiving the foregoing objections, see documents produced in response to Defendant's 26(a)(1) initial and supplemental disclosures.

**REQUEST FOR PRODUCTION NO. 2:** Produce a complete copy of any and all notes, ledgers, diaries, memoranda, correspondence, written or recorded statements, or other documents, in your possession, which are related in any way to the sexual assault of NJ.

**RESPONSE:** Defendant objects to this Request as overly broad in scope because by requesting "…or other documents in your possession which are related in any way…", the Request does not describe or identify with any specificity the type or category of documents or other materials to which Plaintiff is referring. Defendant further objects to the Request as not proportional to the needs of the case because the burden on Perryton ISD to respond outweighs any likely benefit. Defendant Perryton ISD also objects to this Request to the extent it requires Perryton ISD to produce personally identifiable student information in violation of the District's obligations under the Family Educational Rights & Privacy Act ("FERPA"). Student records protected by FERPA may be released in this matter only in response to a subpoena or court order unless the requestor provides written consent from the student's parent or the adult student. For records relevant to this matter, Perryton ISD will comply with any lawfully served subpoena or court order in accordance with the procedures required by FERPA. Defendant further objects to production of any document protected by attorney client privilege. See General Objection No. 1, and Defendant's privilege log.

Subject to and without waiving the foregoing objections, see documents produced in response Defendants 26(a)(1) initial and supplemental disclosures.

**REQUEST FOR PRODUCTION NO. 3:** Produce any and all exhibits you anticipate you will use at any deposition, hearing, proceeding or trial in this matter.

**RESPONSE:** Defendant has not yet determined what exhibits it will use at any deposition, hearing, proceeding or trial in this matter. Defendant will supplement this response in accordance with the Federal Rules of Civil Procedure and any scheduling order entered by the Court. See also documents produced in response in response to RFP No. 2.

**REQUEST FOR PRODUCTION NO. 4:** Produce a copy of all non-privileged communications between PISD Administration and the PISD school board relating in any way to Underwood after June 1, 2022.

**RESPONSE:** Defendant objects to this request as duplicative of RFP No. 2. Defendant Perryton ISD also objects to this Request to the extent it requires Perryton ISD to produce personally identifiable student information in violation of the District's obligations under the Family Educational Rights & Privacy Act ("FERPA"). Student records protected by FERPA may be released in this matter only in response to a subpoena or court order unless the requestor provides written consent from the student's parent or the adult student. For records relevant to this matter, Perryton ISD will comply with any lawfully served subpoena or court order in accordance with the procedures required by FERPA. Defendant further objects to production of any document protected by attorney client privilege. See General Objection No. 1, and Defendant's privilege log.

Subject to and without waiving the foregoing objection, see documents attached.

**REQUEST FOR PRODUCTION NO. 5:** Produce any and all materials prepared by any and all expert witnesses retained by you in anticipation of the hearing on the merits of this matter, including, but not limited to reports, documents, notes, literature, summaries, charts, graphs, video tapes, audio tapes, compact disks (CDs) or digital video disks (DVDs).

**RESPONSE:** Defendant has not yet designated its expert witnesses. Defendant will produce expert materials through the appropriate disclosures in accordance with the Federal Rules of Civil Procedure and any scheduling order entered by the Court.

**REQUEST FOR PRODUCTION NO. 6:** Produce a complete copy of all documents which relate in any way to PISD's background review of Underwood prior to his retention by PISD.

**RESPONSE:** Defendant objects to this Request as overly broad in scope because by requesting documents which "...relate in any way...", the Request does not describe or identify with any specificity the type or category of documents or other materials to which Plaintiff is referring. Defendant further objects to the Request as not proportional to the needs of the case because the burden on Perryton ISD to respond outweighs any likely benefit. Defendant further objects as Underwood's criminal history information is confidential by law and may not be disclosed.

Subject to and without waiving the foregoing objections, see Underwood's personnel file produced with Defendant's 26(a)(1) Initial Disclosures.

**REQUEST FOR PRODUCTION NO. 7:** Produce a complete copy of all nonprivileged communications between PISD and Amarillo Independent School District which refer in any way to Underwood.

**RESPONSE:** Defendant objects to this Request as overly broad in scope because by requesting documents which "…refer in any way…", the Request does not describe or identify with any specificity the type or category of documents or other materials to which Plaintiff is referring. Defendant further objects to the Request as not proportional to the needs of the case because the burden on Perryton ISD to respond outweighs any likely benefit.

Subject to and without waiving the foregoing objections, any communications with Amarillo ISD would be included with Underwood's personnel file which was previously produced as part of Defendants 26(a)(1) Initial Disclosures.

**REQUEST FOR PRODUCTION NO. 8:** Produce a complete copy of any and all communications between Underwood and PISD since September 1, 2022, to Underwood.

**RESPONSE:** Defendant objects to this request as vague and overly broad because the references to "any and all communications" is not limited in scope. As written, the request asks for information that is not relevant to this matter because it exceeds the scope of issues raised in Plaintiff's Original Complaint. Defendant further objects because the request is not proportional to the needs of the case and, therefore, places an unreasonable and undue burden on Perryton ISD. Defendant Perryton ISD also objects to this Request to the extent it requires Perryton ISD to produce personally identifiable student information in violation of the District's obligations under the Family Educational Rights & Privacy Act ("FERPA"). Student records protected by FERPA may be released in this matter only in response to a subpoena or court order unless the requestor provides written consent from the student's parent or the adult student. For records relevant to this matter, Perryton ISD will comply with any lawfully served subpoena or court order in accordance with the procedures required by FERPA.

Subject to and without waiving the foregoing objections, see documents attached.

**REQUEST FOR PRODUCTION NO. 9:** Produce a complete copy of any and all written, recorded, and/or signed statements or interviews of any person, including the Plaintiff, Defendants, witnesses, or any agent, representative or employee of the parties, concerning the subject matter of this action.

**RESPONSE:** Defendant objects to this request as duplicative of RFP No. 2. Defendant Perryton ISD also objects to this Request to the extent it requires Perryton ISD to produce personally

identifiable student information in violation of the District's obligations under the Family Educational Rights & Privacy Act ("FERPA"). Student records protected by FERPA may be released in this matter only in response to a subpoena or court order unless the requestor provides written consent from the student's parent or the adult student. For records relevant to this matter, Perryton ISD will comply with any lawfully served subpoena or court order in accordance with the procedures required by FERPA. Defendant further objects that any such statement is protected by attorney client privilege. See General Objection No. 1, and Defendant's privilege log.

Subject to and without waiving the the foregoing objections, Defendant has not responsive documents.

**REQUEST FOR PRODUCTION NO. 10:** Produce a complete copy of any and all written, communications between Underwood and NJ.

**RESPONSE:** Defendant objects to this request as vague and overly broad because the references to "any and all communications" is not limited in scope and exceeds information available to Defendant. As written, the request asks for information that is not relevant to this matter because it exceeds the scope of issues raised in Plaintiff's Original Complaint. Defendant further objects because the request is not proportional to the needs of the case and, therefore, places an unreasonable and undue burden on Perryton ISD.

Subject to and without waiving the foregoing objections, see documents attached and the ParentSquare messages previously produced with Defendant's 26(a)(1) Initial Disclosures.

**REQUEST FOR PRODUCTION NO. 11:** Produce a complete copy of any and all documents and/or information which was provided to any law enforcement branch by PISD which was related in any way to Underwood.

**RESPONSE:** Defendant objects to this request as duplicative of RFP No. 2. Defendant Perryton ISD also objects to this Request to the extent it requires Perryton ISD to produce personally identifiable student information in violation of the District's obligations under the Family Educational Rights & Privacy Act ("FERPA"). Student records protected by FERPA may be released in this matter only in response to a subpoena or court order unless the requestor provides written consent from the student's parent or the adult student. For records relevant to this matter, Perryton ISD will comply with any lawfully served subpoena or court order in accordance with the procedures required by FERPA.

Subject to and without waiving the foregoing objections, see documents produced with Defendant's 26(a)(1) Initial Disclosures and attached.

**REQUEST FOR PRODUCTION NO. 12:** Produce a complete copy of any and all communications between PISD and SJ which relate in any way to Underwood.

**RESPONSE:** Defendant objects to this request as vague and overly broad because the references to "any and all communications" is not limited in scope. As written, the request asks for information that is not relevant to this matter because it exceeds the scope of issues raised in Plaintiff's Original Complaint. Defendant further objects because the request is not proportional to the needs of the case and, therefore, places an unreasonable and undue burden on Perryton ISD.

Subject to and without waiving the foregoing objections, see documents attached.


**REQUEST FOR PRODUCTION NO. 13:** Produce a complete copy of any and all Complaints received by PISD relating in any way to Underwood.

**RESPONSE:** Defendant objects to this request as vague and overly broad because the reference to "any and all Complaints . . . relating in any way . . . " is not limited in scope. As written, the request asks for information that is not relevant to this matter because it exceeds the scope of issues raised in Plaintiff's Original Complaint. Defendant further objects because the request is not proportional to the needs of the case and, therefore, places an unreasonable and undue burden on Perryton ISD. Defendant Perryton ISD also objects to this Request to the extent it requires Perryton ISD to produce personally identifiable student information in violation of the District's obligations under the Family Educational Rights & Privacy Act ("FERPA"). Student records protected by FERPA may be released in this matter only in response to a subpoena or court order unless the requestor provides written consent from the student's parent or the adult student. For records relevant to this matter, Perryton ISD will comply with any lawfully served subpoena or court order in accordance with the procedures required by FERPA.

Subject to and without waiving the foregoing objections, Defendant has no responsive documents.


**REQUEST FOR PRODUCTION NO. 14:** Produce a complete copy of any and all logs, registers and/or digital data that would tend to show the identity of each person that logged into the PISD video camera system from December 1, 2023 to April 24, 2024.

**RESPONSE:** See documents attached.


**REQUEST FOR PRODUCTION NO. 15:** Produce a copy of any and all documents associated with PISD's investigation(s) into Underwood.

**RESPONSE:** Defendant objects to this Request as overly broad in scope because by requesting "...all documents associated with ....", the Request does not describe or identify with any specificity the type or category of documents or other materials to which Plaintiff is referring. Defendant further objects to the Request as not proportional to the needs of the case because the burden on Perryton ISD to respond outweighs any likely benefit. Defendant Perryton ISD also objects to this Request to the extent it requires Perryton ISD to produce personally identifiable student information in violation of the District's obligations under the Family Educational Rights & Privacy Act ("FERPA"). Student records protected by FERPA may be released in this matter

Defendant Perryton ISD's Responses to                                                 Page 22
Plaintiff's First Discovery Requests

246

only in response to a subpoena or court order unless the requestor provides written consent from the student's parent or the adult student. For records relevant to this matter, Perryton ISD will comply with any lawfully served subpoena or court order in accordance with the procedures required by FERPA. Defendant further objects to this request as duplicative of RFP No. 2.

Subject to and without waiving the foregoing objection, see documents produced in response to RFP No. 2.

**REQUEST FOR PRODUCTION NO. 16:** Produce a complete copy of any and all documents, including without limitation, all physical, documentary, electronic and photographic evidence, related to your claims or defenses in this action.

**RESPONSE:** Defendant objects to this Request as overly broad in scope because by requesting "…all documents …related to your claims or defenses with ….", the Request does not describe or identify with any specificity the type or category of documents or other materials to which Plaintiff is referring. Defendant further objects to the Request as not proportional to the needs of the case because the burden on Perryton ISD to respond outweighs any likely benefit. Defendant Perryton ISD also objects to this Request to the extent it requires Perryton ISD to produce personally identifiable student information in violation of the District's obligations under the Family Educational Rights & Privacy Act ("FERPA"). Student records protected by FERPA may be released in this matter only in response to a subpoena or court order unless the requestor provides written consent from the student's parent or the adult student. For records relevant to this matter, Perryton ISD will comply with any lawfully served subpoena or court order in accordance with the procedures required by FERPA. Defendant further objects to this request as duplicative of RFP. No. 2.

Subject to and without waiving the foregoing objections, please see documents provided with Defendant's 26(a)(1) Initial Disclosures and in response to RFP No. 2.

**REQUEST FOR PRODUCTION NO. 17:** Produce a complete copy of any and all documents or other evidentiary materials relied upon, or that may be relied upon, by any expert or lay witness in rendering their opinions that you expect to call as a witness at trial.

**RESPONSE:** Defendant has not yet designated its expert or lay witnesses. Defendant will produce witness materials through the appropriate disclosures in accordance with the Federal Rules of Civil Procedure and any scheduling order entered by the Court.

**REQUEST FOR PRODUCTION NO. 18:** Produce a current Curriculum Vitae for any expert you intend to call as a witness at trial.

**RESPONSE:** Defendant has not yet designated its expert witnesses. Defendant will produce expert materials through the appropriate disclosures in accordance with the Federal Rules of Civil Procedure and any scheduling order entered by the Court.

**REQUEST FOR PRODUCTION NO. 19:** For each request for admission of fact below to which you have not responded with an unqualified admission, produce all documents or other information on which your denial or other response is based.

**RESPONSE:** Defendant objects to this Request as overly broad in scope because by requesting "...all documents or other information...", the Request does not describe or identify with any specificity the type or category of documents or other materials to which Plaintiff is referring. Defendant further objects to the Request as not proportional to the needs of the case because the burden on Perryton ISD to respond outweighs any likely benefit. Defendant Perryton ISD also objects to this Request to the extent it requires Perryton ISD to produce personally identifiable student information in violation of the District's obligations under the Family Educational Rights & Privacy Act ("FERPA"). Student records protected by FERPA may be released in this matter only in response to a subpoena or court order unless the requestor provides written consent from the student's parent or the adult student. For records relevant to this matter, Perryton ISD will comply with any lawfully served subpoena or court order in accordance with the procedures required by FERPA. Defendant further objects to this request as duplicative of RFP. No. 2.

Subject to and without waiving the foregoing objections, please see documents provided with Defendant's 26(a)(1) Initial Disclosures and in response to RFP No. 2.

**REQUEST FOR PRODUCTION NO. 20:** Produce a copy of all videos related to the subject matter of this lawsuit.

**RESPONSE:** Defendant objects to this Request as overly broad in scope because by requesting all videos "...related to the subject matter...", the Request does not describe or identify with any specificity the type or category of videos to which Plaintiff is referring. Defendant further objects to the Request as not proportional to the needs of the case because the burden on Perryton ISD to respond outweighs any likely benefit.

Subject to and without waiving the foregoing objections, Defendant will supplement this Response.

**REQUEST FOR PRODUCTION NO. 21:** Produce all documents and/or communications which relate in any way to PISD's report(s) to law enforcement concerning Underwood's actions.

**RESPONSE:** Defendant objects to this Request as overly broad in scope because by requesting all documents and/or communications "...which relate in any way...", the Request does not describe or identify with any specificity the type or category of videos to which Plaintiff is referring. Defendant further objects to the Request as not proportional to the needs of the case because the burden on Perryton ISD to respond outweighs any likely benefit.

Subject to and without waiving the foregoing objections, see the documents produced with Defendant's 26(a)(1) Initial Disclosures.

**REQUEST FOR PRODUCTION NO. 22:** Produce any and all records or documents which tend to show that PISD conducted in-service or training of PISD teachers since August 1, 2022.

**RESPONSE:** Defendant objects to this Request as vague, overly broad and unduly burdensome because by it does not specify the topics or types of in-service or training requested, or limit the in-service or training to a specific groups of type of teacher. Defendant further objects to the Request as not proportional to the needs of the case because the burden on Perryton ISD to respond outweighs any likely benefit.
Subject to and without waiving the foregoing objections, see the documents attached.

**REQUEST FOR PRODUCTION NO. 23:** Produce any and all records or documents which tend to show that PISD conducted in-service or training of PISD administrators since August 1, 2022.

**RESPONSE:** Defendant objects to this Request as vague, overly broad and unduly burdensome because by it does not specify the topics or types of in-service or training requested, or limit the in-service or training to a specific groups of administrator. Defendant further objects to the Request as not proportional to the needs of the case because the burden on Perryton ISD to respond outweighs any likely benefit.

Subject to and without waiving the foregoing objections, see documents produced in response to RFP No. 22.

**REQUEST FOR PRODUCTION NO. 24:** Produce any and all records or documents which tend to show that PISD conducted in-service or training of concerning PISD policies DH and/or FFH since August 1, 2022.

**RESPONSE:** Defendant objects to this request as it is duplicative of RFP No. 22.

Subject to and without waiving the foregoing objection, see response to RFP No. 22, and attached.

**REQUEST FOR PRODUCTION NO. 25:** Produce a complete copy of any and all communications between Underwood and Greg Brown since September 1, 2022.

**RESPONSE:** Defendant objects to this Request as overly broad in scope because by requesting "any and all communications," the Request does not describe or identify with any specificity the type or category of documents or other materials to which Plaintiff is referring. Defendant further objects to the Request as not proportional to the needs of the case because the burden on Perryton ISD to respond outweighs any likely benefit. Defendant Perryton ISD also objects to this Request to the extent it requires Perryton ISD to produce personally identifiable student information in violation of the District's obligations under the Family Educational Rights & Privacy Act ("FERPA"). Student records protected by FERPA may be released in this matter only in response to a subpoena or court order unless the requestor provides written consent from the student's parent or the adult student. For records relevant to this matter, Perryton ISD will comply with any lawfully

served subpoena or court order in accordance with the procedures required by FERPA. Defendant further objects to this request as duplicative of RFP No. 2.

Subject to and without waiving the foregoing objections, please see documents produced in response to RFP No. 2 and attached.

**REQUEST FOR PRODUCTION NO. 26:** Produce a complete copy of any and all Complaints received by PISD concerning Underwood.

**RESPONSE:** Defendant objects to this Request as overly broad in scope because by requesting "any and all Complaints . . .", the Request does not describe or identify with any specificity the type or category of documents or other materials to which Plaintiff is referring. Defendant further objects to the Request as not proportional to the needs of the case because the burden on Perryton ISD to respond outweighs any likely benefit. Defendant Perryton ISD also objects to this Request to the extent it requires Perryton ISD to produce personally identifiable student information in violation of the District's obligations under the Family Educational Rights & Privacy Act ("FERPA"). Student records protected by FERPA may be released in this matter only in response to a subpoena or court order unless the requestor provides written consent from the student's parent or the adult student. For records relevant to this matter, Perryton ISD will comply with any lawfully served subpoena or court order in accordance with the procedures required by FERPA. Defendant further objects to this request as duplicative of RFP. No. 2.

Subject to and without waiving the foregoing objections, please see documents provided in response to RFP No. 2.

**REQUEST FOR PRODUCTION NO. 27:** Produce a complete copy of Underwood's personnel file at PISD.

**RESPONSE:** See the documents produced with Defendant's 26(a)(1) Initial Disclosures, and attached.

**REQUEST FOR PRODUCTION NO. 28:** Produce any and all records or documents which tend to show that PISD conducted in-service or training for teachers or PISD Administrators concerning Title IX policies and requirements since January 1, 2021.

**RESPONSE:** Defendant objects to this Request to the extent it is duplicative of RFP No. 22.

Subject to and without waiving the foregoing objection, see documents provided in response to RFP No. 22, and attached.

**OBJECTIONS AND RESPONSES TO
PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION**

**REQUEST FOR ADMISSION NO. 1:**    Admit that Underwood contacted NJ on his personal mobile telephone in violation of PISD Policies and Procedures.

**RESPONSE:** Defendant has made reasonable inquiry and lacks sufficient information to either admit or deny because Defendant's employees were not eye-witnesses to the actions of Underwood at all times. Based on Underwood's admission contained in the Factual Resume in Underwood's criminal case in Federal Court, case no. 2:24-CR-045-Z, Defendant believes Underwood contacted NJ on his personal mobile telephone in violation of Perryton ISD Policies and Procedures.

**REQUEST FOR ADMISSION NO. 2:** Admit that Brown was more concerned about the status of PISD's football team than the health and mental condition of NJ after Underwood's arrest.

**RESPONSE:** Denied.

**REQUEST FOR ADMISSION NO. 3**: Admit that Underwood routinely contacted NJ after school hours via mobile telephone.

**RESPONSE:** Admitted. Underwood contacted NJ through the ParentSquare application via his mobile telephone after school hours. Based on Underwood's admissions contained in the Factual Resume in Underwood's criminal case in Federal Court, Case no. 2:24-CR-045-Z, Defendant believes Underwood contacted NJ after hours through other applications via mobile telephone.

**REQUEST FOR ADMISSION NO. 4:** Admit that Underwood sexually abused NJ on multiple occasions.

**RESPONSE:** Admitted. Based on Underwood's admissions contained in the Factual Resume in Underwood's criminal case in Federal Court, Case no. 2:24-CR-045-Z, Defendant believes Underwood sexually abused NJ on multiple occasions.

**REQUEST FOR ADMISSION NO. 5:** Admit that each sexual abuse encounter by Underwood against NJ occurred on PISD grounds.

**RESPONSE:** Defendant has made reasonably inquiry and lacks sufficient information to either admit or deny because Defendant's employees were not eye-witnesses to the actions of Underwood and NJ at all times.

**REQUEST FOR ADMISSION NO. 6:** Admit that the PISD video camera system captured multiple instances of NJ entering Underwood's office by herself.

**RESPONSE:** Denied. Defendant's video surveillance camera system captured NJ entering a locker room, weight room and the hallway that led to Underwood's office, but there is no video footage of NJ entering or leaving Underwood's office.

**REQUEST FOR ADMISSION NO. 7**: Admitted that a female PISD student was admonished and/or punished by a PISD Administrator for referring to Underwood as a "pedophile" in September 2023.

**RESPONSE:** Admitted. Underwood admonished a Perryton ISD student for referring to Underwood as a pedophile.

**REQUEST FOR ADMISSION NO. 8:** Admit that Underwood was regularly observed alone with female students in his office, including but not limited to NJ.

**RESPONSE:** Admitted that NJ was regularly observed in Underwood's office while the office door was open and NJ was sitting across from Underwood's desk. No other female students were reported to be alone in Underwood's office.

**REQUEST FOR ADMISSION NO. 9:** Admit that a Gruver administrator reported Underwood's inappropriate behavior toward NJ on or about March 21, 2024 to PISD principals Tori Little and Sandy Wheeler.

**RESPONSE:** Admitted that on or around March 4, 2024, a Gruver ISD administrator reported to Tori Little and Sandy Wheeler that Underwood had transported NJ home from a track meet in Canyon, Texas, alone in his car.

**REQUEST FOR ADMISSION NO. 10**: Admit that PISD principals Tori Little and Sandy Wheeler reported to the Gruver administrator in March 2024 that an investigation of Underwood was being conducted by PISD.

**RESPONSE:** Admitted.

**REQUEST FOR ADMISSION NO. 11:** Admit that PISD investigated Underwood's inappropriate relationship with NJ and/or other female PISD students prior to April 20, 2024.

**RESPONSE:** Admitted that Defendant investigated Underwood for a possible inappropriate relationship with NJ prior to April 20, 2024, but not with any other female students.

**REQUEST FOR ADMISSION NO. 12:** Admit that Underwood retaliated against PISD football players for Complaints made against Underwood's actions to female PISD students.

**RESPONSE:** Defendant has made reasonable inquiry and lacks sufficient information to either admit or deny because Defendant's employees were not eye-witnesses to the actions of Underwood all times. However, it was reported to Defendant that Underwood admonished various athletes for not taking action to stop rumors of an improper relationship between he and NJ.

**REQUEST FOR ADMISSION NO. 13:** Admit that the sexual abuse of NJ continued for more than six (6) weeks AFTER Brown's March 4, 2024 admonition letter to Underwood.

**RESPONSE:** Defendant has made reasonable inquiry and lacks sufficient information to either admit or deny because Defendant's employees were not eye-witnesses to the actions of Underwood at all times. Based on Underwood's admission contained in the Factual Resume in Underwood's criminal case in Federal Court, case no. 2:24-CR-045-Z, Defendant believes Underwood may have continued to have a sexual relationship with NJ until he was arrested and held without bond on federal charges.

**REQUEST FOR ADMISSION NO. 14:** Admit that PISD took no action to enforce the requirements set forth in Brown's March 4, 2024 admonition letter to Underwood.

**RESPONSE:** Denied.

**REQUEST FOR ADMISSION NO. 15:** Admit that PISD did not notify SJ about any potential inappropriate relationship between Underwood and NJ prior to April 22, 2024.

**RESPONSE:** Denied. SJ was advised by High School Principal Tori Little and counselors Paige Waide and Randi Cunningham of a potential inappropriate relationship between NJ and Underwood in October or November of 2023. SJ was encouraged to discuss her relationship with Underwood, and Little and Waide recommended that SJ search NJ's phone for inappropriate communications between NJ and Underwood since Defendant had no authority to do so. SJ insisted there was nothing inappropriate going on and that NJ needed to have a close relationship with Underwood to help NJ deal with the divorce/custody issues between SJ and NJ's mother. On March 4, 2024, Tori Little again informed SJ of a possible inappropriate relationship between NJ and Underwood and advised SJ that Underwood drove NJ home from a track meet in Canyon, Texas. In response, SJ emailed Tori Little, and copied Greg Brown, to advise Mrs. Little that SJ requested Underwood to take NJ home and there was nothing improper going on between NJ and Underwood and wished that everyone would stop spreading rumors to the contrary.

**REQUEST FOR ADMISSION NO. 16:** Admit that Underwood was awarded an extension to his contract with PISD on the same day that Underwood received Brown's March 4, 2024 admonition letter.

Defendant Perryton ISD's Responses to
Plaintiff's First Discovery Requests

Page 29

**RESPONSE:** Denied. Underwood's contract was extended by the Board at the February 2024 Board meeting. Underwood signed his contract on March 3, 2024.

**REQUEST FOR ADMISSION NO. 17:** Admit that Underwood was given a raise for the following school year on the same day that Underwood received Brown's March 4, 2024 admonition letter.

**RESPONSE:** Denied.

**REQUEST FOR ADMISSION NO. 18:** Admit that PISD's video camera system captured NJ walking through a dark locker room on multiple occasions to reach Underwood's office.

**RESPONSE:** Admitted.

**REQUEST FOR ADMISSION NO. 19:** Admit that PISD had possession of video evidence of NJ entering Underwood's office alone after March 4, 2024.

**RESPONSE:** Denied. Defendant's security camera system captured NJ entering a locker room, weight room and the hallway that led to Underwood's office, but there is no video footage of NJ entering or leaving Underwood's office.

**REQUEST FOR ADMISSION NO. 20:** Admit that PISD had possession of video evidence of NJ entering Underwood's office alone before March 4, 2024.

**RESPONSE:** Denied. Defendant's security camera system captured NJ entering a locker room, weight room and the hallway that led to Underwood's office, but there is no video footage of NJ entering or leaving Underwood's office.

**REQUEST FOR ADMISSION NO. 21:** Admit that NJ was the subject of chants at an away basketball game on November 15, 2024, where the opposing student section chanted "Underwood" at her during play.

**RESPONSE:** Defendant has made reasonably inquiry and lacks sufficient information to either admit or deny whether NJ was the subject of chants at an away basketball game on November 15, 2024, where the opposing student section chanted "Underwood" at her during play.

**REQUEST FOR ADMISSION NO. 22:** Admit that at least one member of the PISD school board communicated to Underwood to end his relationship with NJ prior to Underwood's arrest.

Defendant Perryton ISD's Responses to                                      Page 30
Plaintiff's First Discovery Requests

**RESPONSE:** Denied. Prior to Underwood's arrest, Trustee Bryce Hale told Underwood to make a conscious effort to stay away from NJ.

**REQUEST FOR ADMISSION NO. 23:** Admit that at least one member of the PISD school board was aware of Complaints against Underwood concerning inappropriate relationships with female PISD students in February 2024.

**RESPONSE:** Admitted that at least one Trustee was aware of a complaint against Underwood in December 2023.

**REQUEST FOR ADMISSION NO. 24:** Admit that Underwood was referred to as "Perv" while employed by Amarillo ISD.

**RESPONSE:** Defendant has made reasonably inquiry and is not aware of Underwood being referred to as a "Perv" while employed by Amarillo ISD.

**REQUEST FOR ADMISSION NO. 25:** Admit that Underwood set the policies for PISD athletics as the PISD Athletic Director.

**RESPONSE:** Admitted that Underwood set procedures and regulations for PISD Athletics.

**REQUEST FOR ADMISSION NO. 26:** Admit that PISD Policies DH and FFH were violated by Underwood while he was employed by PISD as its Athletic Director.

**RESPONSE:** Admitted.

**REQUEST FOR ADMISSION NO. 27:** Admit that PISD athletic policies were violated by Underwood traveling home with NJ from a track meet.

**RESPONSE:** Denied. Underwood violated a directive by the Superintendent by traveling home alone with NJ from a track meet.

# Exhibit 5

**2:44**



**Wes ›**

Tue, Jan 9 at 7:24 PM

My wife got her hair cut today. Ready for a beauty shop rumor about our AD?

> I've heard a few in the past few days. Which one is this one?

About the affair that he's having?



I always "learn" so much when she gets her hair done!

> Just finished the girls basketball game. I'm gonna get to a quiet place and give you a quick call to catch you up on a few things regarding Cole.

Mon, Jan 22 at 2:33 PM

> Three things...
>
> I got a resignation from Ethan Kerl. He made it effective today so we won't be paying him to the end of the year.
>
> Jed Symons wants to come to

+ iMessage

257

# Exhibit 6

# PERRYTON ISD ATHLETIC CODE OF CONDUCT

## Introduction

Participation in athletics as defined by the University Interscholastic League is not a right but a privilege. Students are not required to take part in athletics, therefore, it is imperative that all student-athletes taking part in the Perryton Athletic Program understand the following Athletic Code and conform to the rules therein.  The Athletic Director, Assistant Athletic Director, and Head Coaches.

The goal of our athletic department in Perryton is to ultimately create great young men and women that are equipped to face the challenges that the real world presents. How we plan to accomplish this goal is to build character traits that allow each of our student athletes to become employable adults.
Also, to teach all of our student athletes to have servant's heart through community service. We want to establish a work ethic that is unmatched by other schools and other school districts. This work ethic will be displayed and executed each day by our student athletes and coaches.

## Expectations

We will set a clear expectation to our student athletes that the core principle for each sport will be tied back to our weight room and track. These are the two pillars that will establish our foundation for the culture that will be outlined throughout the athletic department in Perryton. We will align our athletic culture with the expectations that our student athletes are to perform at a high level in the classroom each and every day. Failure to meet these expectations will result in a tutorial and extra conditioning contract that will be provided to all of our teachers throughout the school district.

**Perryton Athletic Programs will be based on four core values:**

**Hard Work:**   We want student athletes and coaches that are invested in each of our athletic programs. We will accomplish this through a weight room culture that is physically challenging to all of our athletes. We will set high expectations for our athletes. There is no replacement for physically outworking your opponent.

**Dedication:**   Every decision that is made in our athletic program will be to benefit our student athletes. Our coaches and athletes will work tirelessly to ensure the success of each program. We understand we have the unique opportunity to represent the entire community in all the sports we compete in. This is a statement that our department doesn't handle lightly.

**Trust:**   Firm belief in the reliability, truth, ability, or strength of someone or something. We will teach our kids how to be reliable through the accountability standards we have established. We will create an environment that is conducive to trust between athletes, coaches, staff members, administration, and community members.

**Family:**   It is defined in Perryton athletics as a group of young athletes that share common goals and values that allows them to wear the Perryton name across

259

their chest. They understand that the expectations for student athletes are higher and require a dedication that far exceeds that of a traditional student. All of our boys and girls programs have dedicated themselves to their team and coaches more than they have to themselves. This will allow for a family atmosphere.

## JURISDICTION

Student participation in athletic activities is encouraged. Perryton ISD makes athletic activities available as an extension of the regular school program, with this important difference: participation in the regular curriculum is a right afforded to each student, while participation in the athletic program is a privilege that carries additional expectation for acceptable conduct. Students engaging in athletic activities represent not only themselves, but Perryton ISD as a whole. Student-athletes are not only recognized on the playing fields or courts but also in the community as Rangers/Rettes. For this reason, their behavior must be exemplary and reflect the finest attributes of Perryton ISD at all times and places. We will develop athletes and a product that give Perryton ISD and the community a sense of pride in our Rangers/ Rangerettes.

The Perryton Athletic Code of Conduct extends beyond and is in addition to school policy. The Athletic Code of Conduct will be enforced on all student-athletes grades 7-12 participating in athletics. Perryton Athletics jurisdiction is as follows:

- Regardless of whether school is in session;
- Regardless of whether the offense occurs on or off school property or at a school related event;
- Regardless of whether the student is directly involved with the extracurricular activity at the time the prohibited conduct occurs;
- Regardless of whether the sport is in-season;
- Regardless of where or when the conduct occurs.

It is possible that a student who violates school policy will incur consequences from both the appropriate school administrator and from his/her head coach, assistant athletic director or athletic director for the same violation. It is also possible that a student participating in athletics could violate the Perryton Athletic Code of Conduct and be subject to discipline without having violated school policy.

**Individual Basis**: The Athletic Director and head coaches are leaders and will be allowed to make decisions on an individual basis while striving for fairness and consistency. However, very few situations and individuals involved are exactly the same. Leaders will make decisions based on what Perryton Athletics will call an "**Individual Basis**" which includes but is not limited to the following:

*The Student Athlete's Current, attitude, discipline, work ethic, and cooperation in all phases: school, athletics, and community.

*History of the Student-Athlete's attitude, discipline, work ethic and cooperation in all phases: school, athletics, and community.

The Athletic Director/Assistant Athletic Director/Head Coach may utilize any available information in order to make individual decisions regarding athletes and their discipline/status. These decisions/investigations are conducted at the discretion of the coach/coordinator/athletic director. The Athletic Director or Athletic Director's designee is hereby authorized to make judgment decisions on situations.

260

**PARTICIPATION:** The goal of the Perryton Athletic Program is to offer the opportunity of participation to all students. There is however a minimum set of standards in regards to being allowed to participate in athletics. The minimum standards are:

**Paperwork:** The student-athlete must complete and return all necessary paperwork set forth by Perryton ISD, UIL, Athletic Director, Coordinator, and Head Coach of current sport. Athletes will be given a designated amount of time to turn in complete paperwork in order to participate.

**Parent Meeting:** It is with-in guidelines for an athletic director or head coach to require parents to attend a parent meeting for current sport in order for an athlete to participate.

**Eligibility:** The student-athlete must remain academically eligible per UIL requirements. Failure of multiple eligibility periods could be a cause for a student-athlete to be removed from a sport and program.

**Select/Club/Non-School Sponsored Event:** In the case of a non-school related event conflicting with a school related athletic event, priority will be given to the school athletic event. Missing school related athletic practice or game for a select/club/non-school activity could result in discipline measures and possible suspension from participation in the next athletic contest. Multiple offenses could be cause for removal from sport and/or program.

**Enrollment In the Athletic Period:** The purpose of the Perryton Athletics' period within the school day is to serve as an in-season and off-season program to improve the athletic program overall by enhancing each student-athlete's abilities, skills, strength, conditioning, injury prevention and team building. It is unrealistic for an athlete not to go through an in/off-season program and benefit from athletics and/or benefit others in athletics. **All athletes must be enrolled in the athletic period to participate in a sport.** Athletes must also go through an off-season program in order to participate in games. **Therefore a student may not add athletics at semester and compete in games during the current school year.** Exceptions will be allowed, but not limited to, new students moving into the district at semester and class scheduling conflicts that are a necessity not a luxury. Furthermore, a student in the athletic period must be competing in a sport unless otherwise approved by the athletic director to serve as student-manager/trainer. **Athletes are also expected and advised to complete at least one year of junior high athletics before joining any high school athletic program. It's highly unlikely that a kid will be allowed to sit out both 7th and 8th grade years of athletics and join athletics once they enter high school. This decision will be made by the athletic director and will be decided on an individual basis. The athletic director has the opportunity to turn away any kid that hasn't competed in at least one year of junior high athletics.**

**Athletic Cloth:** Every athlete will be provided with athletic cloth that they will keep and maintain throughout the school year. It's the responsibility of the athlete to wear this cloth to the athletic period each day. Each athlete will be responsible for turning in this cloth at the end of the school year. If a student fails to turn in all articles of clothing they will be charged a fine that has to be paid at the end of the year. The cost for this cloth will be $25 dollars for the shirt and an additional $25 for the shorts. If they lose both articles of clothing it will be a $50 dollar fine. We will also provide each athlete with sweats for the entire season. The cost for these items will be $50 dollars for the sweat top and an additional $50 dollars for the sweat bottoms. If they lose both articles of clothing it will be a $100 dollar fine. The total cost for all items of clothing that will be provided to our athletes at the start of the school year will be $150 dollars.

**QUITTING:** One of the greatest character qualities taught by athletics and coaches is commitment and the ability to finish what you start regardless of circumstances. Quitting will not be something encouraged or accepted in Perryton Athletics. An athlete may not quit one sport to play another. Once an athlete has participated in their first contest they are officially considered a part of the team. Practice and scrimmages do not constitute official participation.

261

**The following procedures will be in place when an athlete quits a sport:**

*The athlete will not be allowed to participate in full before school or after school practice sessions and/or practice skill workouts for their next sport until the sport they quit is done competing for the year. Sub-varsity players will be held to their sub-varsity schedule and varsity players will be held to their Varsity schedule including playoff schedule. Athletes that quit will be asked to complete 20 miles in two weeks to remain in athletics and have the opportunity to compete in the next sport. If the athlete is in two seasons at once (volleyball/XC, baseball/powerlifting, softball/soccer, etc), and the athlete quits one sport, they will be unable to compete in their second sport until the sport they quit is concluded.

*An athlete has not officially quit a sport until a meeting has been held between athletic directors, head coaches, parent, and athlete.

*Routinely quitting sports could result in removal from the athletic program.

*If an athlete quits the athletic program they will have to meet with the athletic director and head coaches to determine if they will be allowed back into athletics. The decision to allow or not allow the athlete in will be made on an "individual basis".

**ATHLETIC SUSPENSION:**

A head coach may suspend an athlete within their season as a disciplinary action. This suspension is deemed sport specific. A sport specific suspension will only be carried out in that sport. A suspension due to a major infraction of athletic policy such as, but is not limited to alcohol, criminal charges, drugs, and quitting carries over from one sport to the next if the suspension has not been completed. Athletes must attend all practices during their suspensions. Multiple suspensions throughout an athlete's career could result in permanent removal from the athletic program. All decisions in regards to suspension will be made on an "Individual Basis"

**DISMISSAL:**

Dismissal of an athlete from a sport and/or Perryton Athletics overall will not be taken lightly. The dismissal policy from a sport will mirror the quitting policy in regards to full practices before school or after school/skill practice for their next sport, and will be discussed and agreed upon by the head coach that is removing the athlete and athletic director prior to dismissal. Dismissal from the athletic program will be discussed and agreed upon by athletic directors. Once an athlete is dismissed from athletics, the athlete and their parents will have to meet with the athletic director to discuss reinstatement. This decision will be made on an "Individual Basis". If granted reinstatement, the athlete will be required to complete the accountability standards that have been put in place across the entire athletic department. The athletic directors and head coaches will determine when these standards have been met.

**PROHIBITED CONDUCT**

Perryton ISD students who participate in athletics are prohibited from, but not limited to the following:

*possessing, smoking, or using tobacco/vape products;

*possessing, consuming, buying or selling alcohol;

*possessing, using, buying or selling drugs or drug paraphernalia;

*attending any event at which underage drinking or drug use is occurring;

*engaging in serious misbehavior, as that term is defined in the Perryton ISD Student Code of Conduct;

*stealing or using without permission, this will include, but is not limited to athletic equipment and supplies;

*altering grades;

*using profanity;

*lewd or vulgar language;

*obscene gestures;

*fighting and/or assault;

*any conduct resulting in arrest and/or citations from law enforcement officers;

262

*disrespectful behavior or language directed at an authority figure, that will include, but is not limited to teachers, coaches, principals, administrators and other adults or opponents;

*hazing and/or bullying;

*inappropriate behavior in public places;

*being placed in DAEP or ISS;

*inappropriate touching, sexual gestures, or any unwanted touching.

*exposing body parts or under garments that are ordinarily covered up in a public setting

# Athletic Consequence Policy

Athletes must understand that being a Ranger and Rangerette is a privilege that isn't trusted to the weak of heart. With this logo on your chest, more is going to be expected of you, and with that, comes some responsibility for actions displayed. The Rangers and Rangerettes will operate off an athletic accountability system to ensure that our student athletes are meeting our athletic standards.

## PROCEDURES FOR PROHIBITED CONDUCT:

The athletic director and head coaches will determine whether an athletic code of conduct violation has occurred and if the violation is a "**Minor**" or "**Major**" infraction.  Decisions will be made and discipline decided on an individual basis.  The athletic director and head coaches will review all facts and circumstances surrounding a particular violation and individual involved and impose the appropriate disciplinary action.  **Coaches will strive for consistency in punishment for athletic code of conduct violations, but will also exercise sound professional discretion in accordance with the "individual basis" decisions described above.  "Minor" infractions will be dealt with by the head coach as they see fit to address the issue and to help prevent future violations from the athlete involved and/or other athletes in their program.  However, consistent or repetitive "Minor" violations throughout an athlete's career can be considered and dealt with as a "Major" violation.**

## MAJOR VIOLATIONS:

Major violations will be dealt with in the following manner:

*Upon determination of a major violation the student-athlete and the athlete's parent/legal guardian will be notified of the violation and the disciplinary action.  If the athlete and/or parents will not agree to the disciplinary action set forth the athlete could be subject to further punishment or removal from the sport and/or athletic program.

*Athletes are subject to the tutorial and extra conditioning contract in addition to the possibility of game suspension.

**First Offense**-possibility of up to the following suspensions:

| | |
|---|---|
| Baseball | 2 games or 1 tournament |
| Basketball | 2 games or 1 tournament |
| Cross Country | 1 meet |
| Football | 1 game |
| Golf | 1 tournament |
| Powerlifting | 1 meet |
| Soccer | 1 game |
| Softball | 2 games or 1 tournament |
| Tennis | 1 tournament |

263

| Track | 1 meet |
|---|---|
| Volleyball | 2 game or 1 tournament |

**Repeat Offenders**- multiply the above number by 2 or could be subject to dismissal from sport and/or program.

**Major and minor violations in the summer will result in a summer conditioning program of a minimum of 20 miles that has to be completed before the first day of organized team practices or the first day of school.**

*Athletes participating in 2 different sports at the same time and are deemed in violation of athletic policy will serve suspensions in both sports. If the violation is in breach of team/sport policy and handed out by that particular sport's head coach the suspension will be served in that sport only.

*Nothing in this athletic code of conduct limits the authority of the athletic director or head coaches to impose sanctions, including but not limited to the terms of the tutorial and extra conditioning contract for student-athletes who breach team or athletic conduct expectations.

**ALCOHOL/Tobacco/Vape**: The use or association with alcohol, tobacco, or vapes of any kind will not be tolerated. Any alcohol, tobacco, or vape related violation or arrest by a student-athlete are subject to Perryton ISD Student Code of Conduct Policy and will be considered a **Major** Violation of Athletic Policy and could be subject to the above listed discipline for **Major** Violations. Regardless if an athlete is of legal age any use or possession of tobacco or vape products will be deemed a **Minor** Violation. Keep in mind numerous minor violations constitute a major violation. Example: If an athlete is caught with tobacco/vape products two or more times within a school year this will constitute a major rules violation by the athlete on the second violation.
**\*If any athlete punished for the use or association with alcohol, tobacco, or vape products is required to attend DAEP, said athlete must complete the tutorial and extra conditioning contract in order to participate in a future contest.**

**CRIMINAL CHARGES**: Any student-athlete charged with, arrested for, or convicted of a felony may be subject to suspension from athletic competitions, or other disciplinary action may be taken if not an in-season sport, until the matter has been cleared through the courts or punishment has been served. The student-athlete will be expected to participate in all practices during that time in order to remain in the athletic program. Immediate punishment for a charge will be based on the evidence of guilt, and severity of the crime. Depending on the severity of the charges (including serious misdemeanors) and the outcome of the case, a student-athlete may be suspended from games, dismissed from that sport for the remainder of the season, or dismissed from the athletic program for the remainder of the year in addition to physical punishment set forth by the athletic director and head coach. If the student-athlete is not found guilty or all charges are dropped, then the student-athlete will be reinstated to the athletic program. It is at the discretion of the head coach to place the athlete back on the team of the in-season sport due to time missed from the team. The severity of the punishment once convicted will be dictated by the severity of the charges the athlete is convicted of. A felony conviction is subject to up to three times the game suspension listed on the "1st time major infractions" chart, possible removal from program, removal from athletics and/or physical punishment. This decision will be made by the in-season head coach and athletic director.

**DRUG POLICY**: The use or association with drugs of any kind will not be tolerated. Any drug related violation or arrest by a student-athlete is subject to Perryton ISD Student Code of Conduct Policy for Extracurricular Activities and will be considered a **Major** Violation of Athletic Policy and is subject to the above listed discipline for **Major** Violations and is subject to removal from sport or athletic program. Refusal to take a drug test shall be deemed a failed drug test and the inability to take a drug test could be deemed a failed drug test.

264

**Positive Drug Test:** by a student athlete will fall under the guidelines set forth for extracurricular activities. Failed drug tests, as defined as first, second, or third failure will be accumulative through the current school year only in regards to discipline procedures. However, once a student has failed a drug test they will be automatically added to all random tests for the remainder of their participation in extracurricular activities for the current school year.

**\*First Failure:** First time a student fails a drug test they will be required to attend 4 hours of drug counseling. Responsibility for the drug counseling falls on the athlete and their guardians. Perryton ISD is not responsible for providing or paying for the counseling. The student will be subject to disciplinary action set forth by the athletic director and head coach which is consistent across all sports. This must be completed before the student is eligible to participate in their next contest. A failed drug test will be considered a major rules violation and subject to suspensions listed above. In addition, the student will automatically be added to not only the next drug test available but all drug tests after the first failed test for the remainder of the current school year. If the next drug test falls within one calendar month of the failed test the student will have to show a drop in levels. However, after the month grace period levels will have to be completely clean or it will constitute a second failed test.

**\*2ⁿᵈ Failure within the current school year:** Second failed test will require 8 hours of drug counseling. The burden of the drug counseling falls on the athlete and their guardians. The student will lose the opportunity to compete for the remainder of the school year. They will be allowed to remain in their respective extracurricular activity (athletic program) as long as they remain in "good standing" and work towards earning the right to compete the following year. The student will be subject to disciplinary action set forth by the athletic director and head coach which is consistent across all sports. It will be at a head coach's discretion to allow the student the ability to participate in their sport the following year.

**\*3ʳᵈ Failure within the current school year:** Removal from extracurricular program for current school year. The student can request back in the following year and is subject to athletic director and head coach approval. This decision to allow the student back in will be based on an "individual basis". Students will still have to attend all practice and team functions during their suspensions. Repeat offenders from year to year are subject to the possibility of being dismissed from the athletic program.

**PRACTICES:**
Practices during season in the athletic period or outside of the athletic period are mandatory and therefore subject to disciplinary action. An excused reason for missing a practice is due to injury or sickness any other reason for missing will be at head coach's discretion to deem it an excused or unexcused miss. **However, a coach must be notified prior to practice in order for any miss to be deemed excused. Sickness or Injury must be accompanied by a note from a doctor. Notes from parents do not serve as a medical note.** The school provides a medical trainer and all athletes must see the school provided trainer to release them from practice or physical activity and set parameters for the future. When an athlete is held out for practice and/or games because of an injury the athlete is still required to attend all team functions and practices. Missed rehab for an injury does constitute a missed practice. If the athlete cannot afford financially to go to the doctor the school nurse can fill that role; the athlete does however, have to come to school in order for the nurse to see them. If the athlete does not produce a note from a doctor, trainer, or school nurse the miss will be considered unexcused. **Multiple unexcused missed practices show a lack of commitment/effort and could result in dismissal from a sport and/or program.**

**Game for Game Misses:** If an athlete misses a game for an unexcused reason as deemed by head coach and verified by athletic director the athlete may serve a suspension for each game missed. The student athlete will be subject to disciplinary action set forth by the athletic director and head coach which is consistent across all sports.

265

**GAME DAY**: Student-athletes must be in attendance 50% of their school day in order to participate in a game the same day unless prior approval has been granted by the athletic director and high school principal.

**LETTERING**: Student-athletes may receive from the school only one major award during their high school career according to the UIL. Perryton ISD awards one letter-jacket (jacket, letter, and sport symbol only) to a student-athlete during their high school career. In order to letter in a sport the student-athlete must be on a varsity team. Special consideration and decisions can be granted from the athletic director and head coach.

**TRAVEL POLICY**:
**Players will travel to and from games on the team bus**. Some exceptions will be made when based on a "common sense" decision and necessity not just "want to". Decisions will be made at the head coaches' discretion.

**Perryton Athletics Bus Policy falls under the following guidelines**:
    \* Players must travel to and from the games on the team bus, unless they have received APPROVAL from the coaches for other modes of transportation **PRIOR to departure**.

    **\*Players may be released to a parent or legal guardian at out of town games with a signed and dated note** releasing the athlete from the coach to the parents/legal guardian at the time they are released **which requires the parent's/legal guardian's PRESENCE.**

    **\*Players may be released to someone designated by the parent or legal guardian but a note and approval must be in the coach's possession** prior to leaving for the trip. **Verbal confirmation by the parent is also necessary**. If a coach does not have a signed note **prior to leaving and verbal confirmation the athlete will not be released to the designated party**. Just verbal confirmation or just a note will not work; it will take a combination of both in order for the athlete to be released to someone other than their parent/legal guardian.

    \*Athletes will be informed of leave and return times. It is the athlete's responsibility to communicate to parents/legal guardians. It is the athlete's job to be on time. Every effort will be made by coaching staff to notify proper personnel as to unexpected changes in departure and/or arrival time.

    \*All athletes will conduct themselves with class when in a school vehicle and representing Perryton athletics on a trip.

    \*Failure to follow procedures will result in disciplinary actions and possible removal from the team and/or program.

If the district does not provide transportation parents will be responsible for getting the child to the designated location or allow another entity to provide that transportation. Examples of this will be travel to a practice not held at a facility where the athlete's school day is held.

**DRESS CODE**:
We expect all our athletes to meet school policy concerning dress code. In addition, boys will not wear earrings or any other visible piercings during athletic periods, **during the school day, during athletic events as a spectator**, or when traveling, playing, or working out as a team. Boys will be expected to have their hair in accordance with Perryton ISD policy, which is cut no longer than the top of a T-Shirt and look neat. If a coach asks an athlete to cut their hair, then it is expected that the athlete will be given a reasonable amount of time to get a haircut. **Girls will not be allowed to wear nose rings during any athletic period or when traveling, playing, or working out as a team.**

**PREGNANCY**: Female athletes that become pregnant while in athletics or recently had a baby will not be discriminated against due to their condition. However, it could be a safety concern to both the athlete and/or

266

baby, as well as a liability to other competitors and coaches for the pregnant athlete to compete in practice and game situations while pregnant or after recently having a baby.

**The following guidelines will be in place when a female athlete becomes pregnant or a coach is notified of an athlete being pregnant:**

*Perryton Athletics will need a confirmed pregnancy test result from the school nurse or medical doctor.
*Perryton Athletics will need a signed consent form by the athlete's parent/legal guardian and the athlete themselves stating they understand the risk of competing to the health of the baby and/or pregnant athlete and remove liability of other competitors and coaches.

*The pregnant athlete and parent/legal guardian will also sign off on the athlete being held to the same standard as everyone else in athletics in all areas such as but not limited to: physical expectations, commitment, effort, attitude, ability level, and time constraints, school/practice attendance, etc.

*If all of the previously stated conditions are not met due to the Perryton Athletic Policy stating that an athlete has to play a sport to be in athletics the student will be removed or not allowed into athletics.

**SELECTION OF TEAMS:**
The head coach of each sport will determine the players on each team.  The selection of teams will include, but is not limited to: skill level, knowledge of sport, athletic ability, potential, attitude, experience, work ethic, commitment, position, and ability to be a good teammate. Sub-varsity team members will receive adequate playing time based upon performance, work ethic, commitment, practice evaluation.  Members of varsity teams are not guaranteed playing time.  To stay true to our commitment to teach life lessons through athletics all athletes once in Perryton Athletics will be taught to earn what they get.  Athletes will be expected to earn their positions, playing times and teams.  It is at the coaches discretion as to what team to place an athlete on or to place them on a team at all if the athlete has not earned their right on to a team..

**SOCIAL MEDIA:**
 Student-athletes should be aware that inappropriate pictures, videos, and comments affect the perception of the student-athlete, the athletic department and Perryton ISD.  This can also be detrimental to a student-athlete's collegiate and employment future.  Social media could be considered proof of a rules violation.  Also, any comments made by an athlete that are negative toward the school, team, coaches are considered a violation.

**TEAM MEETINGS/DINNERS:**
Team meetings that are organized by a coach are mandatory. A team meeting/dinner organized by parents for a particular team must be approved by and then organized through the head coach.

**PARENT CONFERENCE:**
*Parents should not confront a coach before, during, or following a contest or practice.  These are busy and emotional times for both parties involved and will not promote an objective analysis of the situation.
**Parent conferences will only be established and held to fix a problem not create a problem**.  If deemed by the athletic director and head coach that the parent is trying to fix a problem a conference will be granted.
*Parent conferences will be scheduled a day in advance with the coach before the school day or during a designated conference period if available.
*Parents will be required to follow the proper chain of command in order to have their issues heard and addressed. The proper chain of command is: coach in question with head coach present, head coach with athletic directors present, and then the superintendent.
*Parent conferences will not be held to address: playing time, other players, or sport specific philosophy and/or execution, training practices, etc.  The meeting will be shut down if anyone is belligerent.

267

Harassment of a coach or derogatory comments toward a coach or another athlete by a parent during a contest or practice will result in the parent being removed from the facility. Multiple offenders could be banned permanently from future contests.

**Hazing:**

Any conduct deemed by the coaching staff and athletic director to be considered hazing is not tolerated. Offenders will be dealt with on an individual basis. Hazing is grounds for removal from the program and punishable by DAEP.

**Locker Room Conduct:**

1. Cell phones are NOT to be used in the locker room for taking pictures when people are not dressed. Any photo taken inside the locker room needs to consider the surrounding people and make sure everyone is dressed. All pictures are subject to scrutiny. Be careful.
2. Horseplay cannot be allowed. People get hurt, often unintentionally when horseplay conduct is happening.
3. Any inappropriate activity will be reviewed and consequences handled through the head coach and athletic director.

SPORTS THIS CODE OF CONDUCT PERTAINS TO (each sport may have their own as well as agreed upon with the AD): Cross Country, Football, Volleyball, Basketball, Soccer, Track, Tennis, Baseball, Softball, Powerlifting, Cheerleading, and Golf

## AGREEMENT

I understand that the above expectations and rules are in addition to school and UIL policies and I will abide by all rules and expectations without excuse. I understand that it is the coaches' discretion to implement disciplinary actions for not following any of the above expectations or rules.

If you agree to all expectations and rules and agree to fully commit yourself please sign and return this page to your head coach. If you do not sign, then a meeting with the coach and athletic director must be completed to review your child's involvement in Perryton athletics.

**Student Signature:**_____

**Date:**_____

**Parent/Guardian Signature:**_____

**Date:**_____

\*Please remove this page sign and return to the appropriate coach.

268

# Exhibit 7

**3:20**



Sarah ›

Tue, Mar 26 at 8:00 AM

**Do you have the ice bath photo from BeReal?**

No. I heard that one exists, but it's from some time ago. Is this a recent one?

**I have no idea. I'll send it to you if you want it. The situation is bad if it's made it to me.** 😳

**Or at least the rumors are persistent**

Yes. Please send it. And any other details you have heard.



Text Message • RCS

# Exhibit 8

Query    Reports    Utilities    Help    Log Out

JURY

## U.S. District Court
## Northern District of Texas (Amarillo)
## CIVIL DOCKET FOR CASE #: 2:23-cv-00025-BR

D.K. v. N.G., et al
Assigned to: Magistrate Judge Lee Ann Reno
Demand: $9,999,000
Cause: 28:1331 Fed. Question: Personal Injury

Date Filed: 02/17/2023
Jury Demand: Plaintiff
Nature of Suit: 890 Other Statutes: Other
Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**B. C.**

represented by **J Daren Brown**
Stockard Johnston Brown & Netardus, P.C.
PO Box 3280
Amarillo, TX 79116-3280
806-372-2202
Fax: 806-379-7799
Email: dbrown@sjblawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Y Lewis**
Marsh Law Firm PLLC
309 N. Main Street Suite 10
Garden City, KS 67846
620-290-9084
Email: robertlewis@marsh.law
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**D. K.**
*Individually and as Next Friend of B.C.*

represented by **J Daren Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Y Lewis**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**N. G.**

represented by **Chris D Parker**
Farris Parker & Hubbard
5700 SW 45th Street

272

Amarillo, TX 79109
806-374-5317
Fax: 806-372-2107
Email: cparker@pf-lawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**M. S.**                                            represented by **Robert L Craig , Jr**
Craig Terrill Hale & Grantham
PO Box 1979
Lubbock, TX 79408-1979
806-744-3232
Fax: 806-744-2211
Email: bobc@cthglawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark Chisholm**
Craig Terrill Hale & Grantham LLP
9816 Slide Road
Suite 201
Lubbock, TX 79424
806-744-3232
Fax: 806-744-2211
Email: markc@cthgelawfirm.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**J. C.**                                            represented by **Bailey Alexis Sapien**
Sapien Law LLC
3505 Olsen Boulevard
Suite 103
Amarillo, TX 79109
806-414-5774
Email: baileysapien@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chris G Hoffman**
Lovell Hoffman Law PLLC
1008 S Madison
Amarillo, TX 79101
806-376-8903
Fax: 806-376-5345
Email: chris@lovellhoffman.com
*TERMINATED: 12/01/2023*

**Defendant**

**Ragan Watson**                                     represented by **Walter L Taylor**
*TERMINATED: 04/26/2024*                             Taylor Law Firm
6630 Colleyville Blvd
Suite 100
Colleyville, TX 76034

273

512-413-7973
Fax: 512-474-6700
Email: taylorlawfirmdfw@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Karl Tiger Hanner**
Law Offices of Tiger Hanner
PO Box 26489
Austin, TX 78731
512-626-7725
Fax: 512-233-0524
Email: tigerhanner@gmail.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Perryton Independent School District**     represented by **Slater Elza**
Underwood Law Firm
PO Box 9158
Amarillo, TX 79105-9158
806-379-0347
Fax: 806-349-9474 FAX
Email: slater.elza@uwlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Fred A Stormer**
Underwood Wilson Barry Stein & ▮
PO Box 9158
Amarillo, TX 79105-9158
806/376-5613
Fax: 806/379-0316
Email: fred.stormer@uwlaw.com
*ATTORNEY TO BE NOTICED*

**Janet Sobey Bubert**
Underwood Law Firm PC
PO Box 9158
Amarillo, TX 79105
806-376-5613
Fax: 806-349-9474
Email: Janet.Bubert@uwlaw.com
*ATTORNEY TO BE NOTICED*

**Mediator**

**ADR Provider**     represented by **Scott Weston Sherwood**
Sherwood and Sherwood
PO Box 947
Panhandle, TX 79068
806-537-3591
*LEAD ATTORNEY*

274

| Date Filed | # | Docket Text |
|---|---|---|
| 02/17/2023 | 1 | COMPLAINT WITH JURY DEMAND against All Defendants filed by D. K., B. C.. (Filing fee $402; Receipt number ATXNDC-13526437) Clerk to issue summons(es). In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements and Judge Specific Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Brown, J) (Main Document 1 replaced with redaction on 3/27/2023) (nht). (Entered: 02/17/2023) |
| 02/17/2023 | 2 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by B. C., D. K.. (Clerk QC note: No affiliate entered in ECF). (Brown, J) (Main Document 2 replaced with redaction on 3/27/2023) (nht). (Entered: 02/17/2023) |
| 02/21/2023 | 3 | New Case Notes: A filing fee has been paid. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge (No magistrate judge assigned). Clerk to provide copy to plaintiff if not received electronically. (nht) (Entered: 02/21/2023) |
| 02/21/2023 | 4 | Summons Issued as to J. C., Perryton Independent School District, N.G., M. S., Ragan Watson. (nht) Modified text on 3/22/2023 (nht). (Main Document 4 replaced on 3/22/2023) (nht). (Entered: 02/21/2023) |
| 02/21/2023 | 5 | MOTION Motion to Proceed Under Pseudonym filed by D. K. (Brown, J) (Main Document 5 replaced with redaction on 3/27/2023) (nht). (Entered: 02/21/2023) |
| 02/28/2023 | 6 | SUMMONS Returned Executed as to All Defendants. (Brown, J) (Main Document 6 replaced with redaction on 3/27/2023) (nht). (Entered: 02/28/2023) |
| 02/28/2023 | 7 | ORDER granting 5 Motion to Proceed Under Pseudonym. Accordingly, the Court ORDERS that parties are required to use pseudonyms D.K. and B.C. as set forth in the Complaint and to redact all personal identifying information regarding Plaintiff and B.C. from documents submitted to the Court. Defendants are further ORDERED not to publicly disclose Plaintiff or B.C.'s names or personal identifying information. (Ordered by Judge Matthew J. Kacsmaryk on 2/28/2023) (awc) (Main Document 7 replaced on 3/22/2023) (nht). (Entered: 02/28/2023) |
| 03/06/2023 | 8 | STANDING ORDER OF REFERENCE to Magistrate Judge Lee Ann Reno (Ordered by Judge Matthew J. Kacsmaryk on 3/6/2023) (nht) (Main Document 8 replaced on 3/22/2023) (nht). (Entered: 03/06/2023) |
| 03/07/2023 | 9 | STANDING ORDERS (Ordered by Magistrate Judge Lee Ann Reno on 3/7/2023) (daa) (Main Document 9 replaced on 3/22/2023) (nht). (Entered: 03/07/2023) |
| 03/15/2023 | 10 | ANSWER to 1 Complaint,,,, filed by Perryton Independent School District. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. Attorney Slater Elza added to party Perryton Independent School District(pty:dft) (Elza, Slater) (Entered: 03/15/2023) |

| 03/15/2023 | 11 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Perryton Independent School District. (Clerk QC note: Affiliate entered in ECF). (Elza, Slater) Modified on 3/16/2023 (nht). (Entered: 03/15/2023) |
|---|---|---|
| 03/15/2023 | 12 | ANSWER to 1 Complaint, filed by N.G. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. Attorney Chris D Parker added to party N.G.(pty:dft) (Parker, Chris) Modified text on 3/22/2023 (nht). (Entered: 03/15/2023) |
| 03/15/2023 | 13 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by N.G. (Clerk QC note: No affiliate entered in ECF). (Parker, Chris) Modified text on 3/22/2023 (nht). (Entered: 03/15/2023) |
| 03/15/2023 | 14 | ANSWER to 1 Complaint,,,, filed by J. C.. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. Attorney Chris G Hoffman added to party J. C. (pty:dft) (Hoffman, Chris) (Main Document 14 replaced with redaction on 3/27/2023) (nht). (Entered: 03/15/2023) |
| 03/15/2023 | 15 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by J. C.. (Clerk QC note: Affiliate entry indicated). (Hoffman, Chris) (Main Document 15 replaced with redaction on 3/27/2023) (nht). (Entered: 03/15/2023) |
| 03/15/2023 | 16 | ANSWER to 1 Complaint,,,, filed by M. S.. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. Attorney Robert L Craig, Jr added to party M. S. (pty:dft) (Craig, Robert) (Main Document 16 replaced with redaction on 3/27/2023) (Entered: 03/15/2023) |
| 03/15/2023 | 17 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by M. S.. (Clerk QC note: No affiliate entered in ECF). (Craig, Robert) (Main Document 17 replaced with redaction on 3/27/2023) (nht). (Entered: 03/15/2023) |
| 03/17/2023 | 18 | ORDER TO SUBMIT JOINT PROPOSED SCHEDULING ORDER AND SETTING RULE 16 SCHEDULING CONFERENCE: Joint Proposed Scheduling Order due by 4/24/2023. FRCP 16 Scheduling Conference set for 4/27/2023 10:15 AM in US Courthouse, Courtroom 2nd Floor, 205 S. E. 5th Ave., Amarillo, TX 79101-1559 before Magistrate Judge Lee Ann Reno. (Ordered by Magistrate Judge Lee Ann Reno on 3/17/2023) (daa) (Main Document 18 replaced on 3/22/2023) (nht). (Entered: 03/17/2023) |
| 03/20/2023 | 19 | ORDER: The Court ORDERS that parties are required to use the pseudonym "N.G." and to redact all personal identifying information regarding N.G. from documents submitted to the Court. Plaintiff is further ORDERED not to publicly disclose N.G.'s name or personal identifying information. (Ordered by Judge Matthew J. Kacsmaryk on 3/20/2023) (nht) (Entered: 03/20/2023) |
| 03/21/2023 | 20 | ANSWER to 1 Complaint,,,, filed by Ragan Watson. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, |

276

| | | the clerk will notify the presiding judge. Attorney Karl Tiger Hanner added to party Ragan Watson(pty:dft) (Hanner, Karl) (Entered: 03/21/2023) |
|---|---|---|
| 03/21/2023 | 21 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Ragan Watson. (Clerk QC note: No affiliate entered in ECF). (Hanner, Karl) (Entered: 03/21/2023) |
| 03/22/2023 | 22 | ORDER REGARDING REDACTION (Ordered by Magistrate Judge Lee Ann Reno on 3/22/2023) (nht) (Entered: 03/22/2023) |
| 04/03/2023 | 23 | ANSWER to Complaint filed by Ragan Watson. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Hanner, Karl) (Entered: 04/03/2023) |
| 04/21/2023 | 24 | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Robert Y. Lewis (Filing fee $100; Receipt number ATXNDC-13683654) filed by D. K. (Brown, J) (Entered: 04/21/2023) |
| 04/21/2023 | 25 | Proposal for contents of scheduling and discovery order *Joint Proposed Scheduling Order* by Perryton Independent School District. (Elza, Slater) (Entered: 04/21/2023) |
| 04/21/2023 | 26 | MOTION Motion to Excuse Lead Counsel from FRCP 16 Scheduling Conference filed by Perryton Independent School District (Elza, Slater) (Entered: 04/21/2023) |
| 04/25/2023 | 27 | ORDER: On or before May 10, 2023, Karl Tiger Hanner shall either: (1) provide to the Court, and to the Clerk of Court, satisfactory documentation of membership; (2) apply for membership in the Bar of this Court or for admission pro hac vice for this case; or (3) file a motion for withdrawal of counsel. (Ordered by Magistrate Judge Lee Ann Reno on 4/25/2023) (nht) (Entered: 04/25/2023) |
| 04/25/2023 | 28 | ORDER GRANTING DEFENDANT'S MOTION TO EXCUSE LEAD COUNSEL FROM FRCP 16 SCHEDULING CONFERENCE re: 26 Motion. (Ordered by Magistrate Judge Lee Ann Reno on 4/25/2023) (nht) (Entered: 04/25/2023) |
| 04/26/2023 | 29 | CONSENT to Proceed Before a U.S. Magistrate Judge by all parties and Order Reassigning Case. Case reassigned to Magistrate Judge Lee Ann Reno for all further proceedings. Judge Matthew J. Kacsmaryk no longer assigned to case. (Ordered by Judge Matthew J. Kacsmaryk on 4/26/2023) (nht) (Entered: 04/26/2023) |
| 04/27/2023 | 30 | ELECTRONIC Minute Entry for proceedings held before Magistrate Judge Lee Ann Reno: FRCP 16 Scheduling Conference held on 4/27/2023. Amended Joint Proposed Scheduling Order due by 5/5/2023. Attorney Appearances: Plaintiff - J Daren Brown; Defense - Chris D Parker, Robert L Craig, Jr, Chris G Hoffman, Walter L Taylor, Fred A Stormer. (Court Reporter: Digital File) (No exhibits) Time in Court - 1:02. (daa) (Entered: 04/27/2023) |
| 05/01/2023 | 31 | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-13706343) filed by Ragan Watson (Attachments: # 1 Proposed Order Proposed Order for Admission Pro Hac Vice) (Hanner, Karl) (Entered: 05/01/2023) |
| 05/02/2023 | 32 | AMENDED Joint Proposal for contents of scheduling and discovery order by Perryton Independent School District. (Elza, Slater) Modified title on 5/2/2023 (daa). (Entered: 05/02/2023) |
| 05/02/2023 | 33 | ORDER FOR ADMISSION PRO HAC VICE re: 31 Application for Admission Pro Hac Vice of Karl Tiger Hanner. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a |

277

| | | |
|---|---|---|
| | | case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Magistrate Judge Lee Ann Reno on 5/2/2023) (nht) (Entered: 05/02/2023) |
| 05/02/2023 | 34 | ORDER FOR ADMISSION PRO HAC VICE granting 24 Application for Admission Pro Hac Vice of Robert Lewis. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Magistrate Judge Lee Ann Reno on 5/2/2023) (nht) (Entered: 05/02/2023) |
| 05/02/2023 | 35 | SCHEDULING ORDER: Joinder of Parties due by 10/6/2023. Pretrial Materials (expert witnesses) due by 12/22/2023 by parties seeking affirmative relief and due by 2/9/2024 by parties opposing affirmative relief. Deadline for mediation is on or before 4/3/2024. Motions Regarding Expert Witnesses due by 5/17/2024. Amended Pleadings due by 5/24/2024. Discovery due by 6/28/2024. Pretrial Conference set for 2/24/2025 02:00 PM in US Courthouse, Courtroom 2nd Floor, 205 S. E. 5th Ave., Amarillo, TX 79101-1559 before Magistrate Judge Lee Ann Reno. Jury Trial set for 3/3/2025 09:00 AM in US Courthouse, Courtroom 2nd Floor, 205 S. E. 5th Ave., Amarillo, TX 79101-1559 before Magistrate Judge Lee Ann Reno. (Ordered by Magistrate Judge Lee Ann Reno on 5/2/2023) (daa) (Entered: 05/02/2023) |
| 09/19/2023 | 36 | NOTICE of *Change in Law Firm* filed by J. C. (Hoffman, Chris) (Entered: 09/19/2023) |
| 11/30/2023 | 37 | MOTION to Substitute Attorney, *J.C.* added attorney Chris G Hoffman,Bailey Alexis Sapien for J. C.. Motion filed by J. C. (Hoffman, Chris) (Entered: 11/30/2023) |
| 12/01/2023 | 38 | ORDER GRANTING UNOPPOSED MOTION FOR SUBSTITUTION OF COUNSEL re: 37 Motion to Substitute Attorney. Chris Hoffman is hereby withdrawn. (Ordered by Magistrate Judge Lee Ann Reno on 12/1/2023) (nht) (Entered: 12/01/2023) |
| 12/01/2023 | | ***Clerk's Notice of delivery: (see NEF for details) Docket No:38. Fri Dec 1 15:49:02 CST 2023 (crt) (Entered: 12/01/2023) |
| 12/20/2023 | 39 | Designation of Experts by D. K.. (Brown, J) (Entered: 12/20/2023) |
| 01/23/2024 | 40 | Designation of Experts by D. K.. (Brown, J) (Entered: 01/23/2024) |
| 02/08/2024 | 41 | Designation of Experts by M. S.. (Chisholm, Mark) (Entered: 02/08/2024) |
| 02/09/2024 | 42 | Designation of Experts by Perryton Independent School District. (Elza, Slater) (Entered: 02/09/2024) |
| 02/09/2024 | 43 | Designation of Experts by N. G.. (Parker, Chris) (Entered: 02/09/2024) |
| 02/16/2024 | 44 | PLAINTIFFS UNOPPOSED MOTION FOR LEAVE TO AMEND COMPLAINT filed by D. K. (Attachments: # 1 Proposed Amendment) (Brown, J) Enhanced docket text on 2/20/2024 (cmk). (Entered: 02/16/2024) |
| 02/20/2024 | 45 | ORDER GRANTING PLAINTIFF'S UNOPPOSED MOTION FOR LEAVE TO AMEND COMPLAINT re: 44 Motion for Leave to Amend Complaint. (Unless the document has already been filed, clerk to enter the document as of the date of this order.) (Ordered by Magistrate Judge Lee Ann Reno on 2/20/2024) (awc) (Entered: 02/20/2024) |
| 02/20/2024 | 46 | FIRST AMENDED COMPLAINT WITH JURY DEMAND against All Defendants filed by D. K., B. C.. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (awc) (Entered: 02/20/2024) |

| 02/21/2024 | | ***Clerk's Notice of delivery: (see NEF for details) Docket No:45. Wed Feb 21 13:11:00 CST 2024 (crt) (Entered: 02/21/2024) |
|---|---|---|
| 03/07/2024 | 47 | MOTION to Dismiss for Lack of Jurisdiction *Plaintiffs' First Amended Complaint and Supporting Arguments and Authority* filed by Perryton Independent School District (Elza, Slater) (Entered: 03/07/2024) |
| 03/07/2024 | 48 | Unopposed MOTION for Leave to File An Original Answer to Plaintiffs' First Amended Complaint filed by Perryton Independent School District (Elza, Slater) (Entered: 03/07/2024) |
| 03/08/2024 | 49 | ORDER GRANTING DEFENDANT PERRYTON I.S.D.'S UNOPPOSED MOTION FOR LEAVE TO LATE FILE ITS ORIGINAL ANSWER TO PLAINTIFFS' FIRST AMENDED COMPLAINT re: 48 Motion for Leave to File. (Unless the document has already been filed, clerk to enter the document as of the date of this order.) (Ordered by Magistrate Judge Lee Ann Reno on 3/8/2024) (awc) (Entered: 03/08/2024) |
| 03/08/2024 | 50 | ANSWER to 46 Amended Complaint filed by Perryton Independent School District. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (awc) (Entered: 03/08/2024) |
| 04/01/2024 | 51 | Joint MOTION to Amend/Correct 35 Scheduling Order,,, filed by Perryton Independent School District (Elza, Slater) (Entered: 04/01/2024) |
| 04/01/2024 | 52 | ORDER GRANTING JOINT MOTION TO EXTEND MEDIATION DEADLINE re: 51 Motion to Amend/Correct. The parties shall mediate this case on or before April 23, 2024. (Ordered by Magistrate Judge Lee Ann Reno on 4/1/2024) (nht) (Entered: 04/01/2024) |
| 04/10/2024 | 53 | Joint MOTION to Dismiss *Plaintiffs' 6th Claim for Relief Only* filed by B. C., D. K. (Brown, J) (Entered: 04/10/2024) |
| 04/11/2024 | 54 | ORDER GRANTING JOINT MOTION TO DISMISS PLAINTIFFS' STATE LAW TORT CLAIM AGAINST P.I.S.D. AND DENYING AS MOOT P.I.S.D.'S 12(b)(1) MOTION TO DISMISS re: 47 Motion to Dismiss for Lack of Jurisdiction; 53 Motion to Dismiss. (Ordered by Magistrate Judge Lee Ann Reno on 4/11/2024) (nht) (Entered: 04/11/2024) |
| 04/25/2024 | 55 | MOTION to Dismiss *Defendant Ragan Watson Only* filed by B. C., D. K. (Brown, J) (Entered: 04/25/2024) |
| 04/26/2024 | 56 | Alternative Dispute Resolution Summary filed by ADR Provider. Outcome of ADR: Settled as a result of ADR. (mcrd) (Entered: 04/26/2024) |
| 04/26/2024 | 57 | ORDER granting 55 Motion to Dismiss. Party Ragan Watson terminated. (Ordered by Magistrate Judge Lee Ann Reno on 4/26/2024) (nht) (Entered: 04/26/2024) |
| 04/26/2024 | 58 | ORDER TO FILE JOINT STIPULATION OF DISMISSAL: The parties shall file a Joint Stipulation of Dismissal in compliance with Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure on or before May 28, 2024. (Ordered by Magistrate Judge Lee Ann Reno on 4/26/2024) (nht) (Entered: 04/26/2024) |

| PACER Service Center |
|---|
| **Transaction Receipt** |
| 05/13/2024 13:47:25 |

| PACER Login: | tgentryGL | Client Code: | |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 2:23-cv-00025-BR |
| Billable Pages: | 7 | Cost: | 0.70 |

SCOTT SHERWOOD
scott@sherwoodtxlaw.com

CHO SHERWOOD
cho@sherwoodtxlaw.com

MARSHALL SHERWOOD
(1935-2008)

# SHERWOOD &SHERWOOD, P.C.

123 W. 3RD ST.
P.O. BOX 947
PANHANDLE, TEXAS 79068-0947

AREA CODE 806
TELEPHONE 537-3591
FACSIMILE 537-3592

April 22, 2024

Honorable Lee Ann Reno
U.S. District Court - Northern District, Amarillo Division
205 SE Fifth Avenue, Room 321
Amarillo TX 79101

re:    Cause No. 2:23-CV-00025-BR in the United States District Court for the
Northern District of Texas Amarillo Division; *D.K., Individually and as Next
Friend of B.C. vs. N.G., M.S, J.C., Ragan Watson, Individually and in his
Official Capacity as a Coach of Perryton Independent School Distict and
Perryton Independent School District*

Dear Judge Reno:

I am writing to report that this matter was mediated on April 18, 2024, and an
agreement reached. I anticipate that the attorneys will prepare the order and associated
documents and present the matter for the court's consideration in the near future.

I am available at the court's convenience if you should have any questions.

Respectfully,

Scott Sherwood

SS:mm
cc:    Robert Y. Lewis           J. Daren Brown
       Slater Elza               Fred Stormer
       Janet Sobey Bubert        Chris Parker
       Bailey Sapien             Robert L. Craig, Jr.
       Mark Chisholm             Walter L. Taylor
       Karl Tiger Hanner

281

# Exhibit 9

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

S.J., a Parent, Conservator,      )
and Next Friend of N.J.,          )
        Plaintiff,                )
                                  )
vs.                               ) Case No. 2:24-CV-00168-Z
                                  )
PERRYTON INDEPENDENT SCHOOL       )
DISTRICT, and                     )
                                  )
COLE UNDERWOOD, Individually      )
and in his offi___     ___ity as )
Athlet___            ___yton      )
ISD,                              )
                                  )

*********************************************

ORAL DEPOSITION OF

DUCE COOPER

HAD ON THE

3RD DAY OF NOVEMBER, 2025

*********************************************

WORD FOR WORD REPORTING, L.L.C
620 NORTH ROBINSON, SUITE 202
OKLAHOMA CITY, OKLAHOMA 73102
(405)232-9673

REPORTED BY:  DARLA RILEY, CSR

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Duce Cooper 11/03/2025                                                Page 2

APPEARANCES


FOR THE PLAINTIFF:

Mr. Kyle Goodwin
GOODWIN LEWIS, PLLC
420 Northwest 6th Street, Second Floor
Oklahoma City, Oklahoma   73102
(405) 900-5700


FOR THE DEFENDANT, PERRYTON INDEPENDENT SCHOOL DISTRICT:

Mr. Slater Elza
UNDERWOOD LAW FIRM
Post Office Box 9158
Amarillo, Texas   79105
(806) 376-5613
(806) 379-0316 FAX

so I don't really know -- maybe reframe it.  What -- what are you trying to...

Q     (By Mr. Goodwin)  I am trying to figure out why it was your comment to Mr. Brown that broke all of this open when there were again, 30 reports by 20 different people about an inappropriate relationship relating to Cole Underwood and why yours was the one that did this.

        MR. ELZA:  Objection, form.

A     I -- I --the only way I know to answer that is I gave dates and times that they were able to look into and find...

Q     (By Mr. Goodwin)  Okay.  Well, what -- what did you tell Mr. Brown?

A     Through some counseling -- and this happened, I don't know -- I am going to try to say about April -- I don't really know the dates. it was sometime in April.  Mid to late week I was doing some counseling and it came up during counseling that there might be an inappropriate relationship going on at school.  So that passed.

Q     (By Mr. Goodwin)  So what did you do then?

A     I went to Mr. Brown and I said somebody told me there might be an inappropriate relationship but they really don't know.  And he said we have heard that.  We are trying to see if there's proof of that.  So I would say probably a little bit later.

Q     How much later?

A    A couple of weeks.  I have them --

Q    So all this in April then, probably?

A    It might have been.  It might have been the month before and the next one in April because I do all my counseling two weeks.  I don't do week after week.  I usually set a week apart.  And so I would say it was two weeks apart.  It could have been four.  I just don't remember.

But they came back, and I said listen, if you say that, there needs to be proof.  And so I obtained dates and times of people seeing them at school going through -- I don't know -- into rooms, offices, and different things.  I wrote all of that down, and came Sunday, right after church I got Greg Brown and I said, hey we need to sit down.  We sat down.  I handed it to him and I said I don't know.

Q    You gave him the notes of the dates and times?

A    Uh-huh.

Q    With -- is that in your handwriting?

A    It was in my handwriting, yes.

Q    And, again, I don't want to know the identities.  At some point I may have to.  But I don't want to know the identities, but when you talk about counseling this was youth counseling, correct?

A    Both adults and youth.

Q    And so this -- these counseling sessions that you were doing, you learned about this -- or the allegations of an

inappropriate relationship through these counseling sessions both of an adult and of the -- and from children?

A    Yes.

Q    Or teenagers, probably?

A    Yes.

Q    And you reported that to Brown the first time you heard it?

A    Not the dates and times, but I reported that --

Q    Well, you didn't have the dates and times?

A    That's right.  That I reported that somebody had mentioned to me that there was thoughts that something was going on.

Q    And so it was either two weeks before you told him on the second occasion or four weeks?  One of those?

A    Four weeks, because I do two week.

Q    Okay.  So how did you -- so this first -- we will call it the first set of complaints and the second set.

A    Okay.

Q    Are you with me?

A    Uh-huh.

Q    All right.  So the first set of complaints how did you notify Mr. Brown about that?  Was that also at church?

A    I honestly don't remember.

Q    Did you call him?  Did you go see him?

A    I -- I probably called him.  I am -- I am going to say as

honestly as I can tell you I probably called him. I don't know that we sat. I don't remember.

Q    And what -- what was -- what were you told? That -- just that there was generally an inappropriate relationship?

A    Yes.

Q    No specifics about that?

A    No.

Q    Had you heard this from anybody else before the counseling session?

A    No.

Q    Because apparently it was rampant out here, all kinds of rumors about this relationship. Are you aware of that now?

A    Yes.

Q    Did you --

A    And I think around that time is when it became rampant in our community.

Q    Well -- have you looked at the discovery responses in this case?

A    No, sir.

Q    Okay. We will go through those in a second. So this first complaint, have you told me everything about that -- that you received -- how many different people told you this on the first complaint?

A    Three.

Q    Two teenagers and one adult?

A    Two adults and one teenager.

Q    All right. And so you reported that to Mr. Brown, and what did he tell you?

A    That there had been allegations made, but there was no specific proof, and that they were looking into it.

Q    Did he tell you that Mr. Underwood had already been reprimanded for this? Did he tell you anything else?

A    No, we didn't have any discussion about...

Q    And to be fair with you, you were not on the school board at that time?

A    No, sir.

Q    You are now.

A    Yes.

Q    But you were not at that time?

A    Yes, sir.

Q    All right. So when the -- for purposes of the record I think I know the answer to this, but when did you become a school board member for PISD?

A    May.

Q    And when were you voted in?

A    May.

Q    So you were voted in and sworn in the same month?

A    The -- the -- the -- the elections were at the beginning of the month, I think the 25th. And don't hold me to that, but I -- I think that's close.

sessions with these same three people?

A    And others.

Q    So you had more in between time?

A    Uh-huh.

Q    Is that a yes?

A    Yes.  Sorry.

Q    It's okay.

A    Sorry about that.

Q    I tell everyone this.  It's hard.  We can't read uh-huhs and huh-uhs.

A    Okay.

Q    I am not trying to be rude to you.

A    You are okay.

Q    And so how many more reports did you receive after your first set of complaints?

A    Oh, I don't -- I'll say -- I don't -- two or three.

Q    Were those all in a counseling session or were those just talking to people in the community?

A    Counseling.

Q    So during counseling you have had now had five separate reports.  What's the breakdown on teenagers versus adults?

A    I would say three and three, probably.

Q    So about three teenagers and about three adults told you about this relationship.  What else did you hear other than the specifics -- we'll get into that.  What other --

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Duce Cooper 11/03/2025

Page 16

A    -- sports.

Q    Were --

A    Different workouts, out on the field, practice, behind the school.    That's what I remember them telling me.

Q    Were the kids communicating or had access to Coach Underwood's Snap?

A    I don't --

Q    That's how they were putting them together?

A    I don't know the answer to that.

Q    Okay.    So what did you do with -- so from the communications you wrote down the dates and times?

A    I wrote down the dates and times that they had and handed it off to Mr. Brown.

Q    So prior to the first set of complaints, late March or early April --

A    Okay.

Q    -- you had not heard anything about these rumors at all?

A    Not -- well, not from these people, no.

Q    From anybody had you heard them at all?

A    I had heard about the rumor from somebody that came to me with counseling.

Q    So the first set of rumors you reported to Mr. Brown were actually not the first set of rumors you had heard?

A    That I had heard.    But I don't go report every rumor I hear because I hear a lot of rumors.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Duce Cooper 11/03/2025                                          Page 17

Q    Yeah, that's probably true in your position.  So what was different about the -- what we are calling the first set of complaints, what was different about that than the previous rumors you had heard?

A    The person that told me that had a vested interest in Coach Underwood.

Q    What's vested interest mean?

A    They would have been related to him.

Q    Okay.  And they were upset with him?

A    No, they were upset about their relationship.

Q    Okay.  Okay.  Well, I have to have a conversation with counsel off the record about how we handle some of this, but that's -- we will move on.  So the second set, you -- when you had dates and times you had a written piece of paper.  Was it on a notebook or how did you take it down?

A    It would have been off a legal pad, I think.

Q    And you just tore off the sheet?  Did you give that to Mr. Brown?

A    I did.

Q    Were you friends with Mr. Brown?

A    We go to the same church.

Q    Well, I mean, do you consider yourself friends?

A    Yes.

Q    I mean, there's a lot of people at church who may not like each other and they are in the same congregation.

# Exhibit 10

S.J. vs PERRYTON ISD and COLE UNDERWOOD
James Mireles 01/23/2026

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

AMARILLO DIVISION

S.J., as Parent, Conservator, )
and Next Friend of N.J.        )
                               )
          Plaintiff            )
                               )
-vs-                           ) NO. 2:24-cv-00168-Z
                               )
PERRYTON INDEPENDENT SCHOOL    )
DISTRICT, and                  )
COLE UNDERWOOD, Individually   )
and in his official capacity   )
as Athletic Director of        )
Perryton ISD                   )
                               )
          Defendants           )

DEPOSITION OF JAMES MIRELES

TAKEN ON BEHALF OF THE PLAINTIFF

IN OKLAHOMA CITY, OKLAHOMA

ON JANUARY 23, 2026

REPORTED BY:   SUSAN G. STOTTS, C.S.R.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
James Mireles 01/23/2026                                                    Page 2

FOR THE PLAINTIFF:

         MR. KYLE GOODWIN
         MR. TYLER GENTRY
         Attorneys at Law
         GOODWIN LEWIS
         420 Northwest 6th Street, Second Floor
         Oklahoma City, Oklahoma 73102
         (405) 900-5700
         kgoodwin@goodwinlewis.com


FOR THE DEFENDANT APPEARING REMOTELY:

         MR. SLATER ELZA
         Attorney at Law
         UNDERWOOD LAW FIRM
         500 South Taylor Street, Suite 1200
         Amarillo, Texas 79101
         (806) 379-0347
         slater.elza@uwlaw.com

A.    I believe it was probably --

Q.    That was before he was hired at all by Perryton; is that a fair statement?

A.    That's the best way to put that, because I'm trying to get the dates straight.  He hadn't worked for Perryton ISD.

Q.    What else did you do to investigate Cole Underwood's background?

A.    I probably didn't do too much to investigate Cole because Coach Haberthur had worked with him and knew him prior, and basically I was going to take the recommendation of the athletic director and the football coach and the principal if he fit the teaching fields.

Q.    And who was the principal at that time that would have made sure that he would have fit the teaching area?

A.    Ross Sproul.

Q.    How do you spell his last name, sir?

A.    S-P-R-O-U-L, I believe.

Q.    Thank you, sir.

And so you left it up to Mr. Sproul and Mr. Haberthur to determine whether he was fit for the position?

A.    Right.

Q.   What do you do to ensure that there weren't other issues that were not criminal in nature?  Like, for instance, in this particular case, how did you verify or determine whether the teacher or coach would be -- have problems at the past?

A.   Yeah.  Usually when hiring --

MR. ELZA:  Object to the form.

Go ahead.  No, You're fine.  I made an objection.  You just continue on and answer.

THE WITNESS:  Okay.  My job, as superintendent, is not to hire the coaches.  That's the AD's and head football coach.  He's supposed to make sure that he fits the coaching background.  And then also Mr. Sproul has to okay that he fits the teaching -- what he's going to do teaching while he's there coaching and teaching.

I take the recommendation of the athletic director and head football coach, and then I tell the board, you know, and principal and say, "Hey, this is who we want to hire," and then they make their decision according to that.

Q.   (By Mr. Goodwin) Well, obviously, you were not present for Coach Haberthur's deposition.  Tyler Gentry, here in my office, took Mr. Haberthur's deposition about a month or so ago.  Mr. Haberthur was aware; he did know

that Mr. Underwood had previously been placed on administrative leave at Amarillo.

Did you know that, sir?

A. I did not know that. That was -- never came up in our conversation the day he was in my office.

Q. So -- and I'll just tell you, Mr. Haberthur testified he could not remember whether he told you that or not, but you're saying you never heard that before?

A. No. That would have sent a red flag up in my -- as a superintendent of the school, that would have sent up a red flag.

Q. I'm going to come across here. We've got the exhibits -- where are the exhibit books?

MR. GOODWIN: Slater, I'm going to Exhibit No. 15 in our exhibit books, which you already have.

MR. ELZA: One of the prior ones you've already used.

MR. GOODWIN: Yeah, same set of books. It's Exhibit No. 15, one five, and it is the summary of the investigations done into Cole at Amarillo, for your recollection.

Q. (By Mr. Goodwin) Have you seen this document before, sir?

A. I have not.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
James Mireles 01/23/2026                                         Page 14

Q.   I'll just tell you it was in Mr. Underwood's personnel file from Amarillo.  If you turn over to the next document, this is a letter provided by the Amarillo School District to Cole Underwood dated August 7th of 2018 where he was placed on administrative leave.

Go to the next tab, sir, No. 16.  There you go.  Keep going.  One more tab.  There you go.

MR. ELZA:  Kyle, you said -- after 15, you said look at the next document, which was the letter to Cole.  What exhibit was that?

MR. GOODWIN:  Sixteen.  Tab 16.

MR. ELZA:  Okay.  And then is he going to a third document right now?

MR. GOODWIN:  Right now he's on 16, but we will go to 17.

MR. ELZA:  Okay.  That's fine.  I thought you called out three.  Okay.

Q.   (By Mr. Goodwin) Have you seen this document before, sir?

A.   I have not.

Q.   If you'll turn over to the next tab, it's Exhibit No. 17.  This is dated three days later where it's a Summary Memorandum of Administrative Directives.  This is also directed to Cole Underwood

**Word for Word Reporting, LLC**
**405.232.9673 (OKC) | 888.277.9673 (Toll-Free)**

by Chris Tatum, who was the director of secondary personnel at Amarillo.

Have you seen this, sir?

A.   No, I have not.

Q.   So any of this stuff that happened at Amarillo, you were not made aware of?

A.   No, I was not.

Q.   Now, I'll tell you it has been admitted by the school district that Mr. Haberthur was aware that he was placed on administrative leave.

Do you wish you would have been told about that?

A.   I do wish he would have said something about that.

Q.   How do you think you would have handled that? Had Mr. Haberthur told you he had been placed on administrative leave for inappropriate electronic communication with a minor girl, do you think you would have hired him or not?

A.   No. I don't think I would have hired him if I had known that.

Q.   There's multiple other complaints. I'm not going to go through them, but just to move through this as quickly as possible today, he was also -- complaints were made against Mr. Underwood for

Q.    Did you personally observe any untoward behavior by either Mr. Hall or Mr. Langfitt while you were there?

A.    No.

Q.    Well, apparently they resigned.

Did they ever call and talk to you about these issues?

A.    No.

Q.    You don't know anything about them?

A.    I wasn't there when all this happened.

Q.    All right.  And let's turn over to Exhibit No. 13, a gentleman by the name of David Alexander Drew.

Do you remember him?

A.    David Alexander Drew.  That's not ringing a bell.  Oh, yes, yes.  Okay.  Now I can picture him. Yes, I do remember this.

Q.    What happened with Mr. Drew?

A.    I'm trying to remember the best I can on what all happened here.  This was an incident that I handled, and I can't remember what year I handled it. He was not a fully certified teacher.  He was one that we had certified through the district, and I believe he did have an inappropriate relationship with a student.  And I did forget this one.  I'm glad you

reminded me.

Q.   Well, I don't know these folks, so I've got to ask the guy that might.

What do you recall about the allegations against Mr. Drew?

A.   Sexual relations with a student.

Q.   Was this while you were principal the first stint or the second stint, or do you remember?

A.   This is probably while I was principal there, yeah.

Q.   If you look down at the bottom of the second page, that page you're on, it also says, "In 2016 a Perryton Junior High School teacher was accused of inappropriate behavior but no charges were filed."

Now, you were, I think, principal then.  Do you remember that incident when a junior high teacher --

A.   I would have not been dealing with any of that.

Q.   That was out of your purview?

A.   I dealt with the high school, and that was enough without the junior high.

Q.   Do you remember that incident, though, or who that might have been?

A.   I do not remember that incident.  I do

remember the other one.

Q.    What happened with Mr. Drew?

A.    He was immediately suspended and then later on released.

Q.    Did you suspend him?

MR. ELZA:  Hold on.  I'm sorry.  He broke up. I think he said he was suspended.

And then was there more after that?

MR. GOODWIN:  Yes.  He said he was suspended, and what?

THE WITNESS:  Then we let him go.

Q.    (By Mr. Goodwin) He was terminated?

A.    He was terminated.

Q.    Did you perform the investigation of Mr. Drew?

A.    I probably did because I was the high school principal then.

Q.    But you don't remember?

A.    I don't remember a lot about it, but I do remember what happened.  I do remember he was not a certified teacher prior to all this happening.  He was very -- well, he wasn't trained like the other teachers, so there were a lot of issues with his teaching besides this happening.

Q.    He wasn't a great teacher, and he had an

Q.   It's okay.  It's all right.  I'm just trying not to mislead you.  I think Slater would agree with me that Coach Underwood was hired in the summer of '23 before the '23-'24 school year as athletic director.

A.   Okay.  As head football coach and athletic director.

Q.   Yes, sir.  He had already been on as a year for -- as an assistant coach.

A.   Yeah.  He was an assistant coach.  I guess, technically, he was the offensive coordinator.

Q.   There you go.  I didn't know that either.

So he was hired as AD and head football coach in the summer of '23.  And were you a part of that process when he was hired as AD?

A.   Yes.

Q.   What do you recall about that?

A.   Just like I told you before, I was called in by the coaching staff and had a morning meeting, and they all said that we wanted Cole to be our next head coach and athletic director.

So I informed the board kind of about my meeting with him and what they wanted and it made sense to me because it was so late in the season not to go out and try to find somebody and rush through it.

Q.   He was really young at that time, correct?

A.    Oh, he was very young.  He had had maybe a year's experience.

Q.    So was it a little bit of a risk for Perryton in that regard?

A.    Yeah, I think it was.  His coaching that we saw the year before seemed to be -- you know, fit the relevant offensive coordinator and help him call the plays and do all that.

So, yeah, everything fit the bill that, you know, maybe he was the one to replace Coach Haberthur.

Q.    And so during that first year that he was an assistant coach and, sounds like, the offensive coordinator, did you hear any complaints or issues related to either his teaching or his coaching?

A.    I had no complaints on him.

Q.    And how about from a personal standpoint?  In other words, did you receive any complaints during that first year he was an assistant coach for his personal behavior towards students?

A.    I don't remember any.

Q.    All right.  So if you would turn, sir, from the same book you've got to Exhibit No. 7.  I'll just tell you what you're looking at and what Slater will admit is the Perryton Independent School District's discovery responses in this case.

# Exhibit 11

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

AMARILLO DIVISION

S.J., as Parent, Conservator,  )
and Next Friend of N.J.        )
                               )
              Plaintiff        )
                               )
   -vs-                        )      No. 2:24-cv-00168-Z
                               )
PERRYTON INDEPENDENT SCHOOL    )
DISTRICT, and                  )
COLE UNDERWOOD, Individually   )
and in his official capacity   )
as Athletic Director of        )
Perryton ISD                   )
                               )
              Defendants       )

REMOTE DEPOSITION OF DONNA HALE

TAKEN ON BEHALF OF THE PLAINTIFF

IN OKLAHOMA CITY, OKLAHOMA

ON FEBRUARY 19, 2026

REPORTED BY:  SUSAN G. STOTTS, C.S.R.

FOR THE PLAINTIFF:

      MR. TYLER GENTRY
      MR. KYLE GOODWIN
      Attorneys at Law
      GOODWIN LEWIS
      420 Northwest 6th Street, Second Floor
      Oklahoma City, Oklahoma 73102
      (405) 900-5700
      kgoodwin@goodwinlewis.com


FOR THE DEFENDANT APPEARING REMOTELY:

      MR. SLATER ELZA
      Attorney at Law
      UNDERWOOD LAW FIRM
      500 South Taylor Street, Suite 1200
      Amarillo, Texas 79101
      (806) 379-0347
      slater.elza@uwlaw.com

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Donna Hale 02/19/2026                                             Page 6

A.    No, sir.

Q.    Okay.  Did they go to school then, for example, in Pampa?

A.    They went to school in Miami, M-I-A-M-I, Texas.

Q.    And you said you were in Perryton for approximately two years.  What was your job description or role there for Perryton?

A.    I was assistant superintendent over curriculum and instruction.

Q.    Did you have any other job titles while at Perryton?

A.    No, sir.

Q.    Okay.  You were the Title IX coordinator in Perryton as well, correct?

A.    Yes, sir.

Q.    Okay.  And where were you before you were at Perryton?

A.    Miami ISD.

Q.    And how long were you there?

A.    Sorry.  Let me do some math real quick in my head.

Q.    You're fine.

A.    Twenty-one years.

Q.    And what was your role or roles there?

Perryton?

A.   I was.

Q.   Have you been designated as a Title IX coordinator at any previous employment?

A.   In Miami.

Q.   Okay.   Was that like an official title you had, or, as superintendent, that's just what you did?

A.   It was just in policy that you have to identify who the Title IX coordinator is.

Q.   Okay.   And how long were you the Title IX coordinator, for example, in Miami?

A.   I believe the whole time.

Q.   The whole 21 years or just while you were superintendent?

A.   Just the superintendent, the 16.

Q.   In your 16 years as Title IX coordinator at Miami and, too, at Perryton -- let me ask you this first.

Are you also the Title IX coordinator in Bowie?

A.   I am, yes.

Q.   Okay.   So during your tenure as Title IX coordinator over -- gosh, it looks like maybe 18, 19 years, how many Title IX investigations have you been involved with?

Q. Can you give me some examples of the type of reports that would warrant a Title IX investigation?

A. It would be inappropriate relations. It would be someone feeling uncomfortable, communications.

Q. Anything else?

A. Inappropriate conversations that would make someone feel harassed.

Q. Do you think that, in your role as assistant superintendent, you were aware of all the complaints that were being received by Perryton ISD relative to Cole Underwood and ▮▮▮▮▮

A. No, sir, I was not. I was over curriculum and instruction.

Q. Who makes the decision then to do a Title IX investigation?

A. It would be me.

Q. So if you, as a Title IX coordinator, don't have all of the evidence or reports that have been received, how do you know whether a Title IX investigation should have been done or not?

A. I guess I can't answer that question.

Q. Yeah. This is a problem that we've been trying to figure out. I think now, at this point in discovery and in the case, we're up to some 50

different reports and complaints received from teachers, coaches, administrators, administrator from another school, parents, students, over almost a two-semester period relative to Underwood and Natalee. It's not withstanding those from board members and everyone else. We're trying to figure out why, for example, a Title IX investigation was never done.

And what I'm understanding from you is that's your decision, and maybe you weren't aware of all those things?

MR. ELZA: Objection. Form.

Q. (By Mr. Gentry) Is that fair?

A. Yes.

Q. Whose responsibility is it to tell the Title IX coordinator what's going on so you can make that decision?

A. It would be anyone that had a concern.

Q. So if these things, for example, were being reported to Greg Brown, your superintendent, does he have an obligation to tell you?

A. Yes.

Q. So if he was receiving reports and not telling you, is that a problem?

MR. ELZA: Objection. Form.

THE WITNESS: I guess it depends on the

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Donna Hale 02/19/2026                                                    Page 14

reports he was given.

Q.    (By Mr. Gentry) Let's assume he received reports about an inappropriate relationship.  If he doesn't give those to you as the Title IX coordinator, is that a problem with respect to Title IX policy?

A.    Yes.

Q.    Okay.  And if, for example, your principals, Tori Little or Sandy Wheeler, were receiving reports or complaints and not forwarding them to you or to Greg Brown, would that also be a problem under Title IX policy?

A.    Correct.

Q.    Okay.  And we are certainly going to go through some of these, but just, in general, what -- I mean prior to the ultimately arrest of Cole Underwood -- I know were you involved there towards the end, but I want to go prior to that.

What complaints or reports were you aware of prior to his arrest?

A.    I was made aware of social posts that ████ had made where Mr. Underwood was in the photos with other students, including ██████

Q.    Okay.  What else?

A.    I was aware that he -- ██████ had left a track meet with Cole at -- given the dad's permission

to make it back to a ballgame.

I'm thinking.

Q. Okay.

A. I was aware that there had been a conversation with the dad that there were some concerns, and he had said that, "That's Perryton being Perryton." He believed, you know, that's people talking, gossipping. Cole was a good family friend.

Q. Any others?

A. No, sir.

Q. Okay. That then is a stark contrast to the 40 to 50 complaints that I referenced earlier, correct?

A. Not knowing what those 40 or 50 complaints are, I guess.

Q. Okay. That's what I'm getting at. You appeared to be aware of, effectively, two reports or complaints, some social media posts by the child with or about Cole, and then the track meet incident, correct?

A. Yes, sir.

Q. Okay. Just briefly on the track meet incident, did the school violate any policies by permitting ███ to leave that track meet with Cole?

A. I don't believe -- I guess -- yeah, I can't

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Donna Hale 02/19/2026

Page 23

A.    It's obviously very unfortunate that any educator would do that to a student.  There's never a good -- it's never -- there is never reasons that one can justify such actions of an educator.  We are trusted to take care of children, and he did not.

Q.    What would you say is the purpose of a school?

A.    The purpose of a school is to educate students to prepare them for their future adulthood, make them successful, contributing members of society.

Q.    Anything else?

A.    No, sir.

Q.    What about ensuring children's safety while at that school?

A.    I think that's given.  I think that's what the community expects of a school.

Q.    Do you think the school did anything wrong in this case?

MR. ELZA:  Objection.  Form.

THE WITNESS:  I think, looking back, everyone realizes things could have been handled differently.  Hindsight is 20/20.  I think at the time what was believed to be going on, it was unprofessional conduct of Cole Underwood -- unprofessional conduct of Cole Underwood.  I do believe, if there were concrete --

MR. GENTRY:  Then it's Kyle's fault.

MR. ELZA:  Absolutely.

Q.    (By Mr. Gentry) Now, we took James Mireles' deposition and talked with him on a couple of occasions. Mr. Mireles has an interesting thought, and he's been in education for a long time.  When a student says something, like someone is a perv, students usually know before anyone else knows.

Do you agree with that?

A.    I would probably say, yes.

Q.    Right.  Students are boots on the ground. They're seeing these things every day.  They talk to each other.  So if students as early as the fall of '23 are already calling Coach Underwood a pervert or a perv, why is that not being taken seriously?

A.    I can't answer that question.

Q.    And I'm guessing you weren't having conversations, for example, with Greg Brown in the fall of '23 about these reports received where they call him a pervert.

A.    No, sir.

Q.    Okay.  Had you been aware of these things as the Title IX coordinator, is there anything specific that you would have done?

A.    Probably would have initiated or at least

had the conversation that warranted a Title IX.

Q.    If we're getting several allegations of pervert from different students reported by different teachers as early as the fall of '23, do you think that's something that might have warranted the initiation of a Title IX investigation?

MR. ELZA:  Objection.  Form.

THE WITNESS:  Yes.

Q.    (By Mr. Gentry) Okay.  The next one, "Sometime during the football season in 2023, Mike Blackshire verbally asked volleyball coach Abigale Harris, 'How do you like working for a pedophile?'  Coach Harris reported generally hearing statements in the community in the fall of 2023 that Cole Underwood was having a relationship with a student that was supposedly ▮▮▮▮▮  ▮▮▮▮▮

Were you aware of that?

A.    No, sir.

Q.    Would that allegation in and of itself be enough to warrant a Title IX investigation?

A.    Yes, sir.

Q.    "Sometime during football season 2023, volleyball coach Shaun Lynch reported that two football players told him that something was going on between Underwood and ▮▮▮▮▮  ▮▮▮▮▮ and he later heard rumors that the community was also concerned and

that Cole Underwood had used a TheraGun on ███████

legs during a basketball tournament in Gruver in

December of '23."

Were you aware of that?

A.    No, sir.

Q.    Is that something that would have warranted a Title IX investigation?

A.    Yes, sir.

Q.    We are five reports into this list of 16. We are only in the fall of '23, and we've already got parents and teachers and students referring to the inappropriate relationship using the term "pedophile" and "perv."

What more does it take to put a coach like Cole Underwood on leave and begin an investigation?

MR. ELZA:  Objection.  Form.

THE WITNESS:  Is that a rhetorical question?

Q.    (By Mr. Gentry) I'm asking you in your opinion. Why was he not put on leave and an investigation started at this point?

A.    I -- I can't answer that.

Q.    In your opinion, should he have been?

A.    Yes.

Q.    Were you aware that Cole Underwood pulled students out of class and effectively yelled and got

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Donna Hale 02/19/2026

Page 35

A.   No, sir.

MR. ELZA:  Objection.  Form.

Q.   (By Mr. Gentry) Were you aware that students were scared to complain about Cole Underwood for fear of retaliation by him?

A.   No, sir.

Q.   Were you aware that one student who complained, Cole Underwood took his Hudl account away, and it ultimately affected his ability to get athletic-related scholarships in college?

A.   No, sir.

Q.   Were you aware that it had gotten so bad that the students who had complained to the school and felt like the school wasn't doing anything, because they weren't, complained to an administrator at another school?

MR. ELZA:  Objection.  Form.

THE WITNESS:  No, sir.

Q.   (By Mr. Gentry) Were you aware that that school administrator called your school and made reports to Tori Little and Sandy Wheeler who failed to report them to Greg Brown?

A.   No, sir.

Q.   And obviously they didn't report them to you, correct?

A.    Correct.

Q.    I mean, outside of visually -- you walking in the room and visually seeing it, what's worse than a school administrator at another school making a report about an inappropriate relationship?  I mean, what more could you need at that point?

MR. ELZA:  Objection.  Form.

THE WITNESS:  That would be significant information.

Q.    (By Mr. Gentry) Okay.  And that would be information that you were never aware of it sounds like?

A.    Correct.

Q.    Okay.  Now, I'm not going to go through every one of these or we'll be here all day, but there's another 12 or 13 that proceed on through the fall of '23 and into the spring of '24.  I can tell you that we're aware of additional complaints that are not in this list that Greg Brown has identified that he failed to put in here, that Tori Little has identified that, that Sandy Wheeler has identified, that students and teachers have identified that your board members have identified, and what I'm getting from you is you weren't aware of any of those things, correct?

MR. ELZA:  Objection.  Form.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Donna Hale 02/19/2026

Page 40

MR. ELZA:  I think her exact words were "in general" I think is what you were asking.

Q.    (By Mr. Gentry) Do you recall specifically what these, quote, "latest concerns" were?

A.    I think it was from the track meet.

Q.    And based on what you testified earlier, you would have not been aware on March 4th of 2024 that he violated school policy with respect to the track meet incident.

A.    Correct.

Q.    Okay.  If you were aware that he had violated school policy in doing what he did, would that have warranted a Title IX investigation?

A.    Yes.

Q.    If the Title IX coordinator doesn't know the school policies and thus can't determine whether they've been violated, I mean, help me understand how you're supposed to do your job as the Title IX coordinator.

MR. ELZA:  Objection.  Form.

THE WITNESS:  It makes it difficult.

Q.    (By Mr. Gentry) This goes on.  "We have talked several times over the course of the year about rumors and suspicions regarding your relationship with female students."

Are you aware of those discussions?

A.    Just -- I'm sorry.  Say that again.  Over the course year was I aware of all the discussions?

Q.    Yeah.  He says, "We have talked several times over the course of the year about rumors and suspicions regarding your relationship with female students, particularly ███████  ████████

Are you aware of those discussions?  Were you present for those discussions?  What do you know about them?

A.    No, sir, I wasn't aware of all of the discussions.  Mr. Brown and Ms. Little, I think, were having the discussions.

Q.    In your reading of this written directive, did you ask Greg Brown about those discussions?

A.    I believe that's when it was -- the pictures, the collages, the -- leaving the track meet.  Just -- there were some -- there were, in-general questions being raised at this time that I was not aware of the specifics that you were referring to earlier.

Q.    Okay.  And it goes on to provide, "During the last conversation, I told you that you were not to be alone with her and that no more posts of the two of you needed to be published."

Do you know what that last conversation was or when it was?

A.    No, sir.

Q.    So it's fairly clear at this time that he's had several discussions with Cole.  He's already told Cole not to be alone with her, and then as of March 4th, he's apparently done it again and now he's getting a written directive as a result, right?

A.    I would agree with that, yes, sir.

Q.    So if he's already been told not to be alone with her and then he's alone with her again, is the written directive a sufficient response, or should a further investigation have been done?

A.    Further investigation.

Q.    Like, for example, a Title IX investigation?

A.    Correct.

Q.    Okay.  And that would be in addition to all the other complaints that Greg Brown is receiving up to March 4th, right?

A.    Yes, sir.

Q.    Okay.  And those would be complaints again that you were not aware of, a couple of them we talked about 10, 20 minutes ago, right?

A.    Yes, sir.

Q.    Okay.  This goes on.  "Since that

conversation, I have not seen any more posts; however, it has been reported to me that there have been numerous times that you have been alone with her."

Were you aware of that?

A.   No, sir.

Q.   But you told me that you read and reviewed this directive prior to it being given to Cole or at least contemporaneous with it, right?

MR. ELZA:  Objection.  Form.

THE WITNESS:  Yes, sir.

Q.   (By Mr. Gentry) Why did not do anything as the Title IX coordinator at that point?

A.   I think the conversation, honestly, was this is unprofessional conduct of an educator. Unprofessionalism, posting of the pictures, and whatnot.

Q.   Well, you just told me that, if he had been directed not to be alone with her, obviously he continued to be alone with her, now he's given a written directive not to be alone with her, that that would have been enough to warrant a Title IX investigation, but you didn't do one, correct?

A.   Correct.

Q.   Why?

A.   I didn't think about doing one.

Q.    (By Mr. Gentry) Certainly, if you would have been aware of all the complaints received by Greg Brown and others up to March 4th, then we have another track meet incident, I think it's safe to say that, too, would have warranted a Title IX investigation, correct?

A.    Yes, sir.

MR. ELZA:  Objection.  Asked and answered.

Q.    (By Mr. Gentry) The next one, " █████ █████ has come to your office on a regular basis during the school day often with no one but you in your office during her visit."

Were you aware of that?

A.    No, sir, not until, I guess, reading the letter.

Q.    Were you aware of Coach Ryan Daugherty's complaints about █████ █████ being alone in Cole Underwood's office, quote, every day?

A.    No, sir.

Q.    Were you aware that those complaints from Ryan Daugherty were received by Greg Brown following the issuance of this written directive?

MR. ELZA:  Objection.  Asked and answered and form.

THE WITNESS:  No, sir.

Q.    (By Mr. Gentry) If on March 4th Greg Brown

tells Cole, "Don't be alone with her," which is obviously something he's told him before, then after that he is alone with her, according to Ryan Daugherty, quote, every day, is that something that should have been reported to you?

MR. ELZA: Objection. Form.

THE WITNESS: Yes.

Q. (By Mr. Gentry) And is that something that would have been enough to warrant a Title IX investigation?

A. Yes.

Q. Were you aware that following the issuance of this written directive Cole kept a screen saver on his work computer of a picture of him and ███████

A. No, sir.

MR. ELZA: Objections. Form.

Q. (By Mr. Gentry) Were you aware that he gave her his cross necklace that she wore around and showed her friend and things?

MR. ELZA: Are we talking about ███████ ███████

MR. GENTRY: Yes.

MR. ELZA: On both of those questions? Okay.

Q. (By Mr. Gentry) Is that something that would have been appropriate for him to do following the

issuance of this written directive?

A.    No, sir.

MR. ELZA:  Objection.  Form.

Q.    (By Mr. Gentry) It goes on.  "I concede that there is no concrete evidence at this time that there is an inappropriate relationship between you and ███ or any other female student."

Concrete evidence is not the standard for purposes of a Title IX investigation, is it?

A.    No, sir.

Q.    What is your understanding of what the standard is?

MR. ELZA:  Objection.  Asked and answered.

THE WITNESS:  Do I still answer?

MR. GENTRY:  Yes.

MR. ELZA:  Yeah.

THE WITNESS:  Okay.  The purpose of the Title IX investigation is to learn of the situation. If there is any concern, to further -- to go through the entire Title IX process.

Q.    (By Mr. Gentry) Right.  I'm going to jump forward here and come back to this exhibit, but we have in our deposition notebook an Exhibit 53, which is a PowerPoint presentation that Greg Brown put together apparently following the Underwood and ███ ███

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Donna Hale 02/19/2026
Page 48

incident.  And it provides in there, and I quote, "When in doubt --" this is a slide show on Title IX training. Okay?  I know you don't have it in front of you.

But it provides in there "when in doubt, report."  Do you agree with that?

A.   Yes, sir.

Q.   I mean, that seems to me to be a relatively low standard, correct?

A.   Yes, sir.

Q.   Okay.  Meaning it's -- the purpose of the investigation is to determine whether or not the allegation is ultimately right or wrong, isn't it?

A.   Yes, sir.

Q.   It is not the reporting party's responsibility to judge truthfulness.  They make a report, or they should, whether they believe it or not, right?

A.   Yes, sir.

Q.   It is the rumor, the suspicion that results in the Title IX or other corresponding investigation, right?

A.   Yes, sir.

Q.   Okay.  He goes on and describes the standards of liability with respect to Title IX in these slides, and I quote, he provides, "The school or

Q.    It goes on at the end of this letter to provide, "The purpose of this summary and of the directives is to protect you, your career, and your reputation."

Do you agree with that?

A.    Yes, sir.

Q.    You agree that that's appropriate for the purposes of this letter?

A.    I'm sorry.  That is definitely how the letter comes across, that it is to support Cole and his career and not support the student.

Q.    Right.  Everything I see in this evidence is about protecting Cole, about protecting the school, about protecting reputations.  Nothing is about protecting a child with whom an inappropriate relationship has been alleged.

Why is that?

MR. ELZA:  Objection.  Form.

THE WITNESS:  I can't answer that.  I didn't write the letter.

Q.    (By Mr. Gentry) Should ▇▇▇ ▇▇▇ safety had been more paramount?

A.    Yes.

MR. ELZA:  Objection.  Form.

Q.    (By Mr. Gentry) Why, at any point, is ▇▇▇

███████ not brought in and asked about all of these allegations and reports that are being made?

MR. ELZA: Objection. Form. Misstates the evidence.

THE WITNESS: I don't know if she was or was not brought in.

Q. (By Mr. Gentry) You never talked to her, at least?

A. No, sir.

Q. Is that something that you might have done had you initiated a Title IX investigation as the Title IX coordinator?

A. Yes, sir.

Q. And I'm going to backtrack to this report received by Delma Habethur, the administrator at Gruver about complaints she received from students about the inappropriate relationship.

Do you find it odd that no one follows up with Ms. Habethur about the complaint that she made?

A. Yes, sir.

Q. Is that something, for example, that would have been done in a Title IX investigation?

A. Yes, sir.

Q. Okay. And I'm going to jump to our Exhibit 48A, which I'll tell you are handwritten notes

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Donna Hale 02/19/2026

Page 55

quote, every day."

Were you aware of that?

A.   No, sir.

Q.   "People from the community approaching Ryan with concerns."

Were you aware of that?

A.   No, sir.

Q.   "Cole will look at cameras and listen in on people who are on the phone."

Were you aware of that?

A.   I was aware of an incident, yes, early on.

Q.   And aware that he was reprimanded to some extent for that?

A.   Yes.

Q.   Okay.  These complaints by Ryan Daugherty, would they have been important to have been reported to you as the Title IX coordinator?

A.   Yes, sir.

Q.   Did you ever have any -- and I think I asked this, but let me ask it again.

Did you ever have any conversation with Ryan Daugherty at any point about any of this?

A.   No, sir.

MR. ELZA:  Objection.  Asked and answered.

Q.   (By Mr. Gentry) Are you aware that following

the incident with Cole and ▮▮▮▮ that Greg Brown began to do extensive training with employees and staff at Perryton ISD regarding Title IX?

A.    Yes, sir.  I knew of the PowerPoint you spoke of earlier.

Q.    Why did he do that?

MR. ELZA:  Objection.  Form.

THE WITNESS:  I believe it was realized that staff had not had the appropriate training prior to.

Q.    (By Mr. Gentry) Would that have included you?

A.    It would have.

Q.    So the individual responsible for Title IX investigations lacked the sufficient training to perform those; is that what you're telling me?

THE WITNESS:  I --

MR. ELZA:  Objection.  Form.

THE WITNESS:  Sorry.

I did not have training in Title IX when I went to Perryton.  I had it at my prior district.

Q.    (By Mr. Gentry) So you didn't do any Title IX training at least prior to the Cole Underwood-N▮▮▮ ▮▮▮ incident while at Perryton?

A.    Correct, while at Perryton.

Q.    Would that be consistent for other employees and staff?

A.    I'm sorry.  If they had had Title IX training?

Q.    Yeah.  You weren't singled out and told by Greg Brown, "Ms. Hale, don't go to any of these."  I'm guessing if you weren't getting it, no one else was, right?

A.    I believe that's fair to say.

MR. ELZA:  Are you all frozen?

MR. GENTRY:  No.  We can hear you.  It made a weird noise.  You're good.

Q.    (By Mr. Gentry) Again, I know you don't have these in front of you, but we received in our investigation several pictures, which appear to be from various social media or Snapchat accounts by a Jaret Rowlan and a Holdyn Rowland.

Do you know those two, or have you heard of those two students?

A.    No, sir.

Q.    You don't recall either of them during your time at Perryton ISD?

A.    No, sir.

Q.    Well, I'll tell you they were both students who were at Perryton ISD during the Cole-█████ situation.  They were students who complained to administration about their observations and thoughts

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Donna Hale 02/19/2026                                                     Page 62

then it's gone forever, right?

A.    Correct.    You can see a record in Parentsquare of communications back and forth.

Q.    Right.    Were you aware that ████ and Cole regularly communicated on the Parentsquare application?

A.    I was not.

Q.    Were you aware that they regularly communicated on the Parentsquare application following the issuance of the written directive to Cole?

A.    No, sir.

MR. ELZA:    Objection.    Just asked and answered.

Q.    (By Mr. Gentry) Were you aware that they utilized this Parentsquare app to arrange their encounters on the weekends?

MR. ELZA:    Objection.    Asked and answered.

THE WITNESS:    No.

Q.    (By Mr. Gentry) Is this something, for example, that you might have looked into as the Title IX coordinator had a Title IX coordinator had a Title IX investigation been done?

A.    Yes, sir.

Q.    It strikes me that, if he's been instructed not to be around her or communicate with her or

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Donna Hale 02/19/2026                                                 Page 63

whatever it is, one of the easiest things we can do is access these messages between them two to figure out if he's doing that or not, right?

MR. ELZA: Objection. Form.

THE WITNESS: Correct.

Q. (By Mr. Gentry) And for weekends on end in March and in April -- again, I know you don't have these in front of you, but she regularly asks him to prop the door open at the school on the weekend, which he tells her he will do, which obviously means he is there. She's been there for several hours. She will then message him and tell him that she is leaving; he can unprop the door. He will go and do that. And that's how they facilitated these encounters.

Were you aware of any of that?

A. I was not.

Q. Okay. Had you been aware of it and had these messages been monitored or reviewed or investigated by you as early as March, we would have had some idea that they were up at the school alone months before he was ultimately busted or arrested, right?

MR. ELZA: Objection. Misstates evidence.

THE WITNESS: Yes, sir.

Q. (By Mr. Gentry) This all could have been

Q.   Any discussions about "I could have done this," or, "I could have done this," or, "I didn't know this, or, "I didn't know that," anything like that?

A.   Not that I recall.

Q.   Knowing what you know now just in the brief time that you and I have spoke, I want to reask you, is there anything more that the school could have done in this case?

MR. ELZA:  Objection.  Form.

THE WITNESS:  I believe, like I stated earlier, yes.  Looking back reflecting, absolutely.

Q.   (By Mr. Gentry) And if those things would have been done, could we have prevented the rape of this young girl?

MR. ELZA:  Objection.  Form.

THE WITNESS:  We certainly could have intervened much sooner.

Q.   (By Mr. Gentry) That's the purpose of the policies, correct?

A.   Yes, sir.

Q.   Are you aware that at the time of the written directive they had effectively not established a physical relationship yet?

MR. ELZA:  Objection.  Form.

THE WITNESS:  I was not.

Q.    (By Mr. Gentry) Meaning, if we could have stopped it right there, we might have prevented that from ever happening, right?

MR. ELZA:  Objection.  Form.

THE WITNESS:  Yes.

Q.    (By Mr. Gentry) Okay.  Do you find it problematic Greg Brown and others are receiving all of these complaints and not telling you?

A.    Yes.

Q.    Okay.  Meaning, in your position now as superintendent -- and I understand you're also the Title IX coordinator.  Let's just assume you had a separate Title IX coordinator.

Are these things that you would be communicating with your Title IX coordinator?

A.    Yes, sir.

Q.    Do you think that is standard policy or procedure?

A.    Yes, sir.

Q.    If we don't tell the Title IX coordinator anything, it begs the question how the Title IX coordinator is supposed to do his or her job, right?

A.    Yes, sir.

Q.    Okay.  Just a minute.

# Exhibit 12

amarillo.com | AMARILLO GLOBE-NEWS

LOCAL

# Top Perryton ISD officials resign after sexual harassment complaint

**ROBERT STEIN**
Oct. 19, 2017, 11:48 a.m. CT

The Perryton ISD Board of Trustees voted unanimously Thursday to accept the resignations of the district's superintendent and assistant superintendent, who had been on personal leave after a sexual harassment complaint was brought against them.

Robert Hall and Keith Langfitt resigned their positions as superintendent and assistant superintendent respectively.

The board named Watson acting superintendent on Saturday. Watson is a former principal at Edwin F. William Intermediate School who retired at the end of last school year.

Kinnard said the search for an interim superintendent would begin immediately.

"I believe that the agreement reached today was in the best interest of Perryton ISD," Kinnard said in an emailed statement.

"I look forward to letting our administrators and educators now focus on what they do best, which is educating the children in our District. I cannot thank the administrators, teachers and support staff of Perryton ISD enough for the job they do every day. I would also like to thank Mr. Watson who unselfishly agreed to temporarily lead this District through this time of transition."

The board deliberated in closed session for an hour before accepting Hall's resignation, a district news release said. After an additional closed-door meeting that lasted one hour and 15 minutes, trustees accepted Langfitt's resignation.

Hall had been superintendent since March 2010. He started at the district as the principal of Williams Intermediate in 2006. Langfitt started as assistant superintendent in June 2010.

Details about the timeline of the complaint and a subsequent investigation remained scarce on Thursday.

Kinnard received a complaint from a district employee early on the week of Oct. 2, Perryton ISD Communications Director Darin Clark has said. The precise day is not clear.

In his statement Thursday, Kinnard said the Texas Association of School Boards had been contacted - though it was not clear why - and "an investigation initiated" the same day the complaint was received.

The board "contracted a third party, unbiased investigator to conduct a swift and thorough investigation," Kinnard said.

Following a board meeting on Oct. 10, Kinnard said the board looked at a large amount of information related to the complaint.

It is not clear when Hall and Langfitt submitted their resignations. They had taken paid personal leave before the Oct. 10 meeting, Clark has said.

Clark on Thursday directed questions to Kinnard, who declined to answer questions by phone.

Texas Education Agency said late Thursday afternoon that neither it nor the State Board for Educator Certification had received a report from the district or trustees regarding the complaint or resignations.

340

Superintendents are required by law to notify the SBEC within seven business days of educator conduct that results in a firing or resignation. The notification responsibility falls to a board of trustees if they find out a superintendent has failed to do so.

The SBEC can sanction or revoke an educator's certification.

Hall's superintendent and principal certifications were still active Thursday, according to the SBEC website. Both certificates expire in April.

Langfitt has a superintendent certificate and lifetime principal and teaching certificates that were all still active Thursday. His superintendent certificate expires in August.

Perryton ISD, 120 miles northwest of Amarillo, enrolled 2,330 students last school year.

341

# Perryton ISD releases statement following sexual harassment allegations

by Brooke Self
Mon, October 9, 2017 at 3:01 PM



*The president of the Perryton ISD school board released a statement on Monday following allegations of sexual harassment within the District. (ABC 7 Amarillo)*


Comment


Share

PERRYTON, Texas (KVII) — The president of the Perryton ISD school board released a statement on Monday following allegations of sexual harassment within the District.

According to Monty Kinnard, President of the Perryton ISD Board of Trustees, a third-party investigator has been hired by the District to look into the case. The results of the investigation will be presented to the board members at a special meeting Tuesday at 7:30 p.m.

Kinnard said Monday he did not want to release details regarding the investigation.

343

Kinnard released the following statement on behalf of the District:

*As President of the Perryton ISD Board of Trustees, I am providing the following statement on behalf of the District.*

*I received an allegation of sexual harassment from a school employee against 2 District administrators. District policy provides that all school employees shall be free from unlawful discrimination, harassment and retaliation. The District takes complaints of sexual harassment very seriously. An independent investigator has been retained at the direction of the District's legal counsel to conduct a comprehensive and unbiased investigation. The District has also implemented interim action calculated to prevent prohibited conduct during the course of the investigation. Following the conclusion of the investigation, the Board will determine what action, if any, is appropriate.*

*It is the District's policy not to disclose specific details or information about personnel matters. In the interest of protecting the privacy of all parties involved, further statements shall not be provided.*

*On behalf of Perryton ISD, thank you for your cooperation in this matter.*

According to Kinnard, the board members have not heard any of the investigation results yet but they will hear the results Tuesdsay.

*This is a developing story and will be updated as more information is received.*

344

345

# Exhibit 13

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

S.J., a Parent, Conservator,      )
and Next Friend of N.J.,          )
          Plaintiff,              )
                                  )
vs.                               )  Case No.  2:24-CV-00168-Z
                                  )
PERRYTON INDEPENDENT SCHOOL       )
DISTRICT, and                     )
                                  )
COLE UNDERWOOD, Individually      )
and in his official capacity as   )
Athletic Director of Perryton     )
ISD,                              )
          Defendants.            )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

RYAN DAUGHERTY

HAD ON THE

3RD DAY OF NOVEMBER, 2025

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

WORD FOR WORD REPORTING, L.L.C
620 NORTH ROBINSON, SUITE 202
OKLAHOMA CITY, OKLAHOMA 73102
(405)232-9673

REPORTED BY:  DARLA RILEY, CSR

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Ryan Daugherty 11/03/2025

Page 2

APPEARANCES


FOR THE PLAINTIFF:

Mr. Kyle Goodwin
GOODWIN LEWIS, PLLC
420 Northwest 6th Street, Second Floor
Oklahoma City, Oklahoma  73102
(405) 900-5700


FOR THE DEFENDANT, PERRYTON INDEPENDENT SCHOOL DISTRICT:

Mr. Slater Elza
UNDERWOOD LAW FIRM
Post Office Box 9158
Amarillo, Texas  79105
(806) 376-5613
(806) 379-0316 FAX

they went and ate, so I guess it could be a guideline.  Yeah.

Q    I mean, it says policy at the top of the -- the sheet.

A    Then it's a policy.

Q    So would -- how do you treat it, though?  We are talking about this specific policy about you cannot leave with anybody else unless there's a writing the day before.  You would agree with me that's that rule?

MR. ELZA:  Objection, form.

A    Yes, sir.  I mean, I am going to follow that.

Q    (By Mr. Goodwin)  So you follow that every time.  If you do not have something in writing from the parent before, unless your bus breaks down or something?

A    Yes.  Unless it's an emergency, yes, sir.

Q    Okay.

A    Yeah.

Q    All right.  So let's get back up to the November time frame.  You start hearing rumors that people were upset that he was going to practice too much.  What -- what else do you remember about this November complaint period?

A    I don't know if it was around November, like it all kind of gets run together for me.  I know I had an early conversation with Mr. Brown and where I told him like, I don't think that anything is going on between them.  And then I had a later conversation with Mr. Brown, and it might have been in April where I said there is definitely something -- I don't

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Ryan Daugherty 11/03/2025
Page 24

A    No, a hundred percent.

Q    Also, during the football season two football players told the volleyball coach that something was going on between Underwood and ███████  And that was again during football season.  Were you aware of that?

A    No.

Q    So if these rumors were going around, you weren't hearing about it?

A    No.  And what -- and what I would hear, I mean, what I would hear is from my daughter.  I mean, my daughter was a junior at that time, Aubrey Daugherty.  And I mean, her and Rolland, I really pray to God Underwood busted in the very end and...

Q    Her -- her what?  Her enrolling?

A    Her and Rolland --

Q    Oh, got you.

A    Holdyn Rolland, it's a boy.  I mean, he would take pictures of Underwood every day, probably starting in November, you know, around there.  Where he would be in the hallway and talking to ███████

Q    And his name is who?  What's his name?

A    Holdyn Rolland.

Q    Say -- say it again.  I am sorry.

A    H-o-l-d-y-n, and then Rolland.

Q    R-o-l-a-n-d?

A     R-o-l-l-a-n-d, I think.

Q     So Holdyn Rolland was taking pictures of ███████ and Coach Underwood in the hallway together?

A     Correct. After the Instagram -- like ██████ put him on Instagram with a whole bunch of pictures one time. And I don't know when that was.

Q     I think it was December.

A     Okay. So it would probably be around December when he started taking -- maybe January started taking pictures of them. And that's when I really started hearing of things, you know, going on.

Q     Why do you think Holdyn started doing that?

          MR. ELZA: Objection, form.

A     Partly because he's pissed off he wasn't playing football, like he got benched in football.

Q     (By Mr. Goodwin) Do you think Holdyn was legitimately concerned that there was something going on with ██████

A     I think as time grew, yes. At the -- at the start, maybe not. But as time grew, I think -- I think he was, yes.

Q     Okay. So I'll come back to Holdyn here in a little bit. But in December -- November kind of bleeds into December. That's when the collage of pictures was put on?

A     Uh-huh.

Q     When did you first start becoming concerned that something was going on?

A    Yes, a hundred percent.

Q    Do you think that's what he did to ███████

A    Yes.  I think that's --

Q    Do you believe --

A    -- what he did to all of us.

Q    Had -- do you believe that if ██████ would have had full knowledge of these 30 complaints his view might have been different?

        MR. ELZA:  Objection, form.

A    Yes.

Q    (By Mr. Goodwin)  So in December we have the collage of pictures, but at that time you still did not believe anything inappropriate was going on?

A    No.

Q    And to be honest, to be fair to you, it was not.  I mean, nothing physical was going on between them at that time in December.  Now, clearly, Mr. Underwood -- do you know that, sir?  Do you know --

A    No.

Q    -- when the physical relationship started?

A    I don't know when it started.

Q    Have you followed the criminal case at all about how that went down and the facts that came out about that?

A    Like a little bit, but not a lot.  No.  Like I kind of stopped whenever I read his sister's letter.

there.  I never seen Emma.  It would be Mallee and ███

Q    Was it always both of them or was it sometimes just ███

A    No, sometimes it would be just ███

Q    All right.  Let's talk about your camera access.  And then we'll take a quick break.  I usually -- I'll give you a break in about an hour -- about an hour of you testifying, so...

A    Okay.

Q    Camera access.  You said earlier that you did not -- do you have any camera access?

A    No, sir.

Q    Let's talk about during that time frame so it's clear for the record.  At the time of the 2023 and 2024 school year did you have access to the cameras?

A    No, sir.

Q    So that's no access at all?

A    No.

Q    Now, Mr. Brown testified you asked for camera access.

A    Correct.

Q    Because according to Mr. Brown you wanted to do an investigation as to what was going on with ███ and Cole.  Is that correct?

A    Well --

MR. ELZA:  Objection, form.

A    -- for that and other reasons.

Q    (By Mr. Goodwin)  What was the other reason?

A    Like I like to see who gets in the gym and shoots.  You know, we preach a lot to get in the gym and shoot.  Also, I would like to have access to see what my coaches are doing when I am not there, if they are getting the period running and going.  So for all three reasons.  I mean, it wasn't just because of Cole.  But yes, I really wanted during that time to see if he was coming in on the weekends, if, you know, because -- because he would tell us it was because of laundry.  Well, then I wanted to see if she was coming in.  Because it really started ramping up probably January, February is where you hear lots of rumors.

Q    Who were you hearing those from?

A    Probably my daughter the most.  I mean, she -- she hears a lot and so...

Q    What was she telling you?

A    Just what was going on.  I mean, like Cole took her home from a track meet.  So I don't know when that was.  I didn't even know about that because I wasn't at the track meet.  But, you know, saying that.  Cole is always around her, you know, so that's where Holdyn was taking pictures.

Q    Did you -- did your daughter tell you that, that Holdyn was taking pictures?

A    Yes.  Yeah.

A    Yes, sir.  We actually went to court and everything.

Q    Any other cases you've testified in?

A    No, sir.

Q    All right.  Let's turn to Exhibit No. 14.

        (Plaintiff's Exhibit No. 14 was

        introduced and made a part of the

        record.)

A    Okay.

Q    I'll just tell you -- I'll tell you a little bit about this.  My local counsel -- co-counsel is Mr. Brian Heinrich.  He's down in Amarillo.  He received this letter last November anonymously.  Did you write this?

A    No, sir.

Q    There's a lot of information in here.  But if you would just read it very briefly, would you have any idea who would've written this?

A    No, sir.

Q    Were you aware of a special education teacher allowed to resign over child porn with no charges being filed?

A    No, sir.

Q    Did you know anything about, I think his name was -- the gentleman's name was Drew was charged with inappropriate conduct or contact with an underage student here?

A    Yes, sir.

Q    Tell me about that.

A    He was before my time, but I -- he was the woodshop teacher, and that's what I did.  So that's kind of how I knew about that.

Q    All right.  But you were not here at the time?

A    No, sir.

Q    When did you first come to Perryton?

A    Cole's first -- or Cole -- when Cole become AD, so 2023.

Q    That was --

A    It was actually between -- it's just a weird story.  It was supposed to be Coach Hab, and then he resigned, but he had hired me as the assistant AD.  He went to Gruver.  And then Cole came in, and so we didn't know if I was going to become AD or Cole was going to become the AD.  And Cole became the AD.

Q    Did -- I asked you briefly earlier about this.  Were you aware at of all of Coach Underwood's reputation in Amarillo?

A    No, sir.

Q    Were you aware that he had been placed on administrative leave for inappropriate contact with young females?

A    No, sir.  We are talking prior?

Q    Yes.

A    No, sir.

Q    I mean, you found that out since then?

A    Yes, sir.

Q    Since he was arrested, you found that out, to be clear?

means nothing.

THE WITNESS:  Yeah, I don't know.

Q    (By Mr. Goodwin)  So these appear to be what I would say standard policies and procedures adopted by most schools throughout the state of Texas.  That's my understanding, and Slater can correct you if I am wrong about that.  But how often did you look through these policies and procedures?

A    When some-- for me, like when something comes up, then I would look through them.  But I -- I -- I don't really use -- look at them a lot.  It's more the athletic side, because I teach one class, and so at that time I taught two, which was woodshop.  So if something came up as far as like an accident, then I would look through the policies to see the proper paperwork and what else I needed to do for someone cutting their finger in woodshop.  It never happened, okay, but that's -- so I don't look at them every day.

Q    And so I'll try to get to the athletic policies and procedures.  I actually have them in these books somewhere.  We will go through that before I let you go.  But as far as being really familiar with what your requirements are, how often do you study them in a year?

A    The start of the year.

Q    You kind of look at them once at the start of the year?

A    Yes, sir.

Q    All of them?

A    Yes, sir, kind of.

Q    There are -- there are hundreds of pages.

A    Yes.

Q    Do you look at all hundreds?

A    No, not all of them.  I mean, you just -- you sign off that you have a copy of it -- a digital copy of it.

Q    Well, this is probably an unfair question, but I am going to ask you anyway.  What do you believe without looking at all of these policies and procedures, what do you believe that your duty is as it relates to reporting an inappropriate relationship?

A    You have to report it immediately.

Q    To who?

        MR. ELZA:  Objection, form.

A    To me, I know there's laws on it, but it would be to my supervisor, which would be the superintendent of schools.  You could --

Q    (By Mr. Goodwin)  Well, as a coach, is your supervisor the athletic director as well?

A    Yes.

Q    And you understand it's a quandary because the athletic director was the one doing these bad acts?

A    Correct.

Q    And so had you reported these to you direct superior that would have been the guy that was doing the bad acts?

a student, correct?

A    Correct.

Q    Now, you would agree with me here that Cole was definitely involved in a romantic relationship with ███████

MR. ELZA:  Objection, form.

A    That we know today or...

Q    (By Mr. Goodwin)  Yes.

A    Yes, sir.

Q    Well, you said that he -- I am not trying to put words in your mouth -- but the rumors regarding the inappropriate relationship ramped up after January, correct?

A    Correct.

Q    Do you know when this sexual relations began between these two?

A    I do not.

Q    If I would tell you it was after the March 4th letter, do you think more could have been done to protect ███████ from Cole?

MR. ELZA:  Objection, form.

A    Yes.

Q    (By Mr. Goodwin)  So it says -- that first sentence says the District shall notify a parent.  So that's mandatory. Would you agree with me, sir?

A    Yes, sir.

Q    Do you know how many times the District notified ███████

of the rumors or reports of an inappropriate relationship with

████████

MR. ELZA: Objection, form.

A    I do not, but I am guessing zero since we are here today.

Q    (By Mr. Goodwin)  And the District has made -- or Superintendent Brown made a point that is saying ████ constantly stuck up for Mr. Underwood, and you agree with that, correct?

A    Correct.

Q    But had he been known -- had ████ known of more than 30 reports of an inappropriate relationship with ████ do you think he might have acted differently?

MR. ELZA: Objection, form.

A    Yes.

Q    (By Mr. Goodwin)  Turn over to page -- or Exhibit 115, please.  This is FFG Local, student welfare, child abuse and neglect.  Do you see that, sir?

(Plaintiff's Exhibit No. 115 was

introduced and made a part of the

record.)

A    Yes, sir.

Q    Under training it says the District shall provide training to employees as required by law and district policy. Training shall address techniques to prevent and recognize sexual abuse, trafficking, and all other maltreatment of

MR. ELZA:  Objection, form.

A    No, sir.

Q    (By Mr. Goodwin)  Would that surprise you?

A    No.

Q    Do you know that other coaches were afraid of reporting anything about this because of retribution from the athletic director?

A    I was not aware of it, no.

Q    Were you afraid of that?

A    I wasn't afraid to report it, but I knew it wasn't going to be good for me.  Just like this probably isn't good for me. I mean, I am on both sides and you just tell the truth and see where it may lay, so...

Q    So if students were afraid to report it, that's a bad thing.  Would you agree with me?

MR. ELZA:  Objection, form.

A    I would agree with that, yes, sir.

Q    (By Mr. Goodwin)  If the students believe that there was an inappropriate relationship between ▮▮▮▮▮ and Cole Underwood and they were afraid to report it, that prevents the finding of truth, doesn't it, sir?

MR. ELZA:  Objection, form.

A    Correct.

Q    (By Mr. Goodwin)  I mean, isn't it true that oftentimes the students will know about things before you do?

do you wish he had never been here?

A    Hab or Cole?

Q    Cole.

A    Yes.

Q    So anything else you talked to Coach Haberthur about with regard to -- did you talk to Coach Hab about ▮▮▮▮

A    I don't think so.  If I did, we -- we had early discussions about ▮▮▮▮ when I was moving up here that she was a stud in 8th grade and just moving up as a freshman, so...  Because when you take a job you ask about players and what they can do and so I think her name was brought up as being super athletic, like a go-getter and can -- could really go, so...

Q    But -- but just that?  Nothing else about the allegations here?

A    I don't believe so.  Not that I can remember.

Q    Were you coach at a game when ▮▮▮▮ was shooting free throws after this all came out and the other team was chanting Underwood?

A    Yes, it was hell.  Yeah.

Q    Where was that?

A    I want to say Pampa, Texas.

Q    Do you -- so you understand her having to move?

MR. ELZA:  Objection, form.

A    Yes.  Like I mean, me and ▮▮▮▮ had talked about it a

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Ryan Daugherty 11/03/2025                                                Page 87

long time. You know, he was going to leave her here -- I don't think [redacted] wanted to move. He was going to leave her here for the remainder of that season. But yeah, it was -- it was tough.

Q   (By Mr. Goodwin)  What did you -- did you do anything with the other -- Pampa's administration about what was going on?

A   Yes.

Q   What did you do?

A   I texted our whole -- it was more during the summer. I texted our whole district and explained the situation, you know, that hey, some people have been chanting this and that. I mean, they even asked my own daughter and said I bet you are sleeping with the coach too. And she said well, the coach is my dad, so I am -- I am not, you know.

But it -- we just got berated. I mean all the time. But that wasn't the only thing. Like the tornado came in, and they played tornado sirens when we were at games. You know, so it's -- it was just kind of a combination of stuff, I feel like. But I feel like --

Q   Do you think that was hard on [redacted]

A   I think it was hard on the whole team, not just [redacted] I think it was the team -- here's the thing, the team really rallied around her, supported her. I had many conversations with her and the counselor.

# Exhibit 14

Closed Session

Settlement agreement

Cole

April 20 , 1:33 - 3:40 (2hrs, 7 min)

April 7 , 10:40 - 12:07 (unconfirmed due to deleted video) 1 hr 27 min

April 12, 2:54 - 4:00 (1 hr 6 min)

April 13 , 4:05 - 6:01 (1 hr, 56 min)

PISD 00816

364

Cole Underwood - notes on investigation

April 12    4:01 - N leaves through wn

PISD 00817

HS                                                    JH

Football: Head coach -
        OC -
        DC -
        RB-
        Rec-
        ST:

You are risking your carreer, reputation and possibly your
    freedom over this friendship with a 14 year old girl.

- Rhyan Daugherty:
    - lots of call with Cole + ▮▮▮▮▮▮
    - have been watching
    - unprofessional relationship, how he's handled
    - disappointed in Cole and Sandi
    - pulled ▮▮▮▮▮ out of class and acted like they were
        going to give her sweats, then said they were joking
    - ▮▮▮▮ came to Team Tatum, with Cole
    - ▮▮▮▮ goes to Cole's office by herself "everyday"
    - people from the community approaching Rhyan concerned
    - Cole will look at cameras and listen in on people
        who are on the phone
    - Cole

PISD 00818

366

Cole accessed the cameras and listened in on a conversation I had in the cafeteria with someone

- Cole accesses conversation on the cameras

PISD 00819

# Exhibit 15

# DISCIPLINARY HISTORY

# ON

# COLE UNDERWOOD

# AMARILLO ISD

Pltf. 000356



*Amarillo Independent School District, HR Office*

*7200 Interstate 40 West • Amarillo, TX 79106-2598 • (806)326-1499 • Fax (806)354-4741*

To:     Cole Underwood
From:   Chris Tatum, Director of Secondary Personnel
Date:   August 10, 2018
Re:     Summary Memorandum and Administrative Directives

On Tuesday August 7, 2018, a report was received in the AISD HR office that you may be having inappropriate relationship(s) with AISD student(s) via electronic communication. The AISD HR office immediately began investigating these claims. Please allow me to reiterate the following information.

On Tuesday August 7, 2018, an anonymous parent complaint was received by Mr. David Vincent, Principal of Amarillo High School, that you were inappropriately texting and using more than one social media outlet to communicate with individual students. Through the initial investigation, AISD learned that you had indeed been using Snapchat, texts, and Twitter Direct Message (DM) to individually communicate with students.

That afternoon I called you to my office and met with you and Mrs. Camillia Johnston, Director of Auxiliary Personnel, to discuss these allegations. I informed you of an issue we had concerning your use of social media and texting to communicate with individual students. You stated that yes, you did use, Snapchat, text, and Twitter DM to communicate with students, but never in an inappropriate way. You stated that you would rather have them communicate with them this way than directly by phone. I did remind you of your Ethics training and the TEA Ethics videos that you watch at the beginning of each school year and AISD Board Policy that restricts individual communication with student via any type of electronic communication. I asked you to explain what type of communication you are having with students. You stated strictly about sports, workouts, and life advice. You stated that you have never had anything physical or romantic in nature with students, that you love your job and that you work hard. In our discussion we visited about the inability to show the content of a Snap Chat post or Twitter DM, and how communication in that manner can never be verified. You stated there were multiple students that were your Snapchat friends and you then showed us your phone and scrolled through your Snapchat friends. We did verify there were multiple AISD students listed. You said that your players immediately responded to Snapchat, but it would sometimes take hours for them to respond to a text, this is why you used Snapchat.

I then asked about your communication with ▮▮▮▮▮▮▮▮▮▮ a former AISD student that graduated in May of 2018. You stated that you have texted her on several occasions before she graduated about softball and church. You stated that you did talk to her after she graduated about the possibly of cultivating a relationship and since she was out of school and at least 18 years old, you thought that would be appropriate. I reminded you that we hired you as a teacher and coach, not a counselor. At that time you were placed on Administrative Leave pending an investigation into this matter.

Mr. Underwood, as an AISD teacher and coach you are held to a high standard of professionalism and good moral character. While the investigation into a possible inappropriate romantic or sexual relationship with a student has not been confirmed, your actions and social media relationships with AISD students are in direct conflict with AISD Board Policies DH (Exhibit), DH (Local), and DH (Regulation). Specifically:

DH (Exhibit); Employee Standards of Conduct; Standard 3.9

> The educator shall refrain from inappropriate communication with a student or minor, including, but not limited to, electronic communication such as cell phone, text messaging, email, instant messaging, blogging, or other social media network communication. Factors that may be considered in assessing whether the communication is inappropriate include, but are not limited to:

*Graduate every student prepared for success beyond high school.*

    a.   The nature, purpose, timing, and amount of communication;

    b.   The subject matter of the communication;

    c.   Whether the communication was made openly or the educator attempted to conceal the communication;

**DH (Local); Electronic Communication; Use with Students**

Unless an exception has been made in accordance with administrative regulations, an employee shall not use a personal electronic communication platform, application, or account to communicate with currently enrolled students. Unless authorized above, all other employees are prohibited from using electronic communication directly with students who are currently enrolled in the District. Administrative regulations shall further detail:

1. Exceptions for family and social relationships;
2. The circumstances under which an employee may use text messaging to communicate with individual students or student groups; and
3. Other matters deemed appropriate by the Superintendent or designee.

**DH (Regulation); Employee Standards of Conduct; Use of Electronic Media with Students**

An employee who does not have a valid educational purpose, a family relationship, or other appropriate relationship with a student subject to approval of the parent or guardian will not use electronic media to communicate with a student. Examples of potentially acceptable non-educational reasons to communicate with a student via electronic media may include: having a relationship with a student who is a niece or nephew, the child of an adult friend established outside of the school setting, a friend of the employee's child, or a member or participant in the same civic, social, recreational, or religious organization.

In the future, you are directed to:

1. Immediately cease all electronic communication with individual students; including but not limited to text messages, emails, phone calls, and/or social media.
2. Use professional communication with students, staff, and community members at all times.
3. Comply with all State and Federal laws and AISD policies and regulations.
4. When acting in your role as an AISD employee, you will never communicate individually with students via electronic communication.

Please be reminded of AISD Board policies and regulations as noted in Board Policy DFBB(LOCAL) Reasons for Non-Renewal; specifically:

- #14 Failure to meet the District's standards of professional conduct.
- #19 Any activity, school-connected or otherwise, that, because of publicity given it, or knowledge of it among students, faculty, and community, impairs or diminishes the employee's effectiveness in the District.

At this time, adverse action on your employment contract is not being recommended. However, should more information come to our attention regarding your interaction with students, if your ability to be an effective teacher is compromised, if you violate the above directives, or if any other basis for termination or nonrenewal become applicable (including, but not limited to, those set forth above), adverse action may be recommended.

You are to return to work at AHS in your role as a teacher and coach after 4:00 PM today, Friday August 10, 2018.

*In accordance with the Texas Administrative Code [TEC] and Texas Education Code § 21.006, the District, upon your resignation or termination, must report to the State Board of Education Certification [SBEC] 'any evidence' that the educator was involved in a romantic relationship with or solicited or engaged in sexual contact with a student or minor. As a result of the report, SBEC may sanction your teaching credentials.*

---

*I have received a copy of this memorandum. I understand that my signature does not necessarily indicate that I agree with its contents. I further understand that I have the right to respond in writing within 10 working days.*

/s/ _____    Date ___8/10/18___

    Cole Underwood               8/10/18

---

Pltf. 000358

**Graduate every student prepared for success beyond high school.**

Amarillo ISD
003901

EMPLOYEE STANDARDS OF CONDUCT

DH
(REGULATION)

**DRESS AND GROOMING**

Employees will act as role models by exemplifying the highest standard of professional appearance for the educational purposes of teaching community values and proper grooming and hygiene.

**STAFF: GENERAL GUIDELINES**

The dress and grooming of District employees will be clean, neat, in a manner appropriate for their assignments, and in accordance with the following standards:

1. Grooming and dress that will disturb, interfere with, or detract from the educational process will not be allowed.

2. Dresses and all outer garments must fit properly and be of an acceptable length.

3. Halters, tank tops, see-through garments, or clothing with re-vealing/provocative necklines, bare backs, bare midriff, or spa-ghetti straps will not be permitted. In addition, clothing with symbols, phrases, or slogans advertising tobacco, alcohol products, or any controlled substances are unacceptable.

4. Hair must be clean, neatly trimmed, and well groomed.

5. Beards and mustaches will be allowed if they are neatly trimmed.

6. Clothing that purposely reveals undergarments will not be worn.

7. Hemlines for skirts and dresses should be long enough not to be distracting.

8. Jeans may be worn on days designated by the principal or su-pervisor, designated spirit days, and teacher in-service days.

9. All administrative staff members are expected to dress in a pro-fessional manner.

**EXCEPTIONS TO GUIDELINES**

The following exceptions apply to these guidelines:

1. Auxiliary employees in maintenance, custodial, transportation, food service, and positions requiring uniforms are exempted from the general guidelines but must comply with dress and grooming guidelines specified by their supervisors.

2. Exceptions to these general guidelines are to be made as nec-essary to allow staff to observe religious customs or beliefs and as necessary to accommodate medical needs.

**USE OF ELECTRONIC MEDIA**

Electronic media includes all forms of social media, such as text messaging, instant messaging, electronic mail (e-mail), web logs (blogs), electronic forums (chat rooms), video-sharing internet sites (e.g., YouTube), editorial comments posted on the internet, and so-cial network sites (e.g., Facebook, Snap Chat, Twitter, LinkedIn). Electronic media also includes all forms of telecommunication such as landlines, cell phones, and Web-based applications.

DATE APPROVED: 07/01/2017

DH (REGULATION)

1 of 6

Pltf. 000359

Amarillo ISD
188901

EMPLOYEE STANDARDS OF CONDUCT



DH
(REGULATION)

PERSONAL USE
OF ELECTRONIC
MEDIA

As role models for the District's students, employees are responsible for their public conduct even when they are not acting as District employees. Employees will be held to the same professional standards in their public use of electronic media as they are for any other public conduct. If an employee's use of electronic media interferes with the employee's ability to effectively perform his or her job duties, the employee is subject to disciplinary action, up to and including termination of employment. If an employee wishes to use a social network site or similar media for personal purposes, the employee is responsible for the content on the employee's page, including content added by the employee, the employee's friends, or members of the public who can access the employee's page. The employee is also responsible for web links on the employee's page and for maintaining privacy settings appropriate to the content. Employees must refrain from posting student or student group pictures on a personal social media site.

An employee who uses electronic media for personal purposes must observe the following:

1. The employee may not set up or update the employee's personal social network page(s) using the District's computers, network, or equipment.

2. The employee will not use the District's logo or other District copyrighted material without express, written consent.

3. The employee will continue to be subject to applicable state and federal laws, local policies, administrative regulations, and the Code of Ethics and Standard Practices for Texas Educators, even when communicating regarding personal and private matters, regardless of whether the employee is using private or public equipment, on or off campus. These restrictions include:

   • Confidentiality of student records. [See Policy FL]

   • Confidentiality of health or personnel information concerning colleagues, unless disclosure serves lawful professional purposes or is required by law. [See DH (EXHIBIT)]

   • Confidentiality of District records, including educator evaluations, educator inventories (EPI), and private e-mail addresses. [See Policy GBA]

   • Copyright law. [See Policy CY]

   • Prohibition against harming others by knowingly making false statements about a colleague or the school system. [See DH (EXHIBIT)]

Amarillo ISD
188901

EMPLOYEE STANDARDS OF CONDUCT

DH
(REGULATION)

USE OF
ELECTRONIC
MEDIA WITH
STUDENTS

The following definitions apply for the use of electronic media with students:

1.  Electronic media includes all forms of social media, such as text messaging, instant messaging, electronic mail (e-mail), web logs (blogs), electronic forums (chat rooms), video-sharing web sites (e.g., YouTube), editorial comments posted on the Internet, and social network sites (e.g., Facebook, Snap Chat, Twitter, LinkedIn). Electronic media also includes all forms of telecommunication such as landlines, cell phones, and web-based applications.

2.  Communicate means to convey information and includes a one-way communication as well as a dialogue between two or more people. A public communication by an employee that is not targeted at students (e.g., a posting on the employee's personal social network page or a blog) is not a communication. However, the employee may be subject to District regulations on personal electronic communications. [See PERSONAL USE OF ELECTRONIC MEDIA, above] Unsolicited contact from a student through electronic means is not a communication.

An employee who does not have a valid educational purpose, a family relationship, or other appropriate relationship with a student subject to approval of the parent or guardian will not use electronic media to communicate with a student. Examples of potentially acceptable non-educational reasons to communicate with a student via electronic media may include: having a relationship with a student who is a niece or nephew, the child of an adult friend established outside of the school setting, a friend of the employee's child, or a member or participant in the same civic, social, recreational, or religious organization.

The following provisions apply to employees who have a valid educational purpose to communicate with students via electronic media:

1.  An employee who has a valid educational purpose for communicating with a student via electronic media will limit communications to matters within the scope of the employee's professional responsibilities (e.g., for classroom teachers, matters relating to class work, homework, and tests; for an employee with an extracurricular duty, matters relating to the extracurricular activity). When available, employees shall use district-provided means of electronic communication, such as School Messenger or applications designed for group messaging of students. When district-provided electronic communication is not available, the employee shall include an adult district-employee (e.g. another teacher or assistant principal) on the communication.

DATE APPROVED: 07/01/2017

DH (REGULATION)

3 of 6

Pltf. 000361

Amarillo ISD
188901

EMPLOYEE STANDARDS OF CONDUCT

DH
(REGULATION)

2.  All communications with students via electronic media must be appropriate in content and must provide a clear educational benefit to the student.

3.  Electronic media may not be used by an employee to develop a social relationship with a student beyond the relationship that already exists outside the use of electronic media.

4.  The employee is prohibited from knowingly communicating with students through a personal social network page; the employee must create a separate social network page ("professional page") for the purpose of communicating with students. The employee must enable administration and parents to access the employee's professional page.

The following provisions apply to employees who have a valid educational purpose to communicate with students via electronic media. The following provisions also apply to employees who use electronic media to communicate with students who are family members or who have another appropriate relationship with a student subject to approval of the parent or guardian:

1.  The employee is prohibited from soliciting or engaging in sexual conduct or a romantic relationship with a student and is prohibited from making any sexual or romantic references when communicating with a student. [See Policy DF]

2.  The employee does not have a right to privacy with respect to communications with students and parents.

3.  The employee continues to be subject to applicable state and federal laws, local policies, administrative regulations, and the Code of Ethics and Standard Practices for Texas Educators, including:

    •  Compliance with the Public Information Act and the Family Educational Rights and Privacy Act (FERPA), including retention and confidentiality of student records. [See Policies CPC and FL]

    •  Copyright law. [See Policy CY]

4.  Upon request from the administration, an employee will provide the phone number(s), name of social network site(s), or other methods of electronic communication the employee uses to communicate with any one or more currently enrolled students.

5.  Upon written request from a parent or student, the employee will discontinue communicating with the student through any form of one-to-one electronic communication.

DATE APPROVED: 07/01/2017
DH (REGULATION)

4 of 6

Pltf. 000362

Amarillo ISD
188901

EMPLOYEE STANDARDS OF CONDUCT                                    DH
                                                         (REGULATION)

6.  In all cases, an employee must exercise discretion and sound judgment when communicating with a student via electronic media.

For additional information on the proper use of electronic media and technology resources, see CQ (LOCAL) and CQ (REGULATION).

The provisions in this regulation are extensions of the professional standards of conduct. Nothing in this regulation should be construed to support unprofessional conduct at any level.

RELATIONSHIPS
WITH STUDENTS

An employee shall not form romantic or other inappropriate social relationships with students. Any sexual relationship between a student and a District employee is always prohibited, even if consensual. [See FFH]

In investigating whether there was a romantic relationship or other inappropriate social relationship, the District shall consider, but is not limited to considering, the following:

1.  The nature of the communications with the student;

2.  The timing of the communications;

3.  The extent of the communications;

4.  Whether the communications were made openly or secretly;

5.  Whether the communications were within the scope of the employee's professional responsibilities;

6.  The extent that the educator attempted to conceal the communications with the student;

7.  If the educator claimed to be counseling the student, SBEC may consider whether the educator's job duties included counseling, whether the educator reported the subject of the counseling to the student's guardians or to the appropriate school personnel, or, in the case of alleged abuse or neglect, to the appropriate law enforcement agencies; and

8.  Other communications tending to show that the educator solicited a romantic relationship with the student, including, but not limited to:

    a.  Making inappropriate comments about a student's body;

    b.  Making sexually demeaning comments to a student;

DATE APPROVED: 07/01/2017                                    5 of 6
DH (REGULATION)                                             Pltf. 000363

376

Amarillo ISD
188901

EMPLOYEE STANDARDS OF CONDUCT



DH
(REGULATION)

    c.  Making comments about a student's potential sexual performance;

    d.  Requesting details of a student's sexual history;

    e.  Requesting a date;

    f.  Sending suggestive, lewd and/or salacious pictures;

    g.  Engaging in conversations regarding sexual problems, preferences, or fantasies of either party;

    h.  Hugging, kissing, or inappropriate touching;

    i.  Suggesting that a romantic relationship is desired after the student graduates, including graduation plans for dating or marriage; and

    j.  Committing any other acts tending to show that the educator solicited a romantic relationship with a student, including, but not limited to, providing the student with drugs and alcohol.

DATE APPROVED: 07/01/2017          REVIEWED:          6 of 6
DH (REGULATION)

Pltf. 000364

Amarillo ISD
188901

EMPLOYEE STANDARDS OF CONDUCT

DH
(EXHIBIT)

## EDUCATORS' CODE OF ETHICS

The Texas educator shall comply with standard practices and ethical conduct toward students, professional colleagues, school officials, parents, and members of the community and shall safeguard academic freedom. The Texas educator, in maintaining the dignity of the profession, shall respect and obey the law, demonstrate personal integrity, and exemplify honesty. The Texas educator, in exemplifying ethical relations with colleagues, shall extend just and equitable treatment to all members of the profession. The Texas educator, In accepting a position of public trust, shall measure success by the progress of each student toward realization of his or her potential as an effective citizen. The Texas educator, in fulfilling responsibilities in the community, shall cooperate with parents and others to improve the public schools of the community. *19 TAC 247.1*

1.   Professional Ethical Conduct, Practices, and Performance

Standard 1.1. The educator shall not intentionally, knowingly, or recklessly engage in deceptive practices regarding official policies of the school district, educational institution, educator preparation program, the Texas Education Agency, or the State Board for Educator Certification (SBEC) and its certification process.

Standard 1.2. The educator shall not knowingly misappropriate, divert, or use monies, personnel, property, or equipment committed to his or her charge for personal gain or advantage.

Standard 1.3. The educator shall not submit fraudulent requests for reimbursement, expenses, or pay.

Standard 1.4. The educator shall not use institutional or professional privileges for personal or partisan advantage.

Standard 1.5. The educator shall neither accept nor offer gratuities, gifts, or favors that impair professional judgment or to obtain special advantage. This standard shall not restrict the acceptance of gifts or tokens offered and accepted openly from students, parents of students, or other persons or organizations in recognition or appreciation of service.

Standard 1.6. The educator shall not falsify records, or direct or coerce others to do so.

Standard 1.7. The educator shall comply with state regulations, written local school board policies, and other state and federal laws.

Standard 1.8. The educator shall apply for, accept, offer, or assign a position or a responsibility on the basis of professional qualifications.

Standard 1.9. The educator shall not make threats of violence against school district employees, school board members, students, or parents of students.

Standard 1.10. The educator shall be of good moral character and be worthy to instruct or supervise the youth of this state.

DATE ISSUED: 1/30/2017
UPDATE 107
DH(EXHIBIT)-P

1 of 3
Pltf. 000365

378

Amarillo ISD
188901

EMPLOYEE STANDARDS OF CONDUCT

DH
(EXHIBIT)

Standard 1.11. The educator shall not intentionally or knowingly misrepresent his or her employment history, criminal history, and/or disciplinary record when applying for subsequent employment.

Standard 1.12. The educator shall refrain from the illegal use or distribution of controlled substances and/or abuse of prescription drugs and toxic inhalants.

Standard 1.13. The educator shall not be under the influence of alcohol or consume alcoholic beverages on school property or during school activities when students are present.

Standard 1.14. The educator shall not assist another educator, school employee, contractor, or agent in obtaining a new job as an educator or in a school, apart from the routine transmission of administrative and personnel files, if the educator knows or has probable cause to believe that such person engaged in sexual misconduct regarding a minor or student in violation of the law.

2. Ethical Conduct Toward Professional Colleagues

Standard 2.1. The educator shall not reveal confidential health or personnel information concerning colleagues unless disclosure serves lawful professional purposes or is required by law.

Standard 2.2. The educator shall not harm others by knowingly making false statements about a colleague or the school system.

Standard 2.3. The educator shall adhere to written local school board policies and state and federal laws regarding the hiring, evaluation, and dismissal of personnel.

Standard 2.4. The educator shall not interfere with a colleague's exercise of political, professional, or citizenship rights and responsibilities.

Standard 2.5. The educator shall not discriminate against or coerce a colleague on the basis of race, color, religion, national origin, age, gender, disability, family status, or sexual orientation.

Standard 2.6. The educator shall not use coercive means or promise of special treatment in order to influence professional decisions or colleagues.

Standard 2.7. The educator shall not retaliate against any individual who has filed a complaint with the SBEC or who provides information for a disciplinary investigation or proceeding under this chapter.

3. Ethical Conduct Toward Students

Standard 3.1. The educator shall not reveal confidential information concerning students unless disclosure serves lawful professional purposes or is required by law.

Standard 3.2. The educator shall not intentionally, knowingly, or recklessly treat a student or minor in a manner that adversely affects or endangers the learning, physical health, mental health, or safety of the student or minor.

DATE ISSUED: 1/30/2017
UPDATE 107
DH(EXHIBIT)-P

2 of 3
Pltf. 000366

Amarillo ISD
188901

EMPLOYEE STANDARDS OF CONDUCT

DH
(EXHIBIT)

Standard 3.3. The educator shall not intentionally, knowingly, or recklessly misrepresent facts regarding a student.

Standard 3.4. The educator shall not exclude a student from participation in a program, deny benefits to a student, or grant an advantage to a student on the basis of race, color, gender, disability, national origin, religion, family status, or sexual orientation.

Standard 3.5. The educator shall not intentionally, knowingly, or recklessly engage in physical mistreatment, neglect, or abuse of a student or minor.

Standard 3.6. The educator shall not solicit or engage in sexual conduct or a romantic relationship with a student or minor.

Standard 3.7. The educator shall not furnish alcohol or illegal/unauthorized drugs to any person under 21 years of age unless the educator is a parent or guardian of that child or knowingly allow any person under 21 years of age unless the educator is a parent or guardian of that child to consume alcohol or illegal/unauthorized drugs in the presence of the educator.

Standard 3.8. The educator shall maintain appropriate professional educator-student relationships and boundaries based on a reasonably prudent educator standard.

Standard 3.9. The educator shall refrain from inappropriate communication with a student or minor, including, but not limited to, electronic communication such as cell phone, text messaging, e-mail, instant messaging, blogging, or other social network communication. Factors that may be considered in assessing whether the communication is inappropriate include, but are not limited to:

a.   The nature, purpose, timing, and amount of the communication;

b.   The subject matter of the communication;

c.   Whether the communication was made openly or the educator attempted to conceal the communication;

d.   Whether the communication could be reasonably interpreted as soliciting sexual contact or a romantic relationship;

e.   Whether the communication was sexually explicit; and

f.   Whether the communication involved discussion(s) of the physical or sexual attractiveness or the sexual history, activities, preferences, or fantasies of either the educator or the student.

*19 TAC 247.2*

DATE ISSUED: 1/30/2017
UPDATE 107
DH(EXHIBIT)-P

3 of 3
Pltf. 000367

380

Amarillo ISD
188901

EMPLOYEE STANDARDS OF CONDUCT

DH
(LOCAL)

Each District employee shall perform his or her duties in accordance with state and federal law, District policy, and ethical standards. [See DH(EXHIBIT)]

Each District employee shall recognize and respect the rights of students, parents, other employees, and members of the community and shall work cooperatively with others to serve the best interests of the District.

An employee wishing to express concern, complaints, or criticism shall do so through appropriate channels. [See DGBA]

VIOLATIONS OF
STANDARDS OF
CONDUCT

Each employee shall comply with the standards of conduct set out in this policy and with any other policies, regulations, and guidelines that impose duties, requirements, or standards attendant to his or her status as a District employee. Violation of any policies, regulations, or guidelines may result in disciplinary action, including termination of employment. [See DCD and DF series]

WEAPONS
PROHIBITED

The District prohibits the use, possession, or display of any firearm, illegal knife, club, or prohibited weapon, as defined at FNCG, on District property at all times.

EXCEPTIONS

No violation of this policy occurs when the use, possession, or display of an otherwise prohibited weapon takes place as part of a District-approved activity supervised by proper authorities. [See FOD]

ELECTRONIC MEDIA

Electronic media includes all forms of social media, such as text messaging, instant messaging, electronic mail (e-mail), web logs (blogs), electronic forums (chat rooms), video-sharing websites, editorial comments posted on the Internet, and social network sites. Electronic media also includes all forms of telecommunication, such as landlines, cell phones, and web-based applications.

USE WITH
STUDENTS

In accordance with administrative regulations, a certified or licensed employee, or any other employee designated in writing by the Superintendent or a campus principal, may use electronic media to communicate with currently enrolled students about matters within the scope of the employee's professional responsibilities. All other employees are prohibited from using electronic media to communicate directly with students who are currently enrolled in the District. The regulations shall address:

1.    Exceptions for family and social relationships;

2.    The circumstances under which an employee may use text messaging to communicate with students; and

DATE ISSUED: 7/20/2017
LDU 2017.06
DH(LOCAL)-X

1 of 4
Pltf. 000368

381

Amarillo ISD
188901

EMPLOYEE STANDARDS OF CONDUCT

DH
(LOCAL)

3.  Other matters deemed appropriate by the Superintendent or designee.

Each employee shall comply with the District's requirements for records retention and destruction to the extent those requirements apply to electronic media. [See CPC]

PERSONAL USE

An employee shall be held to the same professional standards in his or her public use of electronic media as for any other public conduct. If an employee's use of electronic media violates state or federal law or District policy, or interferes with the employee's ability to effectively perform his or her job duties, the employee is subject to disciplinary action, up to and including termination of employment.

SAFETY REQUIREMENTS

Each employee shall adhere to District safety rules and regulations and shall report unsafe conditions or practices to the appropriate supervisor.

HARASSMENT OR ABUSE

An employee shall not engage in prohibited harassment, including sexual harassment, of:

1.  Other employees.  [See DIA]

2.  Students.  [See FFH; see FFG regarding child abuse and neglect.]

While acting in the course of employment, an employee shall not engage in prohibited harassment, including sexual harassment, of other persons, including Board members, vendors, contractors, volunteers, or parents.

An employee shall report child abuse or neglect as required by law. [See FFG]

RELATIONSHIPS WITH STUDENTS

An employee shall not form romantic or other inappropriate social relationships with students. Any sexual relationship between a student and a District employee is always prohibited, even if consensual [see FFH].

TOBACCO AND E-CIGARETTES

An employee shall not smoke or use tobacco products or e-cigarettes on District property, in District vehicles, or at school-related activities. [See also GKA]

ALCOHOL AND DRUGS

An employee shall not manufacture, distribute, dispense, possess, use, or be under the influence of any of the following substances during working hours while on District property or at school-related activities during or outside of usual working hours:

1.  Any controlled substance or dangerous drug as defined by law, including but not limited to marijuana, any narcotic drug,

DATE ISSUED: 7/20/2017
LDU 2017.06
DH(LOCAL)-X

2 of 4
Pltf. 000369

382

Amarillo ISD
188901

EMPLOYEE STANDARDS OF CONDUCT

DH
(LOCAL)

hallucinogen, stimulant, depressant, amphetamine, or barbiturate.

2. Alcohol or any alcoholic beverage.

3. Any abusable glue, aerosol paint, or any other chemical substance for inhalation.

4. Any other intoxicant or mood-changing, mind-altering, or behavior-altering drug.

An employee need not be legally intoxicated to be considered "under the influence" of a controlled substance.

For purposes of this policy, "under the influence" means lacking the normal use of mental or physical faculties. Impairment of a person's physical or mental faculties may be evidenced by a pattern of abnormal or erratic behavior, the presence of physical symptoms of drug or alcohol use, or by admission.

EXCEPTIONS

It shall not be considered a violation of this policy if the employee:

1. Manufactures, possesses, or dispenses a substance listed above as part of the employee's job responsibilities;

2. Uses or possesses a controlled substance or drug authorized by a licensed physician prescribed for the employee's personal use; or

3. Possesses a controlled substance or drug that a licensed physician has prescribed for the employee's child or other individual for whom the employee is a legal guardian.

NOTICE

Each employee shall be given a copy of the District's notice regarding drug-free schools. [See DI(EXHIBIT)]

A copy of this policy, a purpose of which is to eliminate drug abuse from the workplace, shall be provided to each employee at the beginning of each year or upon employment.

ARRESTS, INDICTMENTS, CONVICTIONS, AND OTHER ADJUDICATIONS

An employee shall notify his or her principal or immediate supervisor within three calendar days of any arrest, indictment, conviction, no contest or guilty plea, or other adjudication of the employee for any felony, any offense involving moral turpitude, and any of the other offenses as indicated below:

1. Crimes involving school property or funds;

2. Crimes involving attempt by fraudulent or unauthorized means to obtain or alter any certificate or permit that would entitle any person to hold or obtain a position as an educator;

DATE ISSUED: 7/20/2017
LDU 2017.06
DH(LOCAL)-X

Pltf. 000370

Amarillo ISD
188901

EMPLOYEE STANDARDS OF CONDUCT

DH
(LOCAL)

3. Crimes that occur wholly or in part on school property or at a school-sponsored activity; or

4. Crimes involving moral turpitude, which include:

- Dishonesty; fraud; deceit; theft; misrepresentation;

- Deliberate violence;

- Base, vile, or depraved acts that are intended to arouse or gratify the sexual desire of the actor;

- Felony possession or conspiracy to possess, or any misdemeanor or felony transfer, sale, distribution, or conspiracy to transfer, sell, or distribute any controlled substance defined in Chapter 481 of the Health and Safety Code;

- Felony driving while intoxicated (DWI);

- Acts constituting public intoxication, operating a motor vehicle while under the influence of alcohol, or disorderly conduct, if any two or more acts are committed within any 12-month period; or

- Acts constituting abuse or neglect under the Texas Family Code.

DRESS AND GROOMING

An employee's dress and grooming shall be clean, neat, in a manner appropriate for his or her assignment, and in accordance with any additional standards established by his or her supervisor and approved by the Superintendent.

DATE ISSUED: 7/20/2017
LDU 2017.06
DH(LOCAL)-X

ADOPTED.

4 of 4
Pltf. 000371

384

Amarillo ISD
188901

TERM CONTRACTS                                                    DFBB
NONRENEWAL                                                      (LOCAL)

REASONS                    The recommendation to the Board and its decision not to renew a
                           contract under this policy shall not be based on an employee's ex-
                           ercise of Constitutional rights or based unlawfully on an employee's
                           race, color, religion, sex, gender, national origin, age, disability, or
                           any other basis prohibited by law.  Reasons for proposed nonre-
                           newal of an employee's term contract shall be:

                           1.    Deficiencies pointed out in observation reports, appraisals or
                                 evaluations, supplemental memoranda, or other communica-
                                 tions.

                           2.    Failure to fulfill duties or responsibilities.

                           3.    Incompetency or inefficiency in the performance of duties.

                           4.    Inability to maintain discipline in any situation in which the
                                 employee is responsible for the oversight and supervision of
                                 students.

                           5.    Insubordination or failure to comply with official directives.

                           6.    Failure to comply with Board policies or administrative regula-
                                 tions.

                           7.    Excessive absences.

                           8.    Conducting personal business during school hours when it
                                 results in neglect of duties.

                           9.    Reduction in force because of financial exigency.  [See DFFA]

                           10.   Reduction in force because of a program change.  [See
                                 DFFB]

                           11.   The employee is not retained at a campus in accordance with
                                 the provisions of a campus turnaround plan.  [See AIC]

                           12.   Drunkenness or excessive use of alcoholic beverages; or
                                 possession, use, or being under the influence of alcohol or al-
                                 coholic beverages while on District property, while working in
                                 the scope of the employee's duties, or while attending any
                                 school- or District-sponsored activity.

                           13.   The illegal possession, use, manufacture, or distribution of a
                                 controlled substance, a drug, a dangerous drug, hallucino-
                                 gens, or other substances regulated by state statutes.

                           14.   Failure to meet the District's standards of professional con-
                                 duct.

                           15.   Failure to report any arrest, indictment, conviction, no contest
                                 or guilty plea, or other adjudication for any felony, any crime

DATE ISSUED: 7/20/2017                                              1 of 6
LDU 2017.06
DFBB(LOCAL)-D1
Pltf. 000372

385

Amarillo ISD
188901

TERM CONTRACTS                                                    DFBB
NONRENEWAL                                                        (LOCAL)

involving moral turpitude, or other offense listed at
DH(LOCAL). [See DH]

16. Conviction of or deferred adjudication for any felony, any
crime involving moral turpitude, or other offense listed at
DH(LOCAL); or conviction of a lesser included offense pursu-
ant to a plea when the original charged offense is a felony.
[See DH]

17. Failure to comply with reasonable District requirements re-
garding advanced coursework or professional improvement
and growth.

18. Disability, not otherwise protected by law, that prevents the
employee from performing the essential functions of the job.

19. Any activity, school-connected or otherwise, that, because of
publicity given it, or knowledge of it among students, faculty,
or the community, impairs or diminishes the employee's effec-
tiveness in the District.

20. Any breach by the employee of an employment contract or
any reason specified in the employee's employment contract.

21. Failure to maintain an effective working relationship, or main-
tain good rapport, with parents, the community, or colleagues.

22. A significant lack of student progress attributable to the edu-
cator.

23. Behavior that presents a danger of physical harm to a student
or to other individuals.

24. Assault on a person on District property or at a school-related
function, or on an employee, student, or student's parent re-
gardless of time or place.

25. Use of profanity in the course of performing any duties of em-
ployment, whether on or off school premises, in the presence
of students, staff, or members of the public, if reasonably
characterized as unprofessional.

26. Falsification of records or other documents related to the Dis-
trict's activities.

27. Falsification or omission of required information on an em-
ployment application.

28. Misrepresentation of facts to a supervisor or other District offi-
cial in the conduct of District business.

DATE ISSUED: 7/20/2017                                           2 of 6
LDU 2017.06
DFBB(LOCAL)-D1                                                   Pltf. 000373

Amarillo ISD
188901

TERM CONTRACTS                                                        DFBB
NONRENEWAL                                                          (LOCAL)

29. Failure to fulfill requirements for state licensure or certification, including passing certification or licensing examinations required by state or federal law or by the District, for the employee's assignment.

30. Failure to maintain licensing and certification requirements, including the completion of required continuing education hours, for the employee's assignment.

31. Failure to complete certification or permit renewal requirements, or failure to fulfill the requirements of a deficiency plan, under an Emergency Permit or a Temporary Classroom Assignment Permit.

32. Any attempt to encourage or coerce a child to withhold information from the child's parent or from other District personnel.

33. Any reason that makes the employment relationship void or voidable, such as a violation of federal, state, or local law.

34. Any reason constituting good cause for terminating the contract during its term.

**RECOMMENDATIONS FROM ADMINISTRATION**

Administrative recommendations for renewal or proposed nonrenewal of term contracts shall be submitted to the Superintendent. A recommendation for proposed nonrenewal shall be supported by any relevant documentation. The final decision on the administrative recommendation to the Board on each employee's contract rests with the Superintendent.

**SUPERINTENDENT'S RECOMMENDATION**

The Superintendent shall prepare lists of employees whose contracts are recommended for renewal or proposed nonrenewal by the Board. Supporting documentation, if any, and reasons for the recommendation shall be submitted for each employee recommended for proposed nonrenewal.

The Board shall consider such information, as appropriate, in support of recommendations for proposed nonrenewal and shall then act on all recommendations. If the Board votes to propose nonrenewal for any employees, it shall also decide whether any requested hearing will be conducted by the Board or by an independent hearing examiner.

**NOTICE OF PROPOSED NONRENEWAL**

After the Board votes to propose nonrenewal, the Superintendent or designee shall deliver written notice of proposed nonrenewal in accordance with law.

If the notice of proposed nonrenewal does not contain a statement of the reason or all the reasons for the proposed action, and the employee requests a hearing, the District shall give the employee

Amarillo ISD
188901

TERM CONTRACTS                                                    DFBB
NONRENEWAL                                                       (LOCAL)

notice of all reasons for the proposed nonrenewal at a reasonable time before the hearing.

The Board has chosen to designate the type of hearing for proposed nonrenewals on a case-by-case basis. In the notice of proposed nonrenewal, the employee shall receive notice of whether the Board [see REQUEST FOR BOARD HEARING, below] or an independent hearing examiner appointed by the commissioner of education [see REQUEST FOR APPOINTMENT OF HEARING EXAMINER, below] will conduct the hearing.

**REQUEST FOR APPOINTMENT OF HEARING EXAMINER**

If the notice of proposed nonrenewal states that the nonrenewal hearing will be conducted by an independent hearing examiner, the employee may request a hearing by filing a written request with the commissioner, and providing the Board a copy of the request, not later than the 15th day after the date the employee received the notice of proposed nonrenewal.

**HEARING PROCEDURES**

The hearing shall be conducted by an independent hearing examiner in accordance with the process described at DFD.

**BOARD DECISION**

Following the hearing, the Board shall take appropriate action in accordance with DFD.

**REQUEST FOR BOARD HEARING**

If the notice of proposed nonrenewal states that the nonrenewal hearing will be conducted by the Board, the employee may request a hearing by providing written notice to the Board not later than the 15th day after the date the employee received the notice of proposed nonrenewal.

When a timely request for a hearing on a proposed nonrenewal is received by the presiding officer, the Board shall notify the employee whether the hearing will be conducted by the Board [see HEARING BY THE BOARD, below] or an attorney designated by the Board [see HEARING BY AN ATTORNEY DESIGNATED BY THE BOARD, below].

In either case, the hearing shall be held not later than the 15th day after receipt of the request, unless the parties mutually agree to a delay. The employee shall be given notice of the hearing date as soon as it is set.

**HEARING BY THE BOARD**

Unless the employee requests that the hearing be open, the hearing shall be conducted in closed meeting with only the members of the Board, the employee, the Superintendent, their representatives, and such witnesses as may be called in attendance. Witnesses may be excluded from the hearing until called to present evidence. The employee and the administration may choose a representative. Notice, at least five days in advance of the hearing, shall be given by each party intending to be represented, including

DATE ISSUED: 7/20/2017                                           4 of 6
LDU 2017.06
DFBB(LOCAL)-D1                                                  Pltf. 000375

Amarillo ISD
188901

TERM CONTRACTS
NONRENEWAL

DFBB
(LOCAL)

|  |  |
|---|---|
| HEARING PROCEDURES | The conduct of the hearing shall be under the presiding officer's control and shall generally follow the steps listed below: |

1. After consultation with the parties, the presiding officer shall impose reasonable time limits for presentation of evidence and closing arguments.

2. The hearing shall begin with the administration's presentation, supported by such proof as it desires to offer.

3. The employee may cross-examine any witnesses for the administration.

4. The employee may then present such testimonial or documentary proof, as desired, to offer in rebuttal or general support of the contention that the contract be renewed.

5. The administration may cross-examine any witnesses for the employee and offer rebuttal to the testimony of the employee's witnesses.

6. Closing arguments may be made by each party.

A record of the hearing shall be made so that a certified transcript can be prepared, if required.

|  |  |
|---|---|
| BOARD DECISION | The Board may consider only evidence presented at the hearing. After all the evidence has been presented, if the Board determines that the reasons given in support of the recommendation to not renew the employee's contract are lawful, supported by the evidence, and not arbitrary or capricious, it shall so notify the employee by a written notice not later than the 15th day after the date on which the hearing is concluded. This notice shall also include the Board's decision on renewal, which decision shall be final. |
| HEARING BY AN ATTORNEY DESIGNATED BY THE BOARD | The hearing must be private unless the employee requests in writing that the hearing be public, except that the attorney may close the hearing to maintain decorum. If the employee does not request a public hearing, only the attorney designated by the Board, the employee, the Superintendent, their representatives, and witnesses will be permitted to be in attendance, and witnesses may be excluded from the hearing until called to present evidence. The employee and the administration may choose a representative. Notice, at least five days in advance of the hearing, shall be given by each party intending to be represented, including the name of the representative. Failure to give such notice may result in postponement of the hearing. |

DATE ISSUED: 7/20/2017
LDU 2017.06
DFBB(LOCAL)-D1

5 of 6

Pltf. 000376

Amarillo ISD
188901

TERM CONTRACTS
NONRENEWAL

DFBB
(LOCAL)

The conduct of the hearing shall be under the control of the attorney designated by the Board and shall generally follow the steps listed at HEARING BY THE BOARD.

Not later than the 15th day after the completion of the hearing, the attorney shall provide to the Board a record of the hearing and his or her recommendation on renewal.

**BOARD REVIEW**

The Board shall consider the record of the hearing and the attorney's recommendation at the first Board meeting for which notice can be posted, unless the parties agree in writing to a different date. The Board shall notify the employee of the meeting date as soon as it is set. At the meeting, the Board shall allow each party an equal amount of time to present oral arguments. The Board shall notify the employee in writing of the Board's decision on renewal not later than the 15th day after the date of the meeting.

**NO HEARING**

If the employee fails to request a hearing, the Board shall take the appropriate action and notify the employee in writing of that action not later than the 30th day after the date the notice of proposed nonrenewal was sent.

DATE ISSUED: 7/20/2017
LDU 2017.06
DFBB(LOCAL)-D1

ADOPTED:

6 of 6

Pltf. 000377

390



Amarillo Independent School District

7200 Interstate 40 West · Amarillo, TX 79106-2598 · (806) 326-1490 · Fax (806) 354-4741

**Doug Loomis**
Chief Human Resources Officer

August 7, 2018
Cole Underwood        *5807 Nicholas Cir*
3205 Linda Ln.
Canyon, TX. 79015    *Amarillo, TX 79109*

Dear Cole Underwood:

We believe it to be in the best interest of you and those of the school district that you be temporarily relieved of your duties until a thorough review can be completed for concerns related to job issues. Therefore, this letter confirms that you were placed on administrative leave with full pay and benefits as of August 7, 2018 until further notice. Placing you on administrative leave is not any determination of wrongdoing. We expect you to be available to district personnel from 8:00 AM to 4:00 PM on scheduled school days, during this leave.

During this period of administrative leave, your contact should be with Doug Loomis, Chief Human Resource Officer, or Chris Tatum, Director Secondary Personnel. You will not be able to participate in District activities, and you are not to return to school, whether during working hours or after, unless prior arrangements have been made with me. You are not to visit any other campuses in the district unless related to your children and previous arrangements have been made for you to be at the campus. If you have questions, please call Chris Tatum, or me. I may require that you check with me periodically by telephone.

As soon as we are able, we will schedule a meeting with you to review the status of the investigation and to advise you of any recommendations or decisions made. Should there be any inquiries by others of you concerning this matter or the investigation, you may refer them to me.

If you have any questions concerning your status, your responsibilities, or the District's expectations during this period, please contact me.

Sincerely,

Doug Loomis

---

Your signature indicates receipt of this documentation and board policy

_____    __08/07/18__    __(806) 202-5633__
Employee                                      Date                     Phone number

Pltf. 000378

391

Amarillo ISD
188901

EMPLOYEE STANDARDS OF CONDUCT

DH
(EXHIBIT)

## Educators' Code of Ethics

The Texas educator shall comply with standard practices and ethical conduct toward students, professional colleagues, school officials, parents, and members of the community and shall safeguard academic freedom. The Texas educator, in maintaining the dignity of the profession, shall respect and obey the law, demonstrate personal integrity, and exemplify honesty. The Texas educator, in exemplifying ethical relations with colleagues, shall extend just and equitable treatment to all members of the profession. The Texas educator, in accepting a position of public trust, shall measure success by the progress of each student toward realization of his or her potential as an effective citizen. The Texas educator, in fulfilling responsibilities in the community, shall cooperate with parents and others to improve the public schools of the community. *19 TAC 247.1*

1.   Professional Ethical Conduct, Practices, and Performance

Standard 1.1. The educator shall not intentionally, knowingly, or recklessly engage in deceptive practices regarding official policies of the school district, educational institution, educator preparation program, the Texas Education Agency, or the State Board for Educator Certification (SBEC) and its certification process.

Standard 1.2. The educator shall not knowingly misappropriate, divert, or use monies, personnel, property, or equipment committed to his or her charge for personal gain or advantage.

Standard 1.3. The educator shall not submit fraudulent requests for reimbursement, expenses, or pay.

Standard 1.4. The educator shall not use institutional or professional privileges for personal or partisan advantage.

Standard 1.5. The educator shall neither accept nor offer gratuities, gifts, or favors that impair professional judgment or to obtain special advantage. This standard shall not restrict the acceptance of gifts or tokens offered and accepted openly from students, parents of students, or other persons or organizations in recognition or appreciation of service.

Standard 1.6. The educator shall not falsify records, or direct or coerce others to do so.

Standard 1.7. The educator shall comply with state regulations, written local school board policies, and other state and federal laws.

Standard 1.8. The educator shall apply for, accept, offer, or assign a position or a responsibility on the basis of professional qualifications.

Standard 1.9. The educator shall not make threats of violence against school district employees, school board members, students, or parents of students.

Standard 1.10. The educator shall be of good moral character and be worthy to instruct or supervise the youth of this state.

DATE ISSUED: 1/30/2017
UPDATE 107
DH(EXHIBIT)-P

1 of 3

Pltf. 000379

392

Amarillo ISD
188901

EMPLOYEE STANDARDS OF CONDUCT                                                      DH
                                                                                 (EXHIBIT)

Standard 1.11. The educator shall not intentionally or knowingly misrepresent his or her employment history, criminal history, and/or disciplinary record when applying for subsequent employment.

Standard 1.12. The educator shall refrain from the illegal use or distribution of controlled substances and/or abuse of prescription drugs and toxic inhalants.

Standard 1.13. The educator shall not be under the influence of alcohol or consume alcoholic beverages on school property or during school activities when students are present.

Standard 1.14. The educator shall not assist another educator, school employee, contractor, or agent in obtaining a new job as an educator or in a school, apart from the routine transmission of administrative and personnel files, if the educator knows or has probable cause to believe that such person engaged in sexual misconduct regarding a minor or student in violation of the law.

2.    Ethical Conduct Toward Professional Colleagues

Standard 2.1. The educator shall not reveal confidential health or personnel information concerning colleagues unless disclosure serves lawful professional purposes or is required by law.

Standard 2.2. The educator shall not harm others by knowingly making false statements about a colleague or the school system.

Standard 2.3. The educator shall adhere to written local school board policies and state and federal laws regarding the hiring, evaluation, and dismissal of personnel.

Standard 2.4. The educator shall not interfere with a colleague's exercise of political, professional, or citizenship rights and responsibilities.

Standard 2.5. The educator shall not discriminate against or coerce a colleague on the basis of race, color, religion, national origin, age, gender, disability, family status, or sexual orientation.

Standard 2.6. The educator shall not use coercive means or promise of special treatment in order to influence professional decisions or colleagues.

Standard 2.7. The educator shall not retaliate against any individual who has filed a complaint with the SBEC or who provides information for a disciplinary investigation or proceeding under this chapter.

3.    Ethical Conduct Toward Students

Standard 3.1. The educator shall not reveal confidential information concerning students unless disclosure serves lawful professional purposes or is required by law.

Standard 3.2. The educator shall not intentionally, knowingly, or recklessly treat a student or minor in a manner that adversely affects or endangers the learning, physical health, mental health, or safety of the student or minor.

Amarillo ISD
188901

EMPLOYEE STANDARDS OF CONDUCT                                    DH
                                                              (EXHIBIT)

Standard 3.3. The educator shall not intentionally, knowingly, or recklessly misrepresent facts regarding a student.

Standard 3.4. The educator shall not exclude a student from participation in a program, deny benefits to a student, or grant an advantage to a student on the basis of race, color, gender, disability, national origin, religion, family status, or sexual orientation.

Standard 3.5. The educator shall not intentionally, knowingly, or recklessly engage in physical mistreatment, neglect, or abuse of a student or minor.

Standard 3.6. The educator shall not solicit or engage in sexual conduct or a romantic relationship with a student or minor.

Standard 3.7. The educator shall not furnish alcohol or illegal/unauthorized drugs to any person under 21 years of age unless the educator is a parent or guardian of that child or knowingly allow any person under 21 years of age unless the educator is a parent or guardian of that child to consume alcohol or illegal/unauthorized drugs in the presence of the educator.

Standard 3.8. The educator shall maintain appropriate professional educator-student relationships and boundaries based on a reasonably prudent educator standard.

Standard 3.9. The educator shall refrain from inappropriate communication with a student or minor, including, but not limited to, electronic communication such as cell phone, text messaging, e-mail, instant messaging, blogging, or other social network communication. Factors that may be considered in assessing whether the communication is inappropriate include, but are not limited to:

a.    The nature, purpose, timing, and amount of the communication;

b.    The subject matter of the communication;

c.    Whether the communication was made openly or the educator attempted to conceal the communication;

d.    Whether the communication could be reasonably interpreted as soliciting sexual contact or a romantic relationship;

e.    Whether the communication was sexually explicit; and

f.    Whether the communication involved discussion(s) of the physical or sexual attractiveness or the sexual history, activities, preferences, or fantasies of either the educator or the student.

*19 TAC 247.2*

DATE ISSUED: 1/30/2017                                    3 of 3
UPDATE 107
DH(EXHIBIT)-P                                          Pltf. 000381

394

Amarillo ISD
188901

EMPLOYEE STANDARDS OF CONDUCT

DH
(LOCAL)

Each District employee shall perform his or her duties in accordance with state and federal law, District policy, and ethical standards. The District holds all employees accountable to the Educators' Code of Ethics. [See DH(EXHIBIT)]

Each District employee shall recognize and respect the rights of students, parents, other employees, and members of the community and shall work cooperatively with others to serve the best interests of the District.

An employee wishing to express concern, complaints, or criticism shall do so through appropriate channels. [See DGBA]

**Violations of Standards of Conduct**

Each employee shall comply with the standards of conduct set out in this policy and with any other policies, regulations, and guidelines that impose duties, requirements, or standards attendant to his or her status as a District employee. Violation of any policies, regulations, or guidelines may result in disciplinary action, including termination of employment. [See DCD and DF series]

**Weapons Prohibited**

The District prohibits the use, possession, or display of any firearm, location-restricted knife, club, or prohibited weapon, as defined at FNCG, on District property at all times.

**Exceptions**

No violation of this policy occurs when:

1.  A District employee who holds a Texas handgun license stores a handgun or other firearm in a locked vehicle in a parking lot, parking garage, or other parking area provided by the District, provided the handgun or other firearm is not loaded and not in plain view; or

2.  The use, possession, or display of an otherwise prohibited weapon takes place as part of a District-approved activity supervised by proper authorities. [See FOD]

**Electronic Communication**

**Use with Students**

A certified employee, licensed employee, or any other employee designated in writing by the Superintendent or a campus principal may use electronic communication, as this term is defined by law, with currently enrolled students only about matters within the scope of the employee's professional responsibilities.

Unless an exception has been made in accordance with administrative regulations, an employee shall not use a personal electronic communication platform, application, or account to communicate with currently enrolled students.

Unless authorized above, all other employees are prohibited from using electronic communication directly with students who are cur-

DATE ISSUED: 3/8/2018
LDU 2018.01
DH(LOCAL)-X

1 of 5

Pltf. 000382

Amarillo ISD
188901

EMPLOYEE STANDARDS OF CONDUCT

DH
(LOCAL)

rently enrolled in the District. Administrative regulations shall further detail:

1. Exceptions for family and social relationships;

2. The circumstances under which an employee may use text messaging to communicate with individual students or student groups; and

3. Other matters deemed appropriate by the Superintendent or designee.

In accordance with ethical standards applicable to all District employees [see DH(EXHIBIT)], an employee shall be prohibited from using electronic communications in a manner that constitutes prohibited harassment or abuse of a District student; adversely affects the student's learning, mental health, or safety; includes threats of violence against the student; reveals confidential information about the student; or constitutes an inappropriate communication with a student, as described in the Educators' Code of Ethics.

An employee shall have no expectation of privacy in electronic communications with students. Each employee shall comply with the District's requirements for records retention and destruction to the extent those requirements apply to electronic communication. [See CPC]

**Personal Use**

All employees shall be held to the same professional standards in their public use of electronic communication as for any other public conduct. If an employee's use of electronic communication violates state or federal law or District policy, or interferes with the employee's ability to effectively perform his or her job duties, the employee is subject to disciplinary action, up to and including termination of employment.

**Reporting Improper Communication**

In accordance with administrative regulations, an employee shall notify his or her supervisor when a student engages in improper electronic communication with the employee.

**Disclosing Personal Information**

An employee shall not be required to disclose his or her personal e-mail address or personal phone number to a student.

**Safety Requirements**

Each employee shall adhere to District safety rules and regulations and shall report unsafe conditions or practices to the appropriate supervisor.

**Harassment or Abuse**

An employee shall not engage in prohibited harassment, including sexual harassment, of:

1. Other employees. [See DIA]

DATE ISSUED: 3/8/2018
LDU 2018.01
DH(LOCAL)-X

2 of 5

Pltf. 000383

Amarillo ISD
188901

EMPLOYEE STANDARDS OF CONDUCT                                        DH
                                                                  (LOCAL)

2.    Students. [See FFH; see FFG regarding child abuse and ne-
      glect.]

While acting in the course of employment, an employee shall not
engage in prohibited harassment, including sexual harassment, of
other persons, including Board members, vendors, contractors,
volunteers, or parents.

An employee shall report child abuse or neglect as required by law.
[See FFG]

**Relationships with Students**

An employee shall not form romantic or other inappropriate social
relationships with students. Any sexual relationship between a stu-
dent and a District employee is always prohibited, even if consen-
sual. [See FFH]

As required by law, the District shall notify the parent of a student
with whom an educator is alleged to have engaged in certain mis-
conduct. [See FFF]

**Tobacco and E-Cigarettes**

An employee shall not smoke or use tobacco products or
e-cigarettes on District property, in District vehicles, or at school-
related activities. [See also GKA]

**Alcohol and Drugs / Notice of Drug-Free Workplace**

As a condition of employment, an employee shall abide by the
terms of the following drug-free workplace provisions. An employee
shall notify the Superintendent in writing if the employee is convict-
ed for a violation of·a criminal drug statute occurring in the work-
place in accordance with Arrests, Indictments, Convictions, and
Other Adjudications, below.

An employee shall not manufacture, distribute, dispense, possess,
use, or be under the influence of any of the following substances
during working hours while on District property or at school-related
activities during or outside of usual working hours:

1.    Any controlled substance or dangerous drug as defined by
      law, including but not limited to marijuana, any narcotic drug,
      hallucinogen, stimulant, depressant, amphetamine, or barbitu-
      rate.

2.    Alcohol or any alcoholic beverage.

3.    Any abusable glue, aerosol paint, or any other chemical sub-
      stance for inhalation.

4.    Any other intoxicant or mood-changing, mind-altering, or be-
      havior-altering drug.

An employee need not be legally intoxicated to be considered "un-
der the influence" of a controlled substance.

DATE ISSUED: 3/8/2018                                              3 of 5
LDU 2018.01
DH(LOCAL)-X                                                   Pltf. 000384

Amarillo ISD
188901

EMPLOYEE STANDARDS OF CONDUCT

DH
(LOCAL)

For purposes of this policy, "under the influence" means lacking the normal use of mental or physical faculties. Impairment of a person's physical or mental faculties may be evidenced by a pattern of abnormal or erratic behavior, the presence of physical symptoms of drug or alcohol use, or by admission.

**Exceptions**

It shall not be considered a violation of this policy if the employee:

1. Manufactures, possesses, or dispenses a substance listed above as part of the employee's job responsibilities;

2. Uses or possesses a controlled substance or drug authorized by a licensed physician prescribed for the employee's personal use; or

3. Possesses a controlled substance or drug that a licensed physician has prescribed for the employee's child or other individual for whom the employee is a legal guardian.

**Sanctions**

An employee who violates these drug-free workplace provisions shall be subject to disciplinary sanctions. Sanctions may include:

1. Referral to drug and alcohol counseling or rehabilitation programs;

2. Referral to employee assistance programs;

3. Termination from employment with the District; and

4. Referral to appropriate law enforcement officials for prosecution.

**Notice**

Employees shall receive a copy of this policy.

**Arrests, Indictments, Convictions, and Other Adjudications**

An employee shall notify his or her principal or immediate supervisor within three calendar days of any arrest, indictment, conviction, no contest or guilty plea, or other adjudication of the employee for any felony, any offense involving moral turpitude, and any of the other offenses as indicated below:

1. Crimes involving school property or funds;

2. Crimes involving attempt by fraudulent or unauthorized means to obtain or alter any certificate or permit that would entitle any person to hold or obtain a position as an educator;

3. Crimes that occur wholly or in part on school property or at a school-sponsored activity; or

4. Crimes involving moral turpitude, which include:

   • Dishonesty; fraud; deceit; theft; misrepresentation;

DATE ISSUED: 3/8/2018
LDU 2018.01
DH(LOCAL)-X

4 of 5

Pltf. 000385



Amarillo ISD
188901

EMPLOYEE STANDARDS OF CONDUCT                                        DH
                                                                 (LOCAL)

- Deliberate violence;

- Base, vile, or depraved acts that are intended to arouse or gratify the sexual desire of the actor;

- Felony possession or conspiracy to possess, or any misdemeanor or felony transfer, sale, distribution, or conspiracy to transfer, sell, or distribute any controlled substance defined in Chapter 481 of the Health and Safety Code;

- Felony driving while intoxicated (DWI);

- Acts constituting public intoxication, operating a motor vehicle while under the influence of alcohol, or disorderly conduct, if any two or more acts are committed within any 12-month period; or

- Acts constituting abuse or neglect under the Texas Family Code.

**Dress and Grooming**   An employee's dress and grooming shall be clean, neat, in a manner appropriate for his or her assignment, and in accordance with any additional standards established by his or her supervisor and approved by the Superintendent.

DATE ISSUED: 3/8/2018                 ADOPTED:                    5 of 5
LDU 2018.01
DH(LOCAL)-X                                                   Pltf. 000386

Amarillo ISD
188901

TERM CONTRACTS                                                      DFBB
NONRENEWAL                                                         (LOCAL)

Reasons                  The recommendation to the Board and its decision not to renew a
                         contract under this policy shall not be based on an employee's ex-
                         ercise of Constitutional rights or based unlawfully on an em-
                         ployee's race, color, religion, sex, gender, national origin, age, dis-
                         ability, or any other basis prohibited by law. Reasons for proposed
                         nonrenewal of an employee's term contract shall be:

                         1.   Deficiencies pointed out in observation reports, appraisals or
                              evaluations, supplemental memoranda, or other communica-
                              tions.

                         2.   Failure to fulfill duties or responsibilities.

                         3.   Incompetency or inefficiency in the performance of duties.

                         4.   Inability to maintain discipline in any situation in which the em-
                              ployee is responsible for the oversight and supervision of stu-
                              dents.

                         5.   Insubordination or failure to comply with official directives.

                         6.   Failure to comply with Board policies or administrative regula-
                              tions.

                         7.   Excessive absences.

                         8.   Conducting personal business during school hours when it re-
                              sults in neglect of duties.

                         9.   Reduction in force because of financial exigency. [See DFFA]

                         10.  Reduction in force because of a program change. [See DFFB]

                         11.  The employee is not retained at a campus in accordance with
                              the provisions of a campus turnaround plan. [See AIC]

                         12.  Drunkenness or excessive use of alcoholic beverages; or
                              possession, use, or being under the influence of alcohol or al-
                              coholic beverages while on District property, while working in
                              the scope of the employee's duties, or while attending any
                              school- or District-sponsored activity.

                         13.  The illegal possession, use, manufacture, or distribution of a
                              controlled substance, a drug, a dangerous drug, hallucino-
                              gens, or other substances regulated by state statutes.

                         14.  Failure to meet the District's standards of professional con-
                              duct.

                         15.  Failure to report any arrest, indictment, conviction, no contest
                              or guilty plea, or other adjudication for any felony, any crime

DATE ISSUED: 7/20/2017                                                        1 of 6
LDU 2017.06
DFBB(LOCAL)-D1
                                                                      Pltf. 000387

Amarillo ISD
188901

TERM CONTRACTS                                               DFBB
NONRENEWAL                                                 (LOCAL)

involving moral turpitude, or other offense listed at DH(LO-CAL). [See DH]

16. Conviction of or deferred adjudication for any felony, any crime involving moral turpitude, or other offense listed at DH(LOCAL); or conviction of a lesser included offense pursuant to a plea when the original charged offense is a felony. [See DH]

17. Failure to comply with reasonable District requirements regarding advanced coursework or professional improvement and growth.

18. Disability, not otherwise protected by law, that prevents the employee from performing the essential functions of the job.

19. Any activity, school-connected or otherwise, that, because of publicity given it, or knowledge of it among students, faculty, or the community, impairs or diminishes the employee's effectiveness in the District.

20. Any breach by the employee of an employment contract or any reason specified in the employee's employment contract.

21. Failure to maintain an effective working relationship, or maintain good rapport, with parents, the community, or colleagues.

22. A significant lack of student progress attributable to the educator.

23. Behavior that presents a danger of physical harm to a student or to other individuals.

24. Assault on a person on District property or at a school-related function, or on an employee, student, or student's parent regardless of time or place.

25. Use of profanity in the course of performing any duties of employment, whether on or off school premises, in the presence of students, staff, or members of the public, if reasonably characterized as unprofessional.

26. Falsification of records or other documents related to the District's activities.

27. Falsification or omission of required information on an employment application.

28. Misrepresentation of facts to a supervisor or other District official in the conduct of District business.

Amarillo ISD
188901

TERM CONTRACTS                                                    DFBB
NONRENEWAL                                                     (LOCAL)

29. Failure to fulfill requirements for state licensure or certification, including passing certification or licensing examinations required by state or federal law or by the District, for the employee's assignment.

30. Failure to maintain licensing and certification requirements, including the completion of required continuing education hours, for the employee's assignment.

31. Failure to complete certification or permit renewal requirements, or failure to fulfill the requirements of a deficiency plan, under an Emergency Permit or a Temporary Classroom Assignment Permit.

32. Any attempt to encourage or coerce a child to withhold information from the child's parent or from other District personnel.

33. Any reason that makes the employment relationship void or voidable, such as a violation of federal, state, or local law.

34. Any reason constituting good cause for terminating the contract during its term.

**Recommendations from Administration**

Administrative recommendations for renewal or proposed nonrenewal of term contracts shall be submitted to the Superintendent. A recommendation for proposed nonrenewal shall be supported by any relevant documentation. The final decision on the administrative recommendation to the Board on each employee's contract rests with the Superintendent.

**Superintendent's Recommendation**

The Superintendent shall prepare lists of employees whose contracts are recommended for renewal or proposed nonrenewal by the Board. Supporting documentation, if any, and reasons for the recommendation shall be submitted for each employee recommended for proposed nonrenewal.

The Board shall consider such information, as appropriate, in support of recommendations for proposed nonrenewal and shall then act on all recommendations. If the Board votes to propose nonrenewal for any employees, it shall also decide whether any requested hearing will be conducted by the Board or by an independent hearing examiner.

**Notice of Proposed Nonrenewal**

After the Board votes to propose nonrenewal, the Superintendent or designee shall deliver written notice of proposed nonrenewal in accordance with law.

If the notice of proposed nonrenewal does not contain a statement of the reason or all the reasons for the proposed action, and the employee requests a hearing, the District shall give the employee

DATE ISSUED: 7/20/2017                                          3 of 6
LDU 2017.06
DFBB(LOCAL)-D1

Pltf. 000389

Amarillo ISD
188901

TERM CONTRACTS                                                    DFBB
NONRENEWAL                                                       (LOCAL)

notice of all reasons for the proposed nonrenewal at a reasonable time before the hearing.

The Board has chosen to designate the type of hearing for proposed nonrenewals on a case-by-case basis. In the notice of proposed nonrenewal, the employee shall receive notice of whether the Board [see REQUEST FOR BOARD HEARING, below] or an independent hearing examiner appointed by the commissioner of education [see REQUEST FOR APPOINTMENT OF HEARING EXAMINER, below] will conduct the hearing.

**Request for Appointment of Hearing Examiner**

If the notice of proposed nonrenewal states that the nonrenewal hearing will be conducted by an independent hearing examiner, the employee may request a hearing by filing a written request with the commissioner, and providing the Board a copy of the request, not later than the 15th day after the date the employee received the notice of proposed nonrenewal.

**Hearing Procedures**

The hearing shall be conducted by an independent hearing examiner in accordance with the process described at DFD.

**Board Decision**

Following the hearing, the Board shall take appropriate action in accordance with DFD.

**Request for Board Hearing**

If the notice of proposed nonrenewal states that the nonrenewal hearing will be conducted by the Board, the employee may request a hearing by providing written notice to the Board not later than the 15th day after the date the employee received the notice of proposed nonrenewal.

When a timely request for a hearing on a proposed nonrenewal is received by the presiding officer, the Board shall notify the employee whether the hearing will be conducted by the Board [see HEARING BY THE BOARD, below] or an attorney designated by the Board [see HEARING BY AN ATTORNEY DESIGNATED BY THE BOARD, below].

In either case, the hearing shall be held not later than the 15th day after receipt of the request, unless the parties mutually agree to a delay. The employee shall be given notice of the hearing date as soon as it is set.

**Hearing by the Board**

Unless the employee requests that the hearing be open, the hearing shall be conducted in closed meeting with only the members of the Board, the employee, the Superintendent, their representatives, and such witnesses as may be called in attendance. Witnesses may be excluded from the hearing until called to present evidence. The employee and the administration may choose a representative. Notice, at least five days in advance of the hearing, shall be given by each party intending to be represented, including

DATE ISSUED: 7/20/2017                                          4 of 6
LDU 2017.06
DFBB(LOCAL)-D1                                              Pltf. 000390

Amarillo ISD
188901

TERM CONTRACTS                                                    DFBB
NONRENEWAL                                                      (LOCAL)

the name of the representative. Failure to give such notice may re-
sult in postponement of the hearing.

Hearing Procedures

The conduct of the hearing shall be under the presiding officer's
control and shall generally follow the steps listed below:

1.  After consultation with the parties, the presiding officer shall
    impose reasonable time limits for presentation of evidence
    and closing arguments.

2.  The hearing shall begin with the administration's presentation,
    supported by such proof as it desires to offer.

3.  The employee may cross-examine any witnesses for the ad-
    ministration.

4.  The employee may then present such testimonial or docu-
    mentary proof, as desired, to offer in rebuttal or general sup-
    port of the contention that the contract be renewed.

5.  The administration may cross-examine any witnesses for the
    employee and offer rebuttal to the testimony of the em-
    ployee's witnesses.

6.  Closing arguments may be made by each party.

A record of the hearing shall be made so that a certified transcript
can be prepared, if required.

Board Decision

The Board may consider only evidence presented at the hearing.
After all the evidence has been presented, if the Board determines
that the reasons given in support of the recommendation to not re-
new the employee's contract are lawful, supported by the evi-
dence, and not arbitrary or capricious, it shall so notify the em-
ployee by a written notice not later than the 15th day after the date
on which the hearing is concluded. This notice shall also include
the Board's decision on renewal, which decision shall be final.

Hearing by an
Attorney Designated
by the Board

The hearing must be private unless the employee requests in writ-
ing that the hearing be public, except that the attorney may close
the hearing to maintain decorum. If the employee does not request
a public hearing, only the attorney designated by the Board, the
employee, the Superintendent, their representatives, and wit-
nesses will be permitted to be in attendance, and witnesses may
be excluded from the hearing until called to present evidence. The
employee and the administration may choose a representative. No-
tice, at least five days in advance of the hearing, shall be given by
each party intending to be represented, including the name of the
representative. Failure to give such notice may result in postpone-
ment of the hearing.

DATE ISSUED: 7/20/2017                                          5 of 6
LDU 2017.06
DFBB(LOCAL)-D1

Pltf. 000391

Amarillo ISD
188901

TERM CONTRACTS                                                      DFBB
NONRENEWAL                                                         (LOCAL)

The conduct of the hearing shall be under the control of the attorney designated by the Board and shall generally follow the steps listed at HEARING BY THE BOARD.

Not later than the 15th day after the completion of the hearing, the attorney shall provide to the Board a record of the hearing and his or her recommendation on renewal.

Board Review

The Board shall consider the record of the hearing and the attorney's recommendation at the first Board meeting for which notice can be posted, unless the parties agree in writing to a different date. The Board shall notify the employee of the meeting date as soon as it is set. At the meeting, the Board shall allow each party an equal amount of time to present oral arguments. The Board shall notify the employee in writing of the Board's decision on renewal not later than the 15th day after the date of the meeting.

No Hearing

If the employee fails to request a hearing, the Board shall take the appropriate action and notify the employee in writing of that action not later than the 30th day after the date the notice of proposed nonrenewal was sent.

DATE ISSUED: 7/20/2017                    ADOPTED:                    6 of 6
LDU 2017.06
DFBB(LOCAL)-D1                                                       Pltf. 000392

8-7-19

On the morning of 8-7-18
Brandy Self told me that
she had heard in the stands
at the VB game last night
some people were talking
about Gresh Underwood
"snap-chatting" with some
Jr. students.

Also, Mrs. Blythe our
cheerleading sponsor told
Mr. Barton a similiar story.

I contacted Chris Tatum
and also asked Mrs Blythe
to fill out a statement.

R. _____ — Principal

Pltf. 000393

*[Handwritten notes on lined paper:]*

Pipebill 9:40am  8-718.          From D. Uhas.

1 ~ Cole Underwood
   - Daily & Sup conversing w/ Jurors.
   " Arrang. Pruot Rept.
   - Also Cheer Spason - Reputed Same.

Pltf. 000394

Mather Bujoke

August 7, 2018

At dinner with several family friends last night, several of the girls that were there began talking about Snap Chat. The conversation moved to Coach Underwood who they said had added added one of them, a softball player, to Snap Chat. She said that he had also added other students to the Snap Chat as well. One of her friends, who has graduated this past year, had commented that he made "uncomfortable" comments to her. She took him off Snap Chat afterward. This student also indicated that Underwood came and talked to her after at the registration asking why she had not responded to a direct message on another social media.

Plff. 000395

408

going back! my best friends neice graduated from AHS 201‾ and he also had her on snap chat. After graduation he sent an inappropriate comment to her as well. Her parents were going to handle it.

Underwood has talked to me about Buanam calling him into his office about being careful on twitter social media. He did not respond favorable in his reaction to me saying he didn't really understand because he is just trying to build relationships with his students and athletes.

Pltf. 000396

409

U.S. Hist.
→ KAMM -

H [illegible] (12:15 pm)

w/ Brag → Some Points of [illegible]

talk about FB situat. → [illegible] W[illegible] separate

He [illegible] in Snap

H B [illegible] too ▮▮ Not to Respond

- Said inapp text on DM to [illegible] Grossmont
  Students.

- Didn't Respond to Him..

⟶ Points w/ Title Concept.

- House Sur w/ other Fmilys FB - Bestes

Lakeside - No Prob w/ Him.

Cole Underwood - Q 3:45   8/7/18
- Chris Tatum, C. Shuster

Painf Complaint - inappropriate commu.
- Texting, SnapChat, DM
with multiple students

CT - Why are you - Rather give commun.
This way (Social Media) than give
direct phone #.

CT - Ethics Video, Social Media training
last year

CT - What communication - about sports,
life advice, work outs
nothing physical at all
watched videos, didn't cross my
mind, Love job, hard work

CT - How can I prove messages not inappro.
can't

CT - exactly why you should not use SM
9 kids texted messaged, friended
snapchat

- Can't defend this no proof of
conversation

Pltf. 000398
411

A.B. - text [illegible] - held off until
she graduated - she's 18 it's ok
- some text before she graduated
about Sball coach, church, etc

CT - not hired to be a [illegible] counselor,
friend - Boundaries

Violator of Policy -

CT Who have you texted - FB team,
in group, ███ , multiple players

DM - multiple students, Snapchat -
FB players - shows Snapchat account

- Admin leave - review letter
- policy - directive to cease
all communications w/ current RTSD
students immediately

- Confidential - Not to talk about it
w/ anyone - investigation -

Z No social, Romantic, Sexual Relationship
w/ any current student

CW - No , never

Pltf. 000399

412



Statement

All of my contact with students has been innocent. As per orders of my boss, Chad Dunnam, we are to communicate as much as possible with our kids. We gave out hand outs with each coach's name and number and were told that it is an expectation to communicate. My communication with ████████████ was about Coach D passing ? who the new coaches would be for softball. Her mother was aware ? part of the conversations. I have met with the ██████ about my communication with ████████████. They supported my sending of the Summer S:C workouts to the girls. The girls didn't have any of their coaches present at Summer S:C so there was no way for them to get their workouts unless through a men's coach.

My Annotations

5:40 CT 1

8/4/18

1. C.U contact CT @ 5:40 pm - 8/7/18

Asked:

(1) - Should I contact Points
to Have them vouch that I
Have permission to come of trucks?
× - CT → Your Call - T.IO ask ted
You Guns Son × to
"No Goddamn" investigators - the more people that
know the more "eyes" her late.

(2) Can My THDCA Rep.?
CT - Your Call -

(3)

7:00pm DV called & Soon put Aprait Use
Called to Vouch For Colij CHmmha. He
told him to Call CT now

SNAP ✓        Soph - Also Plg Xbox.

Saw the Underwad bro(R_A_C) ⚡

(⇒ "If You want" I/a I'd Have taken Ya
on a date."

I. Feel He is like a "Guy" @ School.
He was Always Aroud wants to Be
Emmy's Best Friend.
Don't Feel uncomfble w/ Him - He Just
Acts. Like one of the boys."

Pltf. 000402

Pltf. 000403

1:37
8/8/18

Call From OU to
CT.

1. Foods Expectation From Columbia
→ Contract Cmas @ Meeting.

talled to [REDACTED] tilled - Ken. Men.

Pltf. 000404

417

## Statute Check ☑ §21.005. Requirement to Report Misconduct

Employee Name: Cole Underwood

SBEC Certification: Yes

    Type: Standard--Classroom Teacher History Grades 7-12

No    Did the employee resign?

No    Was the employee terminated?

No    Was the employee nonrenewed

    05/10/18 *Date of employment action

No    Does the employee have a criminal record?

    *If yes, what was the offense?

    *Did the District learn about the offense through the criminal history clearinghouse? N/a

    *If no, who/how did the District learn about the offense?

In accordance to §21.006; Requirement to Report Misconduct
The District must report to SBEC if the educator resigns/nonrenews/terms and there is any evidence that the educator engaged in misconduct described below

| | Does the District have any evidence that the educator: | | Supportive Documentation | | |
|---|---|---|---|---|---|
| No | Abused or otherwise committed an unlawful act with a student or minor; | ☐ Notes to file | ☐ Summary Report | ☐ Title IX Investigation |
| No | Was involved in a Romantic relationship with or solicited or engaged in sexual contact with a student or minor; | ☐ Notes to file | ☐ Summary Report | ☐ Title IX Investigation |
| No | Possessed, transferred, sold, or distributed a controlled substance; | ☐ Notes to file | ☐ Summary Report | |
| No | Illegally transferred, appropriated, or expended funds or other property of the school district; | ☐ Notes to file | ☐ Summary Report | |
| No | Attempted by fraudulent or unauthorized means to obtain or alter a professional certificate or license for the purpose of promotion or additional compensation; | ☐ Notes to file | ☐ Summary Report | |
| No | Committed criminal offense or any part of a criminal offense on school property or at a school sponsored event; | ☐ Notes to file | ☐ Summary Report | |
| No | The educator engaged in conduct that violate the assessment instrument security procedures? | ☐ Notes to file | ☐ Summary Report | |

If required, notification to SBEC by:    08/17/18    Any "Yes" response requires a report to SBEC within 7 days

If an employee resigns &/or terminated, and there is evidence that the educator:

☐ Abused or otherwise committed an unlawful act with a student or minor.

☐ Involved in a romantic relationship with or solicited or engaged in sexual contact with a student or minor.

☐ Possessed, transferred, sold or distributed a controlled substance

☐ Illegally transferred, appropriated, or expended funds or other property of the school district

☐ Attempted by fraudulent or unauthorized means to obtain or alter a professional certificate or license for the purpose of promotion or additional compensation.

☐ Committed a criminal offense or any part of a criminal offense on school property or at a school-sponsored event

☐ Engaged in conduct that violated the assessment instrument security procedures

the superintendent shall notify the State Board of Educator Certification [SBEC] no later than the seventh business day after the resignation/termination date

[Blurb for Reprimand/Exit notice]

In accordance with the Texas Administrative Code [TEC] and Texas Education Code § 21.006, the District, upon your resignation or termination, must report to the State Board of Education [SBEC] "any evidence" that the educator [insert checklist above]. As a result of the report, SBEC may sanction your teaching credentials.

Pltf. 000405

Confidential

## AISD INVESTIGATION SUMMARY REPORT

| | |
|---|---|
| Date Investigation Opened: | 8/7/18 |
| Employee Investigated: | Cole Underwood |
| Complainants(s): | • Individual communication via social media and electronic communication, possibly leading to an inappropriate relationship |
| Witness(s): | • Anonymous parent complaint to D. Vincent and Heather Blythe, AHS Cheer Sponsor |
| Investigator Name(s): | • Chris Tatum |

| Interview Timeline: | |
|---|---|
| Date | 8/7/18-8/10/18 |
| Location | Amarillo High School, ESC |
| Statements | Yes, from D. Vincent and H. Blythe |
| Reprimand | Yes |

| | |
|---|---|
| Description of the Allegation: | Cole Underwood was using social media and text messages to communicate individually with AISD students. Possibly building a romantic relationship with a former AISD student. |
| Summary of Evidence (Confirms or Denies): | No improper romantic or sexual relationship. Self-confirmed by Mr. Underwood that he did communicate individually with AISD students via electronic communication. |
| Applicable Policy: | DH (Local), (Exhibit), (Regulation) |
| Recommended Actions: | Administrative Reprimand with Directives |
| Actual Actions: | Administrative Reprimand with Directives |
| Date accuser was notified of actions: | 8/10/18 |
| Date complainant was notified of actions: | Anonymous parent not notified. H. Blyte notified of non-specific employment action. |
| Other post-investigation follow-up: | Chad Dunnam (AHS AC) will follow up with Mr. Underwood to ensure he is following AISD policy as it relates to electronic communication with students. |
| Date investigation closed: | 8/10/18 |

| Employee Certification | Yes |
|---|---|
| Employee Certification Type (check any that are current): | Teacher |
| SBEC Report: | No |
| Date: | N/A |
| CPS Report: | No |
| Date: | N/A |
| Police Report: | No |
| Date: | N/A |

Kirk Stokes came to me on Monday, January 13th to tell me of something that was discussed among a few soccer players at a dinner while they were at a tournament. Stokes stated that it was said that Coach Underwood has had students to his house and allowed drinking.

I spoke with ████████ one of the players in the conversation. She said that she had heard that two girls ██████████████, had been to Underwood's house to drink. She also stated that ███████████ had said that he had been at Coach Underwood's house to drink.

I spoke to ██████████ ██████ said that his parents had Coach Underwood stay at the ████ house while they were out of town to "babysit" ██████ last year. I asked if there was drinking during that time. ██████ said no ██████ said that Coach Underwood had also done this with ████████ ██████ said that this year Coach Underwood had the receivers over to his house for a steak dinner. He stated that Coach Bergeski was also there. I asked if there was drinking. He said no. I asked if he had any knowledge of Coach Underwood allowing students to drink at his house. He said no.

*Jammy Nash* 1/15/2020

Pltf. 000407

420

December 7, 2021

I called Andrea Pfeifer, Principal at Amarillo High School, about Cole Underwood. Andrea said that last week, both Mr. Bishop and she received an anonymous call from a blocked number. The caller indicated that Cole Underwood was in pictures on ███████████ Facebook page with students that were drinking.

Mrs. Pfeifer relayed the following information:

- She is not friends with ███████████ on Facebook, so she couldn't see any of the pictures.
- She meet with Cole about the concern.
- Cole said he was at a Thanksgiving get-together at the ██████ house.
- Cole said there were adults and students at the gathering.
- Cole said adults were drinking, but he was unaware of any students drinking.
- Cole is friends with ███████████ on Facebook and showed Mrs. Pfeifer the picture in question. Cole is shown in the picture with former student athletes that graduated in May 2021. The picture does not show any alcohol.
- Other pictures on the Facebook page from the gathering showed alcohol. Cole was not shown in any other picture and no students were shown with alcohol.
- Cole told Mrs. Pfeifer he would text ███████ and ask her to take the picture of him of her page.

Mrs. Pfeifer told me about a situation from a party at the ██████ house in May. Many offensive coaches, including Cole, were at the party. There was drinking at the party, but no students were involved. Mrs. Pfeifer said that Coach Dunnam addressed this issue with his coaching staff. Coach Dunnam told his staff they did not need to attend parties at parents of their athlete's houses. The ██████ no longer have a student at Amarillo High School.

Pltf. 000408

421



12-7-21

Cole Underwood

AP - phone call from blocked number

Bloomington call - studen indicted
at a party with underage drinking
pictures on ▮▮▮ facebook page
could not find pictures
at ▮▮▮ over Thanksgiving
kids were there
did't see underage drinking   - kids were with party
parents were drinking       parents were drinking
                            didn't drink kids drink
he pulled up picture of him with ▮
studen As that graduated in May 21 no alcohol
he texted ▮▮▮ she took picture down
Cole's engagement party 2020 at ▮▮▮  - No kids involved
party at ▮▮▮ in May
going away party for ▮▮▮
Durham told officer undes not to go to party
an parents house
Cole doesn't drin but good friend with the fam

Pltf. 000409

Doug - Chris - Karen - Camillia- _____

_____ Cole Underwood _____ has arrived

**Name**

For _____ 345 _____ appointment

**Time**

Drop In _____

Angie, Christina, Iliana, Laurie,
Paige, Paulene, Renee, Shirley, Tina, Vanessa, Vi

Pltf. 000410

Pltf. 000411

( Chris - ) Karen - David - Paige - _____

_____ Nate    Newland _____ has arrived
                    **Name**

For _____ appointment
                    **Time**

Drop In ___ 1:49p _____

Date ___ 5/17/24 _____

Angie, Christina, Eva, Jennifer,
Laurie, Paige B, Renee, Tina

424

Cole Underwood Disciplinary File

1. File Summary
2. Memo with Directives
3. AISD Policy
4. Admin Leave letter
5. AISD Policy
6. David Vincent Statement
7. Chris Tatum notes from DV phone call
8. Heather Blythe Statement
9. Notes from meeting with CT, HB, and Doug Loomis
10. Notes from meeting with CT, CU, and Camillia Johnston
11. CU statement
12. Notes from phone call from CU and DV to CT
13. Notes from meeting with CU and talking with ████████
14. Notes from phone call from CU to CT
15. AISD Statute Check
16. AISD Investigative Summary Report
17. Notes from Tammy Nash regarding alleged drinking at CU's home
18. Notes from David Manchee phone call with Andrea Pfeifer regarding an alleged party

Cole Underwood Disciplinary File Summary

8/7/2018

Parent reported to David Vincent that she overheard people at a VB game discussing Coach Underwood Snap-chatting with students. Heather Blythe reported the same thing that day.

DV reported this information to Chris Tatum. Ms. Blythe wrote a statement. HB's statement indicated: it was reported to her that CU had students on snapchat, he made uncomfortable comments to a graduated student that removed him from snapchat. HB's █████ who graduated █████ (prior to CU being hired), indicated that she received an inappropriate text from CU. HB asked CU about this and he said we was doing what the head coach wanted by contacting and building relationships with students.

12:15 PM-Doug Loomis, HB, and CT met to discuss her statement. She stated that█████████ received a friend request from CU on Snapchat, she did not respond to the request. HB indicated that after she graduated CU sent an inappropriate text to a recently graduated student █████████    HB indicated that she visited with the parents and they were taking care of it.

Talked with ████████████████    no concerns with CU.

3:45 PM-Meeting with CT, CU and Camillia Johnston. Asked CU why he uses social media and text to communicate. Snapchat is faster than text. Asked CU what he talks about in those messages-sports, life advice, working out. CU said he sent texts to ██████████ after she graduated to ask about dating. Sent some texts to her before graduation about softball and church. He texted FB players and ██. CT and CJ looked through the texts, including ██ texts and there was nothing inappropriate. CU indicated that he Snapchatted with multiple students, mostly FB players. CU showed us his Snapchat account, but we could not see any messages. He was asked if he had or had any romantic or sexual relationship with students. He stated, no, never. He was asked to write a statement then placed on Administrative Leave.

5:40 PM-CU called CT to ask if he needed to call the parents of the students we was communicating with to show he had permission to do so. CT suggested that he not do that. CU asked if he needed to call his representative. CT told CU that was up to him.

7:00 PM-Parent called David Vincent to vouch for CU.

8/8/2018

Talked to █████████ (recent graduate). She said that CU told her before she graduated that if she was already graduated, he would ask her on a date. ██ indicated she never felt uncomfortable around CU and that he wants to be everyone's friend.

1:37 PM-Call from CU to CT he indicated that he was just following expectations from his head coach.

8/10/2018

CT and DL met with CU to discuss the investigation. In the meeting we discussed that the investigation found no evidence of an inappropriate romantic or sexual relationship, however CU's communication with students by text or social media was against policy. CU received a memo with directives to

Pltf. 000413

immediately cease all electronic communication with individual students, use professional communication at all times, and complying with all rules and laws. Adverse action was not recommended, based on no evidence of an inappropriate romantic or sexual student relationship.

1. Reports only stated text or social media contact between CU and students
2. No outcry or evidence from any student or parent of any inappropriate touching
3. No outcry or evidence from any student or parent of an inappropriate romantic relationship
4. No outcry or evidence from any student or parent of an inappropriate sexual relationship
5. No outcry or evidence from any student or parent of CU solicitating an inappropriate sexual relationship
6. CU was employed with AISD until he resigned on 6/30/2022
7. There was no report of CU communicating with students by electronic communication after the memo on 8/10/2018

Report of drinking with students
On 1/15/2020 Kirk Stokes, reported that he heard students talking about CU having students at his home drinking. Tammy Nash spoke to ███████████ (one of the students who was talking about it). ██ indicated she did not see anything, but just heard that there were 2 unknown girls from Houston that were drinking at his house. ██ also stated that she heard ███████████ (football player) had been to CU's house to drink. When TN spoke to ██ he indicated that his parents set up CU to come and stay with him ██ at the ████ home while they were away. ██ stated there was no drinking.

Facebook Posts about CU at a party
On 12/7/2021 an anonymous call from a blocked number reported to Andrea Pfeifer that CU was seen in pictures on FB while at a party at ███████████ home (FB booster parent). The caller indicated that CU was in pictures with students while drinking. AP immediately met with CU. CU indicated that the party was a Thanksgiving get-together with friends and their children. AP investigated and there were no pictures of CU with alcohol, and no pictures of students with alcohol. AP indicated that CU doesn't drink, but is close friends with the ████████ CU indicated that the adults were drinking, but their children (students) were not. During the conversation CU told AP that at a family party in May where multiple AISD staff were in attendance, there was drinking by the adults, but none of their children were drinking.

Pltf. 000414

427



**KEN PAXTON**
ATTORNEY GENERAL OF TEXAS

**RECEIVED**

**MAY 1 9 2025**

WG - Irving

May 6, 2025

Ms. Leah Wingerson
Counsel for the Amarillo Independent School District
Walsh Gallegos Trevino Kyle Robinson & Roalson, P.C.
P. O. Box 460606
San Antonio, Texas 78246

OR2025-015107

Dear Ms. Wingerson:

You ask whether certain information is subject to required public disclosure under the Public Information Act (the "Act"), chapter 552 of the Government Code. Your request was assigned ID# 25-008378 (PIR ID # 00825.163.MS.021425).

The Amarillo Independent School District (the "district"), which you represent, received a request for complaints and disciplinary actions against a named employee during a specified time period. You state the district has released some information to the requestor. You claim the submitted information is excepted from disclosure under section 552.101 of the Government Code. We have considered the exception you claim and reviewed the submitted information.

Section 552.101 of the Government Code excepts from disclosure "information considered to be confidential by law, either constitutional, statutory, or by judicial decision." Gov't Code § 552.101. Section 552.101 encompasses section 21.062 of the Education Code, which provides, in relevant part, the following:

> (a) During an investigation by the commissioner for an alleged incident of misconduct, the commissioner may issue a subpoena to compel:
>
> . . .
>
> (2) the production, for inspection or copying, of relevant evidence that is located in this state.

. . .

Ms. Leah Wingerson - Page 2

> (d) All information and materials subpoenaed or compiled in connection with an investigation described by Subsection (a) are confidential and not subject to disclosure under [the Act].

Educ. Code § 21.062(a)(2), (d); *see id.* §§ 5.001(3) ("Commissioner" means the commissioner of education), 21.001(1) ("Commissioner" includes a person designated by the commissioner). You state the submitted information was subpoenaed in an investigation of an educator conducted by the Texas Education Agency (the "TEA") under section 21.062 of the Education Code. You also state, and provide documentation demonstrating, the information at issue was submitted to the TEA in response to the subpoena issued by the commissioner. Based upon these representations and our review, we conclude the district must withhold the submitted information under section 552.101 of the Government Code in conjunction with section 21.062(d) of the Education Code.

This letter ruling is limited to the particular information at issue in this request and limited to the facts as presented to us; therefore, this ruling must not be relied upon as a previous determination regarding any other information or any other circumstances.

This ruling triggers important deadlines regarding the rights and responsibilities of the governmental body and of the requestor. For more information concerning those rights and responsibilities, please visit our website at https://www.texasattorneygeneral.gov/open-government/members-public/what-expect-after-ruling-issued or call the OAG's Open Government Hotline, toll free, at (877) 673-6839. Questions concerning the allowable charges for providing public information under the Public Information Act may be directed to the Cost Rules Administrator of the OAG, toll free, at (888) 672-6787.

Sincerely,

Simone L. Nisbett
Assistant Attorney General
Open Records Division

SLN/tb

Ref:    ID# 25-008378

c:    Requestor

Pltf. 000416

429

*Amarillo Independent School District*

7200 I-40 West • Amarillo, TX 79106 • (806) 326-1420 • Fax (806) 354-4303

**Doug Loomis**
Superintendent

State Board of Educator Certification                           *Via Regular Mail and via email*
Attention: Division of Educator Investigations            *(Chris.Thornton@tea.texas.gov)*
1701 N. Congress, 5th Floor
Austin, TX 78701

Friday, August 22, 2024

Re:      Investigation of Cole Underwood Case by the Commissioner of Education

Dear Chris Thornton, Director of Investigation,

I am writing to express grave concern regarding statements purportedly made by a current or former Amarillo Independent School District (Amarillo ISD or the District) employee(s) who is believed to be or has been, a coach at Amarillo High School. These statements imply that these individuals were aware of an instance of child abuse allegedly committed by a former colleague. If these allegations are accurate and the employee failed to report the abuse, this constitutes a grave violation of both legal and ethical responsibilities.

The District has been aware of allegations against its former employee, Cole Underwood, through various media reports over the past few months. However, on August 9, 2024, a lawsuit was filed against Perryton Independent School District and Mr. Underwood, related to Mr. Underwood's alleged misconduct. With the allegations now being documented in a federal court pleading – which includes much more specificity than previously circulated in the media – I feel compelled to reach out to the Division of Educator Investigations and provide you with context and background information.

The lawsuit in question was filed in the United States District Court for the Northern District of Texas, Civil Action No. 2:24-cv-00168-Z, against Perryton ISD and Mr. Underwood. Therein, the plaintiffs make numerous allegations related to Mr. Underwood's employment with Amarillo ISD, purportedly based upon information provided by either past and/or current Amarillo ISD employees. *See* paragraphs 10-23 of the Complaint. A copy of the Complaint is attached for your review.

Amarillo ISD is closely monitoring the federal charges brought against Mr. Underwood and the emerging reports suggesting there may be additional victims. I want to unequivocally affirm that Amarillo ISD has never been, and is not currently, aware of any allegations of abuse by Mr. Underwood involving any Amarillo ISD student or minor during his tenure with the District. Furthermore, no alleged victims have come forward to the Amarillo ISD Administration.

To be clear, no Amarillo ISD employee (current or past) or any other person has ever reported to the Amarillo ISD Administration that Mr. Underwood abused any child or student or while Amarillo ISD employed him. If any educator had knowledge or suspicion of such abuse, they would have been legally required to report it to Child Protective Services (CPS) in accordance with state law and Board policy. Failure to make such a report is a crime under Texas law, and Amarillo ISD takes this matter very seriously.

*To Graduate Every Student Prepared For Life and Success Beyond High School.* Pltf. 000417

430

*Amarillo Independent School District*

7200 I-40 West • Amarillo, TX 79106 • (806) 326-1420 • Fax (806) 354-4303

**Doug Loomis**
Superintendent

We provide annual training to all our employees on their non-delegable legal duty to report any suspected child abuse.

The District treats every report of suspected child abuse with the utmost seriousness, adhering to a strict policy of thorough investigation. Had any such report been made concerning Mr. Underwood, we would have taken immediate and decisive action. However, it is important to clarify that no such report was ever made to us regarding Mr. Underwood.

In August 2018, AISD did investigate Mr. Underwood for inappropriate communication with students on social media platforms. Consistent with our policies, when an investigation involves private social media communications, particularly those that could potentially lead to misconduct or inappropriate relationships, we place the employee on leave as a precautionary measure.

In this specific case, our investigation found no evidence of abuse. Following the investigation, Mr. Underwood was reinstated with explicit and stern directives regarding future conduct to ensure the continued safety and well-being of our students. The District remains committed to maintaining a safe environment for all students, taking necessary precautions, and responding appropriately to any concerns that arise.

Given the seriousness of the statements contained in the lawsuit and out of an abundance of caution, I decided to bring these developments to the attention of the Division of Educator Investigations. It is essential to ensure that any individual who may have known of potential abuse has fulfilled their legal obligation to report it. The safety and well-being of our students depend on unwavering compliance with these critical reporting requirements, and all educators must be consistently held to the highest standards of conduct.

Thank you for your prompt attention to this serious matter. The AISD team is available to provide any additional information or clarification that may be necessary.

Sincerely,

Doug Loomis, Superintendent
Amarillo Independent School District

Encl.    US District Court |Northern District of Texas, Civil Action No. 2:24-cv-00168-Z, against Perryton ISD and Mr. Underwood

cc:      Mr. Chris Tatum, Chief Human Resources Officer
         Mr. Doyle Corder, AISD Board of Trustees | President
         Mrs. Andrea Slater Gulley, Esq.

*To Graduate Every Student Prepared For Life and Success Beyond High School* Ptf. 000418

431

# Exhibit 16

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

S.J., a Parent, Conservator,     )
and Next Friend of N.J.,         )
        Plaintiff,               )
                                 )
vs.                              )        Case No. 2:24-CV-00168-Z
                                 )
PERRYTON INDEPENDENT SCHOOL      )
DISTRICT, and                    )
                                 )
COLE UNDERWOOD, Individually     )
and in his official capacity as  )
Athletic Director of Perryton    )
ISD,                             )
        Defendants.              )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VIDEOTAPED AND ORAL DEPOSITION OF

SANDI WHEELER

HAD ON THE

24TH DAY OF SEPTEMBER, 2025

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

WORD FOR WORD REPORTING, L.L.C
620 NORTH ROBINSON, SUITE 202
OKLAHOMA CITY, OKLAHOMA 73102
(405)232-9673

REPORTED BY:  DARLA RILEY, CSR

APPEARANCES


FOR THE PLAINTIFF:

Mr. Tyler L. Gentry
Mr. Kyle Goodwin
GOODWIN LEWIS, PLLC
420 Northwest 6th Street, Second Floor
Oklahoma City, Oklahoma   73102
(405) 900-5700


FOR THE DEFENDANT, PERRYTON INDEPENDENT SCHOOL DISTRICT:

Mr. Slater Elza
UNDERWOOD LAW FIRM
Post Office Box 9158
Amarillo, Texas   79105
(806) 376-5613
(806) 379-0316 FAX



Also Present:  Mr. ████████ ████████

Mr. Brad Snyder, Videographer

Q    Do you believe in your capacity as the junior principal that you acted reasonably with respect to the ▮▮▮▮ ▮▮▮▮ Cole Underwood situation?

A    Yes, I do.

Q    Do you believe that there's anything that you could have done better?

A    Yes, I do.

Q    Like what?

A    I should have shared with Ms. Little and Mr. Brown when concerns were mentioned or when it was brought to my attention that it was a concern, I guess.

Q    So you would agree with me that you failed to share certain information with Tori Little and Greg Brown, correct?

A    Yes.

Q    How often did you do that?

A    How often did I fail?

Q    Sure.  How often did you fail to share information with them?  How many times?

A    Three or four.

Q    Okay.  Tell me about each of these.  What's the first one?

A    Each of those?

Q    Sure.  You understand that we are going to be in here for probably --

A    Yes.  I got you.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Sandi Wheeler 09/24/2025                                              Page 11

Q    -- a good portion of the morning?

A    I am good.

Q    Correct?

A    Yes.

Q    Okay.  Fire away.

A    So -- so what -- what I would say is when Cole brought it to my attention that there was a concern regarding he and Nat I should have said something to Tori, that he had mentioned it to me.

Q    When did he bring it to your attention?

A    I would say probably December of 2023.

Q    Okay.  Give me another instance where you failed to share information with Tori Little or Greg Brown.

A    When he brought it to my attention that he was being discussed in a public -- at a public place regarding a situation that, it was -- somebody was talking about the situation.  And I should have brought it to Tori's attention that -- that the rumors were still happening.

Q    Where was that?

A    At the -- the Spot or the bar, or Smoke House -- the bar is what he mentioned it as.

Q    Okay.  And who was there?  Who was talking about it?

A    Well, actually ▉▉▉▉ was telling Cole that it was being discussed.

Q    Okay.  Who was discussing it?

A    Daria Walsh.

Q    Okay.   That's two.   What's another instance where you failed to share information with Tori Little or Greg Brown?

A    Well, I -- I was in the car with Tori, so it wouldn't have been failing to share it with Tori, but an administrator from another district had called to bring the issue to Tori's attention.   And I should have said something to Mr. Brown regarding that situation.

Q    With this the phone call from Delma Habethur?

A    Yes.

Q    And she was the principal at Gruver, correct?

A    Yes.   And still is.

Q    And you all both, as I understand it, both you and Ms. Little failed to tell Mr. Brown about that report, correct?

A    I don't know what Ms. Little did.

Q    Okay.   But you didn't?

A    Correct.

Q    Was it your understanding that she was not going to tell Ms. -- Ms. -- Mr. Brown?

A    Yes.

Q    Any others?

A    No.

Q    Okay.

A    Not that I recall.

that if you were responsible that the school is ultimately responsible?

MR. ELZA: Objection, form.

A   No.

Q   (By Mr. Gentry)  So if you as an administrator have liability, have some responsibility in this situation, you don't believe that that translates to liability for the school?

MR. ELZA: Objection, form.

A   It does according to policy.

Q   Right. Do you believe that you violated Perryton ISD policies in this case?

A   No.

Q   Let me ask it a different way.

A   Okay.

Q   Do you believe that you have violated Perryton ISD policies by virtue of failing to share information with Tori Little or Greg Brown?

A   Yes.

Q   So your first answer was incorrect, right?

A   Yes.

Q   Are you going to be honest with me today?

A   Yes.

MR. ELZA: Objection, form.

Q   (By Mr. Gentry)  Okay. And I am not going to go through

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Sandi Wheeler 09/24/2025                                        Page 17

A    I guess I am not following what the -- what is the question?

Q    Apparently this school received upwards of 22 reports, suspicions, complaints, whatever you want to call them, yet despite that over approximately two semesters he was never put on formal leave.  Do you have an issue with that?

        MR. ELZA:  Objection, form.

A    Yes.

Q    (By Mr. Gentry)  Why?

A    The -- well, honestly, I didn't do the investigations.  I don't know what the reports were.  I don't know who they were made to.  That's not my lane.  It wasn't my campus.  I am not a district administrator.  I don't have any position in that.

Q    Well, I mean, from the outside looking in, let's put you in that lane.  From the outside looking in, if you were in that position and had received those reports, would you have put him on leave?

        MR. ELZA:  Objection, form.

A    Leave for investigation, yes.

Q    (By Mr. Gentry)  Okay.  So we learned yesterday that in and around this time there was another teacher that was put on leave following a suspension of an inappropriate Snapchat photo to a student.  Do you know anything about that?

        MR. ELZA:  Objection, form.  Misstates the evidence.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Sandi Wheeler 09/24/2025                                                    Page 19

MR. ELZA: Yes.

THE REPORTER: Okay. Thank you.

Q    (By Mr. Gentry) Now, despite these reports over a period of two semesters, ███████  ███████ was courted and groomed by Underwood and then repeatedly raped for months. How does that happen?

MR. ELZA: Objection, form.

A    I don't know. I am not a pedophile. I don't know how that happens.

Q    (By Mr. Gentry) You would agree with me that it was going on right under your nose while you were having repeated communications with him during this time?

A    Yes, I would agree to that.

Q    You would agree with me that those incidents happened at the school, correct? Or at least some of them.

A    I am not aware of where they happened specifically. Again, it didn't happen on my campus, as far as I know.

Q    How do you think the school is going to defend that fact before a jury?

MR. ELZA: Objection, form.

A    I don't know.

Q    (By Mr. Gentry) I don't either.

MR. ELZA: Object to the sidebar comments.

Q    (By Mr. Gentry) What is your understanding of Perryton ISD's Title 9 policy?

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Sandi Wheeler 09/24/2025                                    Page 20

A      That it is aligned with the State of Texas Title 9 policy.

Q      Which is what?

A      That it is to report abuse and sexual indiscretions and that we will have the same number of sports for girls as we do for boys.  Title 9 encompasses a lot of -- a lot of things.

Q      Do you think that the school violated Title 9 policy in this case?

       MR. ELZA:  Objection, form.

A      Yes.

Q      As a result of that violation a young girl was raped under this school's watch, correct?

       MR. ELZA:  Objection, form.

A      I wouldn't say it was under our watch.  We didn't watch it happen.

Q      (By Mr. Gentry)  Let me ask you again, do you think the school did everything they should have to stop that?

A      No.

Q      There were some questions asked of Greg Brown yesterday about things he could have done better.  And he said in hindsight you can always do things better.  And I certainly agree with that.  But one think he mentioned was that they could have -- or you-all could have followed or watched Cole more closely.  Do you agree with that?

A      Yes.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Sandi Wheeler 09/24/2025                                          Page 28

Q    Do you feel like she would have more liability than --
than you, for example?

MR. ELZA:  Objection, form.

A    Yes.

Q    (By Mr. Gentry)  Are you aware of any times that --
outside of the Ms. Habethur complaint, that she received
information that she did not forward on to Mr. Brown?

A    No.

Q    Okay.  Now, based on this hierarchy, you would agree with
me that per policy if you or Ms. Little or Mr. Underwood
received complaints, those are supposed to run up the chain
towards the superintendent, right?

A    Yes.

Q    Okay.  I think we have already established that at times
that did not occur in this case, correct?

A    Yes.

Q    If you will go to -- let me make sure I give you the
right one here.  I was super organized when we started.  108
for me.  This is a policy identified as DH Local.  Is that the
one that you are on?

(Plaintiff's Exhibit No. 108 was
introduced and made a part of the
record.)

A    Yes, sir.

Q    It starts there at the top.  Each district employee shall

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Sandi Wheeler 09/24/2025                                              Page 29

perform his or her duties in accordance with state and federal law, district policy, and ethical standards. And do you agree with that?

A    Yes.

Q    And during the time period in question in this case, do you think you performed your duties in accordance with state and federal law and district policy and ethical standards?

       MR. ELZA: Objection, form.

A    No.

Q    (By Mr. Gentry) I believe we can both agree that Mr. Underwood certainly didn't perform his duties in accordance, correct?

A    Yes.

Q    What about Ms. Little? Did she perform her duties in accordance with state and federal law and district policy and ethical standards?

A    I don't believe so, no.

Q    What about Mr. Brown?

A    I believe he acted on what he knew.

Q    Well, based on what he knew, do you think that he performed his duties in accordance with state and federal law and district policy and ethical standards?

       MR. ELZA: Objection, form.

A    Yes.

Q    (By Mr. Gentry) Is there some reason why it took you so

improper electronic communication with the employee. So you would agree with me that you violated that policy, is that correct?

A    Yes.

Q    Is that with respect to Mr. Underwood?

A    Yes.

Q    And again, had you made that report, for example, you would agree with me that that's just additional evidence that Mr. Brown could have taken into consideration in his investigation, correct?

A    I wasn't aware of Coach Underwood's Snapchats with anyone besides the varsity -- the football team. That -- that was the Snapchat group I was aware of.

Q    Okay. Does it matter who -- who it was with --

A    No.

Q    -- if it's in violation of policy?

A    No.

Q    It might be a good indication to, for example, check the phone or try to pull those Snapchats, for example?

        MR. ELZA:  Objection, form.

A    Yes.

Q    (By Mr. Gentry)  Okay. Were you aware that that was something that Amarillo ISD ultimately did when they did an investigation to a similar complaint with respect to Mr. Underwood?

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Sandi Wheeler 09/24/2025

Page 39

Q    And does Perryton have a policy that addresses and does that?

A    Yes.

Q    Is that, for example, what we might be referencing when we talk about like a Title 9 policy?

A    Yes.

Q    It provides there at the bottom, duty to report.  Do you see that?

A    Yes.

Q    What do you believe report means?

A    Report means to tell.

Q    Tell who?

A    A supervisor.  Or if it's regarding abuse, we are required to contact CPS.

Q    Who is CPS?

A    Child Protective Services.

Q    Are you required to tell anyone else, like law enforcement, for example?

A    Yes.

Q    And that is ultimately so that they can assist in a corresponding investigation, correct?

A    Yes.

Q    Do you think that everything was properly reported in this case?

A    No.

Q    Yeah, I mean, there's -- if I understand it right, there's some signatures.  Have you signed this before?

A    Yes.

Q    And you signed it without reading it?

A    Yes.

Q    We have got testimony from several witnesses, teachers and coaches and things in this case that provide that the same thing is the case for the employee handbook.  They may be given a copy of it, they sign it, and no one reads it.

        MR. ELZA:  Objection, form.

Q    (By Mr. Gentry)  Is that your general understanding?

        MR. ELZA:  Objection, form.  Sorry.

A    Yes.

Q    (By Mr. Gentry)  That's just kind of the typical procedure, right?

A    Yes.

Q    There's no specific training, for example, that's provided where you walk through that handbook and make sure everyone is reading it, correct?

A    Correct.

Q    Okay.  This travel policy, players will travel to and from games on the team bus.  Some exceptions will be made when based on a common sense decision and necessity, not just what to do.  And it goes onto provide it looks like a couple of different instances where a child may be released from

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Sandi Wheeler 09/24/2025                                    Page 66

that?

A    No.

Q    Would it surprise you to learn that Greg Brown was unaware of those issues that he had at AISD?

A    No.

        MR. ELZA:  Objection, form.

Q    (By Mr. Gentry)  Do you think that he should have been aware of those issues that Cole had at AISD?

        MR. ELZA:  Objection, form.

A    Greg Brown didn't hire Cole.

Q    (By Mr. Gentry)  That's correct.  Mr. Morales did, correct?

A    Yes.

Q    Let's assume Mr. Morales testifies that he did not know about those things.  Do you think that that's appropriate?

        MR. ELZA:  Objection, form.

A    No.

Q    (By Mr. Gentry)  If an administrator within the district knew about some of those things and failed to disclose those to the hiring authority, do you think that that's a problem?

A    Yes.

Q    Okay.  Let's very briefly look at some of that.  If you will go to Exhibit 15 for me in that stack.  Have you seen any documents from Amarillo ISD regarding Cole Underwood?

        (Plaintiff's Exhibit No. 15 was

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Sandi Wheeler 09/24/2025

Page 65

point.

Q    Is he aware that you feel like you have some liability in this case?

A    Yes.

        MR. ELZA:  Objection, form.

Q    (By Mr. Gentry)  Is he aware that you feel like the school has some liability in this case?

A    Yes.

Q    And you are going to tell the jury that too, aren't you?

        MR. ELZA:  Objection, form.

Q    (By Mr. Gentry)  Correct?

A    Is this going to court?

Q    If it does, you are ultimately going to tell the jury that the school has liability, correct?

        MR. ELZA:  Objection, form.

A    Yes.

Q    (By Mr. Gentry)  Meaning you are not going to change your answers, are you?

A    Well, no.

Q    Okay.  What did you know about Cole before he started at Perryton ISD?

A    I knew that he had coached baseball at Amarillo High and that they had made the playoffs.

Q    Had you heard anything about any of his -- we'll say personal issues or getting in trouble at AISD or anything like

that?

A    No.

Q    Would it surprise you to learn that Greg Brown was unaware of those issues that he had at AISD?

A    No.

        MR. ELZA:  Objection, form.

Q    (By Mr. Gentry)  Do you think that he should have been aware of those issues that Cole had at AISD?

        MR. ELZA:  Objection, form.

A    Greg Brown didn't hire Cole.

Q    (By Mr. Gentry)  That's correct.  Mr. Morales did, correct?

A    Yes.

Q    Let's assume Mr. Morales testifies that he did not know about those things.  Do you think that that's appropriate?

        MR. ELZA:  Objection, form.

A    No.

Q    (By Mr. Gentry)  If an administrator within the district knew about some of those things and failed to disclose those to the hiring authority, do you think that that's a problem?

A    Yes.

Q    Okay.  Let's very briefly look at some of that.  If you will go to Exhibit 15 for me in that stack.  Have you seen any documents from Amarillo ISD regarding Cole Underwood?

        (Plaintiff's Exhibit No. 15 was

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Sandi Wheeler 09/24/2025                                                    Page 72

of the superintendent.  This issue is going on through the fall of '23 and spring '24 semester while it is subject to a lawsuit for, while not an identical issue, the same Title 9-type issue.  That case settles, and the next day we magically discover that Cole has done all these things.  Is that not odd to you?

MR. ELZA:  Objection, form.

A    I wasn't aware of that timeline.

Q    Okay.  If you will look at 13 for me.  This is just one of many news articles that we pulled in our research of these issues out there in the Texas panhandle.  And I'll just tell you, it describes a host of similar incidences between teachers and coaches having inappropriate relationships with students in the Texas Panhandle.  Is that fair enough?

(Plaintiff's Exhibit No. 13 was
introduced and made a part of the
record.)

MR. ELZA:  Objection, form.

A    Yes.

Q    (By Mr. Gentry)  The first one on this list, David Drew, Perryton high school, accused of having an inappropriate relationship with a 17-year-old female student.  Do you know anything about that?

A    I do not.  I mean, I am aware of the -- the again, rumors or -- but I was not on that campus.  I am not the

Presumably Tori Little then could look at high school stuff?

A    That's my understanding.

Q    And Greg Brown could probably look at all stuff as the superintendent?

A    I would assume that's why we use it, yes.

Q    If there were allegations as we have here in the fall of '23 and spring '24 semester certainly regarding inappropriate communications amongst a coach and a student, would you agree with me that one of the easiest things that could have been done was to just look at ParentSquare communications?

        MR. ELZA:  Objection, form.

A    Yes.

Q    (By Mr. Gentry)  How easy is it -- let's just say this was your -- your coach.

A    Uh-huh.

Q    A middle school coach --

A    Uh-huh.

Q    -- and a student.  How easy is it for you to look at communications between these two individuals?

A    It -- it takes a little bit of time.  It takes a little bit of clicking around to get to that spot.  But, I mean, and again, until you have a reason to look at it.  I'm not saying we didn't, but until you have a reason to look at it I didn't even know we could do that.  I thought it was a district, like they were able to do it but we as campus were not.

Q     Would you agree with me that in this case we had a lot of reasons to look at it?

A     Yes.

          MR. ELZA:  Objection, form.

Q     (By Mr. Gentry)  Let's look at Exhibit 36 in front of you.

          (Plaintiff's Exhibit No. 36 was
          introduced and made a part of the
          record.)

          MR. ELZA:  I'm sorry.  Say that again.

          MR. GENTRY:  36.

Q     (By Mr. Gentry)  You've got that?

A     Yes.

Q     These are what have been produced to us as those ParentSquare communications between Cole Underwood and ███████  █████ in the time that's at issue.  Fair enough?

A     I haven't seen them.  I --

Q     Take a minute and look at them.

A     Okay.  Okay.

Q     Are you ready?

A     Yep.

Q     Okay.  So these appear to be communications between Cole Underwood and ████████ ███████ certainly available to administrators through ParentSquare from approximately December 7th, 2023, it looks like, until April the 21st, 2024,

A    He is our head basket-- girl's basketball coach.

Q    Have you ever had any conversations with Ryan about any of these issues?

A    Yes.

Q    And what have those been?

A    It was following -- it was when Cole was put on leave. He did say -- I mean, he just came in and said that Mr. Brown had made him the new athletic director -- or the interim athletic director.  We called -- we spoke with Cole on the phone that day.  But as far as specifics to ▮▮▮▮ and Cole, no.

Q    Okay.  You didn't have any conversations with Ryan about like, for example, any of these things that he's telling Greg Brown in these notes?

A    Ryan told me that day that he had reported Cole in November.

Q    Okay.  Do you know what he reported in November -- I presume that's November of '23, right?

A    Yes.  He just told me that he reported that there was -- that he was suspicious of -- I don't remember his exact words. Just that -- that he thought they were -- there was a closeness there or something.

Q    Okay.  He had an issue with it?

A    Yes.

Q    Okay.

there are messages that predates December 3rd of 2023?

A   Yes.

Q   Are you still in possession of those?

A   No.

Q   Okay.  Let's just look at the ones we got.  Just right here at the bottom.  You are in the blue or green and Cole is the gray in these messages, right?

A   Yes.

Q   Okay.  As early as December 3rd, has Greg ever asked you or mentioned to you coaches using Snapchat to communicate with teams?  It goes on to provide earlier this semester I met with him to discuss this and he doesn't want it used.  And then you ultimately respond, correct?

A   Yes.

Q   Let's just start there.

A   Okay.

Q   We talked about all of these Snapchat issues that he had at Amarillo ISD.  Your response to these questions going forward, had you known those things prior to this conversation do you think it would have affected how you responded to him?

A   Absolutely.

Q   Okay.  And it looks like your responses here indicate that you don't have an issue with Snapchat, is that right?

A   I don't have an issue with Snapchat being used appropriately; however, my concern was that I knew there was a

varsity football Snapchat without Cole and one with Cole. And I would prefer that he see what the boys are talking about as a group rather than not. It wasn't necessarily the platform. It could have been a text group. It could have been a Facebook message group. It -- it -- any type of ParentSquare, could have been that.

I don't want -- I am very cautious with my child regarding his communication on-line because I don't want it to jeopardize his future, and we have discussions about that regularly. And my comment was I would rather you be in the group than not.

Q    I think we determined earlier that regardless of appropriateness, district policy does not permit him to communicate with students via Snapchat for any reason.

A    Agree.

Q    Why -- why no mention of that in here to him?

A    I wasn't his boss.

Q    In these communications with him you're not acting as any kind of co-employee, this is all just friendly stuff?

A    Uh-huh.

Q    Do I understand that right?

A    Yes.

Q    And we are to going to be referencing --

A    And I am a mom, and he's a coach of my child.

Q    Okay. And we are going to be referencing these Bates

or something to that effect. I wasn't at the track meet. I don't know.

Q  Okay.

A  But -- but it was -- it was something about Zoe's shorts.

Q  What is Zoe's full name?

A  Oh...

Q  Is it Zoe Salazar?

A  Yes.

Q  Okay. Okay. And if you will turn the page for me, looks like we are still here on January 1. You are asking, did your parents leave satisfied? And he responds, I felt like yes, Estradas. Who are the Estradas?

A  That would be Cristie and Carlos Estrada. They are parents of a student.

Q  Who is their student?

A  Gordo Estrada.

Q  And he's saying it looks like the Estradas are pissed. I addressed the team about shit being said about me and ▇▇▇▇

▇▇▇▇  Do you see that?

A  Yes.

Q  Is this what we talked about earlier, about him addressing the team?

A  Yes.

Q  And that whole retaliation issue?

A  Uh-huh.

Q    Do you know how that meeting between him and these kids went?

A    I know his side of it.  He said he went into the locker room and told the boys not to -- not to be talking about it anymore, that wasn't true, to shut it down.  My thoughts on it were that I didn't want them talking about ████████

Q    Are you aware that he was repeatedly cussing at them over and over and screaming at them and things like that?

A    No.

Q    Okay.  Did you take this issue about him addressing these concerns directly with these boys to Greg Brown after you discovered it?

A    I did not.

Q    Do you think you should have?

A    Yes.

Q    If you would have known some of the things you know now about Cole and his history at AISD would that have affected how you responded to this incident?

A    Absolutely.

Q    Okay.  Do you think it would have affected Greg Brown's response?

A    Yes.

Q    If we flip the page it looks like we are now into January 8th and there's some discussion here where Cole mentions Ryan Daugherty.  Daugherty called him yesterday and told him he

wanted to be a voice to squash the rumors. Is that in reference to the rumors between he and ▓▓▓▓▓

MR. ELZA: Objection, form.

A   You could assume.

Q   (By Mr. Gentry) Okay. What did you think in January 8th? Were you aware of these rumors between Cole and ▓▓▓▓▓

A   Only what Cole told me.

Q   And had you reported what Cole told you about these rumors to Greg Brown?

A   No.

Q   And you would agree with me you should have, correct?

A   Yes.

Q   And that was, I think, the first example you gave me of Cole bringing things to your attention that you failed to share with Greg Brown. Is this one of those examples?

A   Yes.

Q   Okay. At this point in time did you ever ask anyone else about these rumors.

A   I asked my son.

Q   And what did he have to say about it?

A   He said kids talk. He said I...

Q   Did he tell you that kids were talking about Cole and ▓▓▓▓▓

A   He told me Evan said something.

Q   And did you report that to Craig -- or to Greg Brown?

A    No.

Q    So that would be an additional thing that you failed to share that we didn't identify earlier, right?

MR. ELZA:  Objection, form.

A    Yes.

Q    (By Mr. Gentry)  Okay.  Who is Evan?

A    Evan Hernandez.  He was a student at the high school.

Q    How old is your boy at this time?

A    He was a jun-- he was a sophomore.

Q    What about Evan?

A    I believe he was a junior or senior.  A senior.

Q    Ms. Habethur has some interesting comments in her perception of these issues.  And one of them is she finds it very odd that these older boys who don't have anything to do with ███████ are so interested in the relationship between ███████ and Cole.  Do you also find that odd?

MR. ELZA:  Objection, form.

A    No.  It's -- it's high school.  They are all there together in the building.  I -- I don't know anything about that.  I know that I encouraged a relationship between my child and ███████ because I think ███████ is an amazing young woman, and I wanted my son to date her.  That's --

Q    Well, let's --

A    -- where that conversation would go often.

Q    Let me ask it a different way.  I played high school

Klafka not mattering. (Inaudible), you are a piece of shit if you win. Be a winner. I think that's probably...

A    That was in reference to athletic and -- and the fact that Klafka is less than stellar in my opinion as a human and as a coach. However, when his teams win, people hire coaches who win.

Q    Okay.

A    Sometimes regardless of their attitudes or personalities or how they treat others. So that was -- that was in regards to coaching.

Q    Okay. Keep flipping a couple of pages for me to this kind of long text from Cole. He mentions kind of there in the middle just let me know if you hear anything. That's again him asking you for information that you are privy to, right?

A    I suppose.

Q    Do you see now the issue with telling the alleged perpetrator information that you receive about him?

A    Yes.

Q    Okay. Were you talking to Tori Little about any of these allegations at this time?

A    No. I -- well, I spoke to her the day Delma called her. That was the only conversation I recall having with her about the situation.

Q    What did you talk with her about?

A    I just talked to her after she got off the phone with

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Sandi Wheeler 09/24/2025

Page 138

Delma. I said is there evidence? Have we -- you know, do you believe Cole? And she said yes. I was -- I investigated, and I didn't find anything.

Q    Who investigated?

A    Tori said she did.

Q    Tori Little apparently did her own investigation?

A    As far as I know.

Q    Do you think if she did that that would be, for example, in his employment file?

A    I think it should be.

        MR. ELZA:  Objection, form.

A    I don't know if it is or not.

Q    (By Mr. Gentry)  Then lastly here, this conversation with Ms. Habethur that you were privy to, can you tell me what she told Tori Little?

A    Not word-for-word, no. When Tori --

Q    In your best recollection?

A    Tori spoke to her on the phone. She did not have it on speaker. It was -- we were driving in a noisy school van, so I couldn't hear what Delma said. But what I understood it was Delma said a coach who used to work at Perryton reported to her that there were concerns regarding Cole's relationship with ███████ ███████

Q    So a coach made some reports to her and that was something that bothered her?

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Sandi Wheeler 09/24/2025                                                    Page 139

A      That Delma felt --

           MR. ELZA:  Objection, form.

A      -- that Tori needed to know.

Q      (By Mr. Gentry)  What about the boys at the track meet that made several disclosures to her?  Do you remember any of that?

A      I don't know anything about that.

Q      What about her observations of Cole and ▮▮▮▮ at the Christmas basketball tournament?

A      I don't know anything about her conversations about that either.

Q      If a school administrator from another district calls and makes a report to a school administrator at your district, would you agree with me that it has become a pretty big deal at that point?

           MR. ELZA:  Objection, form.

A      Yes.

Q      (By Mr. Gentry)  And that that report is something that should have been taken seriously?

A      Yes.

Q      Any idea why there is not a single write up about that report anywhere?

           MR. ELZA:  Objection, form.

A      No idea.  Again, he wasn't my employee, so it wasn't my -- I am not privy to his file.

Q   (By Mr. Gentry)  I think you told Cole in the text messages it's your understanding that Tori Little was not going to tell Greg Brown about that.

A   Right.  But Tori and I didn't have a conversation about it.  I just didn't know why Tori would tell him if they had already -- my understanding was Tori had already investigated and it was...

Q   Yeah, but this is a subsequent report from an administrator, correct?

A   Yes.

MR. ELZA:  Objection, form.

Q   (By Mr. Gentry)  I mean, it doesn't get any bigger than that, does it?

MR. ELZA:  Objection, form.

A   Well, it can get bigger than that, I am sure.

Q   (By Mr. Gentry)  Well, I mean, from an administrator to an administrator, she's got the same understanding, for example, of Title 9 that you guys would, right?

MR. ELZA:  Objection, form.

A   She should, yes.

Q   (By Mr. Gentry)  That a parent might not have?

MR. ELZA:  Objection, form.

A   Yes.

Q   (By Mr. Gentry)  And I know from the deposition yesterday it's been unclear whether Ms. Little actually told him or not.

Regardless, no one ever follows up with Ms. Habethur, certainly not Greg Brown about these accusations. Do you find that odd?

MR. ELZA: Objection, form.

A    I wasn't aware. I -- I am not aware of conversations between Mr. Brown and Ms. Habethur.

Q    If you are the superintendent and someone comes to you with -- with all of these allegations, do you think it would be a reasonable thing to pick the phone up and call the administrator and get to the bottom of it?

MR. ELZA: Objection, form.

A    Yes. I don't -- I don't know if that happened or not.

Q    (By Mr. Gentry) I am just -- I am just telling you, you do that?

A    Yes.

Q    Okay. And if I understand it right, she told Ms. Little that these boys who she used to teach had come to her because they were in fear of retaliation from Cole Underwood if they took it to Perryton ISD. Do you remember any of that?

MR. ELZA: Objection, form.

A    No.

Q    Last few things here. There's a lot of comments from Cole in these text messages where he's asking you about meetings that he sees on the calendar like between Greg, Tori, and Donna. Why -- what -- what is he -- how does he have

465

# Exhibit 17

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| S.J., a Parent, Conservator, and Next Friend of N.J., Plaintiff, | ) ) ) ) |
| vs. | ) Case No. 2:24-CV-00168-Z ) |
| PERRYTON INDEPENDENT SCHOOL DISTRICT, and | ) ) ) |
| COLE UNDERWOOD, Individually and in his official capacity as Athletic Director of Perryton ISD, Defendants. | ) ) ) ) ) |

*********************************************

ORAL DEPOSITION OF

KURT HABERTHUR

HAD ON THE

5TH DAY OF JANUARY, 2026

*********************************************

WORD FOR WORD REPORTING, L.L.C
620 NORTH ROBINSON, SUITE 202
OKLAHOMA CITY, OKLAHOMA 73102
(405)232-9673

REPORTED BY:  DARLA RILEY, CSR

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Kurt Haberthur 01/05/2026

Page 2

APPEARANCES


FOR THE PLAINTIFF:

Mr. Tyler Gentry
GOODWIN LEWIS, PLLC
420 Northwest 6th Street, Second Floor
Oklahoma City, Oklahoma  73102
(405) 900-5700


FOR THE DEFENDANT, PERRYTON INDEPENDENT SCHOOL DISTRICT:

Mr. Slater Elza
UNDERWOOD LAW FIRM
Post Office Box 9158
Amarillo, Texas  79105
(806) 376-5613
(806) 379-0316 FAX

March of 2011. And went back to Sunray. I was there from 2011 to 2017 -- I'm sorry. It would have been the spring of 2018.

Q    Okay.

A    You understand I am doing teacher contracts in there.

Q    Sure. Sure.

A    And then I went to Amarillo High, the fall of -- so I was there from say, June of 2018 until March of 2020.

Q    Okay.

A    Then I came to Perryton March of 2020. And I left May, I guess, May of '23. And I've been in Gruver ever since.

Q    Is Gruver also where your wife currently is?

A    Yes, sir.

Q    And what is your role or title there at Gruver?

A    Athletic director and head football coach.

Q    What A is Gruver?

A    2A.

Q    My Hamilton Bulldogs just won the 2A state --

A    They did. Congratulations.

Q    There we go. My alma mater. The first one ever. Not so good when I played there. And when you were at Perryton what was your title or role?

A    Athletic director, head football coach.

Q    And when you were at Amarillo what was your title or role?

MR. ELZA:  Yeah.  Ignore me.

THE WITNESS:  Okay.

A     I would say if it -- if it were my family, I would probably be doing the same thing.

Q     (By Mr. Gentry)  Right.  Let's for example, if this was your daughter, do you think it's something you would do too?

A     Yes, sir.

Q     Okay.  And why is that?

A     I don't know if retribution is the right word, but try to make something right out -- out of a wrong.

Q     Do you think a wrong occurred?

A     I do.

Q     Do you think that Perryton ISD and its administration did something wrong in this case?

A     I don't think necessarily, no.

Q     When you say wrong, who did something wrong?

A     Cole Underwood.

Q     We'll come back to that.  I want to jump back to your time at Amarillo.  While you were at Amarillo did you work with Cole?

A     I did.

Q     Okay.  In what capacity?

A     We were coworkers.  He was also a football coach.

Q     And what did you think about him when you worked with him at Amarillo?

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Kurt Haberthur 01/05/2026                                                Page 13

A    I thought he was a hard worker, a good young coach.

Q    Ever observe any issues that he might have had with young girls, for example?

A    No.

Q    We spoke to some various teachers and coaches at Amarillo, and it seems like the consensus -- consensus among them was that his nickname amongst the Amarillo coaching staff was the perv or pedo.  Do you recall any of that?

        MR. ELZA:  Objection, form.

A    I do not.

Q    (By Mr. Gentry)  Okay.  So there was nothing that you saw with respect to your time at Amarillo that caused you any concern about Cole Underwood?

A    No.

Q    Are you aware of whether or not anyone else at Amarillo had any concerns about Cole Underwood?

A    Yes.

Q    Who would to be?

A    Kori Clements.

Q    And we spoke to her. I think I know where we are going on this.  But what was your understanding of what her concerns were?

A    Well, she never said this to me, but through the grapevine or whatever --

Q    Okay.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Kurt Haberthur 01/05/2026                                        Page 14

A    -- that he was maybe talking to some of her players. I never heard any of that from her mouth.

Q    Okay. But it was your understanding that she took some kind of issue with Cole relative to his involvement with her players?

A    Yes.

Q    That was nothing -- or that was never something, though, that you observed?

A    Never observed.

Q    Okay. What about while he was at Perryton? Did you ever notice anything that might cause you concern about his interactions with female athletes?

A    While I was at Perryton?

Q    Yes.

A    No.

Q    Okay. Did you ever observe, for example, him having close relationships with female athletes?

A    No.

Q    Okay. Anything else that you know about what Kori Clements might have had concerns about relative to Cole?

A    No, sir.

Q    Are you aware of anyone else at Amarillo ISD that might have had concerns about Cole?

A    No.

Q    Okay. I believe in your interview with our private

investigator you mentioned being unaware of complaints against Cole while in Amarillo but for those concerns that Kori Clements had, correct?

A    Say that again.  I'm sorry.

Q    Sure.  You were asked by the private investigator about what complaints you were aware of against Cole.  You mentioned two things.  One, the concerns that Kori Clements had.  Which we just talked about, correct?

A    Okay.

Q    Then a period of administrative leave he was put on maybe sometime in 2019.

A    It was either '18 or '19.  I can't...

Q    Okay.

A    I think even I told him I could not remember if it was my first year there or my second year there.

Q    Okay.  What do you know about this period of administrative leave?

A    Okay.  So we were -- that was during the football season. So obviously, we are very busy, game planning, practice, whatnot.  And then Cole was absent, not around.  And our boss, the head football coach, Chad Dunnam, told us that he was put on administrative leave, and that's all he could tell us at that -- at that point.

Q    Did he ever tell you why?

A    I did ask him whenever I was in the process of

Q    And the superintendent at that time would be Mireles?

A    James Mireles, yes, sir.

Q    Was James Mireles involved in the interview or hiring process for Cole before the recommendation?

A    He talked to him in his office, I believe.  He typically talked to them.

Q    And then would you have had discussions with Mireles about Cole as well?

A    Yes.

Q    Do you recall what those discussions were?

A    I do not.  I mean, it would have been along the lines of do you think he'll be good.

Q    Okay.  Do you know what Mireles did of his own volition relative to Cole's hiring?

A    No.

Q    You don't know of any calls he made or anything like that?

A    I do not.

Q    Okay.  Outside of your call to Chad Dunnam, what else did you do relative to the hiring of Cole?

A    I mean, as far as resume or whatnot?

Q    Yeah.  Just -- just you called Chad Dunnam.  I presume you would have looked at his resume.  What -- what do you -- what did you do that you can recall?  Tell me everything you can recall.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Kurt Haberthur 01/05/2026                                              Page 22

A    Discussions with Cole about what we do and how we do things.  And that was not a call to Chad.  That was face-to-face --

Q    Okay.

A    -- at a track meet.

Q    Okay.

A    And that would have been about the extent of it.

Q    Okay.  Who made the decision to put you in charge of hiring Cole?

       MR. ELZA:  Objection, form.

A    I would think the superintendent.

Q    (By Mr. Gentry)  That's what I was trying to get at.  Did you have a discussion with Mireles and he said hey, I want you to take the lead on this deal, for example?

A    I was in charge of hiring anybody on my staff.

Q    Okay.  So as the athletic director it was your responsibility to hire any coaches?

       MR. ELZA:  Objection, form.

A    Yes.

Q    (By Mr. Gentry)  Okay.  And at the time you hired Cole you knew about the comments from Kori Clements -- or alleged comments.  And you knew about some type of administrative leave incident at Amarillo ISD, correct?

A    Correct.

Q    Did you ever think to pick up the phone up and call Ms.

measures against an employee?

A    I think it's standard.

Q    I mean, I would hope so, right?

A    Uh-huh.

Q    What do you think the reason is for keeping a file like that?

A    So you have a background.

Q    Sure.  So, for example, if someone like you goes to hire this individual and you are looking into him, you would have something like this to reference to, right?

         MR. ELZA:  Objection, form.

A    Correct.

Q    Did you ever ask Amarillo ISD to provide a copy of Cole's employment file prior to his hiring?

A    No.

Q    Then how could you have known about any of this?

A    I couldn't have.  Standard -- we don't typically ask for employee files --

Q    Okay.

A    -- that I am aware of.

Q    Do you think now looking at this that maybe you should have?

A    Probably.

Q    Okay.  Do you think if you are set to hire someone at Gruver that you knew maybe had been put on administrative

Q    Okay. And again, I know that you are not privy, but it looks like in our case that Perryton ISD has similarly put individuals immediately on leave upon suspicion of an inappropriate communication. Various names have gone into that. What I am trying to understand is we have got 20, 30, 40 complaints against Cole Underwood and he's never put on administrative leave a single time. Do you find that odd?

MR. ELZA: Objection, form.

A    Yes. I do find it and knowing what we know now. Obviously, things that break policy like Snapchat --

Q    Sure.

A    -- texting, Facebook, Messaging, whatever, Twitter -- I see this one Twitter DM. Yeah, breaking policy puts-- gets you put on administrative leave. Just a general complaint doesn't necessarily.

Q    Let's say we had evidence prior to Cole Underwood's rape of a young girl that he had violated policies.

A    Uh-huh.

Q    Do you think he should have been put on administrative leave?

A    Yes.

MR. ELZA: Objection, form.

Q    (By Mr. Gentry) I agree. And I understand that hindsight is 20/20, but do you think that there's more that you could have done relative to the hiring of Cole Underwood

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Kurt Haberthur 01/05/2026                                                    Page 32

to get a better idea of what was going on with hum at that time based on this employment file, for example?

        MR. ELZA:  Objection, form.

A    Yes, hindsight I wish I had this, and we wouldn't be here today.

Q    (By Mr. Gentry)  Okay.  Now, we have also talked to Mireles, like you -- like our private investigator talked to you.  And Mireles was clear that he too did not see this -- any of this information from this employment file.  Would that -- does that surprise you at all?

A    No.

Q    Okay.  Meaning presumably if he had seen it, you-all would have probably discussed it, correct?

A    Correct.

Q    And I think you've testified you are not sure what Mireles did relative to any kind of interview or phone calls outside of talking to you and Cole?

A    Correct.

Q    Okay.  These two things that you knew about, the comments from Kori Clements and the period of administrative leave that Cole was put on at AISD, did you tell Mireles about those?

A    I don't know if I did or not.

Q    Okay.

A    I would imagine that I did, but I don't know if I did or not.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Kurt Haberthur 01/05/2026                                        Page 33

Q    I believe in your interview that you said that you did, but in our interview with Mireles he never mentions that you made any type of disclosures like that to him.  Do you know which one is right?

A    I don't.  I can't recall.

Q    So if he recalls that you never told him about these two things, can we defer to him on that?

A    I suppose.

Q    Why would you have not told him about the Kori Clements comments or the administrative leave issue?

A    Well, if I didn't, I don't know why.

Q    Is there any particular reason that you wouldn't have?

A    No.

Q    Do you think that it would have been relevant to his hiring?

A    I don't at this point, no.  I mean, at this point, yes, knowing what we know now.  But then, no.  So go back in time and he's put on administrative leave August 7th of 2018.  So he got offered four more contracts with AISD.  If they...

Q    But if you look at these records, they -- they -- they had to conclude their investigation because they could not find that he had done anything wrong.

A    Uh-huh.

Q    Because they could not find the messages that had been deleted, right?

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Kurt Haberthur 01/05/2026                                                    Page 38

A    Is it a problem?

Q    (By Mr. Gentry)   Yeah.

A    It's a problem.

Q    It seems to happen relatively regular out here, doesn't it?

A    I think it's -- if you watch the news a little closer, it's everywhere.

Q    It happens everywhere, right?

A    Yeah.

Q    How do we fix that?

A    I think we -- how do we fix it?

Q    Sure.

A    I think it's probably -- it's obviously a problem with the person that's doing it.

Q    Sure.

A    It probably goes back into their upbringing, their childhood.  You can probably dig a long ways.  I don't know how we fix it.

Q    Let me ask you this.  Do -- do we maybe start with a better hiring process?

A    I think -- I think the sharing of information.

Q    Sure.

A    With -- like that just should be automatic, not you have to ask for it.

Q    Okay.  Do you think that -- that maybe an informal

conversation with a former coach is -- is maybe not a thorough and due diligent investigation into someone's background?

MR. ELZA:  Objection, form.

A    With hindsight, yes.

Q    (By Mr. Gentry)  Okay.  Do you think that if a school has policies to prevent this kind of thing that we -- we follow those policies, maybe that would help prevent what's happening, right?

A    Yes.

Q    You would agree with me that those policies are designed to prevent this type of conduct, right?

A    Yes.

Q    So if schools are not following their own policies, presumably this conduct is going to continue?

MR. ELZA:  Objection, form.

A    Possibly.

Q    (By Mr. Gentry)  So how do we make an example of something like this so that schools start to pay attention to that?

MR. ELZA:  Objection, form.

A    How do we make the example?

Q    (By Mr. Gentry)  Sure.

A    Probably -- well, obviously lawsuits.

Q    Sure.

A    Public -- I don't know if reprimand is the right -- right

# Exhibit 18

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

S.J. a Parent, Conservator,           )
and Next Friend of N.J.,              )
                                      )
          Plaintiff,                  )
                                      )
vs.                                   )  Case No.  2:24-CV-00168-Z
                                      )
PERRYTON INDEPENDENT SCHOOL           )
DISTRICT, and COLE UNDERWOOD,         )
Individually and in his              )
official capacity as Athletic        )
Director of Perryton ISD,            )
                                      )
          Defendants.                 )


DEPOSITION OF ████ NICOLE ████

TAKEN ON BEHALF OF THE DEFENDANTS

IN PERRYTON, TEXAS

ON FEBRUARY 17, 2026


WORD FOR WORD REPORTING, L.L.C.
620 NORTH ROBINSON
SUITE 202
OKLAHOMA CITY, OKLAHOMA   73102
(405)232-9673


REPORTED BY:   JENESSA KENDALL KALSU, CSR

APPEARANCES

For the Plaintiff:

KYLE GOODWIN
Attorney at Law
420 N.W. 6th Street
Second Floor
Oklahoma City, Oklahoma   73102
kgoodwin@goodwinlewis.com


For the Defendants:

MR. SLATER ELZA
Attorney at Law
Post Office Box 9158
Amarillo, Texas   79105
slater.elza@uwlaw.com

S.J. vs PERRYTON ISD and COLE UNDERWOOD
▮▮ 02/17/2026

Page 9

A    I knew who he was, but I didn't know him on, like, a personal basis.

Q    You all didn't grow up together?

A    No, he was younger than I was.

Q    And did you ever express concerns about what you were seeing with Cole and ▮▮ to anybody other than ▮▮ --

A    Yes.

Q    -- and your husband?

A    Well, and my husband.

And yeah, we went to Coach Brown -- Toby Brown I think is his first name -- and he assured me that nothing was going on and I was just seeing things.

And then we went to Chris Lingo who was a school board member. And he is also one of our very good friends.

Q    And that was in the eighth grade?

A    Yes.

Q    Okay. Over that summer, were there any issues with ▮▮ and Cole that you saw or were aware of?

A    Not that I'm aware of. (Shook head.)

Q    Did you ever talk with your ex-husband ▮▮ -- I'm not going to call him your

And then the next thing we knew the case -- CPS released the case and there was no findings.

And until I went to custody court, CPS said they released them because they were living with dad and that the services were no longer required.

Q    Okay.  Have you ever refused to see ██████ when she wanted to see you?

A    No.

Q    Have you ever stated that you did not want to have a relationship with her?

A    No.

Q    Is it your hope that some day that you can repair your relationship with her?

A    Yes.

MR. ELZA:  Okay.  I have no further questions.  I'll pass the witness.

MR. GOODWIN:  Okay.

CROSS-EXAMINATION

Q    (By Mr. Goodwin) Ma'am, how many times were you contacted by the school about reports concerning Cole Underwood and ██████

A    I was never contacted by the school.

Q    Are you aware, ma'am, that it's the

policies and procedures of the school that they are required to contact you when there's a report made about inappropriate relationships?

A    Yes.

I also believe at that time ████ might have given the school -- he had a restraining order on me for 14 days.  He did turn that in to the school because I stopped getting report cards, anything.

And it even stopped on my oldest daughter, because I think there was a miscommunication, but she was not part of that.

So I don't know if there was something in there that got messed up and they were told not to talk to me, I don't know.

Q    I'll tell you that the school has admitted they did not make any of these contacts.

A    Okay.

Q    Were you -- so nobody from the school told you that a kid named Udi said that Mr. Underwood's nickname was "The Perve"?

Have you heard that, ma'am, that his nickname was "The Perve"?

A    No.

Q    Did the school ever tell you that?

S.J. vs PERRYTON ISD and COLE UNDERWOOD
██ ██ 02/17/2026
Page 43

A    No.

Q    Do you know whether the school ever told ███████ that?

A    No.

Q    Did you know that Cole Underwood was retaliating against kids for calling him a "Perve"?

A    I had heard that.  (Nodded head.)

Q    Who did you hear that from, ma'am?

A    Kids in -- kids in the school and then my friend Brittany.

Q    Were you aware that Cole Underwood was contacting not just your daughter, but multiple other female students, via SnapChat?

A    I was not.

Q    Did the school tell you that?

A    No.

Q    Do you know whether the school told ███████ that?

A    I do not.

Q    Were you ever told that Cole Underwood was directly ordered by Superintendent Brown to stay away from ███████ and not be with her alone?

A    I was not.

Q    Do you know whether ███████ was?

A    I believe he was, because he shared that

with me.

Q    So if ▆▆▆ testified that they never told him that, would that be a surprise to you?

A    Yes.

Q    If the school testified that they never told him that --

MR. ELZA:  Objection, form.

Q    (By Mr. Goodwin) -- how was ▆▆▆ supposed to know that, ma'am?

A    I don't -- ▆▆▆ told me that.  So I don't know.

Q    So in the -- so when, in the fall of '25, did ▆▆▆ move in with ▆▆▆

MR. ELZA:  I think you got your date wrong.

THE WITNESS:  Yeah, ▆▆▆ moved in with him in --

Q    (By Mr. Goodwin) It was 2023?  Fall of '23?

A    I believe so.

MR. ELZA:  Yeah, you said '25.

MR. GOODWIN:  Oh, I'm sorry.  My apologies.

THE WITNESS:  Yeah, I was going to say, I believe it was Thanksgiving of '23.

Q    (By Mr. Goodwin) Around Thanksgiving. November-ish?

A    Yeah, yeah.

Q    And I'm not trying to quibble with you about the date.  But in the fall of 2023, ██████ moved from your house into ██████ house?

A    Yes.

Q    And prior to November, she was living with you?

A    Yes, sir.

Q    So these reports that were going on back during football season of 2023, did the school let you know any of the reports that were made to them?

A    No, sir.

Q    Did you know that a gentleman in -- out here in Perryton, told the volleyball coach -- or wanted to know from the volleyball coach how it was working for a pedophile?  Did the school let you know about that?

A    No, sir.

Q    Did they tell you that volleyball coach Shaun Lynch reported to the school that two football players told them, during football season, that something was going on between ██████ and Cole Underwood?

Cole Underwood's relationship with ████ in the eighth grade. Did I understand that correctly?

A    Yes, sir.

Q    And you made two reports to the school about that, correct?

A    I did.

Q    So one was to Toby Brown. I don't know who Toby Brown is. Tell me who Toby Brown is, please.

A    He is a coach. At the time, he was an eighth grade -- he was a ninth grade teacher. I can't remember what he taught. I subbed for him quite a bit and -- but he's also a tennis coach at the high school.

Q    And what did you tell Mr. Brown? So we got two Mr. Browns. I'm going to call him Toby Brown. Okay?

A    Okay.

Q    What did you tell Mr. Brown at that time?

A    I asked if he saw Underwood's -- the way he acted around ████

And he said, "No. I've taught Cole. I've coached with him now and you're overthinking this."

I just kind of said "okay" and let it go.

Q    And was that the last you talked to him

S.J. vs PERRYTON ISD and COLE UNDERWOOD
██ ██ 02/17/2026

Page 50

about it?

A    Yes.

Q    Do you know whether he reported that to anybody else?

A    I do not.

Q    I'll tell you today, in spite of all of the numerous complaints that we have, I wish I had a better number for you, I've not seen that you reported that to Coach Toby Brown.

Did you tell anybody else that you reported it to Toby Brown?

A    Just my husband.

Q    And then you also --

A    And I want to say we did tell Chris, when we talked to Chris Lingo.

Q    I'm moving on to that one next.

A    I think we told him that I spoke to Toby.

Q    Okay.  And so you believe this conversation with Toby Brown happened sometime during the eighth grade year?

A    Yes.

Q    And when did you talk to Mr. Lingo, to the best of your memory?

A    Around -- around the same time.

Q    All right.  And what did you tell

Mr. Lingo?

A    It was me and my husband both.  We told him that we were not happy with Cole and the way he was around the female athletes.  And he agreed with us, because he had a -- he had a daughter that was one of our daughter's friends.

Q    What did he tell you?

A    That he -- he -- I mean, he thought -- I think he told us that at the time there was talks about it and he was -- things were being done.  But we never knew if anything was being done.

Q    Did anything ever get done?

A    Not that I'm aware of.

Q    In fact, nothing ever got done until it was too late, correct, ma'am?

A    Yes.

Q    Okay.  So those are the two reports that you made, correct?

A    Yes.

Q    Did you make any more that you remember?

A    No, I didn't.

Q    Well, obviously -- you talked to Brittany Morgan, obviously, about this.

A    Yes.  Yes, she is my best friend.

Q    She was your best friend.  But you

obviously talked about your feelings about the inappropriate relationship with ████ to Ms. Morgan, didn't you?

A    Yes, I did.

Q    So that would be three --

A    Yes.

Q    -- people you told?

A    Yes.

Q    And I'm guessing, with your relationship with Ms. Morgan, that it was much more than once or twice you talked to her?

A    I talk to her every day.  I mean, I talked to her last night.

Q    Okay.  Fair enough.

And so when did you start expressing concern about Cole's relationship with ████ to Ms. Morgan?

A    Whenever she -- she called me in March and told me --

Q    Of '24?

A    -- of '24, and told me about the ride home from the track meet.

Q    Was that the first time?

A    Yes.

Q    And you did not like that?

S.J. vs PERRYTON ISD and COLE UNDERWOOD
02/17/2026                                                    Page 53

A    I did not like that at all.

Q    Would that have happened about the time that you sent these texts on March 9th?

A    That's probably the day it did happen.

Q    Or the day you found out?

A    Yes, that's the day I found out.

Q    And I'm sorry, I think you just answered this. I've already forgotten.

You don't know of any other relationships that Cole Underwood had with any other female students, correct?

A    I do not.

Q    So if I went down this entire list of complaints that were provided by the school, it would be fair to say you didn't know about any of them?

A    That would be fair.

Q    And you did not receive a copy of the March 4th letter at any time?

A    I did not.

Q    If you would look at the last page, ma'am, the second page of the letter, it's the last paragraph that's written to Cole. Do you see this?

A    (Reviewed document.) Uh-huh.

Q    And do you also see, ma'am, that in this

# Exhibit 19

Case 2:24-cv-00168-Z    Document 58    Filed 04/17/26    Page 496 of 591    PageID 2148

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Francisco Zavala 11/04/2025

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

S.J., a Parent, Conservator,      )
and Next Friend of N.J.,          )
          Plaintiff,              )
                                  )
vs.                               )    Case No. 2:24-CV-00168-Z
                                  )
PERRYTON INDEPENDENT SCHOOL       )
DISTRICT, and                     )
                                  )
COLE UNDERWOOD, Individually      )
and in his official capacity as   )
Athletic Director of Perryton     )
ISD,                              )
          Defendants.            )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

FRANCISCO ZAVALA

HAD ON THE

4TH DAY OF NOVEMBER, 2025

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

WORD FOR WORD REPORTING, L.L.C
620 NORTH ROBINSON, SUITE 202
OKLAHOMA CITY, OKLAHOMA 73102
(405)232-9673

REPORTED BY:  DARLA RILEY, CSR

*Word for Word Reporting, LLC*
*405.232.9673 (OKC) | 918.583.9673 (TULSA)*

APPEARANCES

FOR THE PLAINTIFF:

Mr. Kyle Goodwin
GOODWIN LEWIS, PLLC
420 Northwest 6th Street, Second Floor
Oklahoma City, Oklahoma   73102
(405) 900-5700


FOR THE DEFENDANT, PERRYTON INDEPENDENT SCHOOL DISTRICT:

Mr. Slater Elza
UNDERWOOD LAW FIRM
Post Office Box 9158
Amarillo, Texas   79105
(806) 376-5613
(806) 379-0316 FAX

Q    Okay.  Well, Ms. Little, she said that Zavala would not tell her the names of those that complained.  But you -- you disagree with that?

A    I brought every complaint and I did let her know who told me.

Q    Okay.  The one identity that I have, I don't have a name, but I have -- and I may have this wrong, your brother and your sister-in-law or your sister and brother-in-law?

A    That would be my brother and sister-in-law.

Q    Okay.  Tell me about that particular complaint.

A    So I have a lot of brothers.  Okay?  I'll mention if we are talking about my brother and sister-in-law, there was an incident where Cole had gone back to the locker room after a game and had yelled at the boys and lectured them about talking about him.  And was trying to shut down them talking about him and stuff like that.  My nephew is on the team, so he was on -- in the locker room when that happened.  I brought that complaint to Ms. Little.

Q    And that's the incident with your brother and sister-in-law?

A    Yes.  And then they -- she -- at that point, you know, she was wanting to be able to refer to the report or et cetera.  So I reached out to them and I told them, you know, reach out to Ms. Little.  You've got to let her know that this isn't okay and my sister-in-law did send an e-mail.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Francisco Zavala 11/04/2025                                                Page 20

community during the fall of 2023 of Underwood having a relationship with a student. When did you first start hearing rumors of an inappropriate relationship?

A    Fall of that year.

Q    So it's kind of the same time as Ms. Harris or Coach Harris?

        MR. ELZA: Objection, form.

A    I think so. I can't place it necessarily in the football season. That would be early on in the year. And I at this point can't recall having heard anything at that point during football season. I am highly -- actively involved in football season. My nephews play. I have a lot of family. So I don't recall anything specific.

Q    (By Mr. Goodwin) But you remember receiving complaints in the fall of 2023?

        MR. ELZA: Objection, form.

A    Yes.

Q    (By Mr. Goodwin) And what did you -- what's -- what's your first recollection of hearing a complaint or rumor about an inappropriate relationship?

A    Okay. Again, it's -- it's quite a time later, so early on -- not early on, but like it had to have been basketball season and I got a call from one of my brothers. Now, it's not this one. And I think this -- this bullet point on is mixing in these two things, because this is different.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Francisco Zavala 11/04/2025

Page 21

Q    Okay.

A    My -- one of my brothers called me.  He is a pastor in the community and his -- he went to, I believe, the Gruver tournament.  That might be inaccurate at this point.  I can't remember.  I just know that it was a tournament out of town.  And he called or texted me to say have you seen Coach Underwood with the ████ girl?  And I said what's going on?  And he said nothing.  Nothing.  Just keep an eye on it.  And I said can you send me a video?  Can you send me what's going on?  And he said it's not anything to make a big deal of.  I just -- how did he phrase it -- it's just something to keep an eye on, essentially.  He didn't give me anything outside of that.

Q    He was pretty observant, wasn't he?

A    Yes.  He has a daughter in the same age group.  Of course he would be.  He is a dad and a pastor and a leader.  So we -- coming from what we come from, we do pay attention.  And so that was that.  And, again, I asked for video.  I was not there.  I was not at the event, so I didn't know what he was seeing and I did ask for a video or picture so that I could see what he was seeing.  He did not -- he didn't send anything.

Q    So are you referring to the Theragun incident?

A    He never mentioned the gun to me.  The massage gun?

Q    Yes.

A    So I don't know if that's what he was referencing.

Q    Do you think it was the same tournament or could have been a different tournament, you don't know?

A    I also don't know.  Because I found about the Theragun afterward.  You know, it had already passed.

Q    So you think it's probably a separate incident then?

A    I can't answer that.  I am not sure.

Q    All right.  And is -- is -- was your brother the first one to raise the possibility of an inappropriate relationship here?

MR. ELZA:  Objection, form.

A    At this point I don't know, because, so it's -- it's just been a long time.  I do -- I know that his would have been one of the early ones for sure.

Q    (By Mr. Goodwin)  And do you think you maybe received some more then in addition to him?

A    Well, of course.  I mean, the yelling at the kids in the locker room.  Right?

Q    Yes, ma'am.

A    The -- there was another incident where he -- I can't place it exactly so I don't know where it fits.  I do know that it came close to the or after the locker room incident when he was yelling at them where he pulled out another nephew that I have at the school.  He pulled him out of the choir room and lectured him and told him something along the lines

of I can't believe you are spreading rumors about me. And my nephew actually came crying. And so when that happened -- now again --

Q    Which -- I'm sorry. Let me -- I've got to interrupt you.

A    Okay.

Q    Which nephew is this?

A    That was ███████████.

Q    I'm sorry?

A    ███.

Q    ███?

A    ████████.

Q    I am sorry. I don't hear well.

A    You are okay.

Q    ████████████?

A    Uh-huh. Yes.

Q    And he was pulled out of the choir room?

A    Yes.

Q    And when did that occur, roughly?

A    Again, I'll place it close to when he talked to all the boys in the locker room, but I can't tell you if that was before or after.

Q    And ████ came to you crying. Did he go to you specifically?

A    He came to me after it happened. I can't -- I know that it really upset him. And I don't know if it was the same day

or not at this point.

Q    But he was crying?

A    He was upset, yes.

Q    And so what did you do with that one?

A    I went to Ms. Little and I told her that this was not appropriate. And I didn't like that he was addressing students asking them to stop talking about him. And because this was my second family member.

Q    What was -- what was your other nephew's name?

A    ███████████.

Q    Are they brothers?

A    No. I have a lot of family.

Q    That's fine. I do too.

A    That was -- ███████████ was on the basketball team, so his was the locker room incident. ███ was in the choir room when he got pulled out. So I just went at the point I was upset that he was trying to shut down rumors and talking to students this way. So I just told her something needs to happen here. He can't be pulling out kids out of class to ask them to stop talking. And I can have ███ parents come up here if I need to, but this won't happen again.

Q    And what happened as a result of that complaint?

A    I know he was given a directive not to talk to our students alone. That if he was going to address our students Ms. Little had to be present.

# Exhibit 20

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Dacey Smith 03/24/2026

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

S.J., a Parent, Conservator,      )
and Next Friend of N.J.,          )
          Plaintiff,              )
                                  )
vs.                               )      Case No. 2:24-CV-00168-Z
                                  )
PERRYTON INDEPENDENT SCHOOL       )
DISTRICT, and                     )
                                  )
COLE UNDERWOOD, Individually      )
and in his official capacity as   )
Athletic Director of Perryton     )
ISD,                              )
          Defendants.             )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

DACEY SMITH

HAD ON THE

24TH DAY OF MARCH, 2026

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

WORD FOR WORD REPORTING, L.L.C
620 NORTH ROBINSON, SUITE 202
OKLAHOMA CITY, OKLAHOMA 73102
(405)232-9673

REPORTED BY:  DARLA RILEY, CSR

APPEARANCES


FOR THE PLAINTIFF:

Mr. Tyler Gentry
GOODWIN LEWIS, PLLC
420 Northwest 6th Street, Second Floor
Oklahoma City, Oklahoma   73102
(405) 900-5700


FOR THE DEFENDANT, PERRYTON INDEPENDENT SCHOOL DISTRICT:

Mr. Slater Elza
UNDERWOOD LAW FIRM
Post Office Box 9158
Amarillo, Texas   79105
(806) 376-5613
(806) 379-0316 FAX

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Dacey Smith 03/24/2026                                                    Page 18

time, and I did not live at the house during that time.

Q    Did you ever have any concerns while he was in Amarillo ISD about his interactions with female athletes?

A    I don't think so.

Q    Nothing he ever did that ever caused you concern?

A    I always had concern about him Snapchat -- or having kids on Snapchat and social media, but I think that was across the board, boys and girls.

Q    Okay.  So you were aware that while he was at Amarillo ISD he was Snapchatting -- candidly, I didn't care about the boys -- but he was Snapchatting female student athletes?

A    Correct.

Q    And you were okay with that?

A    I didn't particularly care for it, but...

Q    Well, what did you talk to him -- I mean, did you complain to him about it?  Did you ask him not to do it?  What was the nature of it?

A    Well, I think it stemmed from students in high school but other females that were of age.  I didn't like that he frequented -- frequently Snapchatted other woman, but then it would just turn into a fight if I brought it up about how I didn't trust him, so I learned not to bring it up.

Q    But were your instincts telling that was wrong, for example?

        MR. ELZA:  Objection to form.

You can answer.

A    Not necessarily.

Q    (By Mr. Gentry)  So when you say frequently Snapchatted other woman, would that include these female student athletes?

A    I don't know how often he was Snapchatting them.  I just know he did.

Q    Okay.

A    And I didn't find it appropriate.

Q    Did you ever ask him to stop?

A    I don't think I asked him to stop.  I think I just brought my concern to him.

Q    Okay.  Did you ever report that to Amarillo ISD?

A    I did not.

Q    Why?

A    I guess I didn't think it was an issue to turn in.

Q    Are you aware that they have a policy that he shouldn't be, for example, Snapchatting --

A    I did --

Q    -- students?

A    -- not know of that.

Q    Were you aware that Perryton ISD has a policy and had a policy that he shouldn't be Snapchatting students?

A    I was -- I don't think I was made aware of the policy until after the issues.

Q    And we are going to come back to this.  But you were

effectively the -- the communications and safety director at Perryton ISD, correct?

A    I was, but I did not write a handbook or a manual.

Q    But you as the safety director were not aware that Perryton ISD had a policy that said he can't or shouldn't Snapchat kids, effectively?

A    I guess that's correct.

Q    How is that?

A    I did not read the manual.

Q    Were you also Snapchatting students?

A    No.

Q    But you were aware that he was, for example, Snapchatting students while at Perryton ISD as well?

A    Yes.

Q    Did you ever make a report to Perryton ISD about that?

A    I did not.

Q    And this Snapchatting both at Amarillo and Perryton was something that you-all regularly talked about, right?

A    How do you define regularly?

Q    I mean, I've looked at, gosh, a thousand pages of texts between you and Cole.  You-all are constantly talking about him Snapchatting, is that correct?

A    I wouldn't say constantly.  I think towards the end when were separated I had a heightened concern about it.

Q    But to confirm, you-all were having discussions about it,

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Dacey Smith 03/24/2026

Page 26

A    That would -- that would be before.

Q    When did you first become aware that he was messaging students -- or had gotten in trouble for it?  Obviously you were aware of it, but that he had gotten in trouble for it?

A    I don't know the specific month, but we filed for divorce in December of '23, I believe.  And just some time that spring I know that there had been -- he had expressed to me that he had been confronted about it by administration of how he was communicating with students.

Q    Do you remember who within the administration?

A    I think most specifically Mr. Brown.

Q    Did Greg Brown ever come and have any discussions with you about that?

A    He did not.

Q    Is there any reason for that?  Do you know?

        MR. ELZA:  Objection, form.

A    I think it's a personnel issue.  And although I was connected with that personnel, I don't think that was a discussion to be had with me.

Q    (By Mr. Gentry)  Okay.  This goes on to provide here on Exhibit 17 AISD board policy restricts individual communication with students via any type of electronic communication.  Again, you were unaware that AISD had that policy?

A    That's correct.

Q    And I'll just tell you, Perryton has the exact same policy.  You were unaware too, if I understand it right, that Perryton ISD had a policy restricting individuals from communicating with students via any type of electronic communication?

A    Correct.

Q    Why is it that you were unaware of that?  That seems like a pretty straightforward and obvious policy.  Why were you unaware of it?

A    I didn't read the manual or handbook.

Q    The school didn't require you to do that, correct?

A    Not to my knowledge.

Q    And it didn't put on any trainings or anything like that that might have taught you that there was a policy that an individual shouldn't be communicating with students via electronic communications?

A    Not that I recall.

Q    How then were teachers or coaches or the safety director to know what the policies are that they should be enforcing?

A    I don't recall.

Q    If I am -- well, what I am understanding from you is the school was not doing anything to ensure that you-all knew what those policies were?

A    Not that I recall.

Q    Do you think that's a failure on the part of the school?

A    Potentially.

Q    Well, I mean, just -- just -- just bluntly, how as the safety director are you supposed to enforce safety policy if you don't know what the policies are?

MR. ELZA:  Objection, form.

A    That wasn't a safety policy that I -- that I was to enforce.  That didn't fall directly under my scope, I don't believe.

Q    (By Mr. Gentry)  What was your scope?

A    More so when I took it over was right after Uvalde.  And so we were working with the state mandates coming out that were more focused on physical safety and bullying, anonymous reporting, things like that.  Not necessarily student-to-teacher safety.

Q    If you had been aware that there was a Perryton ISD policy that said Cole could not Snapchat students would you have filed a report knowing that he was Snapchatting students?

A    I could say yes and I could say no.  I don't -- I don't know.  There were other people on campus that were talking to students on social media, so...

Q    But if I understand your testimony right, you didn't know that they couldn't do that?

A    No, I did not know.

Q    You thought it was okay for these individuals, whether they are teachers or coaches or whoever, adults, to be

Snapchatting students?  You thought that was an okay thing to do?

A    I did not personally think it was okay, because I've had students try to add me on Snapchat and I did not add them back because I thought it was inappropriate.  But for somebody else to do that and me not know of the policy --

Q    Yeah, you --

A    -- I might disagree, but what am I to do?

Q    Yeah.  Let me rephrase it.  Well, I think there is a lot of things you can do, but --

        MR. ELZA:  Objection, form.

Q    (By Mr. Gentry)  -- let me rephrase it.  You were not aware that there was a school policy that said that was inappropriate?

A    No.

Q    Okay.  Had you been aware that there was, would you have turned those individuals in?

A    Potentially.

Q    I mean yes or no.  What -- what would have prevented you from turning them in?

        MR. ELZA:  Objection, form.

A    I guess my knowledge of what they were on social media about.

Q    (By Mr. Gentry)  Let me -- let me re-ask it.  If you knew there was a policy that said Cole cannot Snapchat students and

you knew he was Snapchatting students would you have turned your husband in?

MR. ELZA:  Objection, form.  Asked and answered.

Q    (By Mr. Gentry)  Yes or no?

A    I'm not sure.

Q    Why?

A    I am not sure.

Q    So the safety director at Perryton ISD is unsure whether or not she would report a violation of school policy?

A    I think that's what I answered, correct.

Q    What are the policies designed to do?

A    I think it depends on the policy.

Q    Well, just in general what are -- what are the -- a policy that an individual shouldn't be Snapchatting a student do you think is designed to do what?

A    I think protect all parties.

Q    Right.  Including the student effectively, right?

A    They are a party, correct.

Q    So if someone was violating a policy directed at protecting a student and you didn't report them, how are we protecting the student?

A    I am not sure.  But I think -- I mean, there's other policies that people didn't follow that could have protected students that people knew about.

Q    Like what?

A    And they did not turn them in.  Like people giving children rides in a personal vehicle.

Q    Right.  Do you think that someone violated a school policy relative to rides in a personal vehicle?

A    I think that multiple people probably did.

Q    Okay.  Who would that be?

A    Well, namely one, Cole Underwood.

Q    Okay.  Who else?

A    I am sure some of other coaches did it.

Q    Do you know of any that did it?

A    I am not going to say yes off the top of my head and give you a false name.

Q    Well, just -- do you have suspicions of any?

A    Not off the top of my head.

Q    Okay.  You know that Cole gave -- well, ███ several rides in his personal vehicle, correct?

A    I did find that out after he was arrested.

Q    Did you know that he was doing that before the arrest?

A    I did not.

Q    How is it that just about every other coach knew, for example, that he took her back from a track meet on at least one occasion and you didn't know?

        MR. ELZA:  Objection, form.

A    I kind of secluded myself from the community when we were

A     Not that I can recall.

Q     Do you think Greg Brown is an honest person?

A     I believe him to be.

Q     Do you think you've ever made comments to the contrary?

A     Not to my knowledge.

Q     Okay.  Is there anything you think the school could have done differently with respect to the issue between Cole and █████████

A     I don't know.  I think that the correct protocol was taken as far as having a discussion with him about not doing something, such as talking to students on social media or giving them a ride in a personal vehicle.  But at the same time, if a person is going to commit those acts, that's, I guess, at their own discretion.

Q     Cole didn't care what the school was telling him to do or not to do, correct?

A     He didn't care what anybody told him.

Q     Right.  And he told you that several times.  I don't care that the school tells me don't do this, I am going to do it?

A     He did say that.

Q     Yeah.  Did you ever report that?

A     I did not.

Q     Why?

A     I guess I didn't know that it was my place.  I thought the school was aware, as they were, of having had a discussion

with him before.

Q    And I think we have already determined you don't know what your obligations were with respect to reporting it sounds like?

A    I guess in this sense, no.

Q    Okay.  So if the school had issued directives to him, and he tells you I am not going to follow them, you would agree with me that you didn't report that?

MR. ELZA:  Objection, form.

A    I did not report that.

Q    (By Mr. Gentry)  Do you think you should have?

A    I don't know.

Q    What if that report could have prevented a 15-year-old girl from being raped?

A    I mean, hindsight, maybe I would have reported it.

Q    If the school policies require you to report it, would you be in violation of those policies for failure to report?

MR. ELZA:  Objection, form.

A    I would say so.

Q    (By Mr. Gentry)  Yeah.  Do you feel any remorse about that?

A    Do I feel sorry for what happened to her?  Absolutely. But based on allegations that everybody in Perryton knew and everybody at PISD knew, I think that there's other people that should have a lot of remorse also.

Q    Right.  I agree with you.  I think everybody should.  And I do agree that everybody knew.  Tell me a little bit about that comment that everybody knew.

MR. ELZA:  Objection, form.

A    That's just something that I heard.  I did not personally know anything.  The first rumor that I heard was probably in January of February of '24.  And -- and I didn't believe it.  I think I was probably the last person in town to find out.

Q    (By Mr. Gentry)  What was the rumor that you heard in January?

A    That he had a relationship with a student.

Q    Did you have a suspicion about who that might be?

A    Yes.

Q    Who?

A    █████ ██████

Q    Did you report that?

A    I did not.

Q    Do you understand how that's a big problem?

MR. ELZA:  Objection, form?

A    I guess I do not, because I think they knew themself.

Q    (By Mr. Gentry)  Do you think the school was already aware that people had been reporting a concern about an inappropriate relationship between Cole and █████

A    Can you say that again?

Q    Yeah.  Do you think other people had already communicated

to the school concerns about an inappropriate relationship between Cole and █████████

A    That's what I had heard that spring.

Q    Who?  Do you know?

A    I think the only person that comes to mind that said that he had a suspicion was Duce Cooper.

Q    You said everybody knew, and if everybody knew there should be other people that should feel bad too.  Is there anyone specific that you were talking about there?

A    I mean, I think if -- if the allegations are true that everybody knew and that people in town knew, community members, school board members knew, school staff knew, her family knew, like what -- I think that there was a lot of other people in place that could have stopped this.

Q    I agree.  And so again, I am going to ask you.  If that's right, of all of these people that knew about complaints didn't do anything, is that a problem?

        MR. ELZA:  Objection, form.

A    I think it could be a problem, but it's hard to -- if it's just an allegation and they didn't have any definitive proof, I think it's hard to do something about that and take action.

Q    (By Mr. Gentry)  What kind of proof do you think that they would need to have?

A    I don't know.  There could be multiple kinds of proof.

about an inappropriate relationship between Cole and ▉

and the only person you addressed those with were with Cole?

A    Correct.

Q    Okay.  You didn't take them to Greg Brown or any other

administration or anything like that?

A    I did not.

Q    Did you ever talk to any other teachers or coaches or

anyone else at the school about it?

A    I did.

Q    Who?

A    Balinda Dodson.

Q    Who?

A    Balinda.

Q    Spell that for me.

A    B-a-l-i-n-d-a.  Dodson is D-o-d-s-o-n.

Q    Who is she?

A    She used to work at the school.

Q    What did she do?

A    She was in charge of -- I don't know -- transportation

maybe.

Q    She was on admin or something?

A    She worked in our business office.

Q    Okay.  And what did you talk to her about?  Your

concerns?

A    Just the things that I had heard.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Dacey Smith 03/24/2026

Page 44

Q    Okay.  What was her response?

A    She was in -- she didn't believe it to be true either.

Q    Okay.  Anyone else?

A    Liliana Medrano.  Same situation, just what I had heard and she didn't believe it to be true either.

Q    What did she do at the school?

A    She was Greg Brown's administrative assistant.

Q    Anyone else?

A    Brianna Uribe.  She was the one who initially brought the concern to me.  She was the secretary at the high school.

Q    Spell her last name for me.

A    U-r-i-b-e.

Q    So she brought a concern to you?

A    Correct.

Q    What was that concern?

A    She just said oh, well, there's a rumor going around that he is having relationships with the students, but she didn't believe it to be true either.  And working in the front office at the high school she knows how things are falsified or, you know, blown out of proportion with adolescent children, so...

Q    And she -- what was her position again?

A    She was the secretary at the high school.

Q    Okay.  When did you come to you?

A    When?

Q    Yeah.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Dacey Smith 03/24/2026                                          Page 45

A    It was January or February of '24.

Q    So she comes to you with this concern about a rumor she's hearing about Cole and ▇▇▇▇▇

A    Correct.

Q    Okay.  She says I don't think it's true.  Any other discussions about it?

A    No.

Q    Okay.  Anyone else?

A    I don't think so.

Q    Okay.  So we have got Balinda, Liliana, and Brianna, correct?

A    Uh-huh.

Q    Are you aware of whether any of those individuals ever reported their concerns to anyone else besides you?

A    Not to my knowledge.

Q    Okay.  Because I, for example, am aware of what I think is just about every report, 40 to 50 of them.  I don't recognize any of those names as being identified in any of those reports.  So I want to be clear --

A    Okay.

Q    -- you are not aware of whether or not they told anyone else besides you?

A    No.

Q    If they had a concern about an inappropriate relationship, do you think they have an obligation to report?

A    I have.

Q    When?

A    When I still worked at the school.

Q    What was the nature of you seeing them?

A    I went and looked for them.

Q    So you went and found them?

A    After his arrest, correct.

Q    Okay.  So that was something you did of your own volition?

A    Correct.

Q    Is that something you had access to these?

A    Yes.

Q    Okay.  Who else had access to these?

A    I think the only other administrators on this platform, ParentSquare, were Mr. Brown and Donna Hale might have had access also.  I'm not -- I don't recall, though.

Q    So without any direction or anything else, you go and access ParentSquare and you pull these up?

A    Correct.

Q    And -- and -- and you think at least that Greg Brown could have certainly done the same thing?

A    I -- I think he could have looked into it.

Q    Right.  There was some confusion in his deposition as in the access would have been very difficult or maybe he couldn't do it or there was a whole process to it.  Sounds like you did

it pretty easily.  Explain to me how do you do it.

MR. ELZA:  Objection, form.

A    Well, I haven't used the platform in almost a year, but on my end since I was the administrator --

Q    Uh-huh.

A    -- for the platform for the school district --

Q    Uh-huh.

A    -- I was able to go in, and if you click on somebody's profile you can go to -- I don't know -- like a column or something on the side where it says a few messages.  And you can go in and see who they have talked to on the platform.

Q    Okay.  So if he had been directed several times not to be around her, not to be talking to her, all of these things, I mean, it would seem to me that one of the easiest things the school could have done was monitor these ParentSquare messages, which were available, for example, to people like you and Greg Brown.  Right?

MR. ELZA:  Objection, form.

A    They were available to us --

Q    (By Mr. Gentry)  Right.

A    -- correct.

Q    I mean, it seems to me like this would have been the easiest thing to simply pull up.  I mean, they are communicating here --

A    And I will say --

Q    -- for months about --

A    -- this is -- this is in the handbook.  I went back and looked.  It was what we were supposed to communicate with students on.

Q    Well, sure.  That's right.

A    Sure.  Yeah.

Q    That's right.

A    That was the appropriate communication platform.  What I am trying to figure is why no one thinks to look at it when he's directed not to be around her or communicate with her, why is no one pulling these up?

        MR. ELZA:  Objection, form.

A    I'm not sure.

Q    (By Mr. Gentry)  Were you ever directed not to or anything like that?

A    No.

Q    And what did you learn when you pulled them up and you read through them?

A    After I had read through some of the information about them meeting up at the school and various sources such as local news stations reporting on it, et cetera, that's when I went and looked at these.  And then you could kind of piece together that every time she needs to go up to the gym for whatever reason, propping the door open to get it.  I don't know, get on the heating pad and go to the training room,

that's when they were meeting up.

Q    Yeah.

A    But that was --

Q    He's alone at the school.  You were aware that he was at the school, right?

A    Correct.

Q    You thought it was weird that he was there in the spring, for example?  When you-all were having problems I am guessing what you thought have been working on your stuff, instead he's alone at the school?

A    I didn't necessary think it was weird.  I was probably of the selfish intention of mind that he wasn't home.

Q    Okay.  And they're messaging about her coming up there, him opening the door, and then a couple of hours later her telling him you can close the door, that was kind of their MO over these couple of months, correct?

A    That's what it seems.

Q    And it looks like, just based on these timelines that this doesn't start until after -- I mean, the first message here, March 14th of 2024, these don't start until after he's given the written directive on March 4th that we just looked at, not to be around her?

A    That seems what it looks like, yes.

Q    Okay.  And -- and -- and what we have discovered in this case is that effectively Greg Brown thought it of his own

volition to do what he considers an investigation. I guess what I am trying to figure as the safety director, it seems to me that one of the easiest things that he could have done was pull up these ParentSquare messages like you did and he would have easily seen Cole and ▇▇▇▇ facilitating these meet-ups every weekend for the better part of two months, right?

MR. ELZA: Objection, form.

A    I guess if you want to make an inference you could say that's what they were doing, but just looking at these I maybe wouldn't have known that that's why they were meeting up until after I read the news source.

Q    (By Mr. Gentry) Well, if he's aware of 40 something complaints about an in appropriate relationship from teachers and coaches and students and parents and administrators and other school administrators, it's risen to the level of giving him this written directive, which I think did effectively nothing.

A    Correct.

Q    He was on notice that something was allegedly going on. Why not just look up these messages and see for yourself?

MR. ELZA: Objection, form.

A    I just guess he did not think to do that.

Q    (By Mr. Gentry) Okay. But -- but -- if I understand it correctly from you, he had the ability to do it because you did?

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Dacey Smith 03/24/2026                                                    Page 99

and staff to look for suspicious activity at after-school

events and stuff.  Like no, we don't.  Why would he say that?

I don't know, laugh out loud.  Do you see that?

A    I do.

Q    What are you talking about there?

A    I'm not sure.  I think that -- I don't know if this was

the same instance.  There was a basketball game.  I don't

remember who they played.  And there was some chirping going

around that one of the kids from the opposing team might have

a weapon after they lost.  And I didn't know that it was true,

but we had law enforcement there so they kind of went over to

the locker room.  And then I think -- if you know anything

about our radio host in Perryton, he likes to talk about

what's going on in town.  So he probably had him on and asked

him about it because it -- that event got back to him.  So I

bet Greg said we have staff that look for suspicious activity

at actual events.  Which they are there, but I don't know that

they are trained to do that.

Q    Right.  I mean, you clearly are calling him a liar here,

right?  You said he lied on the radio?

A    Well, that's -- yeah, I said he lied on the radio.

Q    Okay.  Earlier I asked you if you thought he was an

honest person, and you said yes.

A    I do.

Q    Okay.  But apparently we have at least one incident here

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Dacey Smith 03/24/2026

Page 100

where you think he lied?

A    That's correct.

Q    Okay.  And not just lied, but lied on the radio to the public, right?  Those listening to the radio?

A    That's what it seems.

Q    And you are saying he lied about safety stuff, apparently about teachers and staff watching for these suspicious things, and you are saying no, we don't.  We don't train them on that. Was that true?

A    That's what it appears.

Q    Okay.  What safety training did you-all do?  Anything?

A    Not specifically to look for suspicious activity at an after-school event.

Q    And the same type of suspicious activity that was going on between Cole and ▮▮▮▮ at some of these events, right?

MR. ELZA:  Objection, form.

A    It guess you could say that.

Q    (By Mr. Gentry)  Okay.  That wasn't something you-all were training on?

A    Not to my knowledge.

Q    But apparently Greg Brown was telling people on the radio that you-all were, and you thought that was wrong?

A    I thought it was inaccurate.

Q    Okay.  Do you still think he's an honest person?

A    I do.

# Exhibit 21

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

S.J., a Parent, Conservator,       )
and Next Friend of N.J.,           )
          Plaintiff,               )
                                   )
vs.                                )  Case No. 2:24-CV-00168-Z
                                   )
PERRYTON INDEPENDENT SCHOOL        )
DISTRICT, and                      )
                                   )
COLE UNDERWOOD, Individually       )
and in his official capacity as    )
Athletic Director of Perryton      )
ISD,                               )
          Defendants.              )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF

BRYCE HALE

HAD ON THE

6TH DAY OF JANUARY, 2026

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

WORD FOR WORD REPORTING, L.L.C
620 NORTH ROBINSON, SUITE 202
OKLAHOMA CITY, OKLAHOMA 73102
(405)232-9673

REPORTED BY:  DARLA RILEY, CSR

APPEARANCES


FOR THE PLAINTIFF:

Mr. Tyler Gentry
GOODWIN LEWIS, PLLC
420 Northwest 6th Street, Second Floor
Oklahoma City, Oklahoma   73102
(405) 900-5700


FOR THE DEFENDANT, PERRYTON INDEPENDENT SCHOOL DISTRICT:

Mr. Slater Elza
UNDERWOOD LAW FIRM
Post Office Box 9158
Amarillo, Texas   79105
(806) 376-5613
(806) 379-0316 FAX

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Bryce Hale 01/06/2026

Page 26

Q    (By Mr. Gentry)   Do you know anything about the repeated complaints that Coach Ryan Daugherty made against Cole Underwood?

A    No.   The only thing I know was that Ryan had called me at one point and asking about the -- getting access to the cameras.

Q    When was that?

A    I -- sometime before April of '23.

Q    And --

A    '24.   Sorry.   '24.   Yes, sir.

Q    And what was your response?

A    I just told him that as a -- as a board that's not what we do.   That he would need to, you know, run that up the ladder.   And I don't know if he was getting any pushback.   He just asked how he could get, you know, as the assistant athletic director.

Q    Sure.   Yeah, it's my understanding from his deposition and from Greg Brown's, that he felt it was getting bad enough that asked Greg Brown, apparently in addition to you, for access to the camera system so he could do his own investigation.

MR. ELZA:  Objection, form.

Q    (By Mr. Gentry)   Is that your understanding?

A    He didn't tell me --

Q    Okay.

533

Q    Okay.   And then as of March 26th what was your understanding of what the community felt like was going on between ████ and Cole?

     MR. ELZA:   Objection, form.

A    I don't know.   I do not remember.

Q    (By Mr. Gentry)   Okay.   And we don't necessarily need to go through all of them.   But let me ask you a general question.   Would you agree with me that on various occasions the school violated its own policies with respect to its handling of the Cole Underwood/████ ████ situation?

A    Yes.

Q    And if the school violated those policies who is ultimately liable for that?

     MR. ELZA:   Objection, form.

A    Whoever violated the policy.

Q    (By Mr. Gentry)   Right.   The school, right?

     MR. ELZA:   Objection, form.

A    Whoever violated the policy, the admin.

Q    (By Mr. Gentry)   Your admin are your highest up, right? There's no one above them, right?   You've got your superintendent -- I mean, outside of the board you've got your superintendent.   And under your superintendent you've got your principals and maybe your A.D., right?

A    Correct.

     MR. ELZA:   Objection, form.

Q    (By Mr. Gentry)  So if all of those individuals are violating school policies relative to this incident you would agree with me then that bears liability on the school, right?

MR. ELZA:  Objection.  Misstates the law.

Objection, form.

MR. GENTRY:  You can answer.

A    Okay.  Ask me that again.

Q    (By Mr. Gentry)  Yeah.  If your highest level administrators, your superintendent, your principals, who have sat in that chair and have admitted to violating policies, and who have also admitted to the school being liable.  I was sitting right here.  If they have violated policies, then the school ultimately bears liability for that, right?

MR. ELZA:  Objection, form.  Objection, misstates the law.

A    No.

Q    (By Mr. Gentry)  Why?

MR. ELZA:  Same objection.

Q    (By Mr. Gentry)  Why does the school not bear liability for their decisions?

MR. ELZA:  The same objection.

A    You know, there's a bunch of policies that the school has.  Obviously, there's going to be slipups.

Q    (By Mr. Gentry)  This was a pretty big slipup, right?  As a result of the violation of various policies a young

15-year-old girl was raped for the better part of two months on school grounds, correct?

MR. ELZA:  Objection, form.

A    Correct.

Q    (By Mr. Gentry)  Do you think that was just a slipup? Yes or no.

MR. ELZA:  Objection, form.

A    No.

Q    (By Mr. Gentry)  What if it was your daughter, how would you feel about it?

MR. ELZA:  Objection, form.

A    I wouldn't feel good.

Q    (By Mr. Gentry)  That girl is going to be messed up for the rest of her life, correct?

MR. ELZA:  Objection, form.

A    Yes.

Q    (By Mr. Gentry)  How do we fix that?

MR. ELZA:  Objection, form.

A    I wish I knew.

Q    (By Mr. Gentry)  Maybe start by following our own policies?  Would you agree with me?

MR. ELZA:  Objection, form.

A    Yes.

Q    (By Mr. Gentry)  If you will go back to the first book to Exhibit 14 for me.

# Exhibit 22

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| S.J., a Parent, Conservator, and Next Friend of N.J., Plaintiff, | ) ) ) ) |
| vs. | ) Case No. 2:24-CV-00168-Z ) |
| PERRYTON INDEPENDENT SCHOOL DISTRICT, and | ) ) ) |
| COLE UNDERWOOD, Individually and in his official capacity as Athletic Director of Perryton ISD, Defendants. | ) ) ) ) ) |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF

FRANK PACHEKO

HAD ON THE

3RD DAY OF NOVEMBER, 2025

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

WORD FOR WORD REPORTING, L.L.C
620 NORTH ROBINSON, SUITE 202
OKLAHOMA CITY, OKLAHOMA 73102
(405)232-9673

REPORTED BY: DARLA RILEY, CSR

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Frank Pacheko 11/03/2025                                                    Page 2

                              APPEARANCES


FOR THE PLAINTIFF:

Mr. Kyle Goodwin
GOODWIN LEWIS, PLLC
420 Northwest 6th Street, Second Floor
Oklahoma City, Oklahoma   73102
(405) 900-5700


FOR THE DEFENDANT, PERRYTON INDEPENDENT SCHOOL DISTRICT:

Mr. Slater Elza
UNDERWOOD LAW FIRM
Post Office Box 9158
Amarillo, Texas   79105
(806) 376-5613
(806) 379-0316 FAX

then football started.

Q    Okay.  So what is your first recollection of hearing anything negative about Cole Underwood as it related to his relationship with young girls?

A    I didn't get that until almost when he got administrative leave.

Q    So you hadn't heard anything?

A    I hadn't heard nothing.  I didn't even pay attention.  I was just busy worrying about my position, doing soft-- football.  And I heard nothing during football season.

Q    Who is the first person that told you that there was an inappropriate relationship between ▇▇▇▇ and him?

A    A lady at the grocery store confronted me and my wife at the grocery store and asked if I knew about the problem.

Q    So is that after he was arrested?

A    No, right before he got arrested.

Q    And who was that?  Who told you that?

A    I don't know who she was.  Told me in the grocery store because she --

Q    Did you just have a shirt on that said --

A    And I had a Perryton shirt and I had my ID because I had come from here to the grocery store, and I had my badge on. They next thing I know hey, you know.  I don't know nothing, what are you talking about.  And she started saying all this stuff and all that.  Like, you are talking to the wrong guy.

And I did cuss and say you are fucking full of shit. I don't know what you are talking about. If I had known I would have whipped his ass.

THE REPORTER: Could you just slow down just a little bit, please?

THE WITNESS: Oh, yes, ma'am. It just fired me up.

MR. GOODWIN: We both talk fast.

THE WITNESS: Yes.

MR. GOODWIN: And we are going to wear her out, but it's okay.

A    No, when that lady confronted me at the grocery store I told her straight up I don't know nothing about what's going. And she kept on egging and saying yes, you do, yes, you do. And I said no, I don't. And I cussed her, I said your fucking bullshit, you are fucking stupid. And my wife grabbed me and she said well, let's just go. We walked off and she kept going grocery shopping and left.

Q    And so it's interesting that you hadn't heard anything about it. We have -- we can go through it if you would like, but we have like 30 complaints from 20 different people inside and outside the school, complaints about Underwood and his behavior going on for like nine months before he was arrested. But you had not heard anything?

A    No, sir.

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Frank Pacheko 11/03/2025                                                    Page 14

letter?

A    No, sir.

Q    Let's talk about your policies and procedures.  When is the last time you read the policies and procedures manual for PISD?

A    Probably about two years ago.

Q    How often do you look at them?

A    Rarely.

Q    What -- what would be an occasion?

A    Just that time.  I haven't seen them since then.  I haven't looked at them since then.

Q    So you signed -- you sign a thing for the school every year that you have access to --

A    I just sign it and go.

Q    Okay.  Do you remember training about Title 9 requirements and the investigations that are required under Title 9?  Do you remember that at all?

A    No, sir.

Q    So if I go through the policies and procedures we -- we would be reading them basically for the first time?

A    Probably, yes, sir.

Q    So I -- well, give me a break.  This may be the shortest depo we take out here.  If you will give me a break, I want to go through some more stuff.

A    Yes, sir.

# Exhibit 23

Perryton ISD
179901

STUDENT WELFARE                                                    FFF
STUDENT SAFETY                                                  (LOCAL)

The District shall notify a parent of a student with whom an educator is alleged to have engaged in misconduct, informing the parent:

1.    As soon as feasible that the alleged misconduct may have occurred;

2.    Whether the educator was terminated following an investigation of the alleged misconduct or resigned before completion of the investigation; and

3.    Whether a report was submitted to the State Board for Educator Certification (SBEC) concerning the alleged misconduct.

For purposes of this policy, misconduct is defined as an educator's alleged abuse or commission of an otherwise unlawful act with the student or involvement in a romantic relationship, or soliciting or engaging in sexual contact with the student.

[See also FFG for reporting requirements related to child abuse and FFH for parental notification requirements regarding prohibited conduct as defined by that policy.]

DATE ISSUED: 10/9/2017                                           1 of 1
UPDATE 109
FFF(LOCAL)-A

# Exhibit 24

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Casey Arruda 11/04/2025

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

S.J., a Parent, Conservator,      )
and Next Friend of N.J.,          )
        Plaintiff,                )
                                  )
vs.                               ) Case No. 2:24-CV-00168-Z
                                  )
PERRYTON INDEPENDENT SCHOOL       )
DISTRICT, and                     )
                                  )
COLE UNDERWOOD, Individually      )
and in his official capacity as   )
Athletic Director of Perryton     )
ISD,                              )
        Defendants.               )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

CASEY ARRUDA

HAD ON THE

4TH DAY OF NOVEMBER, 2025

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

WORD FOR WORD REPORTING, L.L.C
620 NORTH ROBINSON, SUITE 202
OKLAHOMA CITY, OKLAHOMA 73102
(405)232-9673

REPORTED BY:  DARLA RILEY, CSR

APPEARANCES


FOR THE PLAINTIFF:

Mr. Kyle Goodwin
GOODWIN LEWIS, PLLC
420 Northwest 6th Street, Second Floor
Oklahoma City, Oklahoma   73102
(405) 900-5700


FOR THE DEFENDANT, PERRYTON INDEPENDENT SCHOOL DISTRICT:

Mr. Slater Elza
UNDERWOOD LAW FIRM
Post Office Box 9158
Amarillo, Texas   79105
(806) 376-5613
(806) 379-0316 FAX

A    If he asked me to, I would assume I would.

Q    I mean, why would you say no to that?

A    Yeah, I don't see why I would say no.

Q    But that was never asked of you?

A    No, sir.

Q    Did Mr. Brown ever ask to have a meeting with you about what you had seen and observed with regard to Cole and ▮▮▮▮

A    No, sir.

Q    All right.  Let's talk about briefly -- and I'll try to get you out of here -- the policies and procedures of the school.

A    Okay.

Q    We have a book that's almost a full book of those.  But generally I would like to hear from you your impression of what the training consists of with regard to the policies and procedures of PISD.

A    It is offered.  I believe you can either receive it electronically or you can sign that you would rather receive it paper.

Q    What did you do?

A    Electronically.

Q    And so do you sign that sheet and give it to the front -- front desk?

A    Yes, sir.

549

# Exhibit 25

549

**New Message**          Cancel

To: Cole Underwood

> I got a text, and because I knew what it was, I downloaded the app finished the account and confirmed all my information.

Sweet. I'm going to have to explain that in the team app. Kiddos will login to the app using google and their school account right?

Text Message

> Yes. That will work. They can click on the link in the notification and follow the instructions.

iMessage

Perfect

Sun, Dec 3 at 4:48 PM

Has Greg ever asked you or mentioned to you coaches using Snapchat to communicate with teams?

\+    Text Mess

550

**New Message**              **Cancel**

To: Cole Underwood

Earlier this semester I met with him to discuss this and he doesn't want it used so I tried my damndest not to use it. It's just the only thing kids check consistently. So since then I've basically unadded every kid I had, etc. that's why I'm about to push the hell out of parent square. I just think it's so stupid.

He's never said anything to me about it. I think we have to meet the kids where they are, and if there's an issue, there's always a way to find posts. God knows we find that out all the time! I also know they're going to have a fb chat with or without you, and as a parent, I'd rather ▆▆▆ be in a group with you and the team than in one without you.

Well I agree, 110%. But it's definitely frustrating. So I'm moving everything to PS and gonna use it from here on out.

 Message

551

# Exhibit 26

Messages - Cole Underwood (+18062025633)                    +18066795262, daceysmith@hotmail.com

1/16/2024 7:37:11 AM

Good morning

1/16/2024 7:37:23 AM

Cole Underwood (+18062025633)

Morning morning.

How'd you sleep?

1/16/2024 7:38:09 AM

Fine. Just tired. Didn't go to bed until 11:30. What about you?

1/16/2024 7:38:17 AM

Cole Underwood (+18062025633)

Same. Also sleepy.

1/16/2024 7:39:01 AM

You've got a long day ahead

1/16/2024 7:39:09 AM

Cole Underwood (+18062025633)

Very. Will prolly nap.

1/16/2024 7:39:18 AM

I figured

1/16/2024 7:39:49 AM

Cole Underwood (+18062025633)

Yes ma'am.

1/16/2024 7:43:54 AM

Greg lied on the radio

1/16/2024 7:44:10 AM

Cole Underwood (+18062025633)

About

 Exported from: Dacey's 15 Pro (JXYF00JCWN) on 2025.10.27, 17:41 with iMazing 3.4.0 by DigiDNA
Database date when extracted: 2025.10.23, 11:37
Backup checksum: E6E8DA4073972EAB5B46DB5E04A353B26E4414E5AF901C36DCA2520CDFB817C6

Page 157 of 1352

PISD 17964

Messages - Cole Underwood (+18062025633)                                    +18066795262, daceysmith@hotmail.com

1/16/2024 7:44:18 AM

Safety stuff

1/16/2024 7:44:29 AM

Cole Underwood (+18062025633)

😂😂 oops

1/16/2024 7:46:10 AM

Said we train teachers and staff to look for suspicious activity at after school events and stuff. Like no we don't?

1/16/2024 7:46:32 AM

Cole Underwood (+18062025633)

... why would he say that?

1/16/2024 7:47:12 AM

Idk lol

1/16/2024 7:49:32 AM

Cole Underwood



1/16/2024 7:52:36 AM

Grow up


Exported from: Dacey's 15 Pro (JXYF00JCWN) on 2025.10.27, 17:41 with iMazing 3.4.0 by DigiDNA
Database date when extracted: 2025.10.23, 11:37
Backup checksum: E6E8DA4073972EAB5B46DB5E04A353B26E4414E5AF901C36DCA2520CDFB817C6

Page 158 of 1352

PISD 17965

Messages - Cole Underwood (+18062025633)                          +18066795262, daceysmith@hotmail.com

1/16/2024 2:02:58 PM

Me either.

1/16/2024 2:33:21 PM

**Cole Underwood (+18062025633)**
What are you doing?

1/16/2024 2:36:04 PM

Nothing just scrolling Poshmark, waiting for a meeting at 3:00. What are you doing?

1/16/2024 2:36:19 PM

**Cole Underwood (+18062025633)**
Talkin to ole Rhyan. What meeting do you have today

1/16/2024 2:37:03 PM

Just a check in for the Alice training we did at the beginning of the year

1/16/2024 2:37:23 PM

**Cole Underwood (+18062025633)**
Oh woohoo. Who's all in that meeting? You and Britney?

1/16/2024 2:39:00 PM

Me

1/16/2024 2:39:09 PM

**Cole Underwood (+18062025633)**
lol is it just a zoom?

1/16/2024 2:40:44 PM

Yes

1/16/2024 2:41:23 PM

**Cole Underwood (+18062025633)**
I gotcha. Does Greg really not ever ask you anything about safety stuff lol


Exported from: Dacey's 15 Pro (JXYF00JCWN) on 2025.10.27, 17:41 with iMazing 3.4.0 by DigiDNA
Database date when extracted: 2025.10.23, 11:37
Backup checksum: E6E8DA4073972EAB5B46DB5E04A353B26E4414E5AF901C36DCA2520CDFB817C6

Page 170 of 1352

PISD 17977

Messages - Cole Underwood (+18062025633)                                +18066795262, daceysmith@hotmail.com

1/16/2024 2:41:40 PM

Cole Underwood (+18062025633)

Feel like he's never really in tune with safety. Especially after this morning

1/16/2024 2:42:56 PM

lol no. He forwards us stuff sometimes, but we both already get it. Does really know about grants and amendments we do for grant budgets unless we ask him to go in and certify and submit, because he's the only one with this power. However, he doesn't ask them what it's for lol. Just does it.

1/16/2024 2:43:24 PM

Cole Underwood (+18062025633)

Seems a little concerning.

1/16/2024 2:44:21 PM

I mean I guess lol. But that's also why we have one someone hired to do the job? How often does he ask you another athletic stuff, not involving personnel?

1/16/2024 2:44:35 PM

Cole Underwood (+18062025633)

Hahaha I guess pretty rarely 😂😂

1/16/2024 2:47:15 PM

Okay lol so then we're not really that different. As long as no one has safety issues, I guess he doesn't overly care

1/16/2024 2:53:27 PM

Cole Underwood (+18062025633)

True lol

1/16/2024 3:16:43 PM

Which is nice I guess

1/16/2024 3:16:51 PM

Cole Underwood (+18062025633)

I agree.



Exported from: Dacey's 15 Pro (JXYF00JCWN) on 2025.10.27, 17:41 with iMazing 3.4.0 by DigiDNA
Database date when extracted: 2025.10.23, 11:37
Backup checksum: E6E8DA4073972EAB5B46DB5E04A353B26E4414E5AF901C36DCA2520CDFB817C6

PISD 17978

# Exhibit 27



## PERRYTON INDEPENDENT SCHOOL DISTRICT

**Greg Brown**
Superintendent

**Donna Hale**
Assistant Superintendent

**Britney Meraz**
Chief Financial Officer

**Liliana Medrano**
Administrative Assistant

March 4, 2024

To: Cole Underwood
From: Greg Brown
Re: Professional boundaries and conduct

This letter is to follow up on the conversation we had on March 4, 2024. Present in the conversation was yourself, Mrs. Hale, and me. We came together to talk about the latest concerns that were arising from your conduct towards an individual female athlete, ███████

███████

We have talked several times over the course of the year about rumors and suspicions regarding your relationship with female students, and particularly with ███████ ███████ Most of these discussions have been following social media posts where Ms. ███████ posted pictures of you and her. During the last conversation I told you that you were not to be alone with her and that no more posts of the two of you needed to be published. Since that conversation I have not seen any more posts, however it has been reported to me that there have been numerous times that you have been alone with her. It has been reported to me that:

- On March 1, 2024 you left the track meet in Canyon early and traveled alone with ███████ ███████ in your personal vehicle back to Perryton.
- At a previous track meet you left the track meet with ███████ ███████ and traveled to Starbucks to buy coffee. Although you bought coffee for others this is still a time when you were alone with her.
- ███████ ███████ has come to your office on a regular basis during the school day, often with no one but you in your office during her visit. To my knowledge, the door has not been closed during these times, but it remains as an example of times that you are alone with her.

I concede that there is no concrete evidence at this time that there is an inappropriate relationship between you and ███████ or any other female student. However, each one of these times opens up vulnerabilities in your reputation and the reputation of PISD athletics. In order to safeguard your reputation and effectiveness, and the reputation of the district and the Ranger athletic program, I am issuing the following directives to you:

1. You are not to be alone with a female student at any time or in any situation. This includes times away from campus and when you are off duty. As an educator with responsibilities towards male and female students, it is imperative that your actions be "above reproach" which means that there must be an adult witness who can speak to the appropriateness of your interactions with individual students.

2. Your work with our girls athletic program needs to be limited for a time. Any individual attention needs to be distributed among multiple athletes so that there isn't a perception of favoritism towards one athlete or another.

3. You are to lead others on our athletic staff in ensuring that proper boundaries are followed when it comes to staff/student relationships. Male coaches should not be alone with female athletes and it is my expectation that you will ensure proper boundaries are followed.

In addition to these instances it was reported to me that you had used the camera system in the High School to clandestinely listen in to a private phone call that I took in the cafeteria. When I questioned you about it you immediately admitted that you had done it. I commend you for your honesty. However, using the cameras and listening in to conversations without professional reason is a misuse of the system. Secretly listening in to one of your supervisor's conversations is a breach of trust and wholly inappropriate. Should your access to the camera system be restored you are directed to only use it as necessary for professional situations, such as researching a discipline incident or to monitor student activity in an athletic facility. Any other misuse of the system could result in permanent loss of access and/or other disciplinary action.

The purpose of this summary and of the directives is to protect you...your career and your reputation. It is also to protect the reputation and mission of Perryton ISD. We have often discussed together our desire to have an athletic department where the staff leads with character and integrity, which translates to our athletes. These directives will assist us in getting to that place.

Greg Brown

My signature verifies that I have received a copy of this memorandum. It does not necessarily mean that I agree with the content. I understand that I have the right to present a written response within ten working days.

Cole Underwood                                      3/4/24

                                                    Date

PISD 0041

559

# Exhibit 28

NJ ☞ ████ ████  Thu 12/07/23, 1:19 pm

😅😅😅

😊1  😊⁺

NJ ☞ ████ ████  Thu 12/07/23, 1:19 pm

thank you and i will

NJ ☞ ████ ████  Thu 3/14/24, 4:10 pm

Hey Coach Underwood will you prop the door open at the gym for me in like 10 mins ???

NJ ☞ ████ ████  Thu 3/14/24, 4:10 pm

Please

CU  Cole Underwood  Thu 3/14/24, 4:11 pm

Yes. I will.

NJ ☞ ████ ████  Thu 3/14/24, 4:11 pm

Thank you

PISD 0044

NJ  ███ ███                                    Sat 3/23/24, 10:19 pm

Tmrw morning around like 10 can you let me in the trainers room so I can do heating pad and stuff please???



CU  Cole Underwood                                    Sat 3/23/24, 10:20 pm

Yes. I can, I'll prop the door.



NJ  ███ ███                                    Sun 3/24/24, 11:35 am

I'm done in the training room CU, I closed the doors. Thank you



CU  Cole Underwood                                    Sun 3/24/24, 11:36 am

Of course! How's your knee feeling?

NJ  ███ ███                                    Sun 3/24/24, 11:37 am

it's good. ngl it feels the same how it used to when i'm wasn't playing on it tho.

CU  Cole Underwood                                    Sun 3/24/24, 11:39 am

Frustrating. I'm sorry, chica. Maybe when you start PT it'll start feeling better. Let me know or have your dad let me know if y'all need anything.

**PISD 0045**

Case 2:24-cv-00168-Z    Document 58    Filed 04/17/26    Page 563 of 591    PageID 2215

♡1    ☺⁺

NJ 🎓 ▇▇▇ ▇▇▇    Sun 3/24/24, 11:40 am

okay sounds good👍

NJ 🎓 ▇▇▇ ▇▇▇    Sat 3/30/24, 3:48 pm

hey CU can you please prop the door open so i can get in the training room around 4:15.

CU  Cole Underwood    Sat 3/30/24, 3:48 pm

Okay, yes. I will.

👍1    ☺⁺

NJ 🎓 ▇▇▇ ▇▇▇    Sat 3/30/24, 5:28 pm

I'm done in the training room CU, I closed the doors. Thank you

👍1    ☺⁺

CU  Cole Underwood    Sat 3/30/24, 5:29 pm

Thank you. Make sure everything is locked up, please!!

NJ 🎓 ▇▇▇ ▇▇▇    Sun 3/31/24, 1:48 pm

hey CU can you prop the door so i can get in the training room like rn???

**PISD 0046**

4/25/24, 8:28 PM    Perryton Independent School District

CU    Cole Underwood                                          Sun 3/31/24, 1:49 pm

Yes. I can.

NJ    🎓                                   Sun 3/31/24, 3:29 pm

thank you i just left. doors are all closed.

CU    Cole Underwood                                          Sun 3/31/24, 3:30 pm

Oh okay, cool. I'm still here so I'll double check everything before I leave. Never even heard you come in.

CU    Cole Underwood                                          Mon 4/01/24, 10:54 am

I won't be at track today— so please make sure Payton, Khadyn, and Brooks get their turf work in. Then run them through 4-5 run throughs with the boys… with Payton, make sure she runs the exact same every single approach. Then after run throughs, get 4 jumps.

NJ    🎓                                   Sat 4/06/24, 12:05 pm

hey CU will you be able to open the gym for me around 1 so i can get in the training room and go shoot a bit???

PISD 0047

CU  Cole Underwood                                      Sat 4/06/24, 12:06 pm

Yes, I can do that!

NJ  🎓 ███████ ███████                                  Sat 4/06/24, 3:23 pm

thanks i just left. closed all the doors.

( 👍 1 )  ( 😊⁺ )

CU  Cole Underwood                                      Sat 4/06/24, 3:24 pm

Ofc.

NJ  🎓 ███████ ███████                                  Sun 4/07/24, 10:10 am

can you please prop the door open around 10:30 so i can get into the training room.

CU  Cole Underwood                                      Sun 4/07/24, 10:10 am

Yes ma'am. You got it.

NJ  🎓 ███████ ███████                                  Sun 4/07/24, 10:11 am

thanks CU

PISD 0048

4/25/24, 6:23 PM
Perryton Independent School District

NJ                                               Fri 4/12/24, 2:32 pm

can you please prop the door open around 2:45 so i can get into the training room.

CU   Cole Underwood                                                  Fri 4/12/24, 2:33 pm

Sure!



NJ                                               Sat 4/13/24, 3:57 pm

can you please prop the door open like right now so i can get into the training room.

CU   Cole Underwood                                                  Sat 4/13/24, 3:58 pm

Yes. On my way from golf course. May be a second.

NJ                                               Sat 4/13/24, 3:59 pm

👍👍👍

CU   Cole Underwood                                                  Sat 4/13/24, 6:34 pm

Did you ever leave??

PISD 0049

CU  Cole Underwood                                          Sat 4/13/24, 6:34 pm

Lock up??

NJ  📨 ▮▮▮▮ ▮▮▮▮                                            Sat 4/13/24, 6:35 pm

oh yeah i did sorry ive forgot to lyk these past 2 days

👍 1    😊⁺

NJ  📨 ▮▮▮▮ ▮▮▮▮                                            Sun 4/14/24, 12:28 pm

can you please prop the door open at like 12:30 so i can get into the training room.

CU  Cole Underwood                                          Sun 4/14/24, 12:30 pm

Yes.

NJ  📨 ▮▮▮▮ ▮▮▮▮                                            Sun 4/14/24, 1:37 pm

thanks i just left. closed all the doors.

CU  Cole Underwood                                          Sun 4/14/24, 1:37 pm

Good deal. How's your knee since you've started physical therapy?

PISD 0050

**NJ** ☛ ████ ████                              Sun 4/14/24, 1:43 pm

eh it's alright hurts pretty bad especially after i leave PT

**NJ** ☛ ████ ████                              Sat 4/20/24, 1:17 pm

can you please prop the door so i can get in the training room

**CU** Cole Underwood                           Sat 4/20/24, 1:17 pm

Yes. I can do that.

**NJ** ☛ ████ ████                              Sun 4/21/24, 10:46 am

can you please prop the door so i can get in the training room in like 15 minutes???

**CU** Cole Underwood                           Sun 4/21/24, 10:49 am

Yes. I'll head up there shortly.

PISD 0051

9/10

NJ                                     Sun 4/21/24, 11:08 am

uhhh well my fake baby for mrs tanners won't shut up so i'm not gonna go up there 😩 sorry if you already went and propped the door

CU    Cole Underwood                                       Sun 4/21/24, 11:10 am

It's okay. Easy fix. I bet that's a fun project lol

NJ                                     Sun 4/21/24, 11:14 am

uhhh no. it's definitely not.



PISD 0052

# Exhibit 29

Date given to Employee:    2/29/2024

Date returned by Employee:  3-4-24

# Perryton Independent School District

## Employment Contract
### for
### Certified Administrator

1. **Position.** The District agrees to employ Cole Underwood (you) as a Certified Administrator.

2. **Term.** You will be employed on an 12-month basis for the 2024-2026 school year(s), according to the hours and dates set by the District as they exist or may hereafter be amended.

3. **Credentials and Criminal History Review.**

   3.1 **Certification and Licensure Requirement.** You agree to provide, before your start date each school year, the certification, service records, licenses, and other records and information required by state and federal law, the Texas Education Agency (TEA), the State Board for Educator Certification (SBEC), or the District. You agree to maintain any applicable certification, permit or licensure requirements throughout the term of this Contract. If you fail to fulfill the requirements necessary to extend a temporary or emergency certificate or permit, or if your certification or permit expires, is canceled, is relinquished, is suspended, or is revoked, the District may provide you with notice that this Contract is void pursuant to Texas Education Code section 21.0031.

   3.2 **Criminal History Review.** As required by law and/or the District, you agree to submit to a review of your state or national criminal history record information.

4. **Representations.**

   4.1 **Beginning of Contract.** You understand that a criminal history record acceptable to the District, at its sole discretion, is a condition of this Contract. You represent that you have disclosed to the District, in writing, any conviction, no contest or guilty plea, deferred adjudication, or other adjudication for any felony or any offense listed at 19 Texas Administrative Code § 249.16(c) or Policy DH(LOCAL).

   4.2 **During Contract.** You agree that, during the term of this Contract, you will notify the Superintendent or designee in writing of any arrest, indictment, conviction, no contest or guilty plea, deferred adjudication, or other adjudication for any felony or any offense listed at 19 Texas Administrative Code § 249.16(c) or Policy DH(LOCAL). You agree to provide the notification within the time period specified in Board policy, or within seven calendar days if no time period is specified.

   4.3 **False Statements and Misrepresentations.** You represent that any required records or information in your employment application are true and correct. Any false statements, misrepresentations, omissions of requested information, or fraud by you concerning any required records or in the employment application may be grounds for termination or nonrenewal, as applicable.

PISD 0079

571

5. **Duties.**

5.1 **General Standard.** You agree to perform the duties of your assigned position, as prescribed by state law and regulations and by the District, with reasonable care, skill, and diligence.

5.2 **Rules.** You agree to comply with all Board and District directives, state and federal laws and rules, and District policy and regulations, as they exist or may hereafter be amended.

5.3 **Assignment/Reassignment.** You understand that the District has the right to assign or reassign you, transfer you, and to make changes in your responsibilities and duties at any time during this Contract.

5.4 **Supplemental Duty.** A *supplemental duty* is a duty not included in the position that is named in paragraph 1 of this Contract. You understand that this Contract does not apply to assignments of or payments for supplemental duties. This Contract does not create a property right to continued employment in any supplemental duty. If you agree to perform a supplemental duty, the start and end dates for the supplemental duty may be different from the start and end dates under this Contract.

6. **Compensation.**

6.1 **Salary.** The District shall pay you according to the compensation plan adopted by the Board each school year. Your salary includes consideration for all assigned responsibilities and duties of your position, regardless of the actual number of hours or days (including days not designated on the school calendar) that you work during this Contract. Your salary shall be reduced for absences in excess of authorized, paid leave. Your salary does not include consideration for any supplemental duty.

6.2 **Furloughs.** If the District implements a furlough under Texas Education Code section 21.4021, your salary will be reduced in proportion to the number of furlough days. The reduction will be equally distributed over the remainder of the applicable school year.

6.3 **Annualized Salary.** Your salary will be paid out over 12 months, regardless of the work schedule specified in paragraph 2.

6.4 **Incentive and Performance Pay.** If you qualify, you may receive incentive pay or pay for performance under the District's compensation plan, federal law, or state law. An incentive or performance payment is not an entitlement as part of your salary.

6.5 **Overpayments.** You agree that you are not entitled to any fund the District overpays you and you further agree that the District may deduct any overpayments under this Contract from one or more of your paychecks.

6.6 **Benefits.** The District shall provide you with benefits as provided by state law and Board policy. The District reserves the right to amend its policies at any time during the term of this Contract to reduce or increase these benefits, at the Board's sole discretion.

7. **Other Provisions.**

7.1 **Equipment and Reports.** You agree to satisfactorily submit or account for all grades,

PISD 0080

reports, school equipment, or other required items upon request from the District.

7.2 **Special Funding.** If your position is funded by grants, federal funding, or other special funding, you understand that your employment is expressly conditioned on the availability of full funding for the position. If full funding becomes unavailable, your employment is subject to termination or nonrenewal, as applicable.

7.3 **Addenda.** This Contract includes one or more Addenda, as follows:

(1) Addendum A:

(2) Addendum B:

8. **Suspension.** In accordance with Texas Education Code chapter 21, the District may suspend you without pay during the term of this Contract for good cause as determined by the Board.

9. **Termination and Nonrenewal of Contract.**

9.1 **Termination of Contract.** This Contract will terminate, in accordance with the procedures at Texas Education Code chapter 21, if the Board determines that good cause or a financial exigency exists. This Contract will also terminate if you provide written notice of resignation before the penalty-free resignation date (see Tex. Educ. Code § 21.210).

9.2 **Nonrenewal.** The District may nonrenew this Contract in accordance with Texas Education Code chapter 21, as applicable, and Board policy.

10. **General Provisions.**

10.1 **Amendment.** This Contract may not be amended unless you and the District agree, in writing, to an amendment.

10.2 **Severability.** If any provision in this Contract is held to be invalid, illegal, or unenforceable, the other provisions of the Contract will remain in full force and effect.

10.3 **Entire Agreement.** This Contract supersedes all existing agreements, verbal and written, between you and the District regarding your employment. This Contract does not constitute a "unified contract" with any supplemental duties agreement between the parties.

10.4 **Applicable Law.** Texas law shall govern construction of this Contract.

11. **Notice to Employee.** You agree to keep a current address on file with the District's human resources office. Unless Texas Education Code chapter 21 requires a different notice delivery method, you agree that the District may meet any legal obligation it has to give you written notice regarding your employment by hand-delivering the notice to you or by sending the notice by certified mail, regular mail, and/or express delivery service to your address of record.

3. **Expiration of Offer.** The offer of employment under this Contract shall expire unless you sign and return this Contract, without changes, to the Superintendent on or before 3/21/2024 (return date). If you are currently employed under a contract with the District and you fail to

PISD 0081

573

sign and return this Contract, without changes, by the return date, your existing contract will expire on its own terms and your employment will end at the conclusion of that contract.

**I have read this Contract and agree to abide by its terms and conditions:**

_____
**Employee Signature**

3/4/24
_____
**Date**


Perryton Independent School District

_____
**Board President**

2/29/24
_____
**Date**

PISD 0082

# Exhibit 30

N.J. - March 13, 2026

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

S.J., as parent, CONSERVATOR, )
and NEXT FRIEND OF N.J., )
)
     Plaintiff, )
) CASE NO.
) 2:24-CV-00168-Z
vs. )
)
PERRYTON INDEPENDENT SCHOOL )
DISTRICT, and )
)
COLE UNDERWOOD, Individually )
and in his official capacity )
as Athletic Director of )
Perryton ISD, )
)
     Defendants. )
)

ORAL DEPOSITION OF
PLAINTIFF N.J.
MARCH 13, 2026

     ORAL DEPOSITION OF PLAINTIFF N.J., produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on March 13, 2026, from 2:04 p.m. to 3:12 p.m., Nilda Codina, Notary in and for the State of Texas, recorded by machine shorthand remotely from 420 NW 6th Street, 2nd Floor, Oklahoma City, Oklahoma, 73102, pursuant to the Federal Rules of Civil Procedure, and the provisions stated on the record or attached hereto.

N.J. - March 13, 2026

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF:

    Mr. Kyle Goodwin, Esq.   (Via Zoom)
    GOODWIN LEWIS, PLLC
    420 NW 6th Street
    2nd Floor
    Oklahoma City, OK 73102
    Phone (405)900-5700
    kgoodwin@goodwinlewis.com

FOR THE DEFENDANT:

    Mr. Slater C. Elza, Esq.   (Via Zoom)
    UNDERWOOD LAW FIRM, P.C.
    500 South Taylor Street
    Suite 1200
    Amarillo, TX 79101-2442
    Phone (806)376-5613
    Fax (817)439-9922
    slater.elza@uwlaw.com

N.J. - March 13, 2026

A.    Yes.

Q.    Okay.  And, again, I'm just going to try to put a bow on this.  Is Randy the only person prior to March 1st that approached you with concerns about Cole?

A.    Yes.

Q.    Okay.  So you get back from the track meet, you go to the basketball game, and, I mean I don't know another way to say it, kind of all hell breaks loose is that fair with rumors and people talking?

A.    Yes.

Q.    And who talked to you about that, friends, family, school, anyone?

A.    I mean, I heard it all around school.  I mean, Cole addressed me about it, that's all I really remember.

Q.    What did Cole tell you about it?

A.    I mean, he just asked if I'd heard what was going around.

Q.    And had you?

A.    Yes.

Q.    Who had you heard it from?

A.    Everybody at school.

Q.    Okay.  Were these people that brought it up to you out of meanness and to be ugly, or out of care and concern for you, or some combination of both?

A.    Nobody brought it up to my face.    It was all walking through the hallway.    You hear your name being said through the hallways.

Q.    Okay.    Did you have any conversations with your dad about the fallout from that ride home?

A.    Yes.

Q.    Tell me, when did that take place?

A.    I don't know.

Q.    I mean like that next day or two?

A.    Yeah.

Q.    Did your dad tell you that he was in communication with the school about it?

A.    No.

Q.    Do you now know that he had sent an email or a text or something to the school about the ride?

A.    Yes.

Q.    And how did you learn about that?

A.    I don't remember.    I saw it in the deposition, here recently.

Q.    Have you read the depositions from this case?

A.    I've read most of them, yes.

Q.    You read your mom and dad's?

A.    Yes.

Q.    What other ones do you remember reviewing?

A.    I read Sandy Wheeler's, Abbey (phonetic)

N.J. - March 13, 2026

Q.    Do you remember how late in March?

A.    I do not.

Q.    And other than on the trip back from Canyon, did you all ever have any inappropriate physical touching anywhere but up at the school on the weekends?

A.    No.

Q.    Okay.    I'm just trying to transition if I say something that's not right, I want you to tell me?

A.    Of course.

Q.    We talked to a lot of people and we're trying not to make you relive every minute and second of this?

A.    Okay.

Q.    And so late March, I guess, you were still going up there on the weekends, you had been doing that since late January?

A.    Yes, sir.

Q.    And is it correct that it went from that kind of you'd shoot, you all would hang out, talk about whatever you talked about, and then you leave to at some point in late March, that it moved towards sexual contact or conduct?

A.    Yes, sir.

Q.    Did he -- do not take this the wrong way. Did he use any type of physical force to make you have sex with him.    I'm not saying that makes it right or

N.J. - March 13, 2026

Q.   -- so I don't blame you.

A.   Yeah.

Q.   And so let's talk about the first semester, which was kind of when CPS and moving from mom's to dad's; did you keep your grades up that first semester?

A.   Yes.

Q.   And how about the second semester?

A.   Yes.

Q.   No problems or issues with grades?

A.   No, never had a B.

Q.   Never had a B.

A.   No.

Q.   Kyle may be able to say that, but I can't say that.  Kind of with, looking back on that whole year of the transition of this relationship with Cole, did you believe or do you believe that you missed out on opportunities for school events or education or sports or anything?

A.   Yes.

Q.   In what way?

A.   I feel like I missed out on a lot of the social part of my freshman year.

Q.   Okay.  Is that because he kind of kept you divided away from your friends?

A.   Yes.

N.J. - March 13, 2026

Q. Okay. You said you never really saw your dad and Cole as friends, did I understand your testimony correctly?

A. Yes.

Q. Did you all ever socialize with Cole?

A. We did go out to dinner with him one night.

Q. Was there another time or two that those were planned and did not happen --

A. No.

Q. -- if you know?

A. Not that I know of, no.

Q. So I know you've been to a couple of different counselors we really are right towards the end of this. Who was the first counselor you saw after all this broke lose?

A. I know her name was Bobby. I don't know her last name, but it was at the bridge.

Q. How many times did you see Bobby?

A. She had me going twice a week for maybe three weeks, so probably six times.

Q. And is there a reason you quit seeing Bobby at the bridge?

A. I just didn't like her, personally. It wasn't helping me at all.

Q. And was that solely related to the issues

with Cole, or did that also involve the issues with your stepdad?

A.   It was all about Cole.

Q.   I'm sorry, all about Cole?

A.   Yes.

Q.   Okay.  It just sounded weird.  And who was the next counselor?

A.   Now, I still speak to her and her name is Abbey Lenz.

Q.   Spell her last name for us?

A.   L-E-N-Z.

Q.   And where is she?

A.   When I first started talking to her she was out of Pampa, but now I'm pretty sure she was out of Clarendon.

Q.   Okay.  I was thinking Childress, but I think you may be right.  And how often do you still meet with Ms. Lenz?

A.   I speak with her once a month.

Q.   And did those discussions still include Cole?

A.   Sometimes, yes.

Q.   Less than they used to?

A.   Yes.

Q.   What about your stepdad?

A.   I mean, they don't really involve him

anymore.

Q. Okay. Just, generally, what other -- I mean, if you're talking about Cole less and not your stepdad, what is the rest of the counseling focused on?

A. School, my friends, basketball, my mommy my boyfriend, I mean.

Q. Okay. Life?

A. Yeah.

Q. Okay. How are things going in Yukon since you moved?

A. They're better.

Q. I mean, obviously, you remember when your dad was looking at moving to Yukon, do you remember why he was moving or wanting to move to Yukon?

A. I mean, I don't know, specifically, but I just -- I mean, I feel like he knew I needed out of Perryton.

Q. Okay. Was he dating somebody over there?

A. No.

Q. I guess I saw the other day, I guess, is he engaged now?

A. No.

Q. Okay. I thought I saw something. Okay. So when -- after he moved to Yukon, was there a period of time when you were going to stay and go to school and

play basketball in Perryton?

A. We were looking into the possibility, but we were not able to do that.

Q. Say that again.

A. We were looking into the possibility, but we were not able to follow through with that.

Q. Is that because as I understanding because your mom was going to file charges or for custody or something?

A. Yes.

Q. Any other counselors you've seen besides Bobby and Abbey Lenz and of course the school counselors?

A. No.

Q. Say that again, you broke up.

A. No.

Q. Okay. Have you been to any type of medical doctor, I mean not necessarily a counselor, but a medical doctor for any type of treatment or evaluation related to the issues from your relationship with Cole?

A. Right after everything came out, I was taken to get tested for STDs and pregnancy.

Q. Okay. And I'm guessing both of those came out okay?

A. Yes.

Q.    And have you ever been prescribed any type of medication for depression or anxiety, or anything along those lines?

A.    No.

Q.    Do you know if Bobby or Abbey made any type of diagnosis as to depression or anxiety or anything?

A.    I know with Abbey has said I have PTSD.

Q.    Okay.  And that's what you-all focus your counseling on?

A.    Not anymore necessarily, no.

Q.    Okay.  Well, and I know you're not a doctor, but you're living your own life.  How -- I mean, how would you describe how you're doing with the PTSD, is that still an issue or?

A.    I mean, I still go through it every day.

Q.    And explain what you mean by that?

A.    I mean sometimes there's just things that I mean set off those emotions, and bring back the memories of everything I've had to go through.

Q.    Has Cole reached out to you or tried to contact you since he's been in custody?

(Witness crying.)

A.    No.

Q.    (BY MR. ELZA) I think that's all the questions I have.  I will tell you I appreciate you

# Exhibit 31

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

S.J., a Parent, Conservator,     )
and Next Friend of N.J.,         )
          Plaintiff,             )
                                 )
vs.                              )  Case No. 2:24-CV-00168-Z
                                 )
PERRYTON INDEPENDENT SCHOOL      )
DISTRICT, and                    )
                                 )
COLE UNDERWOOD, Individually     )
and in his official capacity as  )
Athletic Director of Perryton    )
ISD,                             )
          Defendants.            )

*********************************************

ORAL DEPOSITION OF

SARAH TREGELLAS

HAD ON THE

4TH DAY OF NOVEMBER, 2025

*********************************************

WORD FOR WORD REPORTING, L.L.C
620 NORTH ROBINSON, SUITE 202
OKLAHOMA CITY, OKLAHOMA 73102
(405)232-9673

REPORTED BY:  DARLA RILEY, CSR

S.J. vs PERRYTON ISD and COLE UNDERWOOD
Sarah Tregellas 11/04/2025                                                    Page 2

APPEARANCES


FOR THE PLAINTIFF:

Mr. Kyle Goodwin
GOODWIN LEWIS, PLLC
420 Northwest 6th Street, Second Floor
Oklahoma City, Oklahoma  73102
(405) 900-5700


FOR THE DEFENDANT, PERRYTON INDEPENDENT SCHOOL DISTRICT:

Mr. Slater Elza
UNDERWOOD LAW FIRM
Post Office Box 9158
Amarillo, Texas  79105
(806) 376-5613
(806) 379-0316 FAX

inappropriate advances on you.  Normally when you were younger and much older than you.  So we all have to answer for some of that.  She did not deserve what happened to her.  It was unfortunate and it was sad.  These rumors could have been brought to administration as a whole, but Perryton in generally apparently would rather gossip than try to help a young lady.

Q    Ma'am, my question was simply a 15-year-old girl was actually raped on the campus of this school, correct?

A    I believe she was consenting, but that is, according to the law, yes, it was rape.

Q    So she wanted it, that's your defense?

        MR. ELZA:  Objection, form.

A    I did not say that.  I said according to the law --

Q    (By Mr. Goodwin)  She was consenting, what's the difference?

        MR. ELZA:  Objection, form.

A    Rape and consent to underage sex are two different things.

Q    (By Mr. Goodwin)  And --

A    Physically, it is a different experience.

Q    Okay.  We will go the policies and procedures.  Does your opinion align with the policy and procedures of this school district?

        MR. ELZA:  Objection, form.

A    It doesn't matter, I'm not a board member anymore.

Q    (By Mr. Goodwin)  You were at the time.

MR. ELZA:  Objection, form.

A    I signed up to enforce those policies, yes.

Q    (By Mr. Goodwin)  But you didn't do that, did you?

MR. ELZA:  Objection, form.

A    Yes, I did.

Q    (By Mr. Goodwin)  Because you believe consensual sex with a 15 year old is different than rape.  That's what you just said, correct?

A    In the conversation with you, yes.  Not -- not in the policy.  I am not going to go defend that.  I am not going to go say any of that.  But your -- the way -- your tone, I don't appreciate it.  And the way you are saying it, I don't appreciate it.

Q    I don't appreciate you thinking that this 15-year-old girl was not raped.

MR. ELZA:  Objection, form.  That's not what the testimony was.

Q    (By Mr. Goodwin)  All right.  Let's go to the next bullet point.  Sometime during football season in 2023 volleyball coach Shawn Lynch reported that two football players told him that something was going on between Underwood and ███████ ███████  correct?  That's what it say?

A    That's what it says.